## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1)Michael Parga, 2) Richard Feltz, 3) Tara O'Donley, and 4) Christopher Wood, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>vs.<br><br>1)Tulsa County; 2) Vic Regaldo, Tulsa County Sheriff, in his official capacity; 3) Terry H. Bitting, 4) Tammy Bruce, 5) Martha Rupp Carter,6) Stephen R. Clark, 7) Theresa Dreiling, 8) Owen Evens, 9) James W. Keeley, 10) Deborah Ludi Leitch, 11) J. Anthony Miller, 12) Dawn Moody, 13) Millie Otey, 14) Kirsten Pace, 15) April Seibert, 16) Clifford Smith, and 17) Sarah Smith, in their capacity as Tulsa County Special Judges; 18)William Musseman, in his capacity as Tulsa County District Court Judge,<br><br>    Defendants. | Case No.18-cv-00298<br><br>**CLASS ACTION COMPLAINT** |

### Introduction

1. In 1980, Tulsa County concluded that "it violated a defendant's 14th Amendment rights to be held in jail if they were too poor to post bail."[1]

---

[1] Tulsa County Court Services, History, https://www.tulsacounty.org/Tulsacounty/dynamic.aspx?id=642 (last visited, June 4, 2018).

2.      In 2018, hundreds of people are detained in the Tulsa County Jail every day solely because they cannot afford to purchase their liberty.

3.      Named Plaintiffs are currently confined in Tulsa County jail cells solely because they do not have enough money to purchase their pretrial release. They are jailed pursuant to Tulsa County's wealth-based detention scheme, which jails people who are unable to meet secured financial conditions of release. No official has conducted any inquiry into any Plaintiffs' ability to pay or made any inquiry into or findings concerning alternative conditions of pretrial release or the necessity of pretrial detention. Because they cannot access the payments Defendants require for their release, the presumptively innocent Plaintiffs will be detained in the Tulsa County Jail for days, weeks, or months.

4.      On behalf of themselves and all others similarly situated, the named Plaintiffs seek declaratory and injunctive relief against the Defendants. After arresting a person, Defendants require secured financial conditions of release, almost always according to a predetermined chart of offenses and corresponding dollar amounts. They do not provide any process for assessing a person's ability to pay or determining the necessity of imposing monetary conditions of release in any individual case. People who are arrested and are unable to pay preset cash deposits to secure their release must remain in jail cells for six or more days before an arraignment, which is the first appearance in front of a judicial officer. Those who cannot afford private counsel are not appointed counsel during the initial period of wealth-based detention, and no lawyer appears with them at arraignment. Defendants refuse to address conditions of release at arraignments.

5.     Defendants' routine practice of requiring people to pay unattainable amounts of money to secure their release is the equivalent of issuing orders of detention against them, but without any of the substantive findings or procedural safeguards constitutionally required for orders of detention. As a result of Defendants' policies, people too poor to pay for their release are jailed for days, weeks, or months. This automatic pretrial detention of poor people has devastating consequences: people who are arrested lose their jobs, are evicted from their homes, endure separation from their children and loved ones, and face pressure to plead guilty as soon as possible because that is often the quickest way to terminate their unlawful confinement. Plaintiffs seek an order declaring that this wealth-based detention scheme violates the Sixth and Fourteenth Amendments to the United States Constitution and an order enjoining Defendants from continuing its operation.

### **Nature of the Action**[2]

6.     Defendants have a policy and practice of refusing to release arrested people from custody unless they pay money. The amount of money required is predetermined in almost all cases by an offense-based, secured money-bail "schedule." Defendants require payment of a generic, predetermined amount without considering a person's ability to pay or the necessity of imposing secured money bail, and without making the substantive findings or providing the procedural safeguards that the United States Constitution and Oklahoma law require to ensure that pretrial detention is necessary to further a compelling government interest.

---

[2] Plaintiffs make the allegations in this Complaint based on personal knowledge as to matters in which they have had personal involvement and on information and belief as to all other matters.

7.     This policy and practice results in the systemic wealth-based detention of arrested people who are too poor to pay financial conditions of release. As a result, the majority of people incarcerated in the Tulsa County Jail are pretrial detainees: More than 62 percent of people incarcerated in the Tulsa County Jail on an average day are awaiting adjudication of state misdemeanor or felony charges. They are presumptively innocent.

8.     As a result of the Defendants' wealth-based pretrial detention policies and practices, as of August 2017, Tulsa County's pretrial detention rate was 18 percent higher than the statewide rate and 83 percent higher than the national average.

9.     Individuals who are living in poverty bear the weight of this systemic illegal detention. Women and people of color, who are more likely to be poor, are most profoundly affected. The disproportionate incarceration of people of color in Tulsa and the unusually high rates of incarceration for women derive in part from Defendants' decision to automatically condition release on monetary payment.

10.     People detained before trial face worse case outcomes than those able to pay for their freedom, including higher rates of conviction and longer sentences. They also endure overwhelming effects on their personal lives—on their families, their employment, and their physical and mental health.

11.     Tulsa County's finances have been burdened by Defendants' pretrial detention policies. The jail costs taxpayers more than $30 million a year. To fund jail operations and jail expansion, the County imposes two different sales taxes, and provides additional funding.

4

## Jurisdiction and Venue

12.     This is a civil rights action arising under 42 U.S.C. § 1983 and 28 U.S.C. § 2201, et seq., and the Sixth and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

13.     Venue in this Court is proper under 28 U.S.C. § 1391.

## Parties

**Plaintiffs**

14.     Plaintiff Michael Parga is a 37-year-old man. He lives in Tulsa County.

15.     Plaintiff Richard Feltz is a 48-year-old man. He lives in Tulsa County.

16.     Plaintiff Tara O'Donley is a 34-year-old woman. She is homeless.

17.     Plaintiff Christopher Wood is a 48-year-old man. He lives in Tulsa County.

**Defendants**

18.     Defendant Tulsa County is a municipal corporation organized under the laws of the State of Oklahoma. Tulsa County maintains policies of jailing people who are unable to pay generic money bail amounts, usually predetermined by the County's bail schedule. Tulsa County also maintains a policy of delaying the appointment of counsel for people who are unable to pay generic money bail amounts and denying counsel at legal proceedings where pretrial release and pretrial detention determinations are made.

19.     Defendant Vic Regalado is the Tulsa County Sheriff. The Tulsa County Sheriff is a County official, the head of the Tulsa County Sheriff's Office, and the keeper of the County Jail. The Tulsa County Sheriff is the final policymaker for the jail in Tulsa

County. The Sheriff's Office detains arrested people who cannot pay a predetermined secured money bail prior to any individualized hearing. The Sheriff's Office continues to detain arrested people who cannot pay a secured money bail amount after an individualized hearing, even though there has been no inquiry into or findings concerning ability to pay, consideration of alternatives conditions of release, or findings concerning the necessity of pretrial detention. Defendant Regalado is sued in his official capacity.[3]

20.     Defendants Terry H. Bitting, Tammy Bruce, Martha Rupp Carter, Stephen R. Clark, Theresa Dreiling, Owen Evens, James W. Keeley, Deborah Ludi Leitch, J. Anthony Miller, Dawn Moody, Millie Otey, Kirsten Pace, April Seibert, Clifford Smith, and Sarah Smith (collectively "Special Judges") are special judges for the District Court for Tulsa County.  Defendant Special Judges are appointed by Tulsa County district court judges. They are authorized by state law to perform the duties of a magistrate in criminal cases. Defendant Special Judges' magistrate duties include making probable cause determinations and bail determinations. Defendant Special Judges make bail determinations in three contexts. First, Defendant Special Judges review and approve arrest warrants. As part of this process, Defendant Special Judges specify conditions of release for the person whose arrest is authorized by each warrant. Second, Defendant Special Judges determine conditions of release for anyone who is arrested without a warrant on a

---

[3] The Tulsa County Sheriff is a final policymaker for Tulsa County's post-arrest jailing policies and practices. Defendant Regalado is named separately from the County as a defendant in the event that the Court concludes that he acts on behalf of the state in this capacity, and thus is subject to prospective relief. If the Court, however, agrees that he is a final policymaker for the County, naming him individually is redundant of a suit against the County.

6

charge that is not included in Tulsa County's secured bail schedule. Third, Defendant Special Judges review the monetary amounts that have been imposed according to the secured bail schedule and have the authority and ability to adjust those money bail amounts or impose alternative release conditions. Defendant Special Judges rarely, if ever, alter monetary amounts. In all of these contexts, when making bail determinations, Defendant Special Judges do not conduct any inquiries into or make any findings concerning people's ability to pay money bail or the necessity of pretrial detention. They do not provide adequate hearings: they do not provide notice of the critical issues at the hearing, an opportunity to be heard or to confront evidence, findings by any legal or evidentiary standard, or an explanation of reasons on the record. They also do not provide counsel before the hearings. Defendant Special Judges are sued in their capacity as Special Judges for declaratory relief only.

21.     In addition to those duties, Defendant Special Judge Dawn Moody presides over arraignments. People who are arrested and jailed pretrial and who cannot afford to purchase their release are detained in jail cells until they appear at arraignment six or more days after arrest. Defendant Moody refuses to address conditions of release at arraignment and she does not conduct any inquiry into or make any findings concerning a person's ability to pay money bail or the necessity of pretrial detention.

22.     Defendant William J. Musseman is a district court judge for the District Court for Tulsa County and the presiding judge for Oklahoma's 14th Judicial District, which encompasses Tulsa County. As presiding judge, Defendant Musseman has general

administrative, rulemaking, and supervisory authority over the District Court for Tulsa County. Defendant Musseman promulgates the secured money-bail schedule that is used to determine the financial condition of release for almost all people arrested in Tulsa County. Defendant Musseman also promulgates the Local Criminal Rules, which specify the procedures by which bail is set and probable cause determined, the timing and conduct of arraignments, and the appointment of counsel. Defendant Musseman is sued in his capacity as a district court judge for the District Court for Tulsa County and the presiding judge for Oklahoma's 14th Judicial District.[4]

## Factual Allegations

### A.  The Named Plaintiffs Are in Jail Because They Are Unable to Pay the Financial Condition Required for Their Release

23.     Plaintiff Michael Parga is a 37-year-old man. He lives in Tulsa County. He is employed, but struggles to meet the basic necessities of life. He supports his wife, who is unemployed.

24.     Mr. Parga was arrested on Thursday, May 31, 2018, in Sand Springs, a city in Tulsa County, for an alleged felony offense. Upon arrest, he was taken to the Sand Springs jail, where the arresting officer told him that he would have to pay $2,000 to be

---

[4] In 2016, Tulsa County sought the assistance of the Vera Institute of Justice ("Vera")—a national policy and research organization that partners with local governments to improve their criminal legal processes—to examine drivers of growth and overcrowding at the Tulsa County jail and devise strategies consistent with the County's public safety goals to reverse that growth. Three of the named Defendants— Sheriff Vic Regaldo, Special Judge Dawn Moody, and District Court Judge William Musseman—along with a number of other Tulsa County leaders and officials participated in the process. Vera concluded that Defendants base pretrial release decisions, whether someone is incarcerated or at liberty while their case is proceeding, largely around money: whether someone can afford the bail amount or not.

released, but he would have to wait until he was transferred to the Tulsa County jail to do so.

25.     On Sunday, June 3, 2018, four days after his arrest—during which time he was confined in a jail cell in Sand Springs—Mr. Parga was transferred to the Tulsa County Jail. When he arrived at the Tulsa County Jail, a Tulsa County Sheriff's Officer told him that he would have to pay $2,000 to get out of jail. No one asked him if he could afford to pay that amount.

26.     Mr. Parga cannot afford to pay for his release. Therefore, he will remain in jail at least until his first appearance before a judicial officer, which is scheduled for June 11, 2018, 11 days after his arrest. Mr. Parga fears that he will lose his job and his home if he is forced to remain in jail until his first appearance.

27.     Plaintiff Richard Feltz is a 48-year-old man. He lives in Tulsa County. He is currently unemployed.

28.     Mr. Feltz was arrested on Saturday, June 2, 2018, for an alleged felony offense. Upon arrest, he was taken to the Tulsa County Sheriff's Office, where a Tulsa County Sheriff's Officer mistakenly told him that he would have to pay $75,000 to be released from jail.

29.     Mr. Feltz was transferred to the Tulsa County Jail a few hours later. At the jail, a Tulsa County Sheriff's officer told him that he would have to pay $50,000 to be released from jail. No one asked him if he could afford to pay that amount.

30.      Mr. Feltz cannot afford to purchase his release from jail. Therefore, he will remain in jail at least until his first appearance before a judicial officer, which is scheduled for June 11, 2018, 9 days after his arrest.

31.      Plaintiff Tara O'Donley is a 34-year-old woman. She is currently homeless and has no stable income.

32.      Ms. O'Donley was arrested on June 4, 2018, for an alleged misdemeanor offense. When she was brought to the Tulsa County Jail, a Sheriff's Officer told her that she had to pay $500 to be released. No one asked her whether she could pay that amount.

33.      Ms. O'Donley cannot afford to pay for her release. Therefore, she will remain in jail at least until her first appearance before a judicial officer, which is scheduled for June 11, 2018, a week after her arrest.

34.      Plaintiff Christopher Wood is a 48-year-old man. He lives in Tulsa County. He works occasionally as a handyman, and when he was arrested he had only $20. He has no other savings and does not have anyone in his life who can afford to get him out of jail.

35.      Mr. Wood was arrested for a misdemeanor charge on June 4, 2018. When he was brought to the Tulsa County Jail, a Sheriff's Officer told him that he would have to pay $1,000 to be released.

36.      Mr. Wood cannot pay that amount of money. Therefore, he will remain in jail at least until his first appearance before a judicial officer, which is scheduled for June 11, 2018, a week after his arrest.

### B. Defendants' Wealth-Based Detention Scheme Detains People Who Cannot Afford to Pay and Releases People Who Can

37.     Defendants, as a matter of policy and practice, impose secured financial conditions of release on almost all people arrested in Tulsa County on misdemeanor and felony offenses, usually in reliance on a chart of predetermined dollar amounts that they refer to as a "schedule."

38.     Under this system, people who are arrested and brought to the Tulsa County Jail are released immediately by Tulsa County Sheriff's deputies if they can afford to pay the monetary amounts that correspond to their booking charges, or if they can afford the premiums and fees required by for-profit bail-bond companies to secure the full money-bail amounts.

39.     Some charges are not covered by the money-bail schedule. For these charges, the Special Judges impose money-bail amounts when they make probable cause determinations. The Special Judges have no information about, and conduct no inquiry into, a person's ability to pay when they impose money-bail amounts on people arrested on charges not covered by the money-bail schedule. They do not consider non-financial alternative conditions of release.

40.     Those who cannot access enough money to pay the amounts required by either the bail schedule or the Special Judges are jailed.

41.     They remain in custody at least until their first court appearances, arraignments, which do not occur until at least six days after arrest.

42.     During that period, they are not provided counsel.

43.     Most people who are detained because they cannot afford to pay the amounts required by either the bail schedule or the Special Judges cannot afford private counsel and thus are not are not represented by counsel during their arraignments.

44.     Clerks from the district attorney's office and public defender's office attend every arraignment, but no attorneys representing either office appear.

45.     The Defendant Special Judge presiding over arraignments refuses to hear arguments concerning conditions of release at the arraignments.

46.     People who are deemed indigent, based on "paupers' affidavits" completed prior to their arraignments, are formally appointed public defenders at their arraignments. But indigent arrested people are not permitted to meet with their lawyers from the public defender's office until after their arraignments have concluded.

47.     People detained solely because of their inability to pay have no opportunity at the first appearance to raise any legal or factual challenges to their wealth-based pretrial detention.

48.     Written bail-reduction motions filed by counsel are the only mechanism for challenging pretrial detention.

49.     Appointed counsel's first opportunity to file a motion challenging the secured money-bail condition is after she has met with her client following the conclusion of the first court appearance at which she is appointed, which is a week into her client's detention.

50.     A written motion challenging secured money-bail conditions of release, once prepared by counsel, routinely takes at least 48 hours to be docketed and heard by a judge.

51.     That means that people who cannot afford to either pay the money Defendants demand for their release or hire an attorney are detained without any opportunity to contest their detentions for a minimum of eight days after arrest.

52.     As a result of Defendants' policies and practices, presumptively innocent people are jailed for a minimum of eight days solely because they cannot afford to make monetary payments or hire counsel, while arrested people with access to money are released immediately.

### a.  Arrest and Initial Money-Bail Setting

53.     When a person is arrested in Tulsa County, the person is brought to the Tulsa County Jail and "booked" by an intake officer.

54.     For almost everyone arrested, what happens next is determined by Tulsa County's secured money-bail schedule.

55.     The secured money-bail schedule is promulgated by Defendant Musseman.

56.     The schedule is a list of offenses and dollar amounts. It predetermines secured financial conditions of release for all but a select few offenses for which individualized conditions of release must be determined by a judge.

57.     For anyone arrested without a warrant for an offense covered by the bail schedule, an intake officer, who is employed by the Tulsa County Sheriff's Office, consults

the money-bail schedule to determine how much money is required for the immediate release of the booked individual.

58.    If a person has been arrested on a warrant, the warrant specifies bail conditions, which are set by Defendant Special Judges. For warrants on charges covered by the bail schedule, Defendant Special Judges exclusively use secured financial conditions of release, and they determine the secured amounts using the schedule.

59.    If the schedule covers the arrest charges, regardless of whether arrests are made with or without warrants, Defendants have a policy of "stacking bail" for people whose booking charges include at least one "stacking-eligible" offense. Stacking is the practice of computing a person's secured financial condition of release by adding the money-bail amounts for each offense on which the person is booked. The person must pay the cumulative amount before being released from jail. The "stacking-eligible" offenses that trigger stacking are determined by administrative directive, issued by Defendant Musseman and subject to amendment at his discretion.

60.    If a person has been arrested on a charge covered by the schedule, or on a warrant specifying a money-bail amount, an intake officer tells the person what offense she has been arrested for and "how much it will cost to get out of jail before seeing a judge."[5]

---

[5] The Tulsa County Sheriff's Office's website contains a video that demonstrates the "inmate booking process" for all people arrested in Tulsa County. *See* Tulsa County Sheriff's Office, Booking Process Video, http://tcso.org/resources/inmate-bookings/ (last visited June 6, 2018) ("Sheriff's Office Video").

14

61.    After informing a person of the financial condition of release, the intake officer allows the person to make a phone call to arrange for the payment of money to secure her release.

62.    "[I]f they are unable to post a bond, the person will remain in custody until their court date." She will be forced to exchange her clothing for a jail uniform and housed in the jail, where she will remain for days, weeks, or months. *See* Sheriff's Office Video.

63.    "[I]f the person is able to pay their bond they will be allowed to be bonded out by a certified Tulsa County certified bondsman," or by payment of cash bail. "[T]hey are also told their court date," and allowed to keep their clothes. "[T]heir property is returned to them, and they are free to go." *See id.*

64.    Working in rotation, Defendant Special Judges review the arrest charges for anyone arrested without a warrant and in detention within 48 hours of arrest. Based on police reports, Defendant Special Judges make probable-cause determinations, review money-bail amounts previously assessed according to the bail schedule, and impose money-bail amounts for those arrested on charges not covered by the bail schedule. Defendant Special Judges carrying out these duties make their bail determinations without inquiring into anyone's ability to pay or into whether pretrial detention is necessary in each case.

65.    Arrested people do not appear before Defendant Special Judges making probable cause determinations and reviewing the bail imposed by schedule. No defense attorneys are present, and there is no opportunity to be heard.

66.     In all cases—whether arrests are made with or without warrants, and whether charges do or do not appear on the secured money-bail schedule—money bail is the default pretrial-release decision-maker. Cash amounts are required of nearly all people who are booked into the jail, except those charged with the most severe offenses, for whom no conditions of release are set.

67.     In each case, money bail is required without any evaluation of the individual circumstances of the arrested person, other than the charges on which she has been booked and, sometimes, prior felony convictions and the contents of the police report.

68.     Even "low" monetary bail amounts are unaffordable for poor people. Significant percentages of people detained on monetary amounts at the bottom end of the bail schedule are unable to pay their way out of jail.

69.     Money bail serves as a detention mechanism not a release mechanism for the indigent.

70.     For many people, bail orders therefore operate as de facto detention orders. But these de facto orders of detention are issued and enforced without the substantive findings or procedural safeguards required by federal law before the government may detain a presumptively innocent person: (1) a finding that pretrial detention is necessary because no less restrictive alternatives are available to meet a compelling government interest, and (2) robust procedural safeguards to ensure the accuracy of that substantive finding.

71.     For wealthy people arrested in Tulsa County, money-bail orders operate as orders of release without supervision of any kind no matter how significant the government's assessment of the risks that the wealthy person poses.

72.     But for poor people arrested in Tulsa County, money-bail orders operate as orders of detention even if their release would pose no risk at all and even if simple and less restrictive alternatives exist to mitigate any risk.

73.     Defendants routinely issue de facto detention orders without any assessment of the risk a person may pose, and without considering non-monetary bail conditions that might sufficiently mitigate any risks. And they issue these de facto detention orders without any meaningful process, let alone the detailed procedures required by due process, including notice of the critical issues to be decided; the assistance of counsel; the right to present evidence and to confront the evidence offered by the government; application of specific legal and evidentiary standards; and an on-the-record statement of reasons for any decision to detain.

> b.   *Defendants' Wealth-Based Detention Scheme Is Not Mandated by Oklahoma Law and Is Contrary to Its Purposes*

74.     These policies and practices enforced in Tulsa County are not required by state law, which instead offers many opportunities for release which are enshrined as a right under the Oklahoma constitution for nearly all people who are arrested.

75.     In addition to the federal constitution rights that Defendants' policies violate, the Oklahoma Constitution guarantees the right to bail to an accused person in a criminal case subject to limited exceptions. Okla Const. art. II, § 8. State law provides that "[e]xcept

17

as otherwise provided by law, bail, by sufficient sureties, shall be admitted upon all arrests in criminal cases where the offense is not punishable by death . . . ." Okla. Stat. Ann. tit. 22, § 1101 (A).

76.     As a matter of history and practice, "bail" is "a process of conditional release," meant "to effectuate and maximize release."[6]  The same is true under Oklahoma law: "Bail" is a "means of procuring . . . release" while "insuring [a person's] future attendance in court, and compelling him to remain within the jurisdiction of the court." *Manning v. State ex rel Williams*, 120 P.2d 980, 981 (Okla. 1942).

77.     "Bail" is not equivalent to "money bail." Bail conditions can include both financial and non-financial conditions of release. "Money bail" refers to those conditions of release that are financial and describes the practice of requiring a defendant to forfeit money if she does not appear for trial. Money bail can be either secured or unsecured. Secured money bail requires people who are arrested to deposit money before they are released; unsecured money bail allows them to be released without depositing any money but requires them to pay if they fail to appear.

78.     In Oklahoma, "the denial of bail is allowed under very limited circumstances," and only after extensive procedural safeguards have been satisfied. *Brill v. Gurich*, 965 P.2d 404, 406 (Okla. 1998).

---

[6] "There is 'bail'—i.e., a process of release—and there is 'no bail[]'—a process of detention." U.S. Dep't of Just. Nat'l Inst. Of Corr., *Fundamentals of Bail: A Resource Guide for Pretrial Practitioners and a Framework for American Pretrial Reform* (2014), http://www.clebp.org/images/2014-11-05_final_bail_fundamentals_september_8,_2014.pdf.

79.     For anyone taken into custody on almost any other offense, Oklahoma law permits Defendants to release the person "on his personal recognizance subject to such conditions as the court or magistrate may reasonably prescribe to assure his appearance when required." Okla. Stat. Ann. tit. 59, § 1334; see also Okla. Stat. Ann. tit. 22, § 1108.1.

80.     A personal recognizance release is "[t]he release of a [person] in a criminal case in which the court takes the [person's] word that he or she will appear for a scheduled matter or when told to appear. [] This type of release dispenses with the necessity of the person's posting money or having a surety sign a bond with the court." BLACK'S LAW DICTIONARY (10th ed. 2014), Westlaw.

81.     In lieu of jailing people upon arrest, Oklahoma law permits law enforcement officials to issue citations to people arrested on misdemeanor offenses or violations of city ordinances. *See* Okla. Stat. Ann. tit. 22, § 209.

82.     State law further authorizes Tulsa County to "establish and fund a pretrial program" to facilitate the release of people who have committed all but a handful of serious offenses and, for all other people, allows release with or without secured money bail by order of a judge under any "conditions prescribed by the judge." 22 Okla. Stat. Ann. § 1105.3.

83.     Tulsa County operates and administers a pretrial release program that is run by Tulsa County Court Services. The pretrial release program is one of only two forms of non-financial pretrial release used in Tulsa County, the other being personal recognizance release.

84.     Tulsa County releases fewer than 500 people each year to the Court Services' pretrial release program. In 2016, 500 people amounted to less than two percent of the 25,704 people admitted into the Tulsa County Jail.

85.     Defendants routinely ignore alternative options under state law that would protect federal constitutional rights against wealth-based pretrial detention.

### c. Initial Arraignment

86.     Once a financial condition of release is imposed, anyone who cannot access the money required for release, and who therefore remains jailed, does not see a judicial officer until the arraignment.

87.     Tulsa County District Court rules mandate that the arraignment happen no later than six days after arrest.

88.     In practice, arraignments often occur more than six days after arrest.

89.     During their six- or more-day detentions, people who cannot afford to pay for their release and cannot afford to hire attorneys are not appointed counsel.

90.     Defendant Special Judge Moody usually presides over arraignments. On occasions when Defendant Moody is unavailable to conduct arraignments, one of the other Defendant Special Judges conducts them in her place. Each of the Special Judges follows the same policies and practices in all respects that are material to Plaintiffs' claims.

91.     Arraignments are conducted via video-link. The Special Judge conducts the arraignments from the courtroom, while people in custody appear on screen from the Tulsa County Jail.

92.     Prior to each arraignment, the judge receives "paupers' affidavits" for the people who are being arraigned. The pauper's affidavit is designed to elicit a person's financial information and is meant to be used to determine each person's eligibility for a public defender.

93.     The initial arraignments are rote exercises, and each routinely lasts less than 30 seconds. No counsel is present on either side and there is no opportunity to challenge the secured money-bail conditions previously imposed.

94.     If the prosecutor has not made a charging decision by the time of the initial arraignment, the judge either releases the person or postpones the arraignment for about a week.

95.     Presumptively innocent people whose arraignments have been postponed and who cannot afford to pay to purchase their liberty are jailed for another week while they wait to be arraigned. They are not assigned counsel until after they are arraigned and so remain unrepresented in the interim unless they can afford to hire their own attorneys.

96.     For everyone being arraigned, the Special Judge reads the charges that the prosecutor has chosen to file, enters a plea of not guilty, and assigns a public defender if the judge determines that the person is financially eligible for one.

97.     As a matter of policy and practice, Defendant Special Judges refuse to address conditions of release at arraignments. They do not make findings concerning whether any person has the ability to pay the money-bail amounts that have previously

been set, and do not hear evidence or making findings concerning alternative conditions of release or the necessity of detention.

### d.  Post-Arraignment Detention

98.    The only opportunity for a person to request modification of her conditions of release is by filing a bail-reduction motion, with one of the Special Judges, through her attorney.

99.    For anyone who is jailed because she cannot afford to pay for her release, and who cannot afford to hire an attorney, the first opportunity to file a bail-reduction motion comes six or more days after arrest when attorneys are first appointed.

100.    Tulsa County District Court policy directs Special Judges not to set a bond-reduction hearing fewer than 48 hours after a motion is filed by an attorney. During that waiting period, the arrested person remains confined in jail.

101.    The judges hearing such motions refuse, as a matter of routine practice, to make findings concerning ability to pay, alternative conditions or release, or the necessity of pretrial detention. As a result, even if and when a financial condition of release is reduced, often weeks after an arrest, it is frequently reduced to amounts that remain unaffordable.

### C.  People Jailed Because They Are Poor Suffer Devastating Consequences

102.    People who cannot pay a secured money bail amount to secure their release after arrest are significantly more likely to be convicted of a crime—and more likely to be convicted of a more serious crime—than people arrested on the same charges but able to

pay to secure their release.[7] Even one day of pretrial detention notably increases a person's likelihood of conviction.[8] And detention until disposition of a case is the single greatest predictor of criminal conviction.[9]

103. Being detained pretrial for any length of time decreases a person's plea bargaining power and increases the likelihood of a plea to time served, even if the person is innocent. Anyone detained at the time of a plea offer faces enormous pressure to plead guilty just to get out of jail.

104. Jailing people after arrest hampers their ability to prepare their defenses for trial. For example, a jailed person without counsel cannot preserve and gather surveillance video that may disappear within hours or days of an alleged crime. A jailed person without counsel cannot take witness statements, and witnesses become more difficult to find each day after arrest. And jailed people, even once they are appointed counsel after a week of incarceration, cannot effectively meet with that counsel and prepare the defense, including by assisting the attorney in finding evidence and witnesses or building a mitigation case that would support community-based or treatment-based alternatives at sentencing.

105. Pretrial detention of any length also has devastating personal consequences: Even one day in jail can "imperil [a person's] job, interrupt his source of income, and

---

[7] Will Dobbie, Jacob Goldin & Crystal S. Yang, *The Effects of Pre-Trial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges*, 20-21, 27 (2017), https://www.princeton.edu/~wdobbie/files/bail.pdf.

[8] Mary T. Philips, New York City Crim., Just. Agency, Inc., *Pretrial Detention and Case Outcomes, Part I: Nonfelony Cases*, 26 (2007), http://www.nycja.org/lwdcms/doc-view.php?module=reports&module_id=669&doc_name=doc.

[9] Christopher T. Lowenkamp, Marie VanNostrand & Alexander Holsinger, *Investigating the Impact of Pretrial Detention on Sentencing Outcomes*, 10-11 (2013), http://www.arnoldfoundation.org/wp-content/uploads/2014/02/LJAF_Report_state-sentencing_FNL.pdf.

impair his family relationships." *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975). Because of the havoc that just days in jail can cause, even those released after an initial period of detention are less likely to mount defenses to their cases, and are more likely to miss court dates, violate terms of release, and otherwise suffer worse outcomes in their criminal cases.

106.   Even a few days in jail significantly increases the risk of job loss, eviction from housing or homeless shelter, exposure to trauma in custody, and broken family connections, especially for people with very young children.

107.   A large body of empirical evidence shows that "low risk" people who are jailed for just two or three days after arrest because they cannot pay money bail are much more likely to commit crimes in the future and to not appear in court in the future because of the de-stabilizing effects of even short periods in jail.

### Class Action Allegations

108.   The named Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

109.   A class action is a superior means, and the only practicable means, by which the named Plaintiffs and unknown Class members can challenge the Defendants' unlawful wealth-based post-arrest detention scheme.

110.   This action is brought and may properly be maintained as a class action pursuant to Rule 23(a)(1)–(4) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

111.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

112.    The Plaintiffs propose one class seeking declaratory and injunctive relief: All people who are or will be detained in the Tulsa County Jail because they are unable to pay a secured financial condition of release.

a. Numerosity (Fed. R. Civ. P. 23(a)(1))

113.    Every person arrested in Tulsa County who is not lawfully preventatively detained is subjected to the Defendants' wealth-based detention scheme in which arrested people either pay for their liberty or, regardless of their ability to pay or personal circumstances, remain confined in a jail cell.

114.    There are hundreds of people subject to these policies at any given time.

115.    Sheriff's Department records show that on June 6, 2018, 1,665 people were detained in the Tulsa County Jail. A majority of them were held pretrial, on money bail amounts, and none or almost none of them were detained under explicit detention orders, issued according to the procedures required by Oklahoma law for orders of detention. Most of them were, and still are, in jail on de facto orders of pretrial detention: money-bail orders entered without following any of the procedures required for valid orders of detention. They would be released immediately if they were not impoverished.

116.    Joinder is impracticable because the class is both too numerous and too fluid for the Court to feasibly hear their independent claims.

117.   Joinder is also impracticable because the members of the class are too poor to hire lawyers to bring independent claims.

b. *Commonality (Fed. R. Civ. P. 23(a)(2))*

118.   The relief sought is common to all members of the Class, and common questions of law and fact exist as to all members of the Class. The named Plaintiffs seek relief declaring that the Defendants' policies, practices, and procedures violate the rights of the Class members and mandating the Defendants to change their policies, practices, and procedures so that the constitutional rights of the Class members will be protected in the future.

119.   These common legal and factual questions arise from one central scheme and set of policies and practices: the Defendants' wealth-based post-arrest detention process. The Defendants operate this scheme openly and in materially the same manner every day. The material components of the scheme do not vary from Class member to Class member, and the resolution of these legal and factual issues will determine whether the members of the class are entitled to the constitutional relief that they seek.

120.   Among the most important common questions of fact are:

- Whether Defendants have a policy and practice of determining the amount of money necessary to secure post-arrest release without inquiry into ability to pay;

- Whether Defendants implement their post-arrest detention scheme without consideration of ability to pay, without findings as to ability to pay, and without consideration of non-financial conditions;

- Whether Defendants require that pre-determined amounts of money be paid upfront before they will release a person from jail; and

- How long arrested people must wait, in jail and without the assistance of counsel, after arrest before they have an opportunity to raise their inability to pay for their release.

121.   Among the most important common question of law are:

- Whether the Defendants' wealth-based post-arrest detention scheme, which requires that arrested people pay money upfront to be released and which does not consider ability to pay or non-financial conditions of release, violates the Fourteenth Amendment's Due Process and Equal Protection clauses;

- Whether it is lawful to impose a secured financial condition of release that operates as a de facto order of pretrial detention because of a person's inability to pay without complying with the substantive findings, legal standards, and procedures required for issuing and enforcing a transparent order of preventive detention; and

- Whether delaying appointment of counsel for at least a week after detaining a person pursuant to an unaffordable secured financial condition of release and until after the initial arraignment violates the Sixth Amendment's Right to Counsel Clause.

   *c. Typicality (Fed. R. Civ. P. 23(a)(3))*

122.   The named Plaintiffs' claims are typical of the claims of the other members of the Class, and the named Plaintiffs have the same interests in this case as all other members of the Class. Each of them suffers the same injuries because Defendants refuse to comply with basic constitutional requirements: The named Plaintiffs and all of the Class members are or will be confined in jail because they cannot or will not be able to afford to pay the Defendants' secured financial condition of release. They also cannot and will not be able to afford retained counsel, and they have not been, and will not be, appointed counsel until they have been detained for at least a week, and until after their arraignment

is over. The answer to whether the Defendants' policies and practices are unconstitutional will determine the claims of the named Plaintiffs and every other Class member.

### d. Adequacy (Fed. R. Civ. P. 23(a)(4))

123.    The named Plaintiffs are adequate representatives of the Class because their interests in the vindication of the legal claims that they raise are entirely aligned with the interests of the other Class members. The named Plaintiffs are members of the class, and their interests do not conflict with those of the other class members.

124.    There are no known conflicts of interest among members of the proposed Class, all of whom have a similar interest in vindicating their constitutional rights.

125.    Plaintiffs are represented by attorneys from Civil Rights Corps and Still She Rises, who have experience in litigating class actions and complex civil rights matters in federal court and knowledge of both the details of the Defendants' scheme and the relevant constitutional and statutory law.

126.    The efforts of Class counsel have so far included investigation of Defendants' money-based pretrial detention system, interviews of jail inmates and attorneys practicing in the area, consultation with local and national experts, and research regarding the legality of Defendants' secured money-bail regime.

127.    Class counsel have studied post-arrest detention systems in other cities and counties in order to investigate the wide array of lawful options in practice for government entities.

128.   Class counsel also have experience litigating similar challenges in other jurisdictions and years of experience litigating class actions and other complex and important cases in federal courts.

129.   As a result, counsel have undertaken significant efforts toward becoming intimately familiar with the Defendants' scheme and with all of the relevant state and federal laws and procedures that do, can, and should govern it. The interests of the members of the Class will be fairly and adequately protected by the named Plaintiffs and their attorneys.

*e. Injunctive or Declaratory Relief (Fed. R. Civ. P. 23(b)(2))*

130.   Class action status is appropriate because the Defendants, through the policies, practices, and procedures that make up their post-arrest detention scheme, have acted in the same unconstitutional manner with respect to all class members. Defendants have created and applied a simple scheme of wealth-based post-arrest detention and release: Defendants release those who can pay and detain those who cannot. They do so without offering any process or providing counsel to challenge the lawfulness of impecunious people's detention or the necessity and effectiveness of the money-bail orders underlying their detention.

131.   The Class therefore seeks declaratory and injunctive relief to enjoin the Defendants from continuing in the future to detain people who are arrested and cannot afford to pay to secure their release. Because the putative Class challenges the Defendants' scheme as unconstitutional through declaratory and injunctive relief that would apply

perforce to every member of the Class, Rule 23(b)(2) certification is appropriate and necessary.

## Claims for Relief

**Count One: Defendants Violate Plaintiffs' Equal Protection and Due Process Rights Against Wealth-Based Detention by Jailing Them Because They Cannot Afford A Monetary Payment.**

132.    Plaintiffs incorporate by reference the allegations in paragraphs 1–130.

133.    The Fourteenth Amendment's Due Process and Equal Protection clauses have long prohibited jailing people solely because of their inability to make monetary payments. Separately, Plaintiffs have a fundamental right to pretrial liberty. Neither the right against wealth-based detention nor the right to pretrial liberty may be infringed unless the government demonstrates that detention is necessary. Defendants violate Plaintiffs' rights by placing and keeping them in jail because they cannot afford to pay monetary bail amounts required without inquiry into and findings concerning ability to pay and without consideration of and findings concerning alternative conditions of release and the necessity of wealth-based pretrial detention.

**Count Two: Defendants Violate Plaintiffs' Right to Pretrial Liberty by Jailing Them Without Procedural Due Process.**

134.    Plaintiffs incorporates by reference the allegations in paragraphs 1–132.

135.    The Due Process Clause requires the government, before depriving anyone of the fundamental right to pretrial liberty, to provide notice of the critical issues to be decided at the hearing. The person must be represented by counsel and have the opportunity to present and confront evidence and to be heard concerning the issue of pretrial release or

detention. Any transparent or de facto order of pretrial detention must be accompanied by findings on the record by clear and convincing evidence explaining why no combination of conditions could sufficiently serve the government's compelling interests.

136.    Defendants violate Plaintiffs' procedural due process rights by depriving them of their fundamental right to pretrial liberty without providing these necessary safeguards to ensure the accuracy of the substantive finding of necessity.

**Count Three: Defendants Violate Plaintiffs' Sixth Amendment Right to Counsel by Not Providing Them with Counsel Adequate to Challenge Their Lengthy Wealth-Based Pretrial Detention.**

137.    Plaintiffs incorporate by reference the allegations in paragraphs 1–135.

138.    The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to counsel at each post-attachment critical stage of the criminal process. The bail hearings to which Plaintiffs are entitled are post-attachment critical stages for which counsel must be provided.

139.    Plaintiffs' right to counsel attaches once they have been stripped of their liberty by virtue of the charges against them and appear before a judicial officer to be informed of the charges lodged against them and have bail set or reviewed.

140.    Bail orders that result in pretrial detention prejudice both Plaintiffs' immediate liberty interests and the ultimate outcomes of their cases. And they constitutionally may be issued only following robust adversarial hearings.

141.    Defendants violate the Sixth Amendment by imposing de facto orders of detention, and detaining Plaintiffs pursuant to these orders, without providing counsel to assist at required pretrial detention hearings.

142.    Defendants further violate Plaintiffs' Right to Counsel by delaying the appointment of counsel for six days or more. Every day that Plaintiffs are jailed increases the likelihood that their cases will be resolved against them, regardless of the strength of the evidence against them. Without counsel, Plaintiffs have no meaningful ability to file bail-reduction motions, the only avenue that Defendants offer for obtaining release from pre-trial detention and avoiding its prejudicial effects. The Sixth Amendment requires that Defendants appoint counsel for Plaintiffs who are detained under de facto detention orders and are too poor to hire lawyers, so that they can meaningfully challenge their prejudicial detentions and so avoid the prejudice of their unlawful pretrial detentions.

**Request for Relief**

143.    WHEREFORE, Plaintiffs and the other Class members request that this Court issue the following relief:

a.    An order and judgment preliminarily and permanently enjoining Defendants Tulsa County, Sheriff Regalado, and Judge Musseman from using secured financial conditions of release to detain Plaintiffs and class members without ensuring an inquiry into and findings concerning a person's ability to pay, without consideration of and findings concerning alternatives, without findings concerning the necessity of detention, and without appointing counsel to assist at bail hearings and meaningfully challenge pretrial detention;

b.    A declaration that the Defendants violate Plaintiffs' and class members' constitutional rights by requiring secured financial conditions of release without inquiry into ability to pay and by issuing and enforcing de facto

orders of wealth-based pretrial detention without consideration of alternatives and without findings that such detention is necessary to serve a compelling interest;

c.  A declaration and permanent injunction that the Defendants violate Plaintiffs' and class members' right to procedural due process under the Fourteenth Amendment by depriving people who are arrested of speedy, individualized release hearings with notice, counsel, the opportunity to be heard and to confront evidence, and findings on the record that the government met its burden to demonstrate by clear and convincing evidence that no alternative condition or combination of conditions would be sufficient to serve its compelling interests;

d.  A declaration that the Defendants violate Plaintiffs' and class members' right to counsel under the Sixth Amendment by failing to provide counsel to indigent people at an individualized bail determination hearing;

e.  An order certifying the class defined above;

f.  An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

g.  Any other relief this Court deems just and proper.


Dated: June 6, 2018

Respectfully Submitted,


*/s/ Ruth Hamilton*
Ruth Hamilton
Hayley Horowitz*
(*pro hac vice* application forthcoming)
Still She Rises, Tulsa
567 E. 36th Street North
Tulsa, OK 74106
ruthh@stillsherises.org
hayleyh@stillsherises.org
918-392-0874

* *Admitted to practice only in New York*

*/s/ Charles Gerstein*
Charles Gerstein
D.C. Bar No. 1033346
(*pro hac vice* application forthcoming)
Alec Karakatsanis
D.C. Bar No. 999294
(*pro hac vice* Application forthcoming)
A. Dami Animashaun**
NY Bar No. 5552849
(*pro hac vice* Application forthcoming)
Civil Rights Corps
910 17th Street NW, Suite 200
Washington, DC 20006
202-670-4809
charlie@civilrightscorps.org
alec@civilrightscorps.org
dami@civilrightscorps.org

*\* \*Admitted to practice in New York.
Not admitted in the District of
Columbia; practice limited pursuant to
D.C. App. R. 49(c)(8), with
supervision by Premal Dharia and
Alec Karakatsanis, members of the
D.C. Bar*


*Attorneys for Plaintiffs*