**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

MICHAEL PARGA, et al.,
on behalf of themselves and all others
similarly situated,

            Plaintiffs,

    v.                               Case No. 18-cv-0298-CVE-JFJ

TULSA COUNTY, et al.,

            Defendants.

**PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND**
**PRELIMINARY INJUNCTION AGAINST DEFENDANT TULSA COUNTY SHERIFF**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGOUND ............................................................................................................... 3

I.   This Case Has Been Subject to Many Lengthy Delays and Further Delay Risks Class Members' Health ................................................................................................ 3

II.  Defendants' Unconstitutional Pretrial Detention Practices ................................. 4

  A.   Booking Decisions Are Based on Wealth .................................................. 4

  B.   Bail Reviews Are Conducted Without Considering Ability to Pay or Alternative Conditions .............................................................................................. 5

  C.   Class Members Remain Detained on Unaffordable Bail Amounts and Without Representation Following Bail Reviews............................................................ 10

ARGUMENT ................................................................................................................ 11

I.   Plaintiff Is Likely to Succeed on the Merits ..................................................... 11

  A.   Arrestees' Detention Absent a Finding of Necessity Violates Their Fundamental Rights to Pretrial Liberty and Against Wealth-Based Detention.......................... 12

  B.   The Sheriff May Not Detain Pretrial Detainees Without Procedural Safeguards ...... 17

II.  Class Members Will Suffer Irreparable Harm Without a Preliminary Injunction............. 19

III. The Risk to Class Members Absent a Preliminary Injunction Outweighs Any Risk to the Sheriff ...................................................................................................... 22

IV.  Emergency Relief Is in the Public Interest ...................................................... 24

CONCLUSION.............................................................................................................. 25

## <u>TABLE OF CONTENTS</u>

**Cases**

*Addington v. Texas*, 441 U.S. 418 (1979) ................................................................. 18

*Bandy v. United States*, 81 S. Ct. 197 (1960) ............................................................ 12

*Boussard v. Parish of Orleans*, 318 F.3d 644 (5th Cir. 2003) .................................... 14

*Brangan v. Commonwealth*, 80 N.E.3d 949 (Mass. 2017) ........................................ 14

*Buffin v. City & Cty. of San Francisco*, No. 15-CV-04959-YGR, 2018 WL 424362 (N.D. Cal. Jan. 16, 2018) ............................................................................................................. 13

*Carlisle v. Desoto Cty., Miss.*, 2010 WL 3894114 (N.D. Miss. Sept. 30, 2010) .......... 15

*Cobb v. Green*, 574 F. Supp. 256 (W.D. Mich. 1983) .................................................. 19

*Concrete Pipe & Prods. v. Constr. Laborers Pension Tr.*, 508 U.S. 602 (1993) ......... 19

*Dodds v. Richardson*, 614 F.3d 1185 (10th Cir. 2010) ............................................... 12

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256 (10th Cir. 2004) ...... 11

*Elrod v. Burns*, 427 U.S. 347 (1976) .......................................................................... 19

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) .......................................................... 19

*Foucha v. Louisiana*, 504 U.S. 71 (1992) ............................................................. 12, 18

*Frazier v. Jordan*, 457 F.2d 726 (5th Cir. 1972) ....................................................... 13

*Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) ................................................................ 19

*Gagnon v. Scarpelli*, 411 U.S. 778 (1973) ................................................................ 19

*Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402 (6th Cir. 2012) ....................... 1

*Illinois League of Advocates for the Developmentally Disabled v. Illinois Dep't of Human Servs.*, No. 13 C 1300, 2013 WL 3287145 (N.D. Ill. June 28, 2013) ..................................... 1

*In re Humphrey*, 19 Cal. App. 5th 1006 (Ct. App. 2018) ............................................ 18

*Jones v. City of Clanton*, No. 15-CV-34, 2015 WL 5387219 (M.D. Ala. Sept. 14, 2015) .......... 22

*Kleinbat v. United States*, 603 A.2d 861(D.C. 1992) ................................................. 18

*Lake v. Speziale*, 580 F. Supp. 1318 (D. Conn. 1984) ............................................... 19

*Lee v. Orr*, No. 13-cv-8719, 2013 WL 6490577 (N.D. Ill. Dec. 10, 2013) .................... 1

*Leisner v. New York Tel. Co.*, 358 F. Supp. 359 (S.D.N.Y.1973) ................................. 1

*Little v. Jones*, 607 F.3d 1245 (10th Cir. 2010) ........................................................ 11

*Lopez-Valenzuela v. Arpaio*, 770 F.3d 772 (9th Cir. 2014) (*en banc*) ................. 13, 18

*Lora v. Shanahan*, 804 F.3d 601 (2d Cir. 2015) ........................................................ 18

*Matthews v. Eldridge*, 424 U.S. 319 (1976) .............................................................. 17

*Mayer v. City of Chicago*, 404 U.S. 189 (1971) ........................................................ 14

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 990) ...................................................... 24

*Morrissey v. Brewer*, 408 U.S. 471 (1972) ................................................................. 19

*N.Y. State Nat. Org. for Women v. Terry*, 697 F. Supp. 1324 (S.D.N.Y.1988) ............................. 1

*Pugh v. Rainwater*, 557 F.2d 1189 (5th Cir. 1977) ..................................................... 12

*Reno v. Flores*, 507 U.S. 292, 302 (1993) ............................................................... 12

*Santosky v. Kramer*, 455 U.S. 745 (1982) ............................................................... 18

*SEC v. Bankers Alliance Corp.*, No. 95-civ-0428, 1995 WL 317586 (D.D.C. 1995 May 10, 1995)
..................................................................................................................... 19

*Simpson v. Miller*, 387 P.3d 1270 (Ariz. 2017) ......................................................... 13

*Singh v. Holder*, 638 F.3d 1196 (9th Cir. 2011) ........................................................ 18

*Stack v. Boyle*, 342 U.S. 1 (1951) ......................................................................... 14

*State v. Brown*, 338 P.3d 1276 (N.M. 2014) ............................................................. 14

*Swarthout v. Cooke*, 562 U.S. 216 (2011) ............................................................... 17

*Tate v. Short*, 401 U.S. 395, 397–98 (1971) ............................................................ 12

*United States v. Bogle*, 855 F.2d 707 (11th Cir. 1988) ................................................ 19

*United States v. Leathers*, 412 F.2d 169 (D.C. Cir. 1969) ............................................ 13

*United States v. Mantecon-Zayas*, 949 F.2d 548 (1st Cir. 1991) .................................... 13

*United States v. Salerno*, 481 U.S. 739 (1987) ............................................ 12, 13, 17, 19

*Wanatee v. Ault*, 120 F. Supp. 2d 784 (N.D. Iowa 2000) ........................................... 19

*Ward v. Village of Monroeville¸*409 U.S. 57 (1972) .................................................... 19

*Washington v. Glucksberg*, 521 U.S. 702 (1997) ....................................................... 13

*Williams v. Farrior*, 626 F. Supp. 983 (S.D. Miss. 1986) ........................................ 13, 14

*Williams v. Illinois*, 399 U.S. 235 (1970) ............................................................... 12

*Wolff v. McDonnell*, 418 U.S. 539 (1974) ............................................................... 19

*Zablocki v. Redhail*, 434 U.S. 374 (1978) ............................................................... 13

**Statutes**

Okla. Stat. Ann. tit. 22, § 1108.1 ......................................................................... 15

Okla. Stat. Ann. tit. 22, § 209 ............................................................................. 15

Okla. Stat. Ann. tit. 59, § 1334 ........................................................................... 15

**Other Authorities**

ABA Standard 10-5.8 ......................................................................................... 18

Anne C. Spaulding, *Coronavirus and the Correctional Facility* ............................... 20, 24

Arnold Foundation, *Pretrial Criminal Justice Research Summary* (2013) .................................. 24

Arnold Foundation, *The Hidden Costs of Pretrial Detention* (2013) ........................................... 24

*Bail Reform in Cook County: An Examination of General Order 18.8A and Bail in Felony Cases* (May 2019)............................................................................................................................. 16

Christina Carrega, *Shampoo, watery soap to disinfect: Conditions on Rikers Island during COVID-19 unsafe, some inmate say*, ABC News (Mar. 29, 2020) ........................................... 21

Crim. J. Pol. Program, *Moving Beyond Money: A Primer on Bail Reform* (October 2016) ........ 20

Criminal Justice Reform Information Ctr., *Criminal Justice Reform Statistics: Jan. 1 – Jun. 31, 2019* (2009).......................................................................................................................... 16

Ctrs. for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19): Protect Yourself* ................................................................................................................................ 21

Ctrs. for Disease Control & Prevention, *Morbidity & Mortality Weekly Report: Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) – United States, Feb. 12-Mar. 16, 2020*.............................................................................................................................. 21

Gabrielle Banks, *Sheriff Gonzalez is seeking compassionate release of some inmates at the Harris County Jail*, Houston Chronicle (Mar. 19, 2020)........................................................... 2

James Fraser & Matt Wynn, *Coronavirus in Oklahoma: spike would leave hospitals without enough beds*, The Oklahoman (Mar. 13, 2020) ..................................................................... 25

Jennifer Gonnerman, *How Prisons and Jails Can Respond to the Coronavirus*, The New Yorker (March 14, 2020), ................................................................................................................. 24

Jing Cai, et al., *Indirect Virus Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020*, 26 Emerging Infections Diseases 26 (June 2020),........................................................ 23

Kenji Mizumoto, *Estimating the Asympomatic Proportion of 2019 Novel Coronavirus onboard the Princess Cruises Ship, 2020*, medRxiv (Feb. 20, 2020), ................................................... 23

Megan T Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes*, J. of L. Econ., and Organization, Vol. 34, Issue 4 (Nov. 2018)............................ 20

New Jersey Judiciary, *2018 Report to the Governor and the Legislature* ..................................... 16

Nicole Wetsman, *Prisons and jails are vulnerable to COVID-19 outbreaks*, The Verge (Mar. 7, 2020) ..................................................................................................................................... 20

Order No. 18-8A of the Cook County Chief Judge ...................................................................... 16

Paul Heaton et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711, 768 (2017) ....................................................................................................... 15, 20

Saint Louis University, *"Ticking Time Bomb": Prisons Unprepared For Flu Pandemic*, ScienceDaily (Sept. 15, 2006) ............................................................................................. 20

Sandhya Kajeepeta et al., *County Jail Incarceration Rates and County Mortality Rates in the United States, 1987-2016*, AJPH (Jan. 2020) ........................................................................ 25

Sean Murphy, *Oklahoma Has 1st Coronavirus Death; Test Shortage Persists*, U.S. News, (Mar. 19, 2020) ............................................................................................................................... 21

*See* World Health Organization, *Director-General Opening Remarks* (March 11, 2020). ............. 1

Shima Baradaran Baughman, *Costs of Pretrial Detention*, Boston Univ. L. Rev., Vol.. 97:1 (2017) ................................................................................................................................ 20

Star-Ledger Editorial Board, *Has bail reform been a success? Check the crime numbers, then decide*, Star-Ledger (Dec. 5, 2018) ............................................................................................ 16

Stecklein, *State still hasn't finished COVID-19 prediction models*, The Norman Transcript (March 31, 2020) ....................................................................................................................... 3

Stephen A. Lauer, et al., *The Incubation Period of Coronavirus Disease 2019 (COVID-19) From Publicly Reported Confirmed* Case, Ann. Intern. Med. (Mar. 10, 2020)................................... 23

Timothy Williams, et al., *"Jails Are Petri Dishes": Inmates Freed as the Virus Spreads Behind Bars*, The New York Times (Mar. 30, 2020)................................................................................ 21

Tulsa County Sheriff's Office, *Jail Information*.......................................................................... 21

United States Department of Justice, National Institute of Corrections, *Fundamentals of Bail* (2014) .................................................................................................................................. 24

Washington D.C. Pretrial Services Agency .............................................................................. 16

Washington D.C. Pretrial Services Agency, FY 2019 Release Rates for Pretrial Defendants within Washington, DC ........................................................................................................ 16

Will Dobbie et al., *The Effects of Pre-Trial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges*, Am. Economic Rev. (2018) .......... 20

Worldometer, *Coronavirus Incubation Period*, ........................................................................ 23

**Treatises**

Moore's Federal Practice § 23.50 (2d ed.1990) ........................................................................ 1

Newberg on Class Actions § 24:83 (4th ed. 2002) .................................................................... 1

Plaintiff Richard Feltz hereby moves this Court for a Temporary Restraining Order and Preliminary Injunction against Defendant Sheriff Vic Regalado on behalf all persons who are or will be detained because they are unable to pay a secured financial condition of release.[1]

## PRELIMINARY STATEMENT

Tulsa County is facing an unprecedented public health disaster, and the county jail is a catastrophe waiting to happen. As COVID-19 has spread across the globe, hundreds of thousands of people have been infected and thousands of people have died.[2] There is no known cure. When COVID-19 enters the jail, experts warn, it "could spread like wildfire."[3] Hundreds of class

---

[1] Plaintiff's Motion for Class Certification remains pending. Plaintiff files this motion on behalf of the putative class members, but for ease of reference describes them as "class members" throughout. Although this is a prototypical case for which the class action vehicle was created, the Court need not rule on the Plaintiff's class certification motion or formally certify a class in order to issue preliminary injunctive relief. *See,* Newberg on Class Actions § 24:83 (4th ed. 2002) ("The absence of formal certification is no barrier to classwide preliminary injunctive relief."); Moore's Federal Practice § 23.50, at 23-396, 23-397 (2d ed.1990) ("Prior to the Court's determination whether plaintiffs can maintain a class action, the Court should treat the action as a class suit."); *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 433 (6th Cir. 2012) ("[T]here is nothing improper about a preliminary injunction preceding a ruling on class certification."); *Lee v. Orr*, No. 13-cv-8719, 2013 WL 6490577, at *2 (N.D. Ill. Dec. 10, 2013) ("The court may conditionally certify the class or otherwise order a broad preliminary injunction, without a formal class ruling . . . ."); *N.Y. State Nat. Org. for Women v. Terry*, 697 F. Supp. 1324, 1336 (S.D.N.Y.1988) ("[T]he Court acted in the only reasonable manner it could under the circumstances, ruling on the continuation of [the] temporary restraining order and leaving the question of class certification for another day."); *Leisner v. New York Tel. Co.*, 358 F. Supp. 359, 371 (S.D.N.Y.1973) ("[R]elief as to the class is appropriate at this time even though when the preliminary injunction motion was heard, the class action had not yet been certified."); *Illinois League of Advocates for the Developmentally Disabled v. Illinois Dep't of Human Servs.*, No. 13 C 1300, 2013 WL 3287145, at *4 (N.D. Ill. June 28, 2013) ("[T]he class allegations in the . . . Complaint are sufficient to establish Plaintiffs' standing to seek immediate injunctive relief on behalf of the proposed class.").

[2] The World Health Organization has officially classified the spread of Covid-19 as a global pandemic. *See* World Health Organization, Director-General Opening Remarks (March 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[3] Gabrielle Banks, *Sheriff Gonzalez is seeking compassionate release of some inmates at the Harris County Jail*, Houston Chronicle (Mar. 19, 2020), https://www.houstonchronicle.com/

1

members are in the Tulsa County Jail because they are too poor to pay their assigned money bail; they are presumed innocent, and no judge has found that allowing them to return home poses a risk of danger to the community or will result in their nonappearance. At the time this suit was filed, these circumstances violated class members' equal protection and due process rights. Now, in the face of a global pandemic, they also threaten class members' lives.

In ordinary times, Defendants' daily violation of constitutional principles has immediately devastating consequences: Removing class members from their homes and communities for even a matter of days leads to lost housing and jobs, destabilized families and communities, increased poverty, and negative criminal case outcomes.[4] Now, it also contributes to an unprecedented and potentially catastrophic personal and public health risk. As criminal court proceedings are indefinitely delayed in light of the pandemic,[5] each class member faces an extended period of unjustified detention, even as the jail promises to become the site of a COVID-19 outbreak. Dozens of people enter and leave the jail every week, housing conditions make necessary hygiene practices and social distancing impossible, and individuals spend substantial time—and eat—in communal spaces. It is thus extremely urgent that no person be unnecessarily and unconstitutionally detained in the Tulsa County Jail during the course of the COVID-19 public health emergency and subjected to the risk of serious illness and death.

The solution is simple: Individuals who are in jail solely because they cannot afford imposed money bail should be released unless and until they are given a due-process-compliant

---

news/houston-texas/houston/article/harris-county-sheriff-gonzalez-jail-inmate-release-15143578.php?utm_campaign=CMS%20Sharing%20Tools%20(Premium)&utm_source=t.co&utm_medium=referral.

[4] *See infra* nn.76-78 and accompanying text.

[5] *See* ECF No. 151-5 (Ok. Sup. Ct. 2d Emergency COVID-19 Order); Ex. 8 (Tulsa Cnty. Dist. Ct. Emergency COVID-19).

hearing. There is no time to waste. A recent analysis predicts that the state's COVID-19 cases will peak in less than three weeks, and that the state will run out of ICU beds by April 11.[6] Plaintiff therefore moves for a temporary restraining order and preliminary injunction enjoining Sheriff Regalado from enforcing any secured financial condition of release imposed on a person unless that person has had a swift, due-process-compliant hearing to determine the necessity of detention. Plaintiff asks that this emergency request be heard as expeditiously as possible, before COVID-19 enters the jail and begins to kill class members who are entitled to relief.

## BACKGOUND

### I.    This Case Has Been Subject to Many Lengthy Delays and Further Delay Risks Class Members' Health

Four Named Plaintiffs, including Mr. Feltz, filed this action on June 6, 2018 on behalf of themselves and hundreds of other people detained in the Tulsa County Jail solely because they could not afford to pay money bail. They sought injunctive relief, and they moved for class certification.[7] In 22 months, the case has been suspended four times—three times over plaintiffs' objection. It was stayed twice to allow the parties to pursue settlement[8]; stayed once to await the outcome of proposed bail reform legislation that failed to pass[9]; and delayed once when it was dismissed and then reinstated.[10] The most recent stay was lifted on March 10, and a motion hearing is set for April 3 to adjudicate Defendants' motions to quash Plaintiffs' deposition

---

[6] Stecklein, *State still hasn't finished COVID-19 prediction models*, The Norman Transcript (March 31, 2020), https://www.normantranscript.com/oklahoma/news/state-still-hasn-t-finished-covid-19-prediction-models/article_c744e06b-ac1d-56c7-b0f8-7404cabae64f.html (citing study by the University of Washington's Institute for Health Metrics and Evaluation).
[7] ECF No. 1 (Compl.); ECF No. 3 (Mot. for Class Cert.). *See supra* n. 1.
[8] ECF No. 19 (Defs.' Req. to Extend time to Answer); ECF No. 118 (Stay Order).
[9] ECF No. 61 (Stay Order); ECF No. 64 (Order Lifting Stay),
[10] Order Dismissing Case (ECF No. 40); Order Reinstating Case (ECF No. 48).

notices.[11]   In the nearly two years since this case was filed—and in the three weeks since the stay

was lifted—the world has changed. The jail threatens to become an epicenter of an outbreak that

could kill hundreds, if not thousands, of Tulsa residents. The Court and parties cannot sit by as

Defendants continue to lock people up, and now expose them to risk of contracting a deadly

pathogen, because they cannot afford to pay money.

## II.      Defendants' Unconstitutional Pretrial Detention Practices

The Tulsa County Jail currently incarcerates over 1,000 people, and the majority are class

members: pretrial detainees held on money bail.[12] More such persons are arriving daily. No

judge has found that their detention serves a valid government interest. All would be

immediately released if they had enough money to pay their preset bond amounts.

### A.  Booking Decisions Are Based on Wealth

To determine who will be jailed and who will be released after arrest, the Sheriff

primarily "uses [an] offense-based, secured money-bail schedule," promulgated by the Tulsa

County District Court.[13] For the minority of persons arrested on warrants, the Sheriff uses money

bail amounts assigned by the judges who approved the warrants.[14] In either case, money bail

amounts are assigned based on arrestees' charges,[15] without any individualized consideration.

---

[11] ECF No. 149 (Order Lifting Stay).

[12] Ex. 6 (Jail Population Report, Apr. 2, 2020).

[13] ECF No. 116 (County Defs.' Mot. for Protective Order Reply) at 4; *see also* ECF No. 58-1 (Def. Judges' Rep. to 3d Proposed Stips.), Stips. No. 1, 2, 5, 6, 9; ECF No. 39 (County Defs.' Answer) ¶¶ 38, 57; ECF No. 116 (County Defs.' Mot. for Protective Order Reply).

[14] ECF No. 32 (First Am. Compl.) ¶ 58.

[15] *See* 51-1 (J. Musseman Aff.) ¶ 2; 51-4 (J. Guten Aff.) ¶ 4; *see also* Ex. 10 (Tulsa County Preset Bond Schedule); ECF No. 32 (First Am. Compl.) ¶ 58.

Anyone who pays the predetermined bail amount is released, while anyone who cannot afford to is detained.[16] The Tulsa County Sheriff "does not have a policy of collecting financial information from arrestees," and "does not have a policy of making an inquiry into whether arrestees can afford secured money bail amounts."[17] Instead, the Sheriff detains arrestees on unaffordable money bail, set without consideration of whether a person's detention is necessary to serve either of the relevant substantial government interests: protecting the public from a specific safety risk or ensuring future appearance from someone who is a flight risk.

## B. Bail Reviews Are Conducted Without Considering Ability to Pay or Alternative Conditions

Under a Tulsa County District Court Local Rule adopted during the pendency of this case, anyone detained on unaffordable bail is supposed to appear before a judge on the Court's "bond docket" within 48 hours of arrest for a bail review.[18] Judges overseeing the bond docket routinely impose money bail amounts without (1) hearing evidence of or assessing arrestees' ability to pay; (2) determining whether the money bail imposed will therefore operate as a de facto detention order; and, if so, (3) hearing evidence and making findings about whether a compelling government interest requires conditions that amount to detention, or a less restrictive condition will suffice. As a result, the Tulsa County Jail is filled with people who cannot afford to post bail, but for whom no judge has ever found that detention is necessary.

---

[16] Ex. 11 (TCSO Policy 19-06) at 6.4(A) ("Inmates are entitled to timely release when they have made bond"); Ex. 12 (TCSO Policy 30.3.2) at III(C)(5) ("If not posting bond, inmates will transition to housing after completing the booking process.").

[17] ECF No 98-5 (Pls.' and Sheriffs' 2d Stips), Sips. No. 5, 6.

[18] At the time this case was filed, the Court did not routinely provide bail hearings for arrestees. Since then, Defendants have repeatedly adjusted their pretrial detention and bail-setting practices and created a bond docket in response to this lawsuit, but the Court still does not offer due-process compliant bail hearings. The bond docket was established in October 2018 by an administrative order, which was superseded by local rule on August 22, 2019. *See* ECF No. 51-2 (Admin. Order 2018-09); ECF No. 89-1 (Local Cr. R. 2).

In a typical bond docket hearing, arrestees appear by video from the jail.[19] The judge, in the courtroom, reads the charges of arrest based on the police report or warrant affidavit.[20] The detainee, represented by appointed counsel solely for purposes of the bond docket, is permitted to present arguments for a reduced bond or personal recognizance release. The judge also considers the allegations in the police report or affidavit in support of the arrest warrant, the person's criminal history report, information provided by courtroom staff who review electronic court records, and, sometimes, input from local bondsman Rusty Roberts, who attends the docket daily.[21] An assistant district attorney sometimes, but infrequently, attends to present argument.[22] The defendant does not have access to all of the information considered by the judge.[23] If the defendant's arguments or representations conflict with information provided by other sources, such as the police report or criminal history information, the judge generally accepts the latter as true, without providing an evidentiary basis; evidentiary hearings are never scheduled. [24] Although bail determinations are supposed to be individualized, according to a statutorily mandated review of monthly bail data compiled by the Public Defender, the bail schedule is a predominant consideration of the bond docket judge: "[M]any bond settings on the docket end up

---

[19] ECF No. 89-1 (Local Cr. R. 2).

[20] Ex. 3 (Horowitz PI Decl.) ¶ 3.

[21] ECF No. 157-5 (J. Guten Decl.) ¶ 7; Ex. 1 (Pub. Def. Jail and Bond Stats., Jul. 2019) at 5 (judge relies heavily on "information in the police report, accepted as true," and the "defendant's criminal history"); Ex. 3 (Horowitz PI Decl.) ¶ 3.

[22] Ex. 3 (Horowitz PI Decl.) ¶ 4.

[23] ECF No. 157-5 (J. Guten Decl.) ¶ 7. In particular, the defendant does not have access to information from the NCIC, a national database of data relating to criminal investigations and proceedings, which is known to be riddled with errors. *See*, e.g., Michael McFarland, *The Human Cost of Computer Errors* (Jun. 1, 2012), https://www.scu.edu/ethics/focus-areas/internet-ethics/resources/the-human-cost-of-computer-errors/; Hannah Gladstein, et al., *Blurring the Lines*, Migration Policy Institute (Dec. 2005), file:///C:/Users/hhorowitz/Downloads/MPI_report_Blurring_the_Lines_120805.pdf.

[24] *Id*. ¶¶ 4, 8; *see also* Ex. 1 (Pub. Def. Jail and Bond Stats., Jul. 2019) at 5 (judge relies heavily on "information in the police report, accepted as true").

the same as the bail schedule amount,"[25] which the defendant is presumed unable to pay.[26] "While a defendant's ability to pay is considered," it is not given substantial weight, as "evidenced by the relatively low number of bond reductions that lead to an inmate's release."[27]

The bond docket judge routinely imposes monetary conditions of release without determining or articulating whether the condition will result in the person's detention and, if so without making evidence-based findings that the person represents a risk of flight or dangerousness that can be addressed only by imprisonment.[28] Local Rule 2 explicitly disclaims the judges' obligation to do so, requiring consideration of factors like the seriousness of the individual's charge and her appearance history only if she "is claiming to be indigent *and not just unable to meet [monetary] conditions of release*."[29] Even for indigent defendants, the policy does not require judicial officers to make any particular findings before imposing unaffordable bond that will lead to the person's detention. The rule instead emphasizes the court's "sole discretion" to determine "appropriate" bond amounts based on a number of factors.[30] In accordance with this written policy, Special Judge David Guten, who has been assigned to preside over the bond docket since February 11, 2019, testified by affidavit that in determining

---

[25] Ex. 1 (Pub. Def. Jail and Bond Stats., Jul. 2019) at 5.
[26] ECF No. 51-4 (J. Guten Aff.), ¶ 5.
[27] *Id*.
[28] Ex. 3 (Horowitz PI Decl.) ¶ 5. In fact, the Court routinely asks defendants how much they can afford, and then imposes bail amounts greater than the amount stated without finding that detention is necessary.  *Id*.
[29] ECF No. 89-1 (Local Cr. R. 2) at 3. The policy to disregard evidence of a defendant's inability to pay absent a claim of indigency is significant in a jurisdiction where preset bond amounts often reach into the tens and even hundreds of thousands of dollars. *See* Ex. 10 (Tulsa County Bail Schedule).
[30] ECF No. 89-1 (Local Cr. R. 2) at 1, 3.

conditions of release, his practice is to consider "many . . . factors," including "[t]he bond index[,] . . . criminal history and previous instances of failure to appear."[31]

The Court's written records likewise show no indication that the Court considers evidence of, or makes findings concerning, ability to pay, danger to the community, risk of nonappearance, or alternatives to detention as a matter of course when imposing monetary bail. Defendants have produced thousands of pages of dockets reflecting Court's bond docket determinations.[32] In cases where the Court refuses to reduce a person's bond from the amount assigned at arrest, the Court's only written record is a docket entry that reads: "Bond Reduction Denied. Bond $[x]."[33] Similarly, in cases where bond is reduced from the predetermined amount, but remains unaffordable, the Court's practice is to record the reduced bond amount—"Bond Reduction Granted, Bond Reduced to $[x]"—without any reference to evidence of dangerousness or risk of flight, or analysis of whether continued detention is necessary.[34] The Court routinely maintains predetermined bails amount without finding that detention is necessary

---

[31] ECF No. 51-4 (J. Guten Aff.), ¶¶ 1, 5.

[32] Ex. 3 (Horowitz PI Decl.) at ¶8; *See also* ECF No. 157-5 (J. Guten Decl.) ¶ 10.

[33] *Id.*; *see also, e.g.*, Ex. 4 (J.E. Bond Docket Record) at 2.This sample court record reflects that the defendant, J.E., remained in jail for six days on unaffordable bail following his bond docket appearance, despite the Court's failure to find that detention was necessary. Indeed, after six days, J.E. was released without any conditions, after the state failed to file criminal charges on two of J.E.'s arrest charges. The record shows no indication that new evidence was provided about, or new consideration given to, dangerousness or risk of nonappearance. *See* Ex. 4 at 2. Apparently, the Court decided based solely on the nature of the charges against him, that J.E. was, after all, not dangerous or a flight risk, but it didn't make that determination until he had been deprived of his liberty for more than a week for no valid reason. *Id.*

[34] Ex. 3 (Horowitz PI Decl.), ¶ 8; *see also, e.g.*, Ex. 5 (C.B. Bond Docket Record) at 2. C.B., like J.E., remained in jail on unaffordable bond after his bond docket appearance, without any record of evidence of dangerousness or risk of nonappearance. His docket sheet likewise confirms the Court's primary focus on the nature of the charges against the defendant. C.B.'s bond was reduced on one count and maintained on two others, without evidence in the record about his ability to pay the aggregate amount or about the government interest in jailing him pretrial. Ex. 5 at 2.

even though "there is a presumption that the arrestee [appearing at bond docket] cannot meet the preset bond and will therefore remain in jail."[35]

In many cases, the Sheriff continues to detain people even after the Court has implicitly acknowledged that they likely do not pose a safety or flight risk. For example, the Court routinely finds class members might be "good candidates" for release, but does not go on to identify and impose conditions that would allow for immediate release.[36] Instead, the Court frequently maintains these class members' unaffordable bail orders while referring them to Tulsa County's Court services' pretrial release program.[37] The program allows for a small number of defendants to be released without posting bond,[38] but a substantial portion of people referred never obtain release through Court Services,[39] and even when they do, their release is delayed by days.[40] The result is that arrestees whose detention the Court has deemed to be likely unnecessary remain jailed by the Sheriff on unaffordable money bail long past their appearance on the bond docket.[41] Each month, dozens of defendants appear on the bond docket, and come

---

[35] ECF No. 157-5 (J. Guten Decl.) ¶ 5; Ex. 1 (Pub. Def. Jail and Bond Stats., Jul. 2019) at 5 ("[M]any bond settings on the docket end up the same as the bail schedule amount.").

[36] *See* ECF No. 110-D (Horowitz Decl. in Opp. to Quash Depos.) ¶¶ 2-4; Ex. 3 (Horowitz PI Decl.) at ¶ 6.

[37] On two days in September 2019, for instance, the bond docket judge referred to Court Services approximately one-third of all people appearing, explicitly noting that they might be "good candidates" for release. ECF No. 110-D (Horowitz Decl. in Opp. to Quash Depos.) ¶¶ 2-4; Ex. 3 (Horowitz PI Decl.) at ¶ 6.

[38] ECF No. 32 (First Am. Compl.) ¶¶ 83, 84.

[39] For example, each one of those fourteen people referred to pretrial Court Services over the course of two bond dockets in September 2019, were still in jail, on money bail conditions, two weeks later. ECF No. 110-D (Horowitz Decl. in Opp. to Quash Depos.) ¶¶ 3-4.

[40] In July 2019, seventy-one people were released on pretrial supervision, "but the pretrial release process . . . [took] several days to complete, keeping those inmates in jail longer than" if the judge identified and imposed nonmonetary conditions of release at the time of the bond docket. Ex. 2 (Pub. Def. Jail & Bond Stats., Aug. 2019) at 5.

[41] These are not the only class members who remain in jail, and who would be released if the Court complied with its obligation to promptly impose release conditions absent evidence of dangerousness or non-appearance necessitating imprisonment. Many defendants spend multiple

away with an unaffordable money bail condition.[42] Because they are too poor to pay, the Sheriff detains them all, even though none has been found by clear and convincing evidence, following a due-process-compliant hearing, to pose an irremediable public safety threat or flight risk.

### C. Class Members Remain Detained on Unaffordable Bail Amounts and Without Representation Following Bail Reviews

Arrestees detained on money-bail amounts that they cannot pay who have appeared on bond docket are back in the same position that Named Plaintiffs were in when they filed this lawsuit: jailed by the Sheriff because they are too poor to pay their bonds. They are unrepresented by counsel because the public defender's appointment is solely for the purpose of bond docket, and they are forced to wait days for their next court appearance and the appointment of counsel.[43] They have no opportunity during that time to challenge their bonds.

---

days jailed by the Sheriff on money bail after the bond docket, before the court finally considers and imposes conditions allowing for release. In July 2019, 11% of people on bond docket—nearly 50 people—were released through PR, bond, or pretrial more than a week after their arrest. Ex. 2 (Pub. Def. Jail & Bond Stats., Aug. 2019) at 5. In June 2019, 3% of arrestees appearing at bond docket were found eligible for PR release, after having been jailed for more than a week, suffering detention that was ultimately found to have served no governmental interest. Ex. 1 (Pub. Def. Jail & Bond Stats, Jul. 2019).

[42] In June and July 2019, more than 800 defendants appeared on bond docket; about 90% of them remained detained more than five days after their appearances. Ex. 1 (Pub. Def. Jail and Bond Stats., Jul. 2019) at 4; Ex. 2 (Pub. Def. Jail and Bond Stats., Aug. 2019) at 4. Among the remaining 10% who eventually secured their release on reduced bond, some remained detained for up to five additional days, indicating that, even among that 10% of persons, money bond was set that the person could *not* immediately afford to pay. Ex. 1 (Pub. Def. Jail and Bond Stats., Jul. 2019) at 4; Ex. 2 (Pub. Def. Jail and Bond Stats., Aug. 2019) at 4.

[43] Local court rules authorize the Sheriff to detains arrestees who cannot afford bail for between six and eight days until their arraignments, or longer during court holidays. *See* ECF No. 89-1 (Local Crim. R. 1(B)); *see also* ECF No. 116-1 (Admin. Order adopting Rule 1(B)) (initial appearance occurs up to six days after arrest, but "if the court date falls on a day the Courthouse is scheduled to be closed, the date should be set for the next day the Courthouse is scheduled to open"). In practice, the number of days specified in the local rules represents the *minimum* amount of time arrestees spend in jail before arraignment. ECF No. 32 (First Am. Compl.) ¶¶ 88. The named plaintiffs, for example, were scheduled for arraignments between seven and eleven days after their arrests. *Id.* ¶¶ 26, 30, 33, 36; ECF No. 114-2 (Feltz records); ECF No. 114-3 (Parga records); ECF No. 114-4 (Wood records).

## ARGUMENT

A preliminary injunction is warranted. All four factors that the court must consider weigh in Plaintiffs' favor: "(1) a likelihood of success on the merits," because the Sheriff jails arrestees in violation of equal protection and due process; (2) "a likelihood that the [plaintiff class] will suffer irreparable harm in the absence of preliminary relief," because their detention under this illegal scheme deprives them of their liberty and their safety during the current global pandemic; (3) ""the balance of equities tips in the movant's favor," because ensuring detainees' access to constitutional procedures causes no harm to the Sheriff; and (4) "the injunction is in the public interest" because the public has no interest in detaining class members without ensuring there is a need to do so, and their continued detention risks causing a viral outbreak that will spread to the community and overwhelm local health resources.[44] The Tenth Circuit has "consistently" admonished that "irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."[45] There are few, if any, more dramatic irreversible harms than deprivation of liberty and risk of illness, permanent physical injury, and even death.

## I.      Plaintiff Is Likely to Succeed on the Merits

Plaintiffs' claims will succeed because thousands of arrestees in Tulsa County each year are deprived of their fundamental rights to liberty and equal protection of the law, without the government having shown that such infringement is necessary to serve a compelling interest. Detainees are also deprived of their right to due process because they are detained without any of the safeguards constitutionally required to protect the liberty and equality interests at stake.

---

[44] *See Little v. Jones*, 607 F.3d 1245, 1251 (10th Cir. 2010) (stating elements for preliminary injunction).
[45] *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (internal quotation marks omitted).

**A. Arrestees' Detention Absent a Finding of Necessity Violates Their Fundamental Rights to Pretrial Liberty and Against Wealth-Based Detention**

When the Sheriff jails arrestees because they cannot afford to pay money bail, he implicates two fundamental rights. First, due process vests arrestees with a fundamental right to liberty.[46] "In our society liberty is the norm, and detention prior to trial . . . is the carefully limited exception."[47] Second, equal protection and due process vest arrestees with a fundamental right against wealth-based detention.[48] A system in which "poor arrestees . . . are incarcerated where similarly situated wealthy arrestees are not, solely because the indigent cannot afford to pay a secured bond" creates a "basic injustice."[49] The Sheriff may not deprive arrestees of their right to liberty or their right against wealth-based detention without establishing that doing so is necessary to serve a compelling interest.[50] Plaintiff is entitled to relief if *either* right is violated without sufficient justification.

---

[46]*United States v. Salerno*, 481 U.S. 739, 750 (1987) (recognizing the "importance and fundamental nature" of "the individual's strong interest in liberty"); *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action."); *Dodds v. Richardson*, 614 F.3d 1185, 1192 (10th Cir. 2010) (("[T]he right of an accused to freedom pending trial is inherent in the concept of a liberty interest protected by the due process clause of the Fourteenth Amendment.")

[47] *Salerno*, 481 U.S. at 755.

[48] *Tate v. Short*, 401 U.S. 395 (1971); *Williams v. Illinois*, 399 U.S. at 244; *Bearden*, 461 U.S. at 665; *Pugh v. Rainwater*, 572 F.2d 1053, 1057 (5th Cir. 1978) ("The incarceration of those who cannot [pay money bail], without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements."); *ODonnell v. Harris County*, 892 F.3d 147, 161 (5th Cir. 2018).

[49] *ODonnell*, 892 F.3d at 162; *see also Bandy v. United States*, 81 S. Ct. 197, 197-98 (1960) (Douglas, J., in chambers) ("To continue to demand a substantial bond which the defendant is unable to secure raises considerable problems for the equal administration of the law. . . . Can an indigent be denied freedom, where a wealthy man would not, because he does not happen to have enough property to pledge for his freedom?"); *Pugh v. Rainwater*, 557 F.2d 1189 (5th Cir. 1977) (jailing a person solely due to inability to pay a money bail violates equal protection), *reversed in unrelated part*, *Rainwater*, 572 F.2d at 1057.

[50] *Reno v. Flores*, 507 U.S. 292, 302 (1993) (pretrial detention permissible only if it is "narrowly tailored to serve a compelling state interest"); *Washington v. Glucksberg*, 521 U.S. 702, 721

With respect to pretrial liberty, the Supreme Court has identified only two compelling governmental interests that can justify pretrial detention: to guard against a risk of flight, and to guard against a likelihood that person will be "responsible for dangerous acts in the community after arrest."[51] But the Sheriff routinely jails arrestees without a judge having found that they present a risk of flight or a danger to the community, let alone that detention is necessary to guard against those risks. That detainees are nominally given the option of paying unaffordable money bond to obtain release does not affect this analysis, because the option is illusory, and the result—detention without justification—is the same. Every appellate court to consider the question has held that an order requiring an unattainable financial condition of release is a de facto order for pretrial detention.[52] A person detained under an unaffordable bail condition suffers a loss of liberty no less than a person detained under an explicit detention order.

---

(1997) (government may not infringe "'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest."); *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978) (infringement on a fundamental right "cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests"); *Frazier v. Jordan*, 457 F.2d 726, 728 (5th Cir. 1972) (an order to pay a fine or serve time in jail violates equal protection and due process unless it is "necessary to promote a compelling governmental interest"); *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 780 (9th Cir. 2014) (*en banc*) (applying strict scrutiny to Arizona pretrial detention law because it infringed on the "fundamental" right to pretrial liberty); *Buffin v. City & Cty. of San Francisco*, No. 15-CV-04959-YGR, 2018 WL 424362, at *8 (N.D. Cal. Jan. 16, 2018) an examination of the *Bearden-Tate-Williams* line of cases persuades the Court that strict scrutiny applies to plaintiffs' Due Process and Equal Protection claims."); 251 F. Supp. 3d at 1156-57 (pretrial liberty infringements must be least restrictive means necessary to promote court appearance and community safety"); *Simpson v. Miller*, 387 P.3d 1270, 1276-1277 (Ariz. 2017) ("heightened scrutiny" applies where, as in *Salerno*, the "fundamental" "right to be free from bodily restraint" is implicated), *cert. denied sub nom. Arizona v. Martinez*, 138 S. Ct. 146 (2017); *Williams v. Farrior*, 626 F. Supp. 983, 986 (S.D. Miss. 1986) (a pretrial detention scheme must meet "strict judicial scrutiny" because of the fundamental rights at issue).

[51] *Salerno*, 481 U.S. 749, 750.

[52] *See ODonnell*, 892 F.3d at 162; *United States v. Leathers*, 412 F.2d 169, 171 (D.C. Cir. 1969) ("[T]he setting of bond unreachable because of its amount would be tantamount to setting no conditions at all."); *United States v. Mantecon-Zayas*, 949 F.2d 548, 550 (1st Cir. 1991) ("[O]nce a court finds itself in this situation—insisting on terms in a "release" order that will cause the

Independently, under the Due Process and Equal Protection Clauses, the Sheriff must

have a compelling reason to engage in wealth-based detention, *i.e.*, to jail people who cannot

afford pretrial bail while releasing those who can. The government has no legitimate interest in

extracting monetary bail from arrestees separate from its interests in ensuring community safety

and a return to court.[53] Therefore, whether the Sheriff's conduct is analyzed in light of the right

to liberty or the right against wealth-based detention, jailing people who cannot afford bail is

unconstitutional unless (a) every person detained presents a risk of nonappearance or harm to the

community, and (b) either the precise amount of bail imposed or detention is *uniquely* effective

at mitigating those risks.[54] If a person's "appearance at trial could reasonably be assured by [an]

alternate form of release, pretrial confinement for inability to post money bail would constitute

imposition of an excessive restraint."[55] The Sheriff violates the constitution when he detains

---

defendant to be detained pending trial—it must satisfy the procedural requirements for a valid *detention* order[.]"); s*ee also State v. Brown*, 338 P.3d 1276, 1292 (N.M. 2014) ("Intentionally setting bail so high as to be unattainable is simply a less honest method of unlawfully denying bail altogether.");*Brangan v. Commonwealth*, 80 N.E.3d 949, 963 (Mass. 2017) (unattainable money bail "is the functional equivalent of an order for pretrial detention, and the judge's decision must be evaluated in light of the same due process requirements applicable to such a deprivation of liberty.").

[53] *See Stack v. Boyle*, 342 U.S. 1, 5 (1951) ("Since the function of bail is limited, the fixing of bail for any individual defendant must be based upon standards relevant to the purpose of assuring the presence of that defendant," and any amount "higher than an amount reasonably calculated to fulfill this purpose is 'excessive' under the Eighth Amendment."); *Mayer v. City of Chicago*, 404 U.S. 189, 197 (1971) (state's "fiscal interest" in legal monetary obligations is "irrelevant" in evaluating constitutionality of government's treatment of low income criminal defendants; *Boussard v. Parish of Orleans*, 318 F.3d 644, 651 n.31 (5th Cir. 2003) ("perceived evil" of "lack of funding for the bail=-bond system, rather than the flight risk, or danger to the community, of an arrestee . . . "does not amount to [a] compelling interest").

[54] *See Rainwater*, 572 F.2d at 1057 (the Constitution requires "meaningful consideration of . . . alternatives" to "incarceration of those who cannot" pay a financial condition of release, and a finding that secured money bail "is *necessary* to reasonably assure defendant's presence at trial." (emphasis added));

[55] *Rainwater*, 572 F.2d at 1058; *id.* (if the government's interest in "appearance at trial could reasonably be assured by … alternate [conditions] of release, pretrial confinement for inability to post money bail" is unconstitutional); *Farrior*, 626 F. Supp. at 985 ("For the purposes of the

arrestees who cannot afford bail, without any determination that they present a relevant risk, or that money bail is the only way to address that risk.

There are ample constitutionally permissible and practically sound alternatives that do not infringe on fundamental liberties. Money bail is a relatively poor way to achieve the purposes of bail. Empirical evidence shows no relationship between money bail and either rates of appearance[56] or public safety.[57] Alternatives abound. Defendants have received a formal report from the Vera Institute of Justice, a national criminal justice policy and research organization, that details alternatives Defendants can employ to ensure that their pretrial detention policies comport with the Constitution,[58] including: using citations in place of arrest and booking for appropriate misdemeanor charges;[59] allowing people to be booked and released with a citation and a court date;[60] ensuring court appearances by means of a court notification system; and

---

Fourteenth Amendment's Equal Protection Clause, it is clear that a bail system which allows only monetary bail and does not provide for any meaningful consideration of other possible alternatives for indigent pretrial detainee infringes on both equal protection and due process requirements."); *Carlisle v. Desoto Cty., Miss.*, 2010 WL 3894114, at *5 (N.D. Miss. Sept. 30, 2010) (holding that because a "compelling state interest" was required for pretrial detention, the plaintiff's rights were violated if he was jailed without a consideration of non-financial alternatives).

[56] Arpit Gupta et al., *The Heavy Costs of High Bail: Evidence from Judge Randomization*, 45 J. Legal Studies 471 (2018) ("We find no evidence that money bail increases the probability of appearance.").

[57] Paul Heaton et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711, 768 (2017) (concluding, after reviewing hundreds of thousands of cases, that detention for even brief periods because of inability to pay money bail led to higher rates of conviction, longer sentences, and a greater likelihood of commission of new crimes in the future); Arpit Gupta et al., *supra* n.56   ("Our results suggest that money bail has a negligible effect or, if anything, increases failures to appear."); Christopher T. Lowenkamp et al., *The Hidden Costs of Pretrial Detention* 4 (2013) ("The longer low-risk defendants are detained, the more likely they are to have new criminal activity pending trial.").

[58] Ex. 7 (Vera Report to Tulsa County Stakeholders) at 27-28, 39.

[59] State law permits law enforcement officers to issue citations in lieu of arrest for state misdemeanors. *See* Okla. Stat. Ann. tit. 22, § 209.

[60] Oklahoma law permits county officials to release the person "on his personal recognizance subject to such conditions as the court or magistrate may reasonably prescribe to assure his

expanding nonfinancial release options, including release into the community with limited intervention such as calls or text reminders of upcoming court dates for low-risk defendants, and oversight by Court Services for higher-risk defendants.

Other jurisdictions release arrestees with similar strategies for promoting court attendance and public safety, such as court reminders, transportation assistance, flexible court appearances including evening and weekend sessions, unsecured bonds, reporting obligations, personal sureties, alcohol monitors, or, in cases of extreme risk, electronic monitoring. Jurisdictions including Washington, D.C.,[61] New Jersey,[62] and Cook County, Illinois[63] have achieved high rates of court appearance, reductions in crime rates and new violent offenses, and reduced jail populations by reducing or entirely eliminating the use of secured monetary bonds and pretrial detention.

---

appearance when require." Okla. Stat. Ann. tit. 59, § 1334; see also Okla. Stat. Ann. tit. 22, § 1108.1.

[61] Washington D.C. Pretrial Services Agency, FY 2019 Release Rates for Pretrial Defendants within Washington, DC, available at https://www.psa.gov/sites/default/files/2019%20Release %20Rates%20_for%20DC%20Pretrial%20Defendants.pdf; Washington D.C. Pretrial Services Agency, FY 2021 Congressional Budget at 12, available at https://www.psa.gov/sites/default /files/FY2021%20PSA%20Congressional%20Budget%20Justification_0.pdf.

[62] New Jersey Judiciary, *2018 Report to the Governor and the Legislature* at 8, available at https://njcourts.gov/courts/assets/criminal/2018cjrannual.pdf?c=dSE; NJ Courts, Criminal Justice Reform Information Ctr., *Criminal Justice Reform Statistics: Jan. 1 – Jun. 31, 2019*, 6 (2009), https://njcourts.gov/courts/assets/criminal/cjrreport2018.pdf?cacheID=t9KI5Gk; Star-Ledger Editorial Board, *Has bail reform been a success? Check the crime numbers, then decide*, Star-Ledger (Dec. 5, 2018), https://www.nj.com/opinion/2018/12/has_bail_reform_been_a_success_ check_the_crime_num.html.

[63] *See* Order No. 18-8A of the Cook County Chief Judge, http://www.cookcountycourt.org/Manage/Division Orders/ViewDivisionOrder/tabid/298/ ArticleId/2562/GENERAL-ORDER-NO-18-8A-Procedures-for-Bail-Hearings-and-Pretrial-Release.aspx; Circuit Court of Cook County, *Bail Reform in Cook County: An Examination of General Order 18.8A and Bail in Felony Cases* (May 2019), available at http://www.cookcountycourt.org/Portals/0/Statistics/Bail%20 Reform/Bail%20Reform%20Report%20FINAL%20-%20%20Published%2005.9.19.pdf (showing that the jail population decreased from 7,443 in September 2017 to 5,799 in December 2018).

Tulsa County arrestees are entitled to a preliminary injunction against the Sheriff, prohibiting him from infringing on their rights to pretrial liberty and against wealth-based detention absent substantive findings of necessity.

**B. The Sheriff May Not Detain Pretrial Detainees Without Procedural Safeguards**

Class members are additionally, and separately, entitled to an injunction against the Sheriff to prohibit him from imprisoning them without "constitutionally sufficient" procedures to ensure that the government has an adequate substantive justification for infringing on their liberty and equal protection interests.[64] The necessary procedures are determined by application of *Matthews v. Eldridge*'s three-part balancing test among "the private interest" at issue, "the risk of an erroneous deprivation" absent the additional safeguard, and the state's interest in not providing it.[65] But the court need not start from first principles to determine the procedures necessary in this context; decades of case law make clear what is needed, but not provided in Tulsa County, before class members can be detained.

*On-the-Record Findings Confirming Either Ability to Pay, or the Need for Pre-Trial Detention by Clear and Convincing Evidence:* Because of the fundamental bodily liberty interest at stake, before the government may detain anyone pretrial, it must establish by "clear and convincing evidence" either a risk of flight or "an identified and articulable threat to an individual in the community" that "no conditions of release can reasonably assure" against.[66] The Supreme Court has consistently held that a standard "equal to or greater than 'clear and convincing'" evidence is required before a person can be taken into custody to avoid a risk of

---

[64] *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (procedural due process violated where "there exists a liberty . . . interest of which a person has been deprived," and "the procedures followed by the State were [not] constitutionally sufficient").

[65] *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976).

[66] *Salerno*, 481 U.S. at 750.

17

dangerousness.[67] Lower courts have followed suit, including specifically in the pretrial detention

context.[68] Because an order requiring an unattainable financial condition of release is a de facto

order for pretrial detention, the Court must likewise treat all monetary bail orders as detention

orders unless it establishes that the defendant has the ability to pay the financial condition and is

willfully refusing to.[69]

*Notice, Adversarial Hearing, and Findings on the Record within 48 Hours of Arrest*: Due

process requires that all required findings be made only after a hearing with the following six

elements: (1) notice of the critical issues to be decided; (2) disclosure of the evidence presented

by the government; (3) an "opportunity to be heard in person and to present witnesses and

documentary evidence; (4) "the right to confront and cross-examine adverse witnesses (unless

the hearing officer specifically finds good cause for not allowing confrontation)"; (5) a "neutral

and detached" factfinder; and (6) findings and reasons on the record of "the evidence relied

---

[67] *Addington v. Texas*, 441 U.S. 418 (1979); *see also See Foucha*, 504 U.S. at 82-83 (state could not confine a mentally ill person where it did not show dangerousness by clear and convincing evidence); *Santosky v. Kramer*, 455 U.S. 745, 756 (1982) ("This Court has mandated . . . 'clear and convincing evidence' . . . when the individual interests at stake . . . are both 'particularly important' and 'more substantial than mere loss of money."); *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 282–83 (1990) (clear and convincing evidence has been required in deportation proceedings, denaturalization proceedings, civil commitment proceedings, proceedings for the termination of parental rights, cases involving allegations of civil fraud, and ohter civil cases implicating important interests).

[68] *See, e.g.*, *Lopez-Valenzuela*, 770 F.3d at 784-85 (striking down a pretrial detention statute that did not require proof by clear and convincing evidence that detention was necessary); *In re Humphrey*, 19 Cal. App. 5th 1006, 1037 (Ct. App. 2018) (court may impose monetary bail condition "only upon a determination by clear and convincing evidence that no less restrictive alternative will satisfy that purpose"); *Singh v. Holder*, 638 F.3d 1196, 1203, 1204 (9th Cir. 2011) (in immigration context, clear and convincing evidence required for pretrial detention based on flight or dangerousness); *Lora v. Shanahan*, 804 F.3d 601 (2d Cir. 2015) (same), vacated and remanded on other grounds, 138 S. Ct. 1260 (2018); *Kleinbat v. United States*, 603 A.2d 861, 868 (D.C. 1992) ("clear and convincing" evidence required to detain someone pretrial based on flight risk); *see also* ABA Standard 10-5.8 ("clear and convincing" standard applies to bail decisions concerning flight and dangerousness).

[69] *See supra* Part I-A.

on."[70] These six elements constitute "the minimum requirements of due process" where arrestees' bodily liberty is at stake.[71] In *United States v. Salerno*, the Supreme Court upheld the federal Bail Reform Act only because the Act prohibited issuance of a detention order unless the arrestee had been provided "a full-blown adversary hearing," "findings of fact" by "clear and convincing evidence," and a "statement of reasons for a decision to detain."[72] The same elements are required here. These safeguards must be provided at the very latest within 48 hours.[73]

## II.   Class Members Will Suffer Irreparable Harm Without a Preliminary Injunction

Any deprivation of constitutional rights is an irreparable harm.[74] And an unconstitutional deprivation of liberty is especially harmful.[75] In addition, class members face extraordinary harms with every day of imprisonment, including long-term lost employment, income, and housing;[76] disrupted families and life-long trauma for adults and children[77]; and worse case

---

[70] *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973).

[71] *Morrissey v. Brewer*, 408 U.S. 471, 489 (1972); *see also Turner*, 564 U.S. at 447 (requiring "notice to the defendant that 'ability to pay' is a critical issue," the opportunity to be heard, and findings on the record; *see also, e.g.*, *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) ("Parties whose rights are to be affected are entitled to be heard."); *Concrete Pipe & Prods. of Cal.. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 617 (1993) ("[D]ue process requires a 'neutral and detached judge in the first instance.'" (quoting *Ward v. Village of Monroeville*, 409 U.S. 57, 61–62 (1972)); *Wolff v. McDonnell*, 418 U.S. 539, 564–65 (1974) (requiring a statement of reasons for revocation of good-time credits).

[72] *Salerno*, 481 U.S. at 750, 752.

[73] *ODonnell*, 892 F.3d at 161.

[74] *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opnion); *Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016).

[75] *United States v. Bogle*, 855 F.2d 707, 710–11 (11th Cir. 1988); *Wanatee v. Ault*, 120 F. Supp. 2d 784, 789 (N.D. Iowa 2000); *SEC v. Bankers Alliance Corp.*, No. 95-civ-0428, 1995 WL 317586, *3 (D.D.C. May 10, 1995); *Lake v. Speziale*, 580 F. Supp. 1318, 1335 (D. Conn. 1984); *Cobb v. Green*, 574 F. Supp. 256, 262 (W.D. Mich. 1983).

[76] Will Dobbie et al., *The Effects of Pre-Trial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges*, Am. Economic Rev., 23 (2018); Shima Baradaran Baughman, *Costs of Pretrial Detention*, Boston Univ. L. Rev., Vol.. 97:1 (2017), at 5.

[77] *E.g.*, Kimberly Howard et al., *Mother-Child Separation, Parenting, and Child Well-Being in Early Head Start Families*, Attach Hum Dev. 2011;13(1):5-26.

outcomes, including pressure to plead guilty.[78] Even these usual, devastating harms of imprisonment, however, pale in comparison to the new trauma of incarceration during the COVID-19 pandemic.

Class members are now facing imminent risk of illness and death because they are in jail. Social distancing measures necessary to avoid illness are impossible in a jail that has communal living, limited access to medical care, and restrictions on inmates' ability to care for their own hygiene. Epidemiologists and penological medical experts around the country warn that these conditions make the jail a "ticking time bomb" for uncontrollable viral spread.[79] Once COVID enters the jail, it will likely spread like wildfire, as it has in other jails around the country. Despite attempted quarantines, Cook County jail in Chicago went from two diagnoses to over a hundred, including a dozen employees, in one week; at Rikers Island, in New York City, the numbers jumped from two positive tests to 253 in twelve days.[80]

---

[78] Will Dobbie, et al., *supra* n.76 at 108; Emily Leslie & Nolan G. Pope, *The Unintended Impact of Pretrial Detention on Case Outcomes: Evidence from NYC Arraignments*, Journal of Law and Economics, Vol. 60, 543 (2017); Arpit Gupta, et al., *supra* n.56; Megan T Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes*, J. of L. Econ., and Organization, Vol. 34, Issue 4, 511–542 (Nov. 2018); Paul Heaton et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711, 711 (2017). *See also* Crim. J. Pol. Program, *Moving Beyond Money: A Primer on Bail Reform*, 7 (October 2016), cjpp.law.harvard.edu/assets/FINAL-Primer-on-Bail-Reform.pdf.

[79] Saint Louis University, "*Ticking Time Bomb": Prisons Unprepared For Flu Pandemic*, ScienceDaily (Sept. 15, 2006), https://www.sciencedaily.com/releases/2006/09/060915012301. htm; *see also* Anne C. Spaulding, *Coronavirus and the Correctional Facility*, https://www.ncchc. org/filebin/news/COVID_for_CF_Administrators_3.9.2020.pdf (epidemiologist explaining to national correctional staff leadership that jails cannot avoid conditions that cause outbreaks of communicable disease); Nicole Wetsman, *Prisons and jails are vulnerable to COVID-19 outbreaks*, The Verge (Mar. 7, 2020) https://www.theverge.com/2020/3/7/21167807/ coronavirus-prison-jail-health-outbreak-COVID-19-flu-soap (Tyler Winkelman, Hennepin Healthcare Research Institute in Minneapolis, compares jails to nursing homes and cruise ships);

[80] Christina Carrega, *Shampoo, watery soap to disinfect: Conditions on Rikers Island during COVID-19 unsafe, some inmate say*, ABC News (Mar. 29, 2020) https://abcnews.go.com/Health/ shampoo-watery-soap-disinfect-conditions-rikers-island-covid/story?id=69767859; Timothy Williams, et al., *"Jails Are Petri Dishes": Inmates Freed as the Virus Spreads Behind Bars*, The

Even without any heightened risk factors, inmates face a serious risk of becoming very ill or even dying. Approximately 20% of people infected with COVID-19 are expected to experience life-threatening complications, and between 1% and 3.4% die. Adults over the age of 60 and people who have serious chronic medical conditions like heart disease, diabetes, and lung disease are at greatest risk of death,[81] but enormous numbers of younger, healthy people are landing in intensive care units at terrifying rates, with life-threatening complications. As of March 26, nearly half of all patients admitted to an ICU in the United States were under 65 years old, and up to a fifth of 20 to 44 year olds diagnosed with the disease at that time had required hospitalization.[82] Tulsa's first COVID-19 death was that of a man in his 50s.[83]

Meanwhile, class members are entirely cut off from their families and support networks. On March 16, the Sheriff suspended all visitation to the Tulsa County Jail;[84] communication with people outside the jail is available only via costly video visitation, a luxury that will be unavailable to many class members, who are by and large detained because of their poverty. And given the Tulsa County District Court's emergency COVID-related measures, class members' periods of pretrial detention will be dramatically extended as court dockets are entirely

---

New York Times (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html?action=click&module=Top%20Stories&pgtype=Homepage

[81] *See* Ctrs. for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19): Protect Yourself*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

[82] See Ctrs. for Disease Control & Prevention, *Morbidity & Mortality Weekly Report: Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) – United States, Feb. 12-Mar. 16, 2020*,  https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm?s_cid= mm6912e2_w#T1_down.

[83]Sean Murphy, *Oklahoma Has 1st Coronavirus Death; Test Shortage Persists*, U.S. News, (Mar. 19, 2020) https://www.usnews.com/news/best-states/oklahoma/articles/2020-03-19/oklahoma-has-1st-coronavirus-death-test-shortage-persists

[84] Tulsa County Sheriff's Office, *Jail Information*, https://tcso.org/jail-information/.

suspended for weeks and months at a time.[85] Class members' extraordinary harms absent emergency relief are unimaginable.

### III.   The Risk to Class Members Absent a Preliminary Injunction Outweighs Any Risk to the Sheriff

Requiring process to ensure that the jail is not filled with people who do not need to be there does not pose any harm to the Sheriff. To the contrary, he will benefit from releasing class members whose detention cannot be justified. The jail will save the cost of unnecessarily feeding and housing class members and providing their medical care.[86] More importantly, reducing the jail population at this time will save the lives of both inmates and Sheriff's Office employees by decreasing the potential damage an outbreak of COVID-19 in the jail will cause. County defendants' counsel represents that the Sheriff has adopted measures aimed at controlling the virus's spread—segregating new persons booked into the jail in a "secure pod" for 14 days before introducing them into other areas of the jail, temperature scanning of persons entering the jail, and a negative airflow room in its medical unit for quarantining anyone who tests positive.[87] These measures are far from likely to keep the virus out or stop its spread once it arrives.

Dozens of people cycle in and out of the jail each day. Persons newly booked into the jail must pass through common spaces before they reach the segregated pod, touching common surfaces and interacting with jail employees. Staff pass in and out daily, and circulate among the population. Temperature scanning will prevent anyone symptomatic from entering the jail, but people infected with COVID-19 are contagious for days, or even weeks before showing

---

[85] *See* ECF No. 151-5 (Ok. Sup. Ct. 2d Emergency COVID-19 Order); Ex. 8 (Tulsa Cnty. Dist. Ct. Emergency COVID-19).

[86] *See Jones v. City of Clanton*, No. 15-CV-34, 2015 WL 5387219, at *3 (M.D. Ala. Sept. 14, 2015).

[87] ECF No. 151 (County Defs.' Mot. to Continue Hearing), ¶ 16.

symptoms.[88] People who appear healthy and are asymptomatic present one of the greatest risks for spreading the disease, even if they share a space with others for only a short period of time.[89] All it will take for an outbreak in the jail is a single infected, possibly asymptomatic inmate, arrestee, or officer. In guidance for law enforcement issued on March 30, Governor Kevin Stitt and Attorney General Mike Hunter warned that, because infected persons "may present no symptoms . . . decreasing jail populations generally" is "[t]he most obvious proactive step" to limit jail population exposure.[90] In particular, the Governor and Attorney General urge jail administrators to "[i]denitfy inmates for whom recognizance bond or bond reduction does not present unwarranted public safety or flight risk."[91] The National Commission on Correctional

---

[88] Researchers estimate that the median incubation period, during which a person shows no symptoms but is contagious, is five days. *See* Stephen A. Lauer, et al., *The Incubation Period of Coronavirus Disease 2019 (COVID-19) From Publicly Reported Confirmed* Case, Ann. Intern. Med. (Mar. 10, 2020), https://www.ncbi.nlm.nih.gov/pubmed/32150748. It is not unusual for people to be asymptomatic for two weeks before finally showing symptoms. *See Id.*. There have been observed incubation periods of up to four weeks. *See* Worldometer, *Coronavirus Incubation Period*, https://www. worldometers.info/coronavirus/ coronavirus-incubation-period/ (citing sources). One study of a cruise ship on which the infection spread estimates that nearly eighteen percent of infected people never showed symptoms. *See* Kenji Mizumoto, *Estimating the Asympomatic Proportion of 2019 Novel Coronavirus onboard the Princess Cruises Ship, 2020*, medRxiv (Feb. 20, 2020), https://www.medrxiv.org/content/10.1101/2020.02.20.20025866v2?__cf_chl_jschl_tk__=8ee058 ec979441202c9618dd33f0a2b7bb9947b6-1584457439-0-AXxVoCDfOKyjfC3D4BUMFaeZaDl EncKRSVCT9LOb_DKv-Q9J3Tclt4SPvEPzctRE-nWVtDj9LvAtdm_5bksrnTUGfDeLDXuL 259I_kC77QMi-BZzFBk9-qnTD2g1YHlVLJ7QscyPjmt-1LY

[89] Researchers studying the outbreak in China found that transmission happens through spread by asymptomatic people; contamination of objects touched by multiple people, which is unavoidable in jail; and virus aerosolization in confined spaces, as in jail. *See* Jing Cai, et al., *Indirect Virus Transmission in Cluster of COVID-19 Cases, Wenzhou, China, 2020*, 26 Emerging Infections Diseases 26 (June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0412_article.

[90] Ex. 9 (Gov. Still & AG Hunter Guidance for Limiting Covid-19 Exposure in Detention Facilities), at 1.

[91] *Id.* at 2.

Healthcare and other experts around the country, join the Governor and Attorney General in calling for states to "consider measures other than detention" in light of the COVID-19 threat.[92]

## IV.     Emergency Relief Is in the Public Interest

A vindication of constitutional rights is always in the public interest.[93] Even in ordinary times, continuing to keep arrestees in jail cells because they are poor has significant negative consequence for the public interest. It devastates peoples' lives, stabilities, incomes, families, and communities unnecessarily. Even just 72 hours in jail after an arrest leads to worse outcomes for all involved by increasing poverty, hurting an arrestee's family, and making it more likely that an arrestee will commit crimes in the future.[94]

Finally, ensuring that no one is unnecessarily detained with a pandemic descending on Tulsa is an essential public health measure, necessary for the wellbeing not only of inmates and staff, but the public in general. Increases in a county's jail incarceration rate are generally

---

[92] Anne Spaulding, *supra* n.79; Homer Venters, former chief medical officer on Rikers Island, a physician and an epidemiologist, warns: "From the standpoint of responding to this outbreak, one of the most important questions is: How can we have fewer people in these places--in jails and prisons?" *See* Jennifer Gonnerman, *How Prisons and Jails Can Respond to the Coronavirus*, The New Yorker (March 14, 2020), https://www.newyorker.com/news/q-and-a/how-prisons-and-jails-can-respond-to-the-coronavirus.

[93] *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 990).

[94] *See* United States Department of Justice, National Institute of Corrections, *Fundamentals of Bail*, at 28–29 (2014); *see also, e.g.*, Arnold Foundation, *The Hidden Costs of Pretrial Detention* (2013) at 3, *available at*: http://www.arnoldfoundation.org/sites/default/files/pdf/LJAF_Report_hidden-costs_FNL.pdf (studying 153,407 defendants and finding that "when held 2-3 days, low risk defendants are almost 40 percent more likely to commit new crimes before trial than equivalent defendants held no more than 24 hours"); Arnold Foundation, *Pretrial Criminal Justice Research Summary* (2013) at 5, *available at*: http://www.arnoldfoundation.org/sites/default/files /pdf/LJAF-Pretrial-CJ-Research-brief_FNL.pdf (finding that "low-risk defendants held 2–3 days were 17 percent more likely to commit another crime within two years" and that those detained "4–7 days yielded a 35 percent increase in re-offense rates.").

associated with significant increases in county rates of infectious diseases.[95] If the disease enters the jail, it will spread within its walls, and then back out to the community through staff and people released from custody, who come and go every day from the jail. It will threaten the lives of hundreds of inmates and staff, and spread out among their countless community contacts. An outbreak in the jail will cause hundreds of cases to occur rapidly at a single time, overwhelming the jail medical unit's resources and requiring at least 20% of individuals (those with serious or critical cases of COVID) to need treatment at a local hospital with ventilators and other advanced medical machinery. Such a spike is one of public health officials' greatest fears: rapid spikes in infection will leave Oklahoma, by some estimates, with anywhere between five and fourteen patients for every bed, putting not only COVID patients, but patients requiring care for all conditions, at risk of death.[96] Every person detained on unaffordable money bail represents a high risk of becoming an unnecessary vector for the COVID-19 virus when it inevitably penetrates the jail, and one more bed that is thus not available to another sick member of the Tulsa community. The relief that plaintiff requests—an injunction against detaining pretrial detainees on unaffordable bail, absent a showing that detention serves a significant government purpose—is urgently required by class members, all parties, and the general public.

## CONCLUSION

Emergency action is needed. Class members must not be held in the jail, endangering the lives of others and their own, if their detention cannot be constitutionally justified.

---

[95] Sandhya Kajeepeta et al., *County Jail Incarceration Rates and County Mortality Rates in the United States, 1987-2016*, AJPH (Jan. 2020), available at https://ajph.aphapublications.org/doi/10.2105/AJPH.2019.305413.

[96] James Fraser & Matt Wynn, *Coronavirus in Oklahoma: spike would leave hospitals without enough beds*, The Oklahoman (Mar. 13, 2020)*, https://oklahoman.com/article/5657388/coronavirus-in-oklahoma-spike-would-leave-hospitals-without-enough-beds

Dated: April 3, 2020

/s/ Hayley Horowitz

Hayley Horowitz
Kristina Saleh
STILL SHE RISES, TULSA
567 E. 36th Street North
Tulsa, OK 74106
hayleyh@stillsherises.org
918-392-0874

Charles Gerstein*
Ryan Downer*
Alexandria Twinem*
CIVIL RIGHTS CORPS
1601 Connecticut Avenue NW, Suite 800
Washington, DC 20009
charlie@civilrightscorps.org
ryan@civilrightscorps.org
alexandria@civilrightscorps.org
202-844-4975

*Attorneys for Plaintiffs*

*\*Admitted to practice pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction Against Defendant Tulsa County Sheriff was served on April 3, 2020 via the Northern District of Oklahoma CM-ECF system upon all counsel of record.

*/s/ Hayley Horowitz*