## United States District Court
### NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MICHAEL PARGA, RICHARD FELTZ, TARA O'DONLEY and CHRISTOPHER WOOD, on behalf of themselves and all others similarly situated, )<br><br>Plaintiffs, )<br>vs. )<br> )<br>BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF TULSA; VIC REGALADO, Tulsa County Sheriff, in his official capacity; TERRY H. BITTING, TAMMY BRUCE, MARTHA RUPP CARTER, STEPHEN R. CLARK, THERESA DREILING, OWEN EVENS, JAMES W. KEELEY, DEBORAH LUDI-LEITCH, J. ANTHONY MILLER, DAWN MOODY, MILLIE OTEY, KIRSTEN PACE, APRIL SEIBERT, CLIFFORD SMITH and SARAH SMITH, in their capacity as Tulsa County Special Judges; WILLIAM MUSSEMAN, in his capacity as Tulsa County District Court Judge, )<br><br>Defendants. ) | Case No. 18-cv-00298-CVE-JFJ |

**DEFENDANT TULSA COUNTY SHERIFF'S RESPONSE BRIEF TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AGAINST DEFENDANT TULSA COUNTY SHERIFF**

COMES NOW Vic Regalado, Tulsa County Sheriff, in his official capacity ("Defendant Sheriff"), and submits the following response brief to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction against Defendant Tulsa County Sheriff ("MPI"), Dkt. 158, 159, as specifically limited to this Court's Order directing the Defendant Sheriff to submit briefing "solely on the issue of whether there is a risk of imminent harm from COVID-19

at the Tulsa County Jail, and what procedures the Tulsa County Sheriff has implemented to mitigate such harm." Dkt. 161.

## I. INTRODUCTION

At this time, there are no suspected or confirmed COVID-19 cases in the David L. Moss Criminal Justice Center (also known as the "Tulsa County Jail" or "Jail"). *See* Cooper Affidavit, ¶ 5, Exhibit "J;" Parker Affidavit, ¶ 2, Exhibit "A;" and Brown Affidavit, ¶ 2, Exhibit "B."

Plaintiff Richard Feltz ("Plaintiff") tenders no credible evidence that there is "a risk of imminent harm from COVID-19 at the Tulsa County Jail," Dkt. 161, and his argument that in light of this novel coronavirus "the county jail is a catastrophe waiting to happen" is pure speculation. MPI, p. 1, Dkt. 158. Plaintiff is not even in the Jail. Plaintiff states in his brief that "[c]lass members are now facing imminent risk of illness and death because they are in jail," but he fails to reference supporting evidence that would turn his projection into fact. MPI, p. 20, Dkt. 158.

Plaintiff's MPI does not establish that COVID-19 cases have been confirmed in the Tulsa County Jail or that any of the putative class members is even suffering from symptoms of COVID-19. *See* MPI, Dkt. 158. Plaintiff is not entitled to impose a mandatory injunction on Defendant Sheriff based on a conjectural injury that neither he nor putative class members have suffered. The only COVID-19 related evidence attached to Plaintiff's MPI is: (a) Administrative Orders from Presiding Judge William LaFortune closing all judicial offices and courts except for emergency dockets (which emergency dockets include the daily bond docket); and (b), a "guidance for law enforcement issued on March 30, [by] Governor Kevin Stitt and Attorney

2

General Mike Hunter," entitled "Limiting COVID-19 Exposure in Detention Facilities: Best Practices." *See* Exhibits "8" and "9" to MPI, respectively, and MPI, p. 23, fn. 90.

None of Plaintiff's exhibits identify any risk of imminent harm from COVID-19 at the Tulsa County Jail. *Id*. Indeed, not even the Declaration by Dr. Chiao, submitted by way of supplement to the MPI five days later, makes anything other than prophetic projections undergirded by stereotypes, assumptions and conjectures about what could happen when if, and if and if. *See* Chiao Declaration, Dkt. 164. Dr. Chiao's Declaration is not based on personal knowledge about the Tulsa County Jail, but rather it adopts the words written by another as her own concerning different jails, prisons, "closed detention settings" and "congregate settings" in other places at other times. *See* Chiao Declaration, ¶¶ 8-12, Dkt. 164.

The COVID-19 emergency response plan currently being employed by the Tulsa County Sheriff's Office ("TCSO") in partnership with its medical provider, Turn Key Health Clinics, LLC ("Turn Key"), as well as the Tulsa City-County Health Department ("THD") and Tulsa Area Emergency Management Agency ("TAEMA"), renders Plaintiff's allegations of harm hypothetical, not imminent. *See* Parker Affidavit, ¶ 8, Exhibit "A;" COVID-19 Response Plan for the Tulsa County Jail, Exhibit "C."

## II.   COVID-19 RESPONSE PLAN THAT HAS BEEN IMPLEMENTED IN THE JAIL

Beginning in mid-February, 2020, in an effort to become familiar with the contours of an emergency plan that may be needed to respond to the novel coronavirus, Jail Administrator David Parker ("Parker") consulted the Oklahoma Department of Corrections' ("DOC") Pandemic Plan for H1N1, which Parker in his prior employment as DOC's Director of Division II took part in creating. *See* Parker Affidavit, ¶ 3, Exhibit "A." Defendant Sheriff and Parker

thereafter created a task force to develop a COVID-19 contingency plan should the coronavirus make its way to Oklahoma. *Id*., ¶ 4. As the World Health Organization ("WHO") and the Center for Disease Control ("CDC") began publishing information relevant to stopping the spread of COVID-19, the WHO's and CDC's guidelines were incorporated into TCSO's COVID-19 Response Plan. *Id*., ¶ 5. The THD was an integral partner which supplied TCSO with relevant and needed information concerning the necessary COVID-19 response in the Tulsa County Jail. *Id*., ¶ 6. Guidelines were shared, meetings held, experts consulted and a COVID-19 Emergency Response Plan was drafted, revised and is continually being updated to meet the needs of the fluid nature of this pandemic. *Id*., ¶ 7. Throughout this crisis, Undersheriff George Brown ("Brown") has attended morning video conferences regarding COVID-19 updates, hosted by TAEMA. Brown Affidavit, ¶ 8, Exhibit "B." These are aired on Brown's work computer every day Monday through Friday at 10:30am, and feature Dr. Bruce Dart, Executive Director of the THD. *Id*., ¶ 9. Brown communicates pertinent information learned during these daily COVID-19 updates to his TCSO Division Directors. *Id*., ¶ 10.

A copy of the COVID-19 Response Plan ("Plan") being employed at the Jail (last revised 4/6/2020) is submitted herewith as Exhibit "C."

### A.   Arrests, Bookings and Jail Population Reduction Strategies

Since the arrival of the COVID-19 crisis, bookings at the Tulsa County Jail are down by more than fifty percent. *See* Parker Affidavit, ¶ 9, Exhibit "A." Tulsa County Sheriff's Deputies have been instructed to follow the Governor's Best Practices for limiting COVID-19 exposure when encountering the public, which includes serving process, conducting traffic stops and making arrests. *See* Brown Affidavit, ¶ 3, Exhibit "B." Every Tulsa County Sheriff's Deputy is

provided hand sanitizer, gloves and a mask for his or her shift. *Id*. at ¶ 4. All Deputies have been advised to limit exposure in the field, wear protective masks and gloves when the situation warrants, make frequent use of hand washing and hand sanitizer and maintain social distancing. *Id*. at ¶ 5. All Deputies have also been advised that their patrol vehicles should be cleaned and disinfected twice every shift, and that they should disinfect their duty belt and gear after contact with an individual. *Id*. at ¶ 6. Deputies have been advised to mask any arrestees displaying symptoms consistent with COVID-19, to keep the windows open during transport and to arrange for assessment or transport by a trained Emergency Medical Service or Emergency Medical Technician if the arrestee needs medical attention. *Id*. at ¶ 7. *See also* March 9 TCSO-wide Memo from Trey O'Neal and its attachment entitled, "What Law Enforcement Personnel Need to Know about Coronavirus 2019 (COVID-19)," Exhibit "P."

The Tulsa County District Courts, Tulsa County District Attorney's Office, Tulsa County Public Defender's Office, TCSO and other local law enforcement officials are all working together to keep the Jail population at a minimum. *See* Samantha Vincent, ***Tulsa County Jail Occupancy Hits Record Low*** *as Judges, Attorneys, Police Adjust to Covid-19 Pandemic*, Tulsa World, March 28, 2020, https://www.tulsaworld.com/news/local/crime-and-courts/tulsa-county-jail-occupancy-hits-record-low-as-judges-attorneys-police-adjust-to-covid-19/article_9ba4c86d-0fdc-5223-983b-89fa572ad54f.html, Exhibit "L;" Affidavit of Steve Kunzweiler, Exhibit "K."[1]

---

[1] As noted in Mr. Kunzweiler's Affidavit, pretrial detainees appointed counsel from the Public Defender's Office are currently seeking reconsideration of their bonds before special judges based on COVID-19. *Id*., at ¶¶ 3-5. These same pretrial detainees are claimed to be class members in Plaintiff's MPI. *See* MPI, p. 4, fn. 12, Dkt. 158. However, Plaintiff has previously represented to this Court that "Plaintiffs do not seek relief beyond the point in time at which class members are given counsel and an opportunity to be heard on bail-reduction motions, a time that comes within days." Motion for Reconsideration, p. 8, Dkt. 42.

### B. Movement and Assessment of Inmates/Detainees

All inmates that are booked into the Tulsa County Jail are asked COVID-19 initial screening questions by a Turn Key medical professional. *See* Plan, p. 2, Exhibit "C;" COVID-19 Screening Questionnaire, Exhibit "D." The temperature of every inmate in the Jail is taken daily by medical staff. *Id*. p. 2. During intake and throughout incarceration, Exposure Risk Assessments are completed on any person who may have had person-to-person exposure transfer from the community (local or foreign), including documentation whether the person is symptomatic or asymptomatic. *Id*. CDC algorithms are used to determine exposure risk, and all potential exposure cases are reported to the THD for follow-up evaluations. *Id*. Protective masks were recently distributed to all inmates and detainees in the Jail; TCSO and Turn Key are developing a sterilization station to extend the effective lifespan of each mask. *See* April 8, 2020 Memorandums from Trey O'Neal and David Parker, Exhibit "E;" Cooper Affidavit, ¶ 10d, Exhibit "J." TCSO has 38,000 bars of soap on hand with 40,000 on order along with the material to produce 100 gallons of hand sanitizer once received. *See* Parker Affidavit, ¶ 13, Exhibit "A." On March 18, 2020 the DOC suspended receiving inmates from county jails. *See* March 17, 2020 Letter from DOC, Exhibit "F."

### C. Movement and Assessment of Employees and Visitors

As of March 16, 2020 all jail tours, program providers and visitation has been suspended at the Tulsa County Jail. *See* Plan, p. 3, Exhibit "C." The Tulsa County Jail continues to allow telephone calls and video visitation, provides free and confidential video visitation between attorney and client and allows each inmate/detainee one free video visitation each week. *Id. See also* Parker Affidavit, ¶ 12, Exhibit "A;" March 16, 2020 TCSO Facebook and Twitter social

media posts, Exhibit "M;" and March 18, 2020 emails to the Oklahoma and Tulsa County Bar Associations, Exhibit "N."

In addition to inmates, all employees at the Jail are also asked a series of COVID-19 screening questions and their temperature is taken daily. *See* Brown Affidavit, ¶ 12, Exhibit "B;" March 24, 2020 email from Brown and its attached Questionnaire, Exhibit "G." In fact, *anyone* entering the jail must first submit themselves to having their temperature taken. *See* Brown Affidavit, ¶ 13, Exhibit "B;" March 23, 2020 Memorandums from Trey O'Neal, Exhibit "H;" March 24, 2020 TCSO-wide Memo from David Parker, Exhibit "I;" and Cooper Affidavit, ¶ 10a, Exhibit "J." Anyone with a temperature of 100 degrees or above is refused entry to the Jail. *See* Brown Affidavit, ¶ 14, Exhibit "B;" Cooper Affidavit, ¶ 10a, Exhibit "J." Before returning to work at the Jail, employees who are sent home are required to be fever free for a minimum of 72 hours without the assistance of medication <u>and</u> at least seven days have passed since the onset of symptoms. *Id*.

**D.    Preventative Education of Staff and Inmates/Detainees**

The Jail's COVID-19 Response Plan implements a number of educational campaigns, pushes relevant COVID-19 information daily to staff and inmates, and emphasizes preventative measures to reduce the risk of coronavirus spread. *See* Plan, p. 1, Exhibit "C;" Brown Affidavit, ¶ 15, Exhibit "B." Such efforts are summarized in the following chart:

| Category | Item | Description |
|---|---|---|
| EDUCATION | STAFF EDUCATION: | Staff is continuously trained on adequate housekeeping protocols. This training goes over general facility sanitation, personal hygiene, and instructions for inmates in regards to facility and personal sanitation. Education about the COVID-19 will also be provided as details are available to all three squads via jail administration, jail command staff, or Turn Key. |
| EDUCATION | INFORMATION BULLETIN: | Emails are regularly sent out to staff as key updates are provided in regard to COVID-19. Updates could include new prevention measures, updates provided by the health authorities, changes to this COVID-19 Response Plan, etc. |
| EDUCATION | POSTERS: | Posters and signs are posted throughout the detention center encouraging staff, inmates, and visitors to wash their hands frequently and use general and personal sanitation etiquette while handling business in the facility. This also includes sanitation / precaution posters for the inmates working the Laundry Unit. (Poster Attachments A-H) |
| EDUCATION | INMATE INFORMATION: | Automatic messages will be displayed on inmate tablets and kiosks throughout all housing units giving reminders to wash hands, use social distancing, and to keep their living area cleaned. |
| PREVENTATIVE ACTION | HAND WASHING: | Staff, contract staff, and inmates are reminded on a regular basis on the importance of adequate hand washing. This is being accomplished through verbal recommendation and posted signs. |
| PREVENTATIVE ACTION | HAND SANITIZERS: | Staff is encouraged to use hand sanitizer frequently when they are unable to wash their hands; therefore, detention staff is authorized to bring personal hand sanitizer to work. A donation of alcohol-based hand sanitizer has been made by citizens for officer use. The Jail Services Unit will prepare and distribute hand sanitizer with instructions provided by the Tulsa Health Department from the World Health Organization. Hand sanitizer will be readily available for all inmates in the housing units at the officer's station upon delivery. |
| PREVENTATIVE ACTION | FACILITY CLEANERS: | Specialized germicidal disinfectant has been purchased for the jail. This is being used on a daily basis by detention personnel throughout the entire facility. Facility sprays are documented and kept on file. This is the responsibility of the Jail Services Unit. Facility grade disinfectant is provided for inmate use upon request in housing units. |
| EQUIPMENT / TOOLS | MASKS: | Masks have been purchased to be worn by medical staff, employees, and infected inmates in the event that a positive case of COVID-19 is detected within the detention center. These will be distributed when delivered. All inmates have been offered masks. |
| EQUIPMENT / TOOLS | GLOVES: | Gloves are worn by medical staff, employees, and inmate workers throughout the detention center to prevent contact with the virus. |
| EQUIPMENT / TOOLS | SAFETY GLASSES: | Safety glasses will be worn by medical staff and employees when applicable. |

Plan, p. 1, Exhibit "C." *See also* Examples of Educational and Preventative posters throughout the Jail, Exhibit "O;" and Tulsa County - COVID-19 Exposure Protocol, Exhibit "V." Disinfectant cleaning of equipment surfaces contacted by individuals outside the jail is a priority, and disinfectant cleaning within the jail takes place daily. *See* Plan, p. 1, Exhibit "C;" March 13, 2020 TCSO-wide Memo from Trey O'Neal, Exhibit "Q;" April 6, 2020 email from Trey O'Neal, Exhibit "R;" and April 8, 2020 Memorandums from David Parker, Exhibit "Y."

E. **Intake and Medical Strategies**

As of March 24, 2020 all new bookings are housed in two intake pods in the Jail for a minimum of fourteen days before they are allowed to be relocated to general population. *See* Plan, p. 4, Exhibit "C." These pods are locked down to prevent the potential spread of any virus. *Id*. Outside of the inmate's cell, movement is limited to a single arrestee. *Id*. One week later, TCSO doubled its number of intake pods to four, increasing social distance among the detainees. *Id*. All services, to include meals, court, recreation, medical, etc. take place in these housing units to minimize the risk of virus spread. *Id*.

Turn Key medical staff who will interact with suspected COVID-19 patients will be required to wear appropriate Personal Protective Equipment ("PPE"). *Id*., ¶ 10d. The TCSO has stocked PPE masks for inmates, and Turn Key has stocked and is continuing to acquire PPE to protect employees and inmates, and to effectively minimize the risk of transmission of COVID-19 within the Jail. *Id*. *See also* March 26, 2020 TCSO-wide Memo from David Parker, Exhibit "X."

The emergency COVID-19 Response Plan being implemented by TCSO and Turn Key also addresses the need for use of special negative pressure rooms should someone test positive:

> The inmate identified as possibly being exposed to a respiratory virus will be isolated in the medical unit in a negative air pressure cell for respiratory isolation. This isolation will occur for a fourteen-day period (or the current CDC guideline).
>
> After immediate isolation, the Tulsa Health Department will be notified so that they may evaluate the situation. The David L. Moss Criminal Justice Center has eight negative air pressure cells that are checked daily by medical staff when being used for respiratory isolation, weekly by medical staff when not being used for respiratory isolation, and monthly by the agency's Life Safety Officer.
>
> Should the need for a mass isolation become urgent, pods F17 and F19 have been identified and prepared to house recovering inmates. The jail's maintenance

> department has effectively reversed the air flow for these housing units to be negative pressure. This will significantly minimize the airflow to other areas of the facility. Should these housing units be needed for mass isolation, one pod will be used for symptomatic inmates and the other pod will be used for asymptomatic inmates, or one pod for males and the other for females.

Plan, p. 2, Exhibit "C." *See also* Parker Affidavit, ¶ 10, Exhibit "A;" Cooper Affidavit, ¶ 10b, Exhibit "J." Turn Key has nurse staffing that is physically present at the Jail 24 hours per day, seven days per week. *Id*., at ¶ 10c. Turn Key also employs a full time Medical Director physician at the Jail, as well as two full time mid-level providers. *Id*. There is always at least one provider on call. *Id*. TCSO and Turn Key are currently in discussions to enhance the use of telemedicine within the Jail to protect patients and health staff. *Id*. Contingency plans have also been developed for mass quarantine should it become necessary. *See* Turn Key Health Clinics Emergency Preparedness Plan for Mass Quarantine Requiring Respiratory Isolation, Exhibit "T;" Draft of Emergency Preparedness Plan for Mass Quarantine at the Tulsa County Jail, Exhibit "U;" and March 13, 2020 email from David Parker, Exhibit "W." As noted earlier, however, there are currently no suspected or confirmed COVID-19 cases in the Jail. *See* Cooper Affidavit, ¶ 5, Exhibit "J."

It is the opinion of Turn Key's Chief Medical Officer, Dr. William Cooper, that "there is no heightened risk of imminent harm from COVID-19 at the Tulsa County Jail compared to the risk to free civilians in communities outside of the Jail." Cooper Affidavit, ¶ 6, Exhibit "J." He also opines "that an inmate who shows symptoms of or is suspicious for COVID-19 inside of the Jail is likely to receive prompt treatment and testing, as well as direct observation of symptoms similar to what an individual would receive outside of the Jail." *Id*. at ¶ 7, Exhibit "J."

Should an inmate develop symptoms of COVID-19 and such symptoms showed a worsening in condition, Turn Key would quickly transfer that inmate to a Tulsa hospital for advanced treatment. *Id*. at ¶ 8. TCSO typically sends its jail population to OSU Medical Center for treatment, a facility which now specializes in COVID-19 issues. *See* April 9, 2020 power-point presentation by OSU Medicine to the Board of County Commissioners of the County of Tulsa, Exhibit "S."

### III.  ARGUMENT AND AUTHORITY

The current circumstances do not justify emergency injunctive relief. The speculative threat of COVID-19 in the Jail does not justify setting up the county sheriff by emergency order as a court of review on the judicial procedures employed by the state's judges. In cases throughout the country, detainees are seeking *release* based on the threat of COVID-19 – as opposed to requesting the sheriff sit in review of court proceedings to determine their constitutionality. These cases make clear that the mere threat of COVID-19 creates no presumption for wholesale emergency relief.

In *Carter v. Santa Fe Adult Detention Center,* 2020 WL 1550888, *1 (D. New Mexico April 1, 2020), the court recently considered a prisoner's request for a preliminary injunction based on concerns about the risk of COVID-19. The *Carter* court determined that courts are required to "make an individualized determination as to whether COVID-19 concerns present such extraordinary and compelling reasons *in a particular case* that temporary release or transfer is necessary." *Id.* at *2 (emphasis added) (citing to *United States v. Clark*, 2020 WL 1446895, *3 (D. Kan. March 25, 2020)). "General concerns about possible exposure to or spread of COVID-

19 do not meet the criteria for extraordinary and compelling reasons …" for release. *United States v. Eberhart*, 2020 WL 1450745, *2 (N.D. Cal. March 25, 2020).

Although *Eberhart* and *Clark* address requests for release based on COVID-19 concerns under federal statutes such as the Bail Reform Act, 18 U.S.C. § 3142(i), or under the standard for compassionate release set forth in 18 U.S.C. § 3582(c)(1)(A)(i), the requirements for "extraordinary" and "compelling" circumstances or reasons required by these statutes are comparable to the extraordinary nature of the remedy involved in a request for a preliminary injunction. *See Eberhart,* 2020 WL at *1-2; *Clark,* 2020 WL at *1. In making the required individualized determination regarding the issue of whether a particular inmate's situation presents such extraordinary and compelling reasons to merit release, federal courts have considered a number of factors including the spread of COVID-19 in the particular facility at issue and the particular risk factors of the individual requesting release. *See Clark,* 2020 WL at *1 (considering underlying health condition of individual requesting release, the number of cases of COVID-19 in the facility, and the efforts to mitigate the entrance and spread of the virus in the facility, request for release denied); *Carter,* 2020 WL at *2 (considering lack of COVID-19 cases in facility and personal health condition of person requesting release, motion for release denied); *United States v. Dungee,* 2020 WL 1666470, *2, (W.D. Va. April 7, 2020) (considering only one inmate in the facility possibly tested positive for COVID-19 and was transported to the hospital the same day, considering no evidence presented indicating person requesting release had any specific health risks, request for release denied); *United States v. Zywotko,* 2020 WL 1492900, *2 (M.D. Fla. March 27, 2020) (considering facility's plan to mitigate effects of COVID-19 and prevent its entrance into and spread within the facility, denying request for release); *United*

*States v. Morris E. Zuckerman,* 2020 WL 1659889, *4-5 (S.D.N.Y. April 3, 2020) (considering Zuckerman was 75 years of age, suffered underlying health conditions, and his doctor opined that he was in a high risk category if infected with COVID-19, the court found Zuckerman met the "extraordinary and compelling reason" standard for grant of a "compassionate release"); *United States v. John E. Clark,* 2020 WL 1557397, *3, 5 (M.D. La. April 1, 2020) (considering facility's plan for mitigating effects of COVID-19, lack of evidence of serious medical condition in person requesting release, the court found no "extraordinary and compelling reasons" for relief and the request for release was denied).

Plaintiff has raised only general speculative concerns about the potential effects of COVID-19 within the Tulsa County Jail. Such "[g]eneral concerns about possible exposure to or spread of COID-19 do not meet the criteria for extraordinary and compelling reasons …" *Eberhart*, 2020 WL at *2.

There are numerous objections to Plaintiff's MPI exhibits, such as Exhibits 1-5 addressing bond hearings held prior to the August 22, 2019 implementation of new Criminal Rule 2 (*see* Stuart Southerland email, Exhibit "Z" regarding Horowitz Declaration), as well as to his misstatements of fact, misleading hyperbole and gross misrepresentations of the applicable law. However, this Response Brief is limited per the Court's Order (Dkt. 161) to whether there is a risk of imminent harm from COVID-19 at the Tulsa County Jail, and what procedures the Tulsa County Sheriff has implemented to mitigate such harm. Defendant Sheriff reserves the right to address further issues raised by the MPI and its exhibits as may be permitted.

WHEREFORE, Defendant Sheriff respectfully requests an Order of this Court denying Plaintiff's request for preliminary injunctive relief.

Respectfully submitted,

s/ *Douglas A. Wilson*
Douglas A. Wilson, OBA No. 13128
James R. Rea, OBA No. 30801
Assistant District Attorneys
Tulsa County District Attorney's Office
500 S. Denver Ave., Suite 827
Tulsa, OK 74103
(918) 596-8795
(918) 596-4845
douglas.wilson@tulsacounty.org
jrea@tulsacounty.org

ATTORNEYS FOR VIC REGALADO,
TULSA COUNTY SHERIFF,
IN HIS OFFICIAL CAPACITY

## CERTIFICATE OF MAILING & ELECTRONIC NOTICE

I hereby certify that on April 9, 2020, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

| | |
|---|---|
| Alexander Karakatsanis | Kristina Michelle Saleh |
| Charles Lewis Gerstein | Laura Gaztambide Arandes |
| Devan A. Pederson | Ryan Downer |
| Erin Morgan Moore | Stefanie Erin Lawson |
| Hayley Elizabeth Horowitz | |

s/ *Douglas A. Wilson*
Douglas A. Wilson

14