## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| RICHARD FELTZ,[1] on behalf of himself and all others similarly situated,[2]       ) ) ) | |
| Plaintiff,   ) ) | |
| v.   ) ) | Case No. 18-CV-0298-CVE-JFJ |
| BOARD OF COUNTY COMMISSIONERS OF ) THE COUNTY OF TULSA; VIC REGALADO, ) Tulsa County Sheriff, in his official capacity; ) TERRY H. BITTING, TAMMY BRUCE, ) MARTHA RUPP CARTER, STEPHEN R. ) CLARK, THERESA DREILING, OWEN ) EVENS, JAMES W. KEELEY, DEBORAH ) LUDI LEITCH, J. ANTHONY MILLER, ) DAWN MOODY, MILLIE OTEY, KIRSTEN ) PACE, APRIL SEIBERT, CLIFFORD SMITH, ) AND SARAH SMITH, in their capacities as ) Tulsa County Special Judges; AND WILLIAM ) LAFORTUNE, in his capacity as Tulsa County ) District Court Judge,[3] ) ) Defendants.   ) | |

---

[1]    When the first amended complaint was filed, there were four named plaintiffs. See Dkt. # 32. In an opinion and order dated April 24, 2020, the Court terminated the three named plaintiffs other than Feltz because one had died, and two were no longer represented by counsel.

[2]    Plaintiff filed his motions on behalf of all putative class members. Dkt. # 158, at n.1. The motion for class certification (Dkt. # 3) is pending. However, the Court need not certify the class at this point to resolve the present motions. See Gooch v. Life Investors Ins. Co. of Am., 672 F.3d 402, 433 (6th Cir. 2012) ("[T]here is nothing improper about a preliminary injunction preceding a ruling on class certification."); Kansas Health Care Ass'n, Inc. v. Kansas Dept. of Social and Rehabilitation Svs., 31 F.3d 1536, 1548 (10th Cir. 1994) ("We therefore affirm the district court's conclusion that class certification was unnecessary in this case [in which a preliminary injunction was granted].").

[3]    At the time of the amended complaint (Dkt. # 32), Judge Musseman was the presiding judge of Tulsa County District Court. However, Judge LaFortune became presiding judge on January 1, 2020, and was automatically substituted for Judge Musseman pursuant to Federal Rule of Civil Procedure 25(d). Neither party objected to this substitution, and the Court so ordered.

## OPINION AND ORDER

The issue presented in plaintiff's motions for preliminary injunction and temporary restraining order (Dkt. ## 158, 159) is whether indigent arrestees who are unable to make bail should be released from jail, particularly now during the new coronavirus (COVID-19) pandemic because of risk of exposure.   Courts around the country have been wrestling with this issue and, unfortunately, the Tenth Circuit has yet to address it.   It is against this backdrop that the Court analyzes the facts and the preliminary injunctive relief standard to come to a fair result pending a trial on the merits.

In many jails, COVID-19 has spread rapidly.  In Tulsa, however, there are no confirmed cases of the COVID-19 among inmates at the jail.  There have been significant changes in bail processes and at the jail since this lawsuit was filed.  A new local criminal rule has been adopted, which defendants allege fixes any alleged constitutional problems with the bail system.  The Sheriff has implemented a plan to combat COVID-19, which substantially follows national guidance.  The parties dispute whether these new processes are implemented as they are written, and whether they foreclose constitutional scrutiny.  Discovery is ongoing, and a motion to dismiss for lack of subject matter jurisdiction (Dkt. # 157) remains outstanding.

In light of the progress made in the bail system and the parties involved, namely state and local policymakers, it seems inappropriate for a federal court to interfere with state and local policy at this time.   Moreover, the relief plaintiff seeks—a preliminary injunction against the Sheriff—would do nothing to rectify the bail system; that is the province of the Tulsa County District

Court.[4]  Thus, the Court will confine its analysis at this juncture to the COVID-19 pandemic, and defers more in-depth consideration of the constitutional challenges to the bail system until a more robust record is developed in discovery.

## I.  Factual Background

The factual record and legal arguments for these motions for preliminary injunctive relief consist of the motions of plaintiff, briefs of the parties, including exhibits attached thereto in the form of affidavits/declarations and other documentary evidence, supplements to the motions, and separately filed declarations (Dkt. ## 158-159, 164, 166-168, 171, 175-181, 186-187, 190).  The Court set this matter for oral argument (see Dkt. # 182), and heard oral argument on May 11, 2020.

Although the Court is not granting a preliminary injunction for the reasons stated below, the Court hereby enters this opinion and order as its findings of fact and conclusions of law as to risk of COVID-19 only.  See Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234, 1245 (10th Cir. 2001) ("Under Rule 52(a), a district court is required to make findings of fact and conclusions of law at the time it enters a preliminary injunction."); Fed. R. Civ. P. 52(a) ("In granting or refusing an interlocutory injunction, the court must similarly state the findings and conclusions that support its action.").

---

[4]  Plaintiff argues that the Sheriff can be enjoined from detaining arrestees who cannot afford bail, because he enforces the policy of the Tulsa County District Court.  Dkt. # 187, at 6-19. While this may be true, the Sheriff can still be held criminally liable for releasing detainees without a state court order, which tips the balance of equities in the Sheriff's favor.  See III.A infra.  Further, this opinion and order addresses only the risk of COVID-19 in the jail. Therefore, it is unnecessary at this point for the Court to address plaintiff's argument that the Sheriff is a properly named defendant.

**A. Plaintiff's Legal Challenge to the Bail System**

Persons arrested in Tulsa County on state misdemeanor or felony charges are usually brought to the David L. Moss Criminal Justice Center (the jail). After intake, they are assigned a money bail amount, primarily on an offense-based, secured money bail schedule promulgated by the Tulsa County District Court. See Dkt. # 158-10. For the minority of individuals arrested on warrants, the Sheriff uses money bail amounts assigned by the judges who approved the warrants. Those who cannot make bail, because they are unable to afford it, wait in the jail. See Dkt. ## 158-11; 158-12. They first wait for representation from a public defender. They then wait for opportunities to seek release on personal bond with no up-front payment. In this putative class action lawsuit, plaintiff alleges that putative class members are in jail solely because they are unable to pay bail, in violation of the Equal Protection Clause.[5] Plaintiff also alleges that, for those who are afforded a hearing, the hearing is not due process compliant. These are the alleged circumstances now. At the time of the amended complaint, however, detainees were allegedly held without bail hearings for six or more days. See Dkt. ## 158-2; 158-4. Also, in cases where bond was reduced from the predetermined amount, but remained unaffordable, the court would record the reduced bond amount without any reference to evidence of dangerousness or risk of flight, or analysis of whether continued detention was necessary. See Dkt. # 158-5. Since the lawsuit was filed, administrative orders were implemented, and then Local Criminal Rule 2 was adopted in August 2019, to ensure that a hearing is scheduled within 48 hours and that factors other than inability to afford bail are considered. Plaintiff argues that Local Criminal Rule 2 is unconstitutional both on its face and as applied. He

---

[5]     Plaintiff alleges that the majority of detainees at the jail are putative class members. See Dkt. # 158, at 10 (citing Dkt. # 158-6).

argues that it is facially unconstitutional because it is allegedly wealth-based.  He argues that it is unconstitutional as applied because findings related to consideration of factors other than wealth are allegedly not made on the record and some detainees are not afforded a hearing.

Since this lawsuit was filed and Local Criminal Rule 2 was adopted, "our nation [has faced] a public health emergency caused by the exponential spread of COVID-19 . . . ." In re Abbott, 954 F.3d 772, 779 (5th Cir. 2020).  On March 13, 2020, the President of the United States declared a national state of emergency.  Id. (citing Proc. No. 9994, 85 Fed. Reg. 15,337, 2020 WL 1272563 (Mar. 13, 2020)).  In Tulsa County alone, as of May 10, 2020, there have been at least 695 confirmed positive cases of COVID-19, and at least 36 people have died.  Tulsa World, May 11, 2020, at A1. Local courts were closed, with limited videoconference hearings.  See Dkt. # 158-8.  In addition, the jail is closed to visitors, including attorneys.  However, detainees are able to consult with their attorneys over the phone or through videoconferencing.

The jail holds over 1,000 detainees, and plaintiff argues that "conditions [in light of COVID-19] are terrifying."  Dkt. # 168, at 2.  There are no confirmed cases of COVID-19 at the jail, other than one clerk employee who had limited access to detainees.  Local authorities have worked together to reduce the jail's population by over 20%, and bookings are down by more than 50%.  See Dkt. # 166-1, at 2.[6]  In addition, defendants point out that the Sheriff has implemented a policy to combat COVID-19, which substantially follows the Centers for Disease Control and Prevention (CDC) guidelines for jails and prisons.  However, plaintiff argues that the policy is insufficient because social distancing at the jail is nearly impossible, and when intake detainees are admitted,

---

[6]     Plaintiff attached a guidance for law enforcement issued on March 30.  Dkt. # 158-9.  This document recommends that consideration be given for release of low-level offenders.  Id. at 2.  It appears that this guidance was followed.

they are put in "solitary confinement" (quarantine), which allegedly has negative effects on their mental and physical well being.

After the outbreak of COVID-19 in the general public, plaintiff filed these motions for preliminary injunctive relief (Dkt. ## 158, 159), asking the Court to release putative class members from jail in light of COVID-19. Plaintiff asks for injunctive relief against the Sheriff only. "These motions . . . are not directly about prison conditions or whether public health is best served by releasing which arrestees. They are instead about the process and timing of individualized hearings to determine whether a particular pretrial felony [or misdemeanor] arrestee can be dismissed on a personal bond." Russell v. Harris Cty., Texas, 2020 WL 1866835, at *1 (S.D. Tex. April 14, 2020). All parties agree that the jail's population must be reduced, but they disagree on the best way to accomplish this task. "A federal district court asked to wade into polic[ies of] . . . State and County elected officials is in risky territory." Id. at *2; see also Rizzo v. Goode, 423 U.S. 362, 378 (1976) ("Where, as here, the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law."); R.R. Comm'n of Tex. v. Pullman Co., 312 U.S. 496, 500 (1941) ("Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies."). "And when, as here, these disagreements appear to have been somewhat resolved, at least to the extent necessary to achieve a workable, voluntary process for the safe release of appropriate pretrial, not convicted, arrestees within the present pandemic constraints, that is a powerful reason for a federal court to decline to intervene through the blunt instrument of a [preliminary injunction]." Russell, 2020 WL 1866835, at *2.

i.  Plaintiff's Claims Prior to the Enactment of Local Criminal Rule 2

The original named plaintiffs were pretrial detainees in the custody of the jail at the time this lawsuit was filed on June 6, 2018.  Dkt. # 2.  However, shortly after the lawsuit was filed, named plaintiffs were released upon various terms awaiting trial in their respective criminal proceedings. Feltz, the remaining named plaintiff, was released from detention on June 8, 2018, after posting bond via a private surety, and he went to Florida for 90 days to obtain treatment.  However, he filed this action on behalf of similarly situated individuals who have allegedly not received due process compliant bail hearings and are allegedly detained in violation of the Equal Protection Clause.

In his amended complaint (Dkt. # 32), plaintiff challenged the pretrial detention process in place at the time of his arrest in Tulsa County.  Plaintiff alleged that he and others similarly situated were indigent and were or are unable to post or pay a money bond after arrest for felony and misdemeanor charges, did not have access to counsel by or before their first court appearance, and were therefore detained without counsel or proper process.  Id.

Plaintiff originally sought prospective injunctive relief against all defendants.  Specifically, plaintiff sought "[a] declaration and permanent injunction that the [d]efendants violate [p]laintiffs' and class members' right to procedural due process under the Fourteenth Amendment by depriving people who are arrested of speedy, individualized release hearings with notice, counsel, the opportunity to be heard and to confront evidence, and findings on the record that the government met its burden to demonstrate by clear and convincing evidence that no alternative condition or combination of conditions would be sufficient to serve its compelling interests."  Id. at 33.  Plaintiff also sought declaratory relief against all defendants, generally requesting an order declaring that

plaintiff's and putative class members' Fourteenth Amendment rights are violated through the bail procedure. Id.

Plaintiff alleges that defendants violate: his equal protection and due process rights by jailing putative class members because they cannot afford a monetary payment (count one); his right to pretrial liberty by jailing putative class members without procedural due process (count two); and his right to counsel by not providing putative class members with counsel adequate to challenge their wealth-based pretrial detention (count three). Based on a prior order of this Court (Dkt. # 48), count one remains pending only against Judge Musseman [now Judge LaFortune], the Sheriff, and the Board of County Commissioners of the County of Tulsa; count two remains pending against all defendants; and count three has been dismissed. Injunctive relief remains as an available remedy against Judge Musseman [now Judge LaFortune] in his role as presiding judge. Declaratory relief is the only requested remedy against the special judges.

ii.  Local Criminal Rule 2

Prior to commencement of this suit, defendants allege, the bail process then in effect was already subject to discussions of modification with community stakeholders, including representatives from the district attorney's and public defender's offices and non-profit justice reform groups. These community stakeholders and Judge Musseman were allegedly attempting to create a process that met the concerns of the community stakeholders. Several months after the filing of this lawsuit, a new process was implemented in Tulsa County through Administrative Orders 2018-9 and 2018-10. After the administrative orders were implemented and utilized for a period of time, the administrative orders were repealed after a majority of the district judges and associate judge, pursuant to Local General Rule 17 of the Tulsa County Local Rules, approved and adopted

Local Criminal Rule 2 on August 22, 2019.  Local Criminal Rule 2 expands upon the administrative orders and states:

> Per the authority vested upon the District Court of Tulsa County, State of Oklahoma; and in accordance with the jurisdiction granted by the Oklahoma Legislature over certain misdemeanor and felony criminal matters by [OKLA. STAT. tit. 22, § 1105]; in accordance with the applicable Oklahoma District Court Rules regarding criminal procedure; and all other applicable rules and/or policies adopted by the District Court of Tulsa County, State of Oklahoma, established by [OKLA. STAT. tit. 20, § 23], the Court hereby issues the following Rule regarding a pre-established schedule for bail pursuant to [OKLA. STAT. tit. 22, § 1105.2] and for the initial appearance for persons arrested for certain misdemeanor and felony statutory criminal charges.

**I. Rights of bail for persons accused of statutory criminal offenses.**

The United States Supreme Court has established the accused is not entitled to bail as a constitutional right.  See United States v. Salerno, 481 US 739, 754 (1987) (citing the original source for Eighth Amendment in English Bill of Rights, the majority finds the very language of the Amendment "fails to say all arrests must be bailable").  The accused is protected by both Article II, Sections 8 & 9 of the Constitution of The State of Oklahoma (1988 and 1907) with regard to excessive bail, and the Eighth Amendment, as applied to the States by virtue of the Fourteenth Amendment of the United States Constitution.

The foremost consideration when fixing bail is the probability that the accused, if free, will appear at trial, and the conditions of release are within the sole discretion of the trial court and will not be overturned absent a clear abuse of discretion. Bowman v. State, 585 P.2d 1373 (Okla. Crim. App. 1978), cert. denied 440 U.S. 920 (1979).  Some of the other factors considered when establishing bail include the seriousness of the crime charged against the defendant, his or her reputation and his or her financial condition.  See Brill v. Gurich, 965 P.2d 404 (Okla. Crim. App. 1998); Rule CR 10.5 of the Local Rules of Tulsa County District Court (2003); Rule1.14, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2003).

In accordance with [OKLA. STAT. tit. 22, § 1101], the trial court may only deny bail upon the appropriate findings.  See Brill, 965 P.2d at 404 and Art. II, Sec. 8 of the Oklahoma Constitution.  The Oklahoma Court of Criminal Appeals has noted that "[b]ail is not to be deemed excessive simply because the particular person charged cannot give the bail required."  Ex Parte McClellan, 97 P. 1019, 1020 (Okla. Crim. App. 1908).

Pursuant to [OKLA. STAT. tit. 22, §§ 1105 and 1105.2] and Rule 1 of the Local Rules of the Tulsa County District Court, the District Court of Tulsa County, State of Oklahoma, for certain offenses hereby adopts and affirms the written and established bail schedule found in Appendix A to these Rules.  The provisions of said Appendix are hereby incorporated by reference to this Rule as if fully set forth herein.

Any party, defendant, accused, or other person required or permitted by law to give or post bail as surety or security in a criminal matter may discharge this requirement by cash, surety, property, or personal recognizance depending upon the conditions of release set forth in the bail schedule.

The purpose of the bail schedule is to permit the posting of bail without a delay associated with the "First Appearance" within 48 hours of being confined to the [jail], as mandated by [OKLA. STAT. tit. 20, § 55].  It is the opinion of the Court that the employ of such a schedule, as authorized by state law, "provides speedy and convenient release for those who have no difficulty in meeting its requirements[.]" Pugh v. Rainwater, 572 F.2d 1053, 1057 (5th Cir. 1978).

In particular, this schedule, authorized by [OKLA. STAT. tit. 22, § 1105], shall apply to certain arrests without warrants as permitted by [OKLA. STAT. tit. 22, § 196], or other applicable code.  For offenses not listed on the schedule, conditions of release may only be determined after the individualized hearing described below.

**II. Scheduling of "First Appearance" for individuals not otherwise capable of posting bail pursuant to the schedule established in accordance with [OKLA. STAT. tit. 22, § 1105].**

For those individuals who do not obtain release pursuant to the pre-set bail schedule as outlined above, within forty-eight (48) hours from their arrest, they shall then be brought before the Court for a "first appearance" in accordance with [OKLA. STAT. tit. 22, § 55].  In addition to those obligations established by this Rule, the accused shall be represented by court appointed counsel, if he or she does not have retained counsel for this hearing, for the limited purpose of determining the appropriate conditions of release.  At this time the accused will be given the opportunity to object to the bail amount/conditions of release set for him or her.

The staff of the [jail] shall inform the Tulsa County Court staff of any such accused in a timely fashion and shall additionally facilitate his/her appearance via video transmission or teleconference at a time to be set by the Court.

To the extent an accused is claiming to be indigent and not just unable to meet the conditions of release pursuant to the pre-set bail schedule, the Court in exercising its discretion in setting the conditions of release as allowed by law may consider various

factors, including but not limited to the seriousness of the charge and criminal and appearance history.

To the extent an accused is claiming to be indigent and the charge is not on the pre-set bail schedule, the Court in exercising its discretion in setting the condition of release as allowed by law may consider various factors including but not limited to the seriousness of the charge and criminal and appearance history.

Dkt. # 157-4.

### iii.  Conflicting Accounts of the Implementation of Local Criminal Rule 2

Plaintiff's counsel, Hayley Horowitz, submitted a declaration on April 3, 2020. Dkt. # 158-3. She states that she has periodically attended the bond docket proceedings, approximately a dozen times, and, therefore, has observed over 100 cases. Id. at 2.  This is her account:

- She states that the jail proceedings are conducted via videoconference at the jail. Id. at 2.  "The judge reads the charges of arrest based on the police report or warrant affidavit.  Defendants are represented by counsel for purposes of the hearing. Counsel is permitted to present arguments for reduced bond or PR [personal recognizance] release."  Id. at 1-2.  "An assistant district attorney sometimes, but rarely attends to present argument."  Id. at 3.

- She states that, "[i]f the defendant's arguments or representations conflict with information provided by other sources, such as the police report or criminal history information, the judge routinely accepts the latter as true without providing an evidentiary basis."  Id.; see also Dkt. # 158-1.

- She states that "[t]he bond docket judge routinely imposes monetary conditions of release without determining or articulating whether the condition will result in the person's detention and, if so[,] without making evidence-based findings that the

person represents a risk of flight or dangerousness that can be addressed only by imprisonment.  Indeed, the Court routinely asks defendants how much they can afford, and then imposes bail amounts greater than the amount stated, without finding that detention is necessary."  Dkt. # 158-3, at 3.

- She states that the court will, in many cases, impose monetary bail, sometimes in an amount people had already declared themselves unable to afford, after explicitly or implicitly acknowledging that they likely posed little risk to safety or of flight.  Id.

- She states that, sometimes, the court does implement alternative conditions to serve the purposes of bail, but also maintains monetary bail conditions that prevent release.  Id. at 4.

- She provided the Court with non-public dockets, including bond docket proceedings for people arrested without a warrant.  Id.  She states that the court consistently assigns a monetary bond condition without recording any findings concerning ability to pay or need for detention.  Id.  She states that the court's written record rarely, if ever, reflects evidence of ability to pay, dangerousness, or risk of flight, or analyze[s] whether detention is necessary.  Id. at 5.

Tulsa County Special Judge David Guten also submitted a declaration about the bail proceedings.  Dkt. # 167-4.  His account differs from Horowitz's account:

- The daily bond dockets are still occurring despite the closure of the courthouse.  Id. at 1.

- "No person currently being held in pretrial detention is being held 'because they are poor.'  The rationale for denial of a PR bond and/or imposition of any condition of

12

release is announced from the bench in open court for the benefit of all participants." Id.

- Conditions of release are set at the time of an arrestee's appearance on the bond docket based on all relevant factors. Id.

- "As an additional post-bond-docket safeguard in light of [COVID-19], the public defender's office is actively monitoring the jail population and—if they have any concerns—requesting bond modification via email. Attorneys from Still She Rises [plaintiff's counsel] are also seeking bond modifications via email in an effort to expedite the process. . . The Court is considering each of those informal requests and granting modification where appropriate.. The persons considered for modification informally are not reflected on the daily docket sheets. This informal process does not take the place of or prevent any arrestee from filing a formal bond-modification motion." Id. at 1-2.

In addition, defendants submitted an affidavit of the District Attorney for Tulsa County, Stephen Kunzweiler. Dkt. # 167-5. His account also differs from Horowitz's account. He states that COVID-19, as well as "all individual factors surrounding a suspect's case and circumstances, [are] currently being considered when assessing bond." Id. at 2. Defendants also submitted multiple docket examples, one of which states the reasons for detention. Dkt. # 175-2, at 17.

## B. Current Circumstances at the Jail Since COVID-19

### i. The CDC's Guidance for Jails

The CDC has issued an interim guidance for management of COVID-19 in correctional and detention facilities (the guidance). Dkt. # 171-1. According to the guidance, "[c]orrectional and

13

detention facilities can prevent introduction of COVID-19 from the community and reduce transmission if it is already inside by reinforcing good hygiene practices among incarcerated/detained persons, staff, and visitors (including increasing access to soap and paper towels), intensifying cleaning/disinfection practices, and implementing social distancing strategies." Id. at 8.  The guidance states that it "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." Id. at 1 (emphasis omitted). The guidance further states, "[i]f possible, consider quarantining all new intakes for 14 days before they enter the facility's general population." Id. at 14.  The guidance contains a recommended verbal screening:

- Today or in the past 24 hours, have you had any of the following symptoms?
  - Fever, felt feverish, or had chills?
  - Cough?
  - Difficulty breathing?
- In the past 14 days, have you had contact with a person known to be infected with the novel [COVID-19]?

Id. at 26 (emphasis omitted).  In addition, the CDC recommends:

- Perform pre-intake screening and temperature checks for all new entrants.  Screening should take place in the sallyport, before beginning the intake process, . . .
  - If an individual has symptoms of COVID-19 (fever, cough, shortness of breath):
    - Require the individual to wear a face mask.
    - Ensure that staff who have direct contact with the symptomatic individual wear recommended PPE [personal protective equipment].
    - Place the individual under medical isolation (ideally in a room near the screening location, rather than transporting the ill individual through the facility), and refer to healthcare staff for further evaluation. . . .
    - Facilities with onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective medical isolation and necessary medical care.

14

Id. at 10 (emphasis omitted).  The CDC recommends that, if an inmate tests positive for COVID-19, a plan should be in place to transfer that individual to a local hospital.  Id. at 23.  The CDC recommends " intensifying cleaning and disinfection of the facility, screening (new intakes, visitors, and staff), continued communication with incarcerated/detained persons and staff, and social distancing measures (increasing distance between individuals)."  Id. at 5.  The CDC also recommends implementing social distancing strategies.  Id. at 8.  In sum, the guidance does not recommend that inmates be released from jail; rather, it provides a comprehensive strategy for combating COVID-19 in jails.

ii.  The Jail's Procedures for Preventing COVID-19 Spread

According to the affidavit of jail administrator David Parker dated April 9, 2020, beginning in mid-February 2020, he consulted  the Oklahoma Department of Corrections' (DOC) Pandemic Plan for H1N1.  See Dkt. # 166-1, at 1.  Sheriff Regalado and Parker than created a task force to develop a COVID-19 contingency plan should the virus make its way to Oklahoma.  Id.  Parker incorporated the World Health Organization's (WHO's) and CDC's guidance into the Tulsa County Sheriff's Office's (TCSO's) COVID-19 response in the jail.  Id.  The Tulsa City-County Health Department (THD) was an integral partner in supplying TCSO with relevant and needed information concerning the necessary COVID-19 response in the jail.  Id.  An Emergency Response Plan (COVID-19 Plan) was then drafted, and is continually updated to meet the needs of the fluid nature of the COVID-19 pandemic.  Id.  From March 9 to April 7, 2020, bookings at the jail are allegedly down by more than 50% and the total jail population has dropped more than 20%.  Id. at 2.

TCSO deputies have allegedly been instructed to follow the Oklahoma governor's best practices for limiting COVID-19 exposure when encountering the public.  Dkt. # 166-2, at 1.  All

deputies have been told to limit exposure in the field, wear protective masks and gloves when the situation is warranted, make frequent use of hand washing and hand sanitizer, and maintain social distancing. Id. All deputies have allegedly been told that their patrol vehicles should be cleaned and disinfected twice every shift, and that they should disinfect their duty belt and gear after contact with an individual. Id. All deputies have been told to mask any arrestees displaying symptoms consistent with COVID-19, to keep the windows open during transport, and to arrange for assessment or transport by a trained emergency medical service or emergency medical technician if the arrestee needs medical attention. Id. The Sheriff has implemented mandatory temperature scannings of all persons entering the jail, and has designated specific intake pods to house new persons booked into the jail for 14 days before allowing them into other areas of the jail. Id. at 2; see also Dkt. # 166-3, at 4. In addition to inmates, all employees at the jail are asked a series of COVID-19 screening questions and their temperatures are taken daily. Dkt. # 166-2, at 2. Anyone with a temperature of 100 degrees or above is not permitted entry into the jail. Id. The Tulsa County District Courts, Tulsa County District Attorney's Office, Tulsa County Public Defender's Office, TCSO, and other local law enforcement officials are all working together to keep the jail population at a minimum. See Dkt. # 166-12. Visitors, including attorneys, are prohibited from entering the jail. Dkt. # 168-2, at 2.

All incoming inmates at the jail are allegedly given a questionnaire in which they are asked a number of questions, including whether they have been tested for COVID-19, whether they have been quarantined within the last month, whether they have been in close contact with anyone who has or has been tested for COVID-19, whether they have traveled outside of the country within the past two weeks, whether they have traveled by plane within the last month, whether they have been

in a group of ten or more people within the last two weeks, and whether they have been outside of the state of Oklahoma within the last two weeks.  Dkt. # 166-4.  In the COVID-19 Plan, jail staff are "continuously trained on adequate housekeeping protocols."  Dkt. # 166-3, at 2.  The jail allegedly posts information bulletins, posters, and automatic messages on inmate tablets and kiosks giving reminders to wash hands, use social distancing, and keep living areas clean.  Id.  Masks have been purchased to be worn by medical staff, employees, and infected inmates in the event that a positive case of COVID-19 is detected within the jail.  Id.  Gloves are worn by medical staff, employees, and inmate workers throughout the jail to prevent contact with the virus.  Id.  On March 18, 2020, the DOC suspended receiving inmates from county jails.  Dkt. # 166-6.  The jail continues to allow telephone calls and video visitation, provides free and confidential video visitation between attorneys and clients, and allows each inmate/detainee one free video visitation each week.  Dkt. # 166-1, at 2.

As of March 24, 2020, all new bookings were housed in two intake pods in the jail for a minimum of 14 days prior to relocation.  Dkt. # 166-3, at 5.  One week later (March 31, 2020), two new pods were prepared as intake units.  Id.  These housing units are locked down to prevent the potential spread of COVID-19 or any other virus.  Id.  Outside of the inmates' cells, movement is isolated to a single detainee.  Id.  The COVID-19 Plan also provides:

> In the event of a confirmed case of COVID-19 within the [jail], the isolation processes within this plan should be followed.  The inmate identified as possibly being exposed to a respiratory virus will be isolated in the medical unit in a negative air pressure cell for respiratory isolation.  This isolation will occur for a fourteen-day period (or the current CDC guideline).  After immediate isolation, the Tulsa Health Department will be notified so that they may evaluate the situation.

> The [jail] has eight negative air pressure cells that are checked daily by medical staff when being used for respiratory isolation, weekly by medical staff when not being used for respiratory isolation, and monthly by the agency's Life Safety Officer.
>
> Should the need for a mass isolation become urgent, pods F17 and F19 have been identified and prepared to house recovering inmates. The jail's maintenance department has effectively reversed the air flow for these housing units to be negative pressure. This will significantly minimize the airflow to other areas of the facility. Should these housing units be needed for mass isolation, one pod will be used for symptomatic inmates and the other pod will be used for asymptomatic inmates, or one pod for males and the other for females.

Id. at 3.

iii.  Plaintiff's Experts and Named Witness

On April 8, 2020, plaintiff filed a supplement to his motions (Dkt. # 164), with an affidavit of Elizabeth Chiao, M.D. dated April 3, 2020.  Dr. Chiao has extensive research interests focusing on HIV-related issues.  Dkt. # 164, at 2.  Dr. Chiao opined that the risk posed by infectious diseases in jails and prisons is significantly higher than in the community.  Id. at 4.  She opined that, because people live in close quarters in the jail, social distancing is difficult and inmates are unlikely to comply with local health mandates.  Id. at 8.  She further opined that, "because people cycle in and out of the jail almost every day, it is virtually impossible to create stable units of people isolating those infected from those who are uninfected, which is necessary to contain infection."  Id.  She opined that temperature checks do not work on asymptomatic carriers, "which account for nearly 13% of all transmission, and one negative airflow room for a population of over 1,000 inmates is insufficient to maintain a quarantine."  Id.  She stated that, "[b]ased on my experience working on public health and [i]nfectious [d]iseases, and my review of the relevant literature, it is my professional judgment that the jail is dangerously under-equipped and ill-prepared to prevent and manage a COVID-19 outbreak . . . ."  Id. at 9.

18

In his reply (Dkt. # 168), plaintiff proffered a declaration of Fred Rottnek, M.D. dated April 14, 2020. Dkt. # 168-1. Dr. Rottnek opined that "the COVID-19 pandemic has the potential to devastate the lives of both incarcerated individuals and jail personnel in Tulsa, and result in a medical emergency that could overwhelm local medical infrastructure." Id. at 3. He opined that "there are no steps that administrators can take to ensure that the disease will not enter and spread through the jail and back out to the community." Id. Dr. Rottnek opined that the jail's procedures "should strictly follow CDC guidance for mitigating the risk to inmate and staff populations and the general public." Id. at 3-4. He further opined that, "even if CDC guidelines were strictly followed," the presence of a jail in a community would continue to increase the risk to all community members. Id. at 4. Dr. Rottnek went on to recommend practices for COVID-19 prevention, and opined that the jail "cannot [implement] and has not" implemented these best practices. Id. at 5. He opined that, although there are no confirmed cases at the jail, it is "more likely that it has already entered the jail." Id. at 6. He also challenged the questionnaire given to all arrestees when they are first detained in the jail. Id. He opined that the mental health of detainees in "solitary confinement" is ignored. Id. at 10. Dr. Rottnek admitted that "[t]he latest guidance from the CDC suggests that jails and prisons have a long list of hygiene supplies, cleaning supplies, PPE, and medical supplies on hand and available." Id. However, he opined that, in his experience, jails do not have sufficient PPE for increasing cases of COVID-19. Id. at 11. Dr. Rottnek opined that the COVID-19 Plan places inmates at risk because it compromises their access to healthcare for non-COVID-related conditions. Id. at 12. He opined that a shortage of employees and backup personnel impose a serious risk to the jail. Id. at 13. He concluded that the jail should lower its jail population. Id. at 15.

Plaintiff also provided a declaration of Ashley Selige dated April 13, 2020, who was in the jail, but has since been released. Dkt. # 168-3, at 2. She states that she was brought to the jail just after her arrest on April 3, 2020. Id. At the jail, she was taken to a room where she waited for several hours. Id. There were "approximately a dozen people" in this room, including a detention officer. Id. No one wore a mask. Id. at 2-3. No one warned her to stay apart from the other detainees. Id. at 3. She did not see anyone clean the chairs, telephones, or any of the other surfaces in the room during the hours she was there. Id. She did not see any cleaning supplies in the room, and she was not offered a mask or gloves. Id. There was nowhere for her to wash her hands other than a single bathroom with one sink and toilet for everyone to share; she did not see soap or paper towels in this bathroom. Id. After she had been waiting in this room for several hours, she was taken to a room to speak with a nurse. Id. She was asked if she was taking any medication, and her temperature was taken. Id. The nurse was wearing gloves but no face mask. Id. She was eventually escorted out of this room and into a hallway, where she was given a jump suit to change into. Id. She stayed in her cell for the next five days. Id. at 4. She was allowed out for solitary "rec" time for one hour during each of the first three days, and a half hour each of her last two days. Id. She was then given a video hearing, and her bail was set at $2,500. Id. She was unable to post the bond amount. Id. During her "rec" time, she was permitted to shower, watch television, launder her clothes, read books that were on a table, or walk around or sit in the common space in the pod. Id. During her time at the jail, she did not see anyone cleaning the shared surfaces or supplies, and no one cleaned her cell. Id. at 5. She was not given gloves or a mask. Id. She alleges that the officers delivering her food were not keeping six feet away from her or the other officers. Id. During her time at the jail, her temperature was taken twice, and the nurse taking her temperature was wearing

20

gloves and a mask.  Id. at 6.  No one gave her medical attention or asked questions about her physical

or mental health.  Id.  She began to have nightmares, feel anxious and depressed, and experienced

suicidal thoughts.  Id.

iv.  Plaintiff's Anonymous Witnesses

In a declaration submitted by Horowitz, she states that she interviewed four anonymous

witnesses who prefer to remain unnamed for fear of retaliation.  Dkt. # 168-2, at 3-11.  In defendant

judges' supplemental response (Dkt. # 175), they speculate as to the identity of the anonymous

witnesses in an attempt to rebut their factual allegations, including whether the unnamed witnesses

are entitled to bail.  Dkt. # 175, at 3-5.  Courts typically do not allow "anonymous" witnesses,

forcing the opposition to speculate as to their identities or be unable to respond to their factual

allegations.  Accordingly, the Court will not consider the testimony of these anonymous witnesses.

v.  Defendants' Affidavits and Declaration

In the Sheriff's surreply, he submitted a declaration of William Cooper, D.O. dated April 20,

2020.  Dkt. # 171-2.  Dr. Cooper is the chief medical officer for Turn Key Health Clinics, LLC (Turn

Key), which contracts with the Tulsa County Board of County Commissioners to provide health care

services within the jail.  Id. at 1.  Dr. Cooper states that there are no suspected or confirmed COVID-

19 cases of detainees at the jail.  Id.  He strongly disagrees with plaintiff's characterization of the

lack of medical treatment provided at the jail.  Id. at 1-2.  He states that medical staff will treat the

symptoms associated with COVID-19 (e.g., fever, shortness of breath, pain, diarrhea), and "[t]his

is the most that any health care provider can do, as there is no known cure for COVID-19."  Id. at

2.  He states that, once Turn Key medical staff determines that an inmate may require a higher level

of care than the jail is capable of providing, medical staff will recommend that the patient be

transferred to a local hospital.  Id.  Turn Key makes arrangements for off-site care and hospitalization

for inmates who require hospitalization or care beyond the capabilities available at the jail, including

any inmates who test positive for COVID-19 or develop serious symptoms.  Id.  Further, if a patient

shows signs or symptoms of COVID-19, Turn Key has agreements in place with private laboratories

to test the patient quickly to confirm or rule out a COVID-19 diagnosis.  Id.  These test results are

typically available in less than 48 hours.  Id.

The Sheriff also filed an additional affidavit of Parker dated April 20, 2020.  Dkt. # 171-3.

He states that there are no suspected or confirmed cases of COVID-19 of detainees at the jail.[7]  Id.

at 1.  Three detainees at the jail have been tested for COVID-19, and all three tested negative.  Id.

He states that social distancing strategies are promoted and regularly practiced in the jail.  Id.  The

booking area has been redesignated to incorporate social distancing guidelines.  Id.  In addition,

posters and kiosk messages remind detainees of the importance of social distancing.  Id.  Parker

provided a photograph of the jail's booking area, which shows chairs that are either separated from

one another, presumably by six feet, or taped off.  Dkt. # 171-8.  He also provided an example of

posters in the jail promoting social distancing, and a screen shot from an inmate kiosk available to

all detainees.  Dkt. ## 171-9; 171-10.  He states that, since April 9, 2020, arrestees have been

provided with a surgical mask in pre-booking and are required to wear the mask through the booking

process.  Dkt. # 171-3, at 2; see also Dkt. # 171-11.  In addition, detainees are allegedly instructed

how to use and care for the mask.  Dkt. # 171-3, at 2.; see also Dkt. # 171-12.  He states that soap

is provided to all arrestees upon housing to wash their hands.  Dkt. # 171-3, at 2.  He states that

---

[7]     The Sheriff also filed an affidavit of George Brown dated April 20, 2020, the Undersheriff
        for Tulsa County, in which he states that there are no suspected or confirmed COVID-19
        cases at the jail.  Dkt. # 171-4.

bathrooms with soap and water are available in the booking area for people to wash their hands as desired.  Id.  He states that the jail stocks cleaning and disinfectant chemicals as well as viral disinfectants for each pod, and these products are readily available in the pod.  Id.  The jail is also thoroughly sanitized on a daily basis.  Dkt. ## 171-7, at 2; 171-6, at 1.  He states that washers and dryers, along with automatic scaled soap dispenser integrated into the machines are at no cost, and are available for self-use by all detainees.  Dkt. # 171-3, at 2.  Daily laundry services are also allegedly provided in the jail.  Id.  Finally, he states that no "solitary confinement" is implemented in the jail.  Id.

vi.  Sheriff's Most Recent Declarations

The Sheriff filed an additional declaration of Parker dated May 4, 2020.[8]  Dkt. # 186.  Parker stated that, as of May 4, there are no suspected or confirmed cases of COVID-10 in the jail.  Id. at 1.  He also stated that the employee who had tested positive for COVID-19 offices outside the housing or pod area of the jail.  Id.  The employee shared an office space with another jail employee, who has been tested negative for COVID-19.  Id.  Parker stated that "[n]o close contact with any other TCSO employees or with any inmates has been identified through inquiry or video surveillance.  The subject civilian employee maintained social distancing guidelines."  Id.  In addition, Parker stated that no other civilian employee has tested positive for COVID-19 as of May 4.  Id.  Any employee who calls in sick must have a doctor's release to return to work.  Id. at 2.  Six inmates had been tested as of May 4, and all tested negative for COVID-19.  Id.  Parker stated that

---

[8]     The Court directed the filing of this declaration in lieu of witness examination at the hearing.  See Dkt. ## 181, 182.

he was not aware of any detainee who has been denied testing or has asked for testing.  Id.  The medical provider tests detainees based upon their symptoms.  Id.

On May 8, 2020, the Sheriff filed a declaration of George Roberts, assistant jail administrator (Dkt. # 190), in which Roberts stated that there were no changes to the May 4, 2020 Parker declaration, other than that one detainee was tested for COVID-19, and his or her results were negative.  Dkt. # 190, at 1.

## II.  Legal Standard

Although plaintiff filed motions for preliminary injunction and temporary restraining order, their motions should be treated as a motion for preliminary injunction.  Federal Rule of Civil Procedure 65(a) governs preliminary injunctions; it requires notice and usually requires a hearing.  Rule 65(b) governs temporary restraining orders, which may be issued with no notice or hearing.  Here, the parties have been involved in this case for two years and defendants were given notice of the motions.  Moreover, both sides have fully briefed the motions and have submitted evidence.  Therefore, the Court will treat the motions as one for preliminary injunction.

"When seeking a preliminary injunction, 'the moving party must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest.'"  Little v. Jones, 607 F.3d 1245, 1251 (10th Cir. 2010) (quoting Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009)).  "In addition, the movant must establish 'a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint.'"  Id. (quoting Devose v. Herrington, 42 F.3d 470, 471 (8th Cir. 1994)).

The Tenth Circuit has established three disfavored types of preliminary injunctions: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." Schrier v. Univ. of Colo., 427 F.3d 1253, 1259 (10th Cir. 2005) (internal quotation marks and citation omitted).

Plaintiff's argument that putative class members are being detained solely due to their inability to pay bail falls within the third category because, were the Court to decide that issue on a motion for preliminary injunction, it would be deciding the entire case while the parties are conducting discovery. See Dkt. # 185. The Court lacks a full record, and the affidavits, declarations, evidence, and arguments are vastly conflicting. Therefore, it would be imprudent for the Court to decide the constitutionality of the bail system at this time. The Court declines to do so, and will rule on the motion based on the risks of COVID-19 at the jail only.

Plaintiff's argument that COVID-19 warrants a preliminary injunction is a mandatory preliminary injunction and a preliminary injunction that alters the status quo. It is mandatory because it would require the Sheriff to take affirmative action, and it is a preliminary injunction that alters the status quo because it would require the release of presumably many detainees. "A mandatory preliminary injunction—one which requires the nonmoving party to take affirmative action–is an extraordinary remedy and is generally disfavored." Little, 607 F.3d at 1251 (internal quotation marks omitted). "Before a court may grant such relief, the movant must make a heightened showing of the four factors." Id. (internal quotation marks omitted). "To obtain a preliminary injunction altering the status quo, as requested here, the movant 'must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance

25

of harms.'" <u>Brooks v. Colo. Dept. of Corrections</u>, 730 Fed. App'x 628, 630-31 (10th Cir. 2018)[9]

(quoting <u>O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft</u>, 389 F.3d 973, 975-76 (10th

Cir. 2004)) (emphasis in original).

### III.  Application of the Preliminary Injunction Factors

Plaintiff seeks a preliminary injunction releasing putative class members from a county

facility based on COVID-19 risks.  As a general matter, it is the function of local policymakers to

determine how to address the COVID-19 health and safety issues.  The only role of this Court is to

address the constitutionality of the jail's procedures within the confines of the claims in the amended

complaint.[10]  The Court addresses each <u>Little</u> factor.

### A.  Balance of Equities

There is relatively little case law on the issue of release based on COVID-19 risk.  However,

"federal courts that have considered arguments like [plaintiff's] have indicated that a prisoner is not

entitled to release or transfer based solely on generalized COVID-19 fears and speculation."[11]  <u>Carter</u>

---

[9]     This and all other unpublished decisions cited herein are not precedential, but they may be
cited for their persuasive value. <u>See</u> Fed. R. App. 32.1; 10th Cir. R. 32.1.

[10]    Plaintiff has identified no constitutional right to be free from COVID-19; he merely refers
to "liberty interests."

[11]    It is worth noting that some federal courts have released federal inmates for generalized
COVID-19 concerns.  <u>See</u>, <u>e.g.</u>, <u>Savino et al v. Hodgson et al</u>, 20-CV-10617, Dkt. # 55 (D.
Mass. April 7, 2020) (electronic order).  However, these cases involve federal courts issuing
injunctions with regard to federal inmates.  <u>See</u> <u>Hope v. Doll</u>, 20-CV-562 (M.D. Penn. April
7, 2020).  Here, plaintiff asks the Court for a preliminary injunction against local officials,
over an issue in which the Court has no general authority; this is the role of county and city
policymakers.  <u>See</u> <u>Russell v. Harris Cty., Texas</u>, 2020 WL 1866835, at *9 (S.D. Tex. April
14, 2020) ("This case does not, like many, involve a federal-court challenge to a federal jail
or prison facility, on either the conditions of confinement (including medical care) or on the
duration of confinement and conditions of pretrial release.").

v. Santa Fe Adult Detention Center, 2020 WL 1550888, at *2 (D.N.M. April 1, 2020); see also United States v. Eberhart, 2020 WL 1450745 (N.D. Cal. 2020); Jackson v. Walz, 2020 WL 1442641 (D. Minn. 2020).  "Rather, the court must make an individualized determination as to whether COVID-19 concerns present such extraordinary and compelling reasons in a particular case that temporary release or transfer is necessary."  Carter, 2020 WL 1550888, at *2 (citing United States v. Clark, 2020 WL 1446895, at *3 (D. Kan. March 25, 2020)).  "[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify [release from jail]. . . ."  United States v. Raia, 954 F.3d 594, 595 (3d Cir.  2020); see also United States v. Clark, 2020 WL 1557397, at *4-5 (M.D. La. Apr. 1, 2020) (noting that "[d]efendant cites no authority for the proposition that the fear of contracting a communicable disease warrants a sentence modification" and "there is no evidence before the Court that the BOP's plan to address the pandemic will not adequately protect inmates") (emphasis in original).

Plaintiff argues that the risk to putative class members absent a preliminary injunction outweighs any risk to the Sheriff.  Dkt. # 158, at 28.  He argues that reducing the jail population at this time "will save the lives" of inmates and Sheriff employees by decreasing the potential damage that an outbreak of COVID-19 at the jail would cause.  Id.  Defendants argue that plaintiff will not be injured, and there is no certified class for whom relief can be granted.  Dkt. # 175, at 10.

The Court has already found that the class need not be certified in order to rule on this motion; however, the Court finds that putative class members are not currently facing extraordinary or compelling circumstances because there are no confirmed cases among inmates of COVID-19 at the jail.  This does not mean that inmates at the jail could not, in the future, develop COVID-19 during their time in jail.  But the procedures for combating COVID-19 are extensive, and there is

only speculation at this point that COVID-19 will be rampant at the jail.  Putative class members do have some interest in release from jail based on fear of a virus, but that interest is less on this record than the public's interest in deterring future offenses and ensuring that arrestees appear for trial.  On balance, the Sheriff will be more greatly harmed by a preliminary injunction because he could be subjected to criminal liability for releasing inmates without approval of the Tulsa County District Court, and he would create danger to the community and risk of flight were he to release arrestees.

In addition, the Court must defer to local policymakers during this time.  In the absence of Tenth Circuit precedent, the Court looks to guidance from Fifth Circuit persuasive authority that federal district courts defer to state actions taken in times of emergency, even if they infringe on individual constitutional rights.  In re Abbott, 954 F.3d 772, 783 (5th Cir. 2020).  In In re Abbott, a federal district court temporarily restrained the Governor of Texas's executive order GA-09, which postponed non-essential surgeries and procedures until April 21, 2020.  Id. at 777.  The district court reasoned that the executive order was a total restraint on access to abortions.  Id. at 781.  The Fifth Circuit reversed, holding that the federal district court ignored the required framework governing emergency public health measures.  Id. at 778.  The Court noted that, under Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 31 (1905), "constitutional rights may be reasonably restricted 'as the safety of the general public may demand.'" Id. (quoting Jacobson, 197 U.S. at 29).  "That settled rule allows the state to restrict, for example, one's right to peaceably assemble, to publicly worship, to travel, and even to leave one's home." Id.  The court also noted that judicial review is only available:

> if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has <u>no real or substantial relation to those objects</u>, or is, <u>beyond all question, a plain, palpable invasion of rights secured by the fundamental law.</u>

<u>Id.</u> (quoting <u>Jacobson</u>, 197 U.S. at 31) (emphasis in original).  Here, there is no statute involved, merely a plan implemented by local authorities reasonably related to combating a public emergency. The Court concludes that judicial review of the jail's COVID-19 Plan is not appropriate.

The Court finds that plaintiff has not met his heavy burden of showing that the balance of equities strongly favors plaintiff.

**B. Irreparable Harm**

Plaintiff makes generalized assertions that COVID-19 is "an unprecedented public health disaster, and the county jail is a catastrophe waiting to happen." Dkt. # 158, at 7.  However, plaintiff fails to show that any individual putative class member is at a high risk of developing COVID-19. Defendants have provided evidence that no detainee, much less a putative class member, has been diagnosed with COVID-19.  <u>See</u> Dkt. # 166-10, at 1.  The only person diagnosed with COVID-19 at the jail is a clerk who had limited contact with detainees.  <u>See</u> Dkt. # 171, at 2.  Plaintiff also argues that "solitary confinement" (quarantine) during this COVID-19 pandemic constitutes an irreparable harm.[12]  Dkt. # 168, at 8-10.  However, plaintiff has identified no "right" not to be distanced or quarantined during an international pandemic.  <u>See</u> <u>In re Abbott</u>, 954 F.3d at 784 ("The bottom line is this: when faced with a society-threatening epidemic, a state may implement

---

[12]    In support of this, plaintiff provides a declaration of Craig W. Haney, Ph. D.  Dkt. # 168-7. Dr. Haney states that "it is possible that the extraordinary added stress of social isolation under these especially onerous conditions . . . are so extreme that the[y] will operate to depress prisoners' immune systems and render them even more vulnerable to [the] COVID-19 virus, and less able to combat it if and when they contract it."  <u>Id.</u> at 5.  However, this practice of quarantine complies with the CDC's guidance.

emergency measures that curtail constitutional rights so long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'") (quoting Jacobson, 197 U.S. at 31). Moreover, medical staff at the jail provide medical care and treatment for all inmates for medical and mental health conditions, including those inmates placed in quarantine or isolation. Dkt. # 171-2, at 2.

The procedures that the TCSO has developed to combat COVID-19 are more than adequate to protect individual inmates. Further, they are consistent with the CDC's guidance. Upon entry into the jail, inmates' temperatures are taken. Dkt. # 166-2, at 2. This is consistent with the CDC's guidance that a jail "[p]erform pre-intake screening and temperature checks for all new entrants." Dkt. # 177-1, at 10. Employees' temperatures are also taken, and they are required to stay home for at least 14 days if they have a temperature after symptoms were initially present. The jail has designated entire areas for inmates who might test positive for COVID-19. Dkt. # 166-2, at 2. This is consistent with the CDC's guidance that "an individual [who] has symptoms of COVID-19" should be placed "under medical isolation." Dkt. # 177-1, at 10. The jail has ordered hand sanitizer for employees and inmates, and has ordered 40,000 bars of soap for inmates. Similarly, the CDC recommends that proper hygiene is essential for combating COVID-19 in jails and detention facilities. See Dkt. # 177-1, at 8. The jail has posted signs, posters, and warnings on tablets explaining the precautions inmates should take to combat COVID-19. Most importantly, if any inmate tests positive for COVID-19, he or she will be immediately quarantined and given medical attention. This is consistent with the CDC's guidance that, if an inmate tests positive for COVID-19, a plan should be in place to transfer that individual to a local hospital. Id. at 23.

Plaintiff argues that many of these procedures are ignored, and he provides testimony from a named witness that inmates are still exposed to one another. See Dkt. # 168-3. However, the same is true for the community at large. The City of Tulsa has policies for combating COVID-19 in the general public, but these procedures are not followed absolutely. It is not this Court's role to mandate that county or city-wide procedures be followed strictly. Plaintiff also seems to imply that the conditions in the jail should be such as to eliminate any possibility that an inmate could contract COVID-19. See Dkt. # 168, at 5. This is impractical, even for the general public. Plaintiff argues that the jail's COVID-19 Plan and its implementation should mirror the CDC guidance. However, the COVID-19 Plan does follow many aspects of the CDC guidance. Plaintiff argues that the COVID-19 Plan "contradicts or omits many important CDC guidelines . . . ." Dkt. # 168, at 2. However, plaintiff does not meet his burden to show that putative class members would be safer were they to be released into the general public. Even if the COVID-19 Plan fails to follow all CDC guidance in its practical implementation, this Court should defer to the policy of local officials absent a showing that the policy has no real relation to the public health or safety.

Many of plaintiff's arguments are generalized concerns and speculations about the conditions of the jail. Normally a detainee must exhaust administrative remedies before making a complaint in court. See Peoples v. Gilman, 109 F. App'x. 381, 383 (10th Cir. 2004) (holding that a detainee was required to exhaust administrative remedies because his claim "implicate[d] conditions of confinement and the effects of actions by government officials on the lives of persons confined in prison"). Plaintiff does not claim that putative class members are at a high risk of contracting COVID-19 due to age or illness; his concerns are generalized and speculative. Therefore, the Court

finds that plaintiff has not met his heavy burden of showing putative class members will likely suffer irreparable harm in the absence of preliminary relief.

## C. Public's Interest

The public interest analysis somewhat overlaps with the balance of equities analysis. Plaintiff argues that "vindication of constitutional rights is always in the public interest." Dkt. # 158, at 30. However, as discussed, the Court declines to rule at this time whether a constitutional right to bail has been or is likely to be violated. Plaintiff further argues that releasing inmates is essential to the well being of not only the individual inmates, but also to the public in general. Id. However, there are no confirmed cases of COVID-19 at the jail among inmates. The Court finds that it is not in the public's interest to release numerous putative class member inmates into the general population.

The parties disagree as to whether comity requires the Court to defer to the Sheriff's policy. Defendants argue that federal courts should defer to state courts in matters of sensitive public policy. Dkt. # 175, at 11-12.

In Dixon v. City of St. Louis, 950 F.3d 1052 (8th Cir. 2020), the Eighth Circuit reversed a preliminary injunction issued by a federal district court where the district court did not consider the public's interest in a preliminary injunction. Id. at 1056. The Missouri Supreme Court, like the Tulsa County District Court, had developed a rule modifying bail hearings. Id. at 1055. The federal district court enjoined the state officials from setting bail without considering less restrictive alternatives, and its only discussion of the new rule was that it was not moot. Id. at 1055-56. The circuit court remanded for consideration of the public's interest in light of the new rule. Id. at 1056.

Plaintiff argues that this case is inapposite because, in <u>Dixon</u>, the court did not rule that a preliminary injunction was improper; it held only that the district court should have given more weight to the public interest factor in its analysis in light of the new Missouri Supreme Court rule. Dkt. # 179, at 10.  While this is true, plaintiff's argument on comity is unpersuasive.  Local Criminal Rule 2 is a significant improvement upon the prior bail process in Tulsa County District Court.  And, although the Court is not ruling on the underlying merits of that new process at this time, it is worth noting that state and county policymakers are working together to implement improvements to that process.  "Cooperation and comity, not competition and conflict, are essential to the federal design." <u>Ruhrgas AG v. Marathon Oil Co.</u>, 526 U.S. 574, 586 (1999).

In addition, were the Court to issue a preliminary injunction releasing putative class members, it would be contrary to the public's interest in ensuring arrestees appear for trial and do not present a risk of committing new offenses.  The Court thus finds that plaintiff has not met his heavy burden of showing that the public interest strongly favors granting a preliminary injunction.

**D.  Likelihood of Success on the Merits**

As noted above, the Court cannot determine at this time whether plaintiff is likely to succeed on the merits of the bail system claims.  The record, at this point, is too conflicting and incomplete. Discovery is ongoing.  <u>See</u> Dkt. # 185.

With regard to likelihood of success on the merits, the Sheriff argues that a preliminary injunction would have no effect because he allegedly has no authority to release detainees because they are unable to pay bail. Dkt. # 177, at 17.  He argues that, because plaintiff's claim is based on allegedly unconstitutional judicial procedures employed by the state court judges, and because plaintiff has sued those judges directly, an injunction against the Sheriff is unwarranted.  <u>Id.</u> at 24.

He cites the Tenth Circuit's opinion in <u>Valdez v. City and County of Denver</u>, 878 F.2d 1285, 1289 (10th Cir. 1989), as authority for this proposition.  Dkt. # 177, at 27.  In that case, the Tenth Circuit held that "officials performing ministerial acts intimately related to the judicial process . . . must not be called upon to answer for the legality of decisions which they are powerless to control." <u>Valdez</u>, 878 F.2d at 1289.  He also cites <u>Buffin v. City and County of San Francisco</u>, 2016 WL 6025486, at *5 n.3 (N.D. Cal. Oct 14, 2016), which found that, "as a matter of law there is no county policy where the State directs its judges to set a bail schedule, which the Sheriff's department is required to enforce pursuant to state law." <u>Id.</u>  Thus, the Sheriff argues, injunctive relief against him would be unwarranted.[13]  Plaintiff counters that "[a]n insistence that state law or policy requires the Sheriff to violate the Constitution is not a defense to [p]laintiff's claim for injunctive relief, but rather a basis for granting that relief." Dkt. # 187, at 12 (citing <u>Edwards v. Cofield</u>, 265 F. Supp. 3d 1344, 1346 (M.D. Ala. 2017) (a sheriff "does not enjoy immunity merely because he was following orders. Indeed, . . . <u>Ex Parte Young</u> assumes that the state actor has done nothing more than enforce the law as promulgated by the State.").  Plaintiff also points out that the Court in a prior order (Dkt. # 48) allowed his claims against the Sheriff to proceed.  Dkt. # 187, at 18.

Because the Court has found that putative class members are unlikely to suffer irreparable harm based on COVID-19, it need not address these arguments at this time because it is deferring the merits of plaintiff's underlying claims to a future date.  See <u>Dominion Video Satellite, Inc. v.</u>

---

[13]  The Sheriff also argues that, were he to release detainees from jail, he could face criminal liability and loss of employment.  Dkt. # 177, at 16 (citing OKLA. STAT. tit. 57, § 47 ("The sheriff . . . is hereby required to conform, in all respects, to the rules and directions . . . of the district judge and communicated to him by the proper authority."); OKLA. STAT. tit. 57, § 55 (stating that, if the Sheriff refuses "to comply with any of the rules and regulations established by the district judge . . . he shall, on conviction thereof, by indictment for each case of such failure or neglect of duty . . . pay . . . a fine . . . .")).

Echostar Satellite Corp., 356 F.3d 1256, 1260 (10th Cir. 2004) ("In examining these factors, courts have consistently noted that because a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.") (quotation marks and citations omitted).

**IV.**

**Conclusion**

A preliminary injunction is "an extraordinary and drastic remedy." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997). Plaintiff's request for a preliminary injunction is strongly disfavored. Plaintiff has not made a the required strong showing of the four Little factors for issuance of a mandatory preliminary injunction or a preliminary injunction that alters the status quo. For these reasons, the Court finds that plaintiff's motion for a preliminary injunction (Dkt. # 158) should be denied without prejudice.

**IT IS THEREFORE ORDERED** that plaintiff's motion for a preliminary injunction (Dkt. # 158) is **denied without prejudice**, and plaintiff's motion for a temporary restraining order (Dkt. # 159) is **moot**.

**DATED** this 11th day of May, 2020.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE