Page 1

1                IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OKLAHOMA
2

3    Case No. 18-CV-0298-CVE-JFJ

4    - - - - - - - - - - - - - - - - - -X
     RICHARD FELTZ, et al.,              :
5    On behalf of himself               :
     and all others                     :
6    similarly situated,                :
                     Plaintiff          :
7                                        :
     VS                                  :
8                                        :
     BOARD OF COUNTY COMMISSIONERS       :
9    OF TULSA COUNTY, et al.,            :
                     Defendants          :
10   - - - - - - - - - - - - - - - - - -X

11

12

13              Videotaped deposition of

14          JUDGE WILLIAM J. MUSSEMAN, JR.

15    taken via videoconference before Clifford Edwards,

16    Certified Shorthand Reporter and Notary Public, on

17          December 16, 2020, at 10:09 a.m.

18

19

20

21

22

23

24

25

**Exhibit 7**

**Page 2**

```
1   A P P E A R A N C E S:   (all via videoconference)
2
3   ON BEHALF OF THE PLAINTIFFS:
4   ALLISON HOLT RYAN, ESQ.
    GARY YEUNG, ESQ. (NY Office)
5   MICHELLE A. KISLOFF, ESQ.
    ANNEKE BARAN ALTIERI, ESQ.
6   HOGAN LOVELLS US LLP
    555 Thirteenth Street, NW
7   Washington, DC  20004
    allison.holt-ryan@hoganlovells.com
8   michelle.kisloff@hoganlovells.com
    anneke.altieri@hoganlovells.com
9
10  HAYLEY HOROWITZ, ESQ.
    STILL SHE RISES
11  567 E 36th St N
    Tulsa, Oklahoma  74106
12  hayleyh@stillsherises.org
13
14
15  ON BEHALF OF THE DEFENDANT STATE JUDGES:
16  ERIN MOORE, ESQ.
    ASSISTANT ATTORNEY GENERAL
17  STEFANIE LAWSON, ESQ.
    ASSISTANT ATTORNEY GENERAL
18  DEVAN PEDERSON, ESQ.
    ASSISTANT ATTORNEY GENERAL
19  OKLAHOMA ATTORNEY GENERAL'S OFFICE
    313 N.E. 21st St.
20  Oklahoma City, Oklahoma  73105
    stefanie.lawson@oag.ok.gov
21  erin.moore@oag.ok.gov
    devan.pederson@oag.ok.gov
22
23
24
25
```

**Page 3**

```
1   ON BEHALF OF THE DEFENDANT BOARD OF COUNTY
    COMMISSIONERS AND THE SHERIFF:
2
    DOUGLAS WILSON, ESQ.
3   ASSISTANT DISTRICT ATTORNEY
    DISTRICT ATTORNEY'S OFFICE
4   500 S. Denver Ave. Ste. 900
    Tulsa, Oklahoma  74103
5   douglas.wilson@tulsacounty.org
6
7   ALSO PRESENT:
8   STEVE DeCANIO, VIDEOGRAPHER
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1              INDEX OF EXAMINATION
2                                          PAGE
3   DIRECT EXAMINATION BY MS. RYAN           8
4   CROSS-EXAMINATION BY MR. WILSON         145
5
6              INDEX OF EXHIBITS
7   Plaintiff's Exhibit                     PAGE
8   Musseman No. 1, Affidavit of William
9      Musseman dated April 15, 2019         37
10  Musseman No. 2, Declaration of William
11     Musseman                              38
12  Musseman No. 3, AO-2018-09 Administrative
13     Order Establishment of Bond
14     Docket                                75
15  Musseman No. 4, AO-2018-10 Amended
16     Administrative Order Regarding
17     Pretrial Release Program              75
18  Musseman No. 5, Rule CR 2.  Pre-established
19     Bail and Initial Appearance          119
20  Musseman No. 6, Tulsa County District Court,
21     Bench Card: Judicial Guide to
22     Bond Docket                          135
23  (Reporter's Note:  Exhibits marked remotely and
24  forwarded to US Legal Support for production.)
25
```

**Page 5**

```
1            THE VIDEOGRAPHER:  We are now on the
2       record.  This is the remote
3       video-recorded deposition of Judge
4       William J. Musseman, Jr.  Today is
5       Wednesday, December 16, 2020.  The time
6       is now 10:09 a.m. Eastern Time Zone.
7            We are here in the matter of Feltz
8       vs. Board of County Commissioners of the
9       County of Tulsa.
10           My name is Steve DeCanio, remote
11      video technician on behalf of U.S. Legal
12      Support.
13           At this time the court reporter,
14      Cliff Edwards, on behalf of U.S. Legal
15      Support, will please enter the statement
16      for remote proceedings into the record so
17      we may begin.
18           COURT REPORTER:  The attorneys
19      participating in this deposition
20      acknowledge that I am not physically
21      present in the deposition room and that
22      I'll be reporting this deposition
23      remotely.
24           They further acknowledge that, in
25      lieu of
```

**Exhibit 7**

Page 6

```
 1   the witness will verbally declare his
 2   testimony in this matter as under penalty
 3   of perjury.
 4        The parties and their counsel
 5   consent to this arrangement and waive any
 6   objections to this manner of reporting.
 7        Please indicate your agreement by
 8   stating your name and your agreement on
 9   the record.
10        MS. RYAN:  This is Allison Holt Ryan
11   from Hogan Lovells on behalf of
12   plaintiffs.
13        And I agree.
14        MS. MOORE:  This is Erin Moore from
15   the Oklahoma Attorney General's Office
16   representing state defendant judges.
17        And we agree.
18        MR. WILSON:  Douglas Wilson for the
19   Sheriff and the County Commissioners.
20        I agree.
21        MR. YEUNG:  Gary Yeung representing
22   the plaintiffs.
23        And I agree.
24        MS. LAWSON:  Stefanie Lawson.  I
25   represent the defendant state judges.
```

Page 7

```
 1        I agree.
 2   BY MS. RYAN:
 3        Q    Good morning, Judge Musseman.  As I
 4   mentioned a moment, my name is Allison Ryan, and I'm
 5   going to be taking your deposition today.
 6        Have you ever been deposed before?
 7        COURT REPORTER:  One moment.
 8        A    No, ma'am.
 9        COURT REPORTER:  One moment, please.
10
11             WILLIAM J. MUSSEMAN, JR.
12   at Tulsa County Courthouse, 500 South Denver
13   Avenue, Room 706, Tulsa, Oklahoma, having first
14   been duly sworn, deposed and testified as follows:
15
16        COURT REPORTER:  And any
17   stipulations?
18        MS. MOORE:  We would like the usual
19   stipulations of object to form, and
20   reserving the rest of the objections that
21   aren't privileged-based to be reserved
22   for later.
23        MS. RYAN:  And as the parties have
24   agreed, there are a number of
25   stipulations related to the fact that
```

Page 8

```
 1   this is a remote deposition.  Those have
 2   been recorded by the parties, and there's
 3   no need to state those on the record.
 4        COURT REPORTER:  All set to begin.
 5   Thank you.
 6        MS. RYAN:  Right.
 7
 8        DIRECT EXAMINATION
 9
10   BY MS. RYAN:
11        Q    Good morning, Judge Musseman.  I'll start
12   again.  How are you doing this morning?
13        A    I'm good.  I hope you're well.
14        Q    I am well.
15        So if we were together, I would go over
16   some ground rules for this deposition just to make
17   sure that the court reporter was able to get
18   everything down.  And I'm going to do the same thing
19   here.  They're a little different 'cause this is a
20   remote deposition.
21        So I'm going to be asking the questions,
22   and then you'll be providing answers.  I am going to
23   do my very best to allow you to finish your answers
24   before I ask the next question, and I would just ask
25   that you would do the same; is that okay?
```

Page 9

```
 1        A    Yes, ma'am.
 2        Q    And you understand that you're under oath
 3   here under penalty of perjury just as if you were
 4   in -- testifying in court?
 5        A    I do.
 6        Q    And if for some reason you don't
 7   understand my question, will you let me know so that
 8   I can rephrase?
 9        A    Yes, ma'am.
10        Q    And if you need a break at any time -- I
11   can tell you my normal procedures is to take about
12   -- a break about every hour on -- on record time.
13   Given our short amount of time today, I may take it
14   a little bit longer.  But if you need a break at any
15   time, just let me know, and we'll take a break, so
16   long as you answer the question that's pending in
17   front of you.
18        A    Yes, ma'am.
19        Q    Great.
20        If at some point today you answer a
21   question and then later in the deposition you
22   remember something else with regard to that answer
23   or something that you might need to revise, just let
24   me know, and we'll go back to that question.  And
25   you can share whatever information you have with
```

**Exhibit 7**

Page 10

1  response to that question.
2      A    I will.
3      Q    Is there any reason why you can't give
4  full, complete, and accurate testimony today?
5      A    Faded memory would be the biggest
6  impediment.
7      Q    And if you can't remember something,
8  you'll let me know?
9      A    I will, yes, ma'am.
10     Q    Perfect.
11          But otherwise, there's nothing that's
12  prohibiting you from being able to give true and
13  correct testimony today?
14     A    No, ma'am.
15     Q    Great.
16          All right.  Did you prepare for this
17  deposition?
18     A    Yes.
19     Q    And what did you do to prepare?
20     A    I read the Local Criminal Rule 1 and
21  Local Criminal Rule 2.
22          I read my previous -- I think there were
23  two affidavits I'd signed in this case.  I read
24  those.
25          I reviewed -- I reviewed the -- a couple

Page 11

1  statutes that deal with responsibilities and
2  authority of the presiding judge.  I'm not the
3  presiding judge now, and I refreshed my memory as to
4  the -- those statutes.
5      Q    Oklahoma State Statutes?
6      A    And I --
7      Q    I'm sorry, Judge Musseman.
8          Oklahoma State Statutes; is that right?
9      A    Yes, ma'am.
10     Q    Okay.
11     A    And I looked at a couple of AOs just to
12  jog my memory back of, you know, 2017/2018 time
13  frame.
14     Q    Okay.  Did you --
15     A    AOs are administrative orders.
16     Q    I'm sorry.
17     A    Yeah.  No, no, no.  And, in fact, we're
18  going to be talking about those AOs.  I -- we'll --
19  we'll get to that in a minute.
20     Q    I want to make sure that we use the same
21  language when we talk about things today, but thank
22  you.
23          Any -- anything else that you reviewed?
24     A    Not that I remember, no.
25     Q    Did you meet with counsel in preparation

Page 12

1  for this deposition?
2      A    Yes, ma'am.
3      Q    How many times?
4      A    One time.
5      Q    And about how long was that meeting?
6      A    Forty-five minutes.
7      Q    Okay.
8      A    That is my best guess.
9      Q    Understood.
10          And was there anyone else in that meeting
11  with you and counsel, besides you and counsel?
12     A    No.
13     Q    Okay.  And have you discussed --
14     A    I wasn't even -- I wasn't in the room
15  with them.  I -- it was by -- I think it was by a
16  Microsoft Teams.
17     Q    Okay.  Thank you for that clarification.
18          But no one else was in the Teams meeting
19  besides you and counsel?
20     A    Correct.
21     Q    And have you discussed your deposition
22  with anyone else besides counsel?
23     A    No, ma'am.
24     Q    Great.
25          All right.  I'd like to cover some

Page 13

1  background material to start.  So I just want to
2  make sure that I have every -- my research correct
3  on this.
4          Am I right that you have served as a
5  judge in Tulsa County since 2009?
6      A    Yes, ma'am.
7      Q    And prior to that, you were an ADA in
8  Tulsa County?
9      A    Yes, ma'am.
10     Q    And during your time as an ADA, you
11  overlapped with Judge Guten for a period of time; is
12  that right?
13     A    I think so.  But I don't remember if he
14  was an intern or a DA.
15     Q    You -- did you work with him when you
16  were in the ADA's office?
17     A    No.  I -- it -- it's a big office, and he
18  was never on my team.  I don't -- I think he might
19  have even been at juvenile.  I -- I think we were in
20  the same office at the same time.
21     Q    Got it.
22     A    But that's about it.
23     Q    Did you have any other legal work
24  experience between law school and joining the -- the
25  DA's office?

**Exhibit 7**

Page 14

1     A     Legal work experience?
2     Q     Right.
3           Did you hold -- did you practice as an
4  attorney --
5     A     No.
6     Q     -- between the time you graduated law
7  school and starting at the D -- DA's office?
8     A     No.
9     Q     And so in 2009, you became a Tulsa County
10  district court special judge; is that right?
11    A     Correct.
12    Q     And how did you obtain that position?
13    A     I applied for it and was interviewed by
14  the district judges in the interview process.  I was
15  selected.
16    Q     And am I right that in 2010, you became a
17  Tulsa County district court judge?
18    A     Yes, ma'am.
19    Q     And that was an elected position?
20    A     It was.  I was elected in 2010 and sworn
21  in to begin in January of 2011.
22    Q     So between 2009 and 2011, when you were a
23  special judge, what dockets did you preside over?
24    A     The family docket, generally divorces,
25  but paternities.  It -- it's the divorce docket, if

Page 15

1  you will.
2           Then after I was elected, but before I
3  was sworn in, when I was still a special judge, I
4  did the protective order docket for two months while
5  that judge was out for medical leave.
6     Q     And then you began serving as the
7  presiding judge of the district court in
8  January 2018; is that right?
9     A     Yes.
10    Q     And you held that position until
11  January 2020?
12    A     Yes.
13    Q     So from the time that you were sworn in
14  in 2011 to be a district court judge, until you
15  began serving as the presiding judge in
16  January 2018, what dockets did you preside over?
17    A     Criminal felony.
18    Q     Okay.  And what part of the criminal
19  process did the criminal felony docket oversee?  So
20  for instance, did you oversee arraignments?  Did you
21  oversee preliminary hearings?  Did you just oversee
22  trials?
23           What was a part of your docket at that
24  time?
25    A     Criminal felony docket deals with cases

Page 16

1  after they have been through the initial appearance,
2  the arraignment, the preliminary hearing.
3           If there's a preliminary hearing bind
4  over, the case comes for district court arraignment,
5  and then that felony criminal judge would have the
6  case from there, whether it's for disposition or
7  trial.  If it's for disposition or even trial, you
8  would -- you would handle the effects afterwards, if
9  there's applications to revoke based upon probation
10  violations.
11           I'm -- I'm -- I'm not giving you all the
12  details --
13    Q     That's okay.
14    A     -- but I don't want to talk for 20
15  minutes explaining.  I think you get the picture.
16    Q     I do.  I think that was a very helpful
17  answer.  Thank you.
18           So between -- we just mentioned -- I
19  mentioned it -- you mentioned a moment ago that you
20  began serving as the presiding judge in
21  January 2018.
22           We're going to talk about your
23  administrative responsibilities in a minute, but did
24  your docket responsibilities change when you began
25  serving as presiding judge in January 2018?

Page 17

1     A     No.
2     Q     So you continued to maintain your
3  criminal felony docket at that -- that time; is that
4  right?
5     A     Yes.
6     Q     And you still maintain that docket now?
7     A     No.
8     Q     So after you -- when did that change?
9     A     There was a retirement of a senior judge,
10  senior to me.  I can't remember the day.  I think it
11  was the end of March.  But I took over her civil
12  docket in April.  It was more of a process than an
13  event.  I maintained the criminal docket in full
14  effect and did that civil docket as I could for
15  months until we were able to shut down my criminal
16  docket.  But I was off of that docket, I no longer
17  had docket responsibilities, I think, effective
18  first of September.  And whether there's a holiday
19  in there -- it was September 1 or September 4, but
20  it would -- first of September, we had -- had
21  my docket -- criminal docket shut down from any
22  further computer assignments.  And I had assigned
23  out the cases on my docket, but for a handful of
24  trials that probably are just easier for me to keep
25  than to give fligh **Exhibit 7**

Page 18

1    Q    I understand.  If at any point prior --
2  strike that.
3         So we're here on some litigation.  Do you
4  have a sense of what this litigation is about?
5    A    A sense, yes, but what -- I don't know.
6  I -- it -- it's about -- it's about the bond docket.
7    Q    Okay.
8    A    That's what I know, and I understand that
9  would be a pedestrian explanation in your mind of
10 what this lawsuit is about.
11   Q    For purposes of this discussion, that is
12 entirely fair.
13        So prior to your serving as presiding
14 judge in January 2018, did you ever set bond
15 amounts?
16   A    Yes.
17   Q    As what part of your responsibilities?
18   A    The applications to accelerate or revoke
19 probations on those felony matters where there was
20 dispositional resolution that resulted in probation,
21 when the State would file applications supported by
22 probable cause that they had violated the rules of
23 probation, I would issue the warrant and set bond on
24 those probation violation applications.
25   Q    Any other circumstances where you would

Page 19

1  set bond?
2    A    I'm sorry.  Could you speak up?
3    Q    Of course.
4         Any other circumstances where you would
5  set bond?
6    A    You know, in the day-to-day life of state
7  court, you would cover dockets or you would have
8  requests from officers that needed a judge, and they
9  couldn't find anyone else, and they would present
10 warrants and ask for bonds.
11        So in that situation, I -- I've signed
12 warrants and issued bonds with those warrants,
13 warrants for arrest.
14   Q    I understand.
15        Is it fair to say it wasn't a part of
16 your general docket work or part of your general
17 responsibilities dealing with the setting of bond
18 for pretrial detention prior to becoming presiding
19 judge?
20   A    I'm not comfortable saying that, but
21 it's -- it's accurate.  It --
22   Q    Okay.
23   A    -- was a very fringe, but present, part
24 of the job, because even when they would be bound
25 over -- when individuals are bound over from

Page 20

1  preliminary hearing and they appear in front of a
2  district court, if it's not a case where they have
3  resolved it and there was a disputed hearing at the
4  preliminary hearing level, many times there would be
5  continued requests for bond.
6         Even at the district level, bond is --
7  it's a fluid -- it's a fluid dynamic.  People's
8  lives change, support changes, family moves in and
9  out of jurisdictions.  So it's not unusual that
10 there would be multiple requests for bond hearings
11 or extra modifications to a bond or release, even
12 once they show up to district court but before trial
13 or even plea.
14        That -- really, that is a fringe part or
15 a -- you know, you could -- it's a very small part
16 of the general docket that a felony criminal judge
17 handles, but it's still -- it's ever -- ever
18 present, and it's something you deal with weekly.
19   Q    That's -- that's very helpful.
20        So perhaps a more fair thing to say is
21 it's not something that was a part of your everyday
22 responsibilities, but it was something that you
23 handled as a part of your responsibilities?
24   A    I believe that to be more accurate.
25   Q    Okay.  And so it -- did you handle bond

Page 21

1  modification-type motions when you were presiding
2  over your felony docket?
3    A    Yes.
4    Q    And when you were presented with one of
5  those motions, what was the process after you
6  received the motion, not your deliberative process,
7  but the legitimate -- you had -- it has been filled.
8  What is the next step?
9    A    It was case by case.  And please
10 understand that many times, if not most times, I
11 would, in fact, say that it is a rarity that it was
12 filed.
13   Q    Okay.
14   A    The attorney would ask for it orally, and
15 it was a case-by-case basis.
16        Sometimes when the attorney asked for it,
17 the attorney would say, you know, Judge, I -- I
18 would like to set this for hearing, but I need a
19 little bit of time to follow up with these witnesses
20 and see if they say what my client claims they say.
21        Other times the attorney had all the
22 information and was ready to go that day if I would
23 hear it.  And if the DA, if the prosecutor wanted a
24 day or two before answering, I would give them a day
25 or two.

**Exhibit 7**

Case 4:18-cv-00298-SPF-JFJ   Document 365-7   Filed in USDC ND/OK on 05/26/23   Page 7 of 58
Darron Wilborn so dam mseman Cook
5/16/2020

Page 22

1    Usually, in fact, I would say north of
2  90 percent of the time, the DA's office felt fine
3  with the information that they had in front of them,
4  and we would do it on the spot or that day at the
5  docket.
6       Q    So when you say "it," you would do "it"
7  on the top -- that day, are you referencing a
8  hearing?
9       A    Yes.
10      Q    What was that --
11      A    A hearing for determination on bond.
12      Q    And what would that hearing look like?
13      A    It's very case by case.  You make me
14  uncomfortable.
15           But generally, it would be an opportunity
16  for the defense to share everything they think I
17  should know about their client before I set bond.
18  And usual -- I don't want to say usually.  Many
19  times the attorney would give me that information as
20  an officer of the court.
21           I did not believe that the bond
22  hearings -- I don't -- I did not believe that the
23  rules of evidence apply to bond hearings.  And I did
24  not require them to call witnesses.  Many times I
25  would let them tell me what the mother would say or

Page 23

1  what their witnesses would say if allowed to call,
2  because it was easier for them not to try to track
3  those witnesses down.  And other times, they would
4  call those witnesses themselves.
5           So either it would be by statement of the
6  attorney and/or statement of the attorney and
7  additional witnesses.  That is primarily, you know,
8  it.
9       Q    Would there be a court reporter
10  transcribing those hearings?
11      A    Oh, sometimes.  It -- it was available,
12  if they wanted it and -- and --
13      Q    Do you --
14      A    Sometimes they did -- some -- they -- I'm
15  sorry.
16           Sometimes defense counsel wanted it.
17  Many times they did not.  So it was -- there was a
18  court reporter available and utilized in some
19  sessions.
20      Q    Let me ask a broader question.  When you
21  ran your general docket, I'm sure there were
22  numerous types of motions and preliminary matters
23  and up to and including trial that you heard.
24           Did you generally have a court reporter
25  in your courtroom or --

Page 24

1       A    Yes, ma'am.
2       Q    -- was it --
3       A    I'm sorry.  I answered before.  I'm
4  sorry.
5           Yes.
6       Q    No.  No, no, no.  It's entirely fair.
7  I -- it goes faster if you read my mind.  It's only
8  for the court reporter that we're having to slow it
9  down.
10          So there generally was a court reporter
11  in your -- in your courtroom; is that fair?
12      A    Yes, ma'am.
13      Q    Okay.  And so what times would the court
14  reporter not transcribe what was happening on the
15  record?
16      A    She would transcribe records when I told
17  her we were going to make a record.
18      Q    Okay.
19      A    I would make -- I would tell her we're
20  going to make a record when any party requested it.
21      Q    Okay.  That makes sense.
22          So you've -- you've heard -- and we're
23  in -- I understand in a hypothetical world, when you
24  were on your felony docket, you hear the bond
25  modification motion.  You allow defense to present

Page 25

1  argument.
2           I presume you allow the prosecutor to
3  respond to that argument?
4       A    Yes, ma'am.
5       Q    And then would -- how would you make your
6  findings?
7       A    May I go back to an answer I've already
8  given before I answer this one or would you rather
9  me --
10      Q    Please --
11      A    -- answer your question?
12      Q    No.  Please.  And then I'll come back to
13  this.
14      A    This discussion has jogged my memory when
15  you said, What is the process when a request for a
16  bond hearing or modification was made at the
17  district court level?
18          Sometimes if there had been a contested
19  preliminary hearing, I would take the bond request
20  under advisement or have them file a motion, and I
21  would have that hearing the same day that I would
22  rule on the sufficiency of the evidence at the
23  preliminary hearing so that I could read the
24  testimony of the transcript.
25          I found that extremely helpful

Exhibit 7

Johnathan Brian Musseman, Volume I
05/16/2020

Page 26

1  Allegations may look and appear one way, and then
2  when you see the contest -- when you see the
3  testimony and how the evidence comes out at
4  preliminary hearing, it gives a much better view of
5  the incident than maybe cold allegations on an
6  information.
7       So I -- I really didn't think about that
8  earlier when you asked the process for bond request
9  in front of me as a district judge.  Many times I
10 would consider the transcript of the preliminary
11 hearing if that was available.
12      Q     That -- no.  Thank you for correcting
13 that.
14      So just so I'm clear:  You found it
15 helpful to look at that transcript and the evidence
16 presented at the preliminary hearing in order to
17 make your determination of whether bond should be
18 adjusted or not?
19      A     Sometimes I did, yes.
20      Q     Okay.  All right.  So going back to my
21 question that was pending before we -- and I
22 appreciate that revision -- I asked after the
23 defense had made argument, I presumed you allowed
24 the prosecutor to respond?
25      A     Yes, ma'am.

Page 27

1       Q     And I think you said, "Yes."
2       And then I asked:  How would you then
3  make your findings?
4            MS. MOORE:  And -- and just to be
5            clear, we're not asking him his mental?
6            We're asking him the physical, what he
7            did in the courtroom thing?
8            MS. RYAN:  That's right.
9            MS. MOORE:  Okay.
10           MS. RYAN:  I may get to mental
11           questions, but only on an aggregate
12           basis, not to any particular case.
13 BY MS. RYAN:
14      Q     But that -- the question pending before
15 the judge right now is how -- physically, what was
16 the process by which you made your findings?
17      A     I would state my opinion on the record
18 that I would --
19      Q     So when you -- I'm sorry.  I --
20      A     I'm sorry.
21      If -- if it was on the record, then there
22 would be a transcript of my ruling and explanation,
23 along with the order.  If it was not on the record,
24 I would make a minute.  As I gave my ruling, I would
25 then dictate the minute to my clerk that I wanted

Page 28

1  that captured what I had just done, and I had the
2  attorneys agree that that was an accurate minute.
3       Q     So would that minute include the oral
4  findings that you had provided from the bench?
5       A     Yes.  Well --
6       Q     A summary of the oral findings that you
7  had provided from the bench?
8       A     Sometimes.  And if there was a record, it
9  most likely would not.  If it was a record, the
10 minute is not going to say as much because there's a
11 transcript.
12      Q     If there's not a transcript, would the
13 minute be a summary of your findings that you had
14 announced from the bench?
15      A     I wouldn't feel comfortable saying that.
16 Every case is different.  Sometimes the minutes were
17 more detailed with complicated cases.
18      But on a routine docket, if you've got 75
19 on the docket that day, the minute is just -- it's
20 just a minute.  It's -- it's a -- it's a minute as
21 to what happened that day.
22      Q     Would it include -- if you had decided to
23 not reduce bond, would it have included your reasons
24 for not reducing bond or any reason for not reducing
25 bond?

Page 29

1       A     Hit or miss.  Some -- sometimes they
2  would, and sometimes they probably did not.
3       Q     So if I went back to your, like, dockets
4  from that time and looked at your bond reduction
5  minute entries that did not have a transcript, do
6  you think it's more likely than not that there would
7  be some basis for what your ruling had been
8  announced orally in court?
9       A     Yes, I think there would be some basis.
10      Q     That was helpful.  Thank you.
11      And so when you were making your ruling
12 on those bond modification motions, what factors
13 were you considering?
14      A     Oh, first and foremost, their likelihood
15 to return to court.  I looked to family support in
16 the community.  I looked at jobs.  I looked at other
17 cases they've had and if they show up.  Contact with
18 counsel.  Sometimes they -- they have good contact
19 with counsel.
20      Really, any factor that was presented to
21 me that would show they're going to come back to
22 court, make their best effort to come back.
23      Q     A moment ago you said that it's a fluid
24 dynamic around bond.  I just wonder if you could
25 explain what you m... **Exhibit 7**

Page 30

1    A    Many of the people that I experienced --
2  now, this is just my anecdotal experience.  Please
3  don't take it --
4    Q    Understood.
5    A    -- more.
6         Many of my -- the people that I
7  experienced on that criminal docket were in
8  different states of active addiction.  Whether their
9  cases were drug crimes or not, they were in active
10 states of addiction.
11        They may -- and it seemed routine that
12 they would have opinions or ideas about what their
13 family support was that simply wasn't true, that
14 they had burned bridges with family, and they really
15 did not have these places they could go if they were
16 released.  But over time, many times those
17 relationships would change.  Sometimes they would
18 actually strengthen, and family would be willing to
19 offer places to live or transportation to court or
20 to work.
21        Sometimes those relationships would
22 actually weaken or break where they just did not
23 have -- they thought maybe they had family or
24 friends in town and learned they really did not have
25 any connections in town.

Page 31

1         Sometimes -- when I say "fluid," jobs
2  would come and go.  Many of the people -- and this
3  is not a blanket statement, but many of the people
4  that appeared in front of me didn't have what I
5  would consider careers, with 401(k)s, but they would
6  work labor.  They would work hourly jobs.  And many
7  of those jobs were even seasonal.
8         So at -- at the time of arrest, they may
9  not be employed, and they may not have been employed
10 for two months, but the seasons changing and roofing
11 jobs are available or they started doing their
12 yardwork, and things are entirely different in the
13 span of 30 days.
14        I'm sure I could go on.  There's --
15 there's as many things to explain what I meant by
16 fluid situation as my imagination would allow, but I
17 think that captures, at least, my thought process.
18   Q    That's helpful.  I want to drill down
19 on -- on one piece of it.
20        So if the person has filed a bond
21 reduction hearing -- and this is -- again, I'm not
22 talking about bond docket.  I'm not talking about
23 arraignments.  I'm not talking about any of this.
24 I'm talking about bond reduction hearings when you
25 were -- as a part of your docket as -- your felony

Page 32

1  docket.
2         Did you presume they were unable to pay
3  whatever bond had been set previously if they were
4  appearing before you on a reduction motion?
5    A    I never put a presumption in the record.
6  I don't -- I don't think I ever made that finding.
7  I tried to start over.  That's a tough question.
8         I -- I -- I didn't make a finding that I
9  was presuming they were unable to pay it, but
10 obviously that bond amount or the conditions that
11 had been set were not securing their release.  So I
12 tried to listen to their situation, the allegations
13 of the crime, their family support, and then
14 determine what conditions or -- what condition or
15 multiple conditions could be put in place to secure
16 their release that they were going to back to court.
17        I -- I feel like I'm avoiding your
18 question.  I -- I don't mean to.  That's tougher
19 than it -- than it sounds.  I -- did you want ask --
20   Q    I also think you're avoiding my question,
21 and I also think you don't mean to.  So I'm going to
22 ask -- I do think you kind of walked through your
23 thought process there a little bit.  So I'm going to
24 unpack it if that's okay.
25        If they are before you on a bond

Page 33

1  reduction motion, and they are still detained, is it
2  a fair presumption, whether you made it in the
3  record at the time or not, that they are unable to
4  pay the bond as -- or meet the conditions as set at
5  the time of that modification motion?
6    A    No, ma'am, it's -- it's not fair to say
7  that.
8    Q    Okay.  And why is it not fair to say they
9  are unable to pay the amount if they remained
10 detained?
11   A    These are not blanket statements.  And
12 I -- I think I made very clear that this is a volume
13 docket, and every case is different and so is every
14 offender.  And these are anecdotal experiences.
15        Many times it would be the case, and the
16 attorney would tell me -- many times the public
17 defender would make this part of the pitch -- that
18 they could make this bond, but they think there
19 should be a lower bond because the family wants to
20 pay a lower bond so there's more money to give them
21 towards a private lawyer.  And so they had remained
22 in custody because the family is trying to hold on
23 to the money to see if they could get a lower bond
24 to apply more money to private counsel.
25        That was -- I -- I don't want

**Exhibit 7**

Page 34

1    to mislead you and say that that happened every
2    time, but that was something that is ever present in
3    these dockets, where the family has a finite amount
4    of resources, and they want and trust a lawyer, and
5    they had -- this finite amount of resources could be
6    impacted substantially by the bond.
7            So they are able to make the bond, but
8    they are preferring to have a lower bond so that
9    they could choose counsel of choice.
10   Q    So how would that factor into your
11   decision-making of the larger factors of whether to
12   reduce bond or not?
13   A    I'm going to answer.  This is a
14   deliberative process, but that is a big factor to
15   me.  That is a positive factor for the offender,
16   that they have family support and they have a
17   willingness to hire counsel of choosing.  Those are
18   positive factors for their return to court, in my
19   estimation.
20   Q    Okay.  We may come back to this later,
21   but I think that's helpful.  And just as a
22   consideration in time, I'm going to move forward,
23   but like I said, we may come back to this later.
24           Okay.  Let's talk a little bit about the
25   bail schedule.

Page 35

1    A    Okay.
2    Q    When I say "bail schedule," what does
3    that mean to you?
4            I going to make sure we're using the same
5    language.
6    A    I might get my statutes wrong.  I don't
7    have anything in front of me.  But we have -- I
8    think bail schedule is the preset bails -- bail
9    schedule.  I think the statutory authorization is
10   something like 1105.
11           But we're thinking about -- I am thinking
12   you're talking about the preset bonds that people
13   that are arrested without a warrant, if they have
14   the means to do so, may immediately post them for
15   their release.
16   Q    And so I -- that is also what I am
17   referring to when we refer to bail schedules.
18           So throughout the course of today, when I
19   use the word "bail" schedule or "bond" schedule, I'm
20   going to be referring to exactly what you were just
21   talking about, which is the preset bonds that mean
22   that when you're arrested, you can pay and be
23   released immediately.
24           Is that -- or is it fair that we both use
25   that word to describe that concept?

Page 36

1    A    Yes.  And helpful.
2    Q    Okay.  Perfect.
3            All right.  I am going to enter a couple
4    of documents which you will have seen recently into
5    evidence here, just so we can use them as we talk
6    about this.
7            MS. RYAN:  So, first, I am going to
8    mark -- you should have it in your
9    documents.  It was previously marked by
10   my team as Document ZZZZZ [sic].
11           THE WITNESS:  I'm sorry.  Are you
12   asking me to grab my accordion now to
13   look at them?  I was told not to look at
14   anything.
15           MS. RYAN:  Yes.  Now I'm asking you
16   to --
17           THE WITNESS:  Can you give me --
18           MS. RYAN:  And I appreciate that.
19   Now I'm asking you to pull out two
20   documents, one that was labeled ZZZZZ
21   [sic] and one that was --
22           THE WITNESS:  I'm sorry.  I'm sorry.
23           MS. RYAN:  -- labeled AA --
24           THE WITNESS:  I'm sorry.  Ma'am --
25           MS. RYAN:  Let me tell you what they

Page 37

1    are.  Let me tell you what they are.
2            THE WITNESS:  One at a time.  IC or
3    V, I can't hear the difference.
4            MS. RYAN:  Yes.  I am asking you to
5    pull out your two declarations in this
6    case.  One of them should be labeled
7    ZZZZZ [sic], it has a tab that's --
8            THE WITNESS:  Z as in zebra?
9            MS. RYAN:  Yes, five [sic] Zs,
10   Exhibit 1.  Yes.
11           And then I'm -- and just for
12   efficiency, I'm going to ask you to also
13   pull out the five As.  That's AAAAA.
14           So for the --
15           THE WITNESS:  Yes, ma'am.
16           MS. RYAN:  For the document that was
17   previously marked ZZZZZ.  I'm going to
18   ask the court reporter to mark that as
19   Exhibit 1 for purposes of this
20   deposition.
21           I'm going to ask my colleague, Gary,
22   to put that on the screen.
23           (Whereupon, Plaintiff's Exhibit
24   Musseman No. 1, Affidavit of William
25   Musseman dated June 2, 20__, was

Exhibit 7

Dodge v. William Musselman, et al.
5/26/2020

Page 38

1             marked for identification.)
2             MS. RYAN:  And then the document
3     previously marked Exhibit AAAAA, I'm
4     going to ask to have marked as Exhibit 2
5     for purposes of this deposition.
6             (Whereupon, Plaintiff's Exhibit
7             Musseman No. 2, Declaration of
8             William Musseman, was marked for
9             identification.)
10    BY MS. RYAN:
11        Q     While my colleague is getting that up on
12    the screen and you have them in front of you, let's
13    take a look at the one that's now Exhibit 1, which
14    is your affidavit from April the 15th, 2019.
15            Do you have that document in front of
16    you?
17        A     I think so.  I don't see a date to
18    confirm.
19        Q     I think there may be a date on the top of
20    the document, the -- the document -- the filing
21    stamp from the federal court that said -- that says
22    April 15, 2019 in the top right corner.
23        A     Yes, ma'am.  Yes.
24        Q     Perfect.
25            Do you recognize this document?

Page 39

1        A     Yeah, I think so.  I think I signed this
2     earlier, yeah.
3        Q     Is it --
4        A     I recognize what it is.
5        Q     It's -- it's an affidavit that you
6     submitted in conjunction with this litigation --
7        A     Yes.
8        Q     -- is that right?
9        A     Great.
10       Q     Yes.
11       Q     On the second page, is that your
12    signature?
13       A     It is.
14       Q     Great.
15            And so you were declaring the information
16    in this -- in this document for purposes of proof in
17    this litigation; is that correct?
18       A     For the purposes of what in this
19    litigation?
20       Q     Submitting proof in this litigation,
21    providing the court with proof, evidence in this
22    litigation.
23       A     My intent was to sign this as evidence.
24       Q     Okay.  All right.  So let's take a look
25    at paragraph 3 of this document.  I'll give you a

Page 40

1     second to read that.
2        A     If you will.  Thank you.
3        Q     No problem.
4        A     Okay.
5        Q     Great.
6        A     I read it.
7        Q     So taking a step back, do you know when
8     Tulsa County began using a bail schedule?
9        A     No, ma'am.
10       Q     Would it sound right if you -- if I said
11    that you started -- the Tulsa County started using a
12    bail schedule in 2001 in response to the statutes we
13    were speaking about a moment ago?
14            MR. WILSON:  Object to the form of
15            the question.
16    BY MS. RYAN:
17       Q     You can answer.
18       A     Things that are ten years old seem like
19    two years ago to me now.  2001 does not mean
20    anything, but I would have no reason to dispute that
21    accuracy.
22            Probably if I had to give my best guess,
23    I would say around 2004, but -- so that 2001 I think
24    is a fair -- it's fair.
25       Q     Do you have any knowledge, either

Page 41

1     personally or as a part of your official capacity as
2     a special judge, district court judge or the
3     presiding judge, how the original bail schedule that
4     was used in Tulsa County was set?
5        A     No, ma'am.
6        Q     Okay.  Do you have knowledge as to how
7     the bail schedule is revised?
8        A     Yes, ma'am.
9        Q     And can you share that with me?
10       A     There is a meeting of the presiding
11    judge, the district attorney, and the public
12    defender, and the bond schedules are adjusted,
13    revised, modified, whatever term you want to use, by
14    that group.
15       Q     Are they -- are there any other community
16    stakeholders included in that meeting besides -- I'm
17    going to count the district attorney and the public
18    defender as community stakeholders, but any other
19    community stakeholders?
20       A     I'm only testifying now to the ones that
21    I've experienced.  How others have done it in the
22    past, no.
23            And it -- I feel like the -- the reason
24    that I say those three people is I -- I believe that
25    the authority -- or the statute as delegated in, I

**Exhibit 7**

Dodge, William Joseph - 03/16/2020

Page 42

1  think, our Criminal Rule 1, that was the procedure
2  by which it was outlined.
3      Q     And I -- I meant to say this when we
4  started today:  I am going to be asking you several
5  questions where obviously your role as presiding
6  judge would have allowed you to have knowledge of.
7  So for instance, we're talking about the bond
8  schedule and your work with that as presiding judge.
9          If I phrase a question that makes -- as I
10 just did, that makes clear that perhaps you're
11 not -- you're not still presiding judge, and so you
12 may not have current knowledge, just let me know.
13 That's fine.
14     A     Okay.
15     Q     All right.  So on the bond schedule, what
16 factors are considered in setting and determining
17 those amounts, the amount on the schedule?
18     A     The bonds had been set -- there are --
19 let's except out for this discussion:  There are
20 some bonds actually set by statute.  But the bonds
21 that are to be set on the bond schedule were already
22 set before I was ever a judge.
23          So the modification -- I mean, I guess I
24 could just give you examples of things we have done.
25 When -- I think it was Judge Nightingale was the

Page 43

1  presiding, bonds were reduced because there had been
2  a state question that was passed by the voters that
3  changed our drug possession to misdemeanor.  So any
4  drug in Oklahoma, marijuana or heroin, what --
5  whatever it might be, possession of drugs is a
6  misdemeanor.
7          So to reflect that change by state
8  question, we adjusted -- we, the court, the
9  presiding judge, in consultation with the DA and the
10 public defenders I described before, reduced all of
11 those possession of controlled drug bonds to a
12 thousand dollars to reflect the misdemeanor that
13 they are now, not a felony.
14         We consider other similar counties.  If
15 Tulsa County has a bond for a charge that is really
16 out of whack or much higher than Oklahoma County, we
17 consider that and try to maintain some type of
18 consistency with counties similar to us.
19         We consider the violence, the charge, the
20 type of charge, the offense charged.  I think that's
21 a fair statement of what's considered.
22     Q     So you shared several different factors
23 with me --
24     A     I can't -- I'm sorry.
25     Q     Yeah.  Sorry.  You --

Page 44

1      A     That's okay.
2      Q     You shared several different factors with
3  me, including some bonds being set by state statute,
4  some bonds in response to --
5      A     I didn't really consider that a factor.
6  I was trying to except out that there are some of
7  those.
8      Q     I'm just trying to be as comprehensive as
9  possible for why the amounts are what they are on
10 the schedules.
11         So one of the reasons the amounts are
12 what they are on the schedule is because state
13 statute requires it.
14         Another reason that the amounts are what
15 they are on the schedule is there are times when the
16 offense is changed from a felony to a misdemeanor,
17 like the drug possession statute that you gave to
18 us, and that might reflect a change in the bond
19 schedule; correct?
20     A     Yes, ma'am.
21     Q     You also mentioned that you look at
22 the -- schedule amount in other counties?
23     A     Yes, ma'am.
24     Q     And that you look at the violence of the
25 charge, the type of charge, and the offense charged

Page 45

1  as the factors to what the amount should be on the
2  bond schedule?
3      A     Yes, ma'am.
4      Q     Do you consider, as a part of the bond
5  schedule, risk of flight or return to court?
6      A     Yes.
7      Q     What would an example of how return to
8  court would be reflected in the amount for a
9  particular offense in the bond schedule?
10     A     I -- I don't understand your question.
11     Q     So I just asked whether chancing of --
12 the chance of returning to court was a factor in the
13 amount set on the bond schedule for any given
14 offense, and you said that it was.
15         So my question is:  Can you give me an
16 example of an offense where the bond schedule
17 reflects whether someone is going to return to court
18 or not?
19     A     Where the bond schedule reflects whether
20 they're going to return to court or not?
21     Q     Yes.
22     A     I don't -- I can't answer.  I don't know
23 what you're asking.
24     Q     Okay.  A moment ago we walked through the
25 factors of what the amount on the bond schedule

Exhibit 7

Dodge v. Duisman Demand/Ok
5/26/2020

Page 46

1  are.
2      A    Yes.
3      Q    After we walked through those factors, I
4  asked you if returning to court was a factor that
5  contributed to the amount of any charge on the bond
6  schedule.  And you said, "Yes."
7          So I'm asking for an example of how
8  returning to court impacts a given charge on the
9  bond schedule?
10     A    I'm having to guess at what you're
11  asking.  I understand what --
12     Q    I -- I don't want -- I don't want you to
13  guess.  Let -- let me try it again.
14         We walked through several factors that
15  you say play into the amount on the schedule for
16  the --
17     A    Yes.
18     Q    Let me start again.
19         Does whether someone -- does whether
20  someone will return to court affect the amount on
21  the bond schedule for any given offense?
22     A    I believe it does.
23     Q    How?
24     A    For example, eluding.
25     Q    Can you give me another example where

Page 47

1  return to court is impacted in the bond schedule --
2  or the bond schedule is returned -- is impacted by
3  the factor of returning to court?
4      A    Oh, boy.  Not off the top of my head
5  right now.
6      Q    Okay.  I'm just -- let's move on.
7          All right.  So I'm going to talk about
8  the use of the bond schedule for warrantless arrest.
9          How are the bond amounts determined for
10  someone who is arrested on a warrantless arrest?
11     A    Bond schedule?
12     Q    Yes.
13     A    You said, Let's use the bond schedule?
14     Q    Well, I guess it's a question I'm asking.
15         So for someone on a warrantless arrest,
16  how is the bond amount determined?
17     A    By that process I answered earlier.  It's
18  the preset bond schedule.  The present bond schedule
19  is the product of the presiding judge, the DA, and
20  the public defender.
21     Q    Great.  I wanted to make sure that we
22  were on the same page.
23         Are there any individualized
24  determinations, beyond the bond --
25     A    Yes.

Page 48

1      Q    -- schedule, for a warrantless arrest?
2      A    Yes, ma'am, there are.
3      Q    What are those -- and what are those
4  individualized determinations?
5      A    Domestic assault and battery.  I -- and I
6  think there's some others, but unless it's put in my
7  face, I'm not going to know it.
8          The judges that deal with that would
9  probably know better.  I'm sorry.
10         I know domestic assault and battery is
11  one of those.  And if I recall right, I thought the
12  statute, the -- the pretrial bond Statute 1105 at
13  some point tells us which ones can't be set by bail
14  schedule.
15     Q    So for the ones that on the schedule, for
16  the -- for any offense on the schedule, is there any
17  individualized determination of the amount of bond
18  at the time of arrest?
19     A    When you say individualized
20  consideration, tell me what you mean.
21     Q    Do people receive any bond amount
22  separate from what is on the bond schedule for
23  offenses that are listed on the bond schedule?
24     A    Yes.  Many times, but not --
25     Q    So --

Page 49

1      A    -- not at booking.  I --
2      Q    Okay.
3      A    You're saying "process."  Well, the
4  process is you're booked, and you get the bond
5  schedule amount.  And if you have the means to make
6  that bond schedule amount, your release will be
7  immediate.  The others will be in front of a judge
8  for an individualized determination within 48 hours.
9          And, yes, those bond amounts are
10  individualized and many times different than the
11  bond -- this preset bond amount, is the process.
12     Q    Yup.  So we'll get to the docket hearing
13  and -- or the bond docket in a few minutes.  I'm
14  focused on the time of arrest and booking.
15         Are there any individualized
16  determinations of the bond schedule made when
17  someone is arrested and booked, or is it only what's
18  on the bond schedule?
19     A    It would be an anomaly if there was an
20  exception, but I can see exceptions.  I could see an
21  arrest and a call to the judge.  I -- I could see
22  something like that happening.
23         But, no, I -- I think the practice is, is
24  that they will get the bond amount that is on the
25  preset schedule.  **Exhibit 7**

Page 50

1  Q    You're not aware of any deviation for the
2  bond schedule -- from the bond schedule at the time
3  of arrest and booking?
4  A    I am not personally, no.
5  Q    All right.  Are there any offenses on the
6  bond schedule where personal recognizance is the
7  default on the schedule?
8  A    I don't know.
9  Q    When you were presiding judge over the
10 bond schedule and revising the bond schedule at that
11 time, were there any offenses where personal --
12 being released on personal recognizance was the
13 default?
14 A    I don't think so.
15 Q    And why is that the case?
16 A    That has been a topic of discussion.  And
17 one of the things that -- we've looked to other
18 states that have done that.  California is a good
19 example.  And those states have enabling statutes
20 that allow for it.
21     We could not find that in Oklahoma.  We
22 found the pretrial release in Section 11 -- or I
23 think it was Section 1105, if I -- if I recall
24 correctly.  And that at least allows for the
25 presiding judge by standing order to characterize a

Page 51

1  classification of charges to be considered for
2  pretrial, which is the closest I could find as a way
3  to get to PR, because we're looking at conditions
4  other than monetary release.
5      But the statute also explains that it's
6  just an evaluation and recommendation from pretrial
7  that has to be approved by the judge.
8  Q    So would the presiding judge have the
9  authority to make that classification as an
10 evaluation, as you just mentioned, for a category of
11 offenses on the bond docket -- I mean, on the
12 bond --
13 A    Ma'am --
14 Q    -- schedule?
15     Excuse me.
16 A    Ma'am -- ma'am, I believe -- oh, on the
17 bond schedule?  I'm talking about pretrial release.
18 So you've kind of -- okay.
19 Q    So we're --
20 A    Time out.  I'm sorry.  Will you ask that
21 again?
22 Q    I'm solely focused on the bond schedule.
23 We're going to get --
24 A    Okay.
25 Q    -- to the bond docket in a few minutes.

Page 52

1  I'm solely focused on the bond schedule.
2      And I asked, when you were presiding
3  judge, were there any offenses for which the default
4  amount on the bond schedule was personal
5  recognizance.
6      And you said, No.
7      And I asked --
8  A    I don't think so.
9  Q    And I asked why.
10     And you said there had been some
11 discussions, and then you pointed to the Oklahoma
12 Statute 1105 as to what authority the presiding
13 judge has over what I presume to be bond schedule
14 amounts.
15     So does that help center you with what
16 we're talking about in --
17 A    It -- it does.  1105 was not really about
18 bond schedule amounts.  That was the authority to
19 set or have cases reviewed for pretrial release.
20 Q    Okay.
21 A    And I was inartful in the way I told you
22 about it 'cause I was trying to do it by way of
23 illustration.
24 Q    Okay.
25 A    At least that statute gave a roadmap and

Page 53

1  explained who had the authority.  The presiding
2  judge, not an individual judge, but the presiding
3  judge had the authority, at least by standing order,
4  to create a -- a class of cases that could
5  immediately be reviewed by pretrial services to
6  consider for release on pretrial.  If they made that
7  recommendation for release, then they could show it
8  to the individual judge for authorization.
9      I got off track on the bond schedule, but
10 I was using it by way of example.  You asked the
11 question why was there no standing PRs?
12     There's no enabling statute to that
13 effect, that I could find, that allowed for the
14 standing order of PRs.
15 Q    So it's your -- is it fair to say that
16 you do not believe that the presiding judge of Tulsa
17 County has the authority to have standing PRs for
18 certain categories of offenses on the bond schedule?
19 A    Yes, ma'am.
20 Q    And so --
21 A    Right or wrong, that's -- that's my
22 belief, yes, ma'am.
23 Q    And what is that belief based on?
24 A    What I just explained.
25 Q    So your -- [Exhibit 7] is

Exhibit 7

Page 54

1   that fair?
2       A   Yes, ma'am.
3       Q   And you mentioned that there had been
4   discussions.
5           Can you share who those discussions have
6   been with?
7       A   Yes.  The Public Defender's Office, the
8   DA's office, and I think even Still She Rises was a
9   part of that, and it came at a time -- it continued
10  for some period of time, but it -- it was sparked,
11  if you will, with the Vera.
12          And I -- it's hard to tease out sometimes
13  what was the product of Vera versus just setting of
14  bonds, but Vera sparked a lot of these conversations
15  that had.  In my memory, it's contemporaneous in
16  time to when Vera was in town.  We were having
17  conversations with public the defenders, the DAs,
18  judges about:  Is -- is there a way to have standing
19  PRs?
20      Q   So that's --
21      A   Personal recognizance.
22      Q   There's some categories of offenses for
23  which there is no associated jail time as a part of
24  the recommended sentence for that offense; is that
25  fair?  Trespassing as an example?

Page 55

1       A   What -- what -- what did you say?  Jay --
2       Q   Trespassing as -- trespassing as an
3   example.
4       A   I don't dispute anything you're saying.
5   I don't know.
6       Q   If there is a category of offenses for
7   which the eventual sentence, should one have been
8   convicted, is no jail time, is it your position that
9   the presiding judge does not have the authority to
10  book and release individuals on those types of
11  charges, and instead those folks have to be detained
12  even though the ultimate sentence would not be
13  detention?
14      A   Yes, ma'am.
15      Q   So you don't think the presiding judge
16  has the authority over those issues?
17      A   Not on a standing order, no, ma'am.
18      Q   So you --
19      A   But --
20      Q   You are mentioning on a standing order.
21  Do you think that they have -- that the court itself
22  could issue a local rule as to the bond schedule on
23  those categories of offenses?
24      A   If I understand your question right, I --
25  a local rule?

Page 56

1       A   I don't know.  I've never contemplated
2   that.
3       Q   So when you say "standing order," I'm
4   assuming you mean administrative order; is that
5   fair?
6       A   Well, I -- yes.  I was thinking
7   administrative order, yes, ma'am.
8       Q   And so your position is the presiding
9   judge alone, perhaps through the administrative
10  order, doesn't have that -- have that power.
11          My question is:  Do you have an opinion
12  as to the authority of the entire court through a
13  local rule as to the ability to change the bond
14  schedule on those categories of offenses?
15      A   I don't have an opinion.
16      Q   Okay.  Have you discussed the possibility
17  of a local rule as to certain categories of offenses
18  on the bond schedule being default PRs?
19      A   I don't recall that.  If I ever did, I
20  have no memory of that.
21      Q   All right.  Just a couple more questions
22  on the -- bond schedule, and then we'll take a
23  break.
24          So a minute -- a moment ago you mentioned
25  that anyone who pays the amount at the time of

Page 57

1   arrest and booking on the bond schedule, they're
2   immediate release; is that right?
3       A   Yes.
4       Q   Can an individual post their own -- own
5   bond amount that's listed on the schedule and be
6   released, or do they have to work with a bail
7   bondsman in order to post that amount?
8       A   They can post their own.
9       Q   And anyone who does not post that amount
10  is detained until the bond docket hearing at a
11  minimum; is that right?
12      A   That's how I understand the process, yes,
13  ma'am.
14      Q   And so if an individual can't afford to
15  pay the amount on the bond schedule, then they're
16  detained until that hearing 24 to 48 hours later?
17      A   Yes, ma'am.
18      Q   And that applies to felony and
19  misdemeanor charges?
20      A   Yes, ma'am.
21      Q   And so the key distinguishing factor
22  between those who appear on bond docket and don't
23  appear on bond docket, those who have paid and
24  don't -- haven't paid; is that fair?
25      A   Those t— **Exhibit 7**

Page 58

```
1     Q    Have paid --
2     A    -- the distinguishing factor between
3  those that have paid the preset bond and those that
4  cannot?
5     Q    Yes.
6     A    Yes.  That's an immediate factor --
7     Q    Okay.
8     A    -- yes.
9     Q    Great.
10         MS. RYAN:  So I'm going to -- we've
11         been going about an hour.  Do you want to
12         take a -- a super-short break and then
13         come back, and we'll talk about some of
14         these administrative orders?
15         THE WITNESS:  I'll leave it up to
16         you.  I can go on.  I know you're -- you
17         feel pressed for time.  I -- I don't need
18         a break now, but it's up to you and
19         everyone else.  I'm ready.
20         MS. RYAN:  I could use a quick
21         break.  Okay.  I'll try to take the next
22         section a little longer than this
23         section.
24         THE VIDEOGRAPHER:  The time is
25         11:09 a.m.  And we're going off the
```

Page 59

```
1     record.
2          (Whereupon, there was a recess taken
3          from 11:09 a.m. to 11:21 a.m.)
4          THE VIDEOGRAPHER:  The time is
5          11:21 a.m.  And we're back on the record.
6  BY MS. RYAN:
7     Q    Welcome back, Judge Musseman.  I want to
8  cover a couple of things -- go back to a couple of
9  things we were talking about, and then we'll move
10 forward to the adoption of the administrative orders
11 that you mentioned earlier.
12         So I realized we got so engaged in our
13 conversation that I didn't ask you what your
14 responsibilities were when you were presiding judge.
15    A    The -- the responsibilities are
16 statutorily described, but generally speaking, the
17 presiding judge has the authority and authorization
18 to make judicial assignments and case assignments to
19 all judicial employees and special judges in the
20 judicial district.
21         So assignment of workload, assignment of
22 cases, assignment of dockets is generally the
23 responsibility of the presiding judge.
24    Q    And then the authority to issue certain
25 administrative orders as well; is that right?
```

Page 60

```
1     A    I don't know really the authority to
2  issue AOs.  I see AOs more as the vehicle or the
3  method by which you conduct your responsibilities.
4     Q    As a part of those responsibilities, do
5  you have oversight responsibilities over any of the
6  district court judges or special judges?
7     A    Presiding judges have the -- yes.  You
8  say "oversight."  It's described as -- I'm trying to
9  think of the wording.  I don't have it in front of
10 me.
11         Presiding judges have the authority --
12 supervisory control is what they call it, but
13 supervisory control is not to be mistaken with
14 interfering with a judge's independent thinking and
15 thought process.  You don't supervise the decisions
16 they make.
17         Supervisory control by the statute refers
18 more to making certain that the employees -- and
19 they have a definition and tell you who is
20 considered a judicial employee -- are maintaining
21 the objectives of the judicial district and the
22 Supreme Court.
23    Q    Would one of those objectives be
24 consistency in the way various matters are handled,
25 not necessarily the -- the decisions in those
```

Page 61

```
1  matters, but the process by which those matters are
2  handled?
3     A    Ms. Ryan, that is -- that is a good
4  question.  I'll tell you I could talk to you for two
5  hours about that.  There is --
6     Q    Well, I've only got two hours.  So you
7  can't talk to me for two hours about that.
8     A    There is an inherent and always present
9  tension between consistency and individualized
10 assessment.
11         So, yes, I agree with your statement, but
12 I caution you, personally, I believe it is artistic,
13 not mechanical.  You do want consistency.
14 Consistency, I think, is a moral factor to consider
15 in some of the decisions we make, but consistency
16 just for the sake of consistency comes at the cost
17 of individualized assessment.
18    Q    That makes sense.
19         I -- I think you would agree, though,
20 that there are certain state and federal
21 constitutional -- setting aside this case and
22 whether we agree on this case, there are certain
23 state and federal constitutional procedural
24 mechanisms which consistency is required; is that
25 fair?
```

**Exhibit 7**

Dodge - 11.16.2020

Page 62

1   A    Yes.  I'll say that's fair.

2   Q    Right.

3        And so I guess my question is:  As
4   presiding judge, is one of your responsibilities
5   attempting to -- understanding these are all
6   individuals -- ensure as much consistency as
7   possible?

8   A    Stated a way I'm more comfortable with,
9   was to try to take steps under my supervisory
10  control authority to make certain that they were
11  meeting the objectives of the 14th Judicial District
12  as dictated by the Supreme Court and statutes.

13  Q    And that would include potentially, like,
14  training opportunities for the court; is that fair?

15  A    There is from time to time training, but
16  that process is ad hoc, and it's on items as they
17  pop up and are necessary.

18        For example, you know, there are state
19  questions that have been passed which kind of leads
20  things to be different around here.  So we might
21  have pop-up sessions for training.  And there are
22  training on other areas, on telephonic search
23  warrants to think of something in the immediate
24  past.

25        But, yes, it -- it is a -- it is a method

Page 63

1   that is used.

2   Q    What -- what other --

3   A    So --

4   Q    No, no, no.  I apologize.

5        What other steps would you take, under
6   your supervisory control authority, to make certain
7   that the judges were meeting the objective of the
8   14th Judicial District?

9   A    The -- the rule-making process and the
10  administrative orders.  And then in a county our
11  size -- please understand my county is different
12  than -- you know, we have 77 counties in the State
13  of Oklahoma.  My judicial district is different than
14  many.

15        We have a judicial district that has at
16  least a size, population that has many judges.  So
17  we have divisions, and each division, criminal,
18  family, juvenile, these divisions -- civil, these
19  divisions have their own administrative chiefs, and
20  they certainly help filter down and communicate to
21  different employees of the judicial district for the
22  presiding judge and with the presiding judge.

23  Q    Very helpful.

24        A couple of follow-ups on that.  So you
25  mentioned the rule-making process and administrative

Page 64

1   order.

2        Is there other policy guidance,
3   supervisory guidance that you issue as presiding
4   judge outside of the rule-making process and
5   administrative orders?

6   A    Would that include discussions with
7   employees?

8   Q    I'm looking at something more -- again,
9   going back to our consistency points, discussions
10  would be ad hoc, is why I asked about training.

11        I'm trying to understand how the
12  consistency --

13  A    Ms. -- okay.  I was going to say -- I'm
14  sorry.  I didn't mean to interrupt.  Please finish.

15  Q    No, no, no, no.

16        Just so were on the same page and have a
17  clean record:  I'm trying to nail down, when you
18  were presiding judge, how did you communicate,
19  through your supervisory authority, the objectives
20  to the judges?

21        And you mentioned -- we talked about
22  training and how that was used sometimes, and that
23  was more ad hoc.  You mentioned the rule-making
24  process.  You mentioned administrative orders.

25        I'm trying to determine if there's

Page 65

1   anything else not ad hoc, not one off, that you used
2   as a part of your supervisory authority to
3   communicate the objectives?

4   A    Dialogue.

5   Q    Okay.  Anything else?

6   A    Not that I can think of sitting here in
7   this moment.

8   Q    Okay.  And then you mentioned a minute
9   ago that you also relied on your administrative
10  chiefs for the various divisions to help communicate
11  the objectives for the -- the various issues.

12        Is that fair?  I may be flubbing that a
13  little.  But is that fair?

14  A    No.

15        That's fair, yes.

16  Q    Okay.  And so when we think about the
17  bond schedule, under what administrative chief would
18  that fall?

19  A    Criminal.

20  Q    And is that also the same for the bond
21  docket that we talked about a few minutes ago?

22  A    Yes, ma'am.

23  Q    And so during your time as presiding
24  judge, who was the administrative chief of the
25  criminal division?

**Exhibit 7**

Page 66

1    A       Those are one-year terms, and the -- the
2  presiding judge is a two-year term.
3           I worked a lot with Judge Moody.  So I
4  think Judge Moody was one of them.  And the other
5  one -- maybe Judge Holmes.
6    Q       Okay.
7    A       If memory serves right.  Please, this
8  is -- my memory's fading.
9    Q       That's something I can -- yeah.  That's
10  something I can check.
11           So, again, going back to the question I
12  asked you a minute ago, are you aware of any policy
13  guidance, rule-making, administrative orders that
14  either Judge Moody or Judge Holmes issued regarding
15  the bond docket during your time as presiding judge?
16               MS. MOORE:  Object to form.
17    A       No.
18  BY MS. RYAN:
19    Q       What about -- about the bond schedule
20  during your time as presiding judge?
21    A       No.
22    Q       Okay.  All right.  Also going back to one
23  other thing on the bond schedule, and then we'll
24  move forward to the bond docket.
25           So you mentioned that 1105 is, you

Page 67

1  believe, the statute that gives you the authority
2  to -- to revise/set the bond schedule as a standing
3  order; is that right?
4    A       I think so, yes.
5    Q       And to your knowledge, is there any other
6  statute that either expands or limits that authority
7  beyond 1105?
8    A       Yes.  I mean -- and I said earlier that
9  the preset bond schedule -- I explained the process,
10  and I won't go back into that, but that's so many of
11  these cases and subclassifications that are set by
12  somebody other than us.  The Supreme Court -- I said
13  by statute, but that is by the Supreme Court
14  statute.
15           I -- you know, I know you talked about,
16  and you probably are -- I -- not probably.  You know
17  much more about these cases.  You're mentioning
18  about the ones that don't carry jail time.  So many
19  of those are not even before us, because those are
20  set by the Supreme Court and by statute to create
21  consistency.
22           I -- I think I'm answering your question.
23  You said, What other areas or what other statutes or
24  authority sets those bonds?
25           And I -- I think I've answered your

Page 68

1  question --
2    Q       Yeah.
3    A       -- completely.
4    Q       I think, for purposes of this discussion,
5  let's set aside all categories of offenses in the
6  bond schedule that you believe are outside of the
7  presiding judge's authority.  They have been set by
8  someone else, either the legislature or the Supreme
9  Court.  So let's set those aside.
10    A       Yes, ma'am.
11    Q       So only those for which you believe you
12  have authority.
13           Am I right that that authority you
14  believe is vested through 1105?
15    A       Yes.
16    Q       And are you aware --
17    A       The schedule -- I don't -- I don't have
18  these in front of me.  I --
19    Q       Yeah.
20    A       As I sit --
21    Q       I'm not going to put --
22    A       As I sit here --
23    Q       I'm not going to put a document in front
24  of you and impeach you on this -- I'm not going to
25  do that.  We're on the same page.

Page 69

1    A       I don't even know if 1105 is the right
2  statute cite.  But, yes, ma'am.
3    Q       Are there -- again, that category of
4  offenses that is within your purview, are there any
5  other statutes that limits that broad category of
6  offenses, your authority to set the bond schedule
7  amount for those?
8    A       Not that I'm aware of as I sit here
9  today.
10    Q       Okay.  And when we talked about the bond
11  schedule a few minutes ago and I asked whether there
12  were -- the risk of flight was incorporated into the
13  charge --
14    A       Sometimes, yes.
15    Q       -- that's based on the charge itself;
16  correct?
17    A       Yes.
18    Q       Not based on any individualized
19  characteristics of the individual who has been
20  charged with that offense; correct?
21    A       Correct.  This is prior to an arrest of
22  anyone.
23    Q       Right.
24    A       Yes.
25    Q       And so when we're talking about

Exhibit 7

Page 70

1  the individualized nature and whether there were
2  individual factors in the bond schedule, to the
3  extent there's any sort of factors in the bond
4  schedule, those are necessarily limited to the
5  factors of that offense, not any given person?
6      A    You're limiting more -- me more than I'm
7  comfortable.  But, yes, I -- I think so.  I think
8  you're right.
9      Q    Okay.  All right.  Let's switch gears.
10         So for purposes of this next set of
11  questions, I'm going to be referring to the bond
12  docket.  When I use that phrase, what I am
13  describing is the appearance of a detainee in front
14  of a judge 24 to 48 hours after arrest.
15         Is that a fair characterization of bond
16  docket?  And if not, can you correct it?
17      A    I will adopt it.
18      Q    Okay.  Before bond docket was
19  implemented, which -- when was bond docket
20  implemented?
21      A    I don't remember.
22      Q    If I said -- if I told you it was in the
23  fall of 2018, October, I believe, does that sound
24  about right?
25      A    Yes, ma'am.

Page 71

1      Q    Okay.  So prior to the creation of bond
2  docket -- how long did people who were arrested and
3  did not post the bond on the bond schedule, how long
4  did they stay in jail before seeing a judge?
5      A    As soon as feasible, not to extend 48
6  hours.
7      Q    Prior to the adoption of the bond docket?
8      A    Yes.  I'm relying upon what -- I'm
9  relying upon the directives.  I think it's our --
10  our CR 1 -- our CR 1, the -- the Local Rule CR 1.
11      Q    Understood.  Which I understood set up
12  the bond docket or my understanding of the Local
13  Rule --
14      A    No.  No.  CR 2.  CR 2.
15      Q    Okay.  My question is:  Prior to
16  Administrative Order 2008 -- I mean, 2018-9 and
17  2018-10 -- which I believe were administrative
18  orders you issued; correct?
19      A    I -- I think.  I mean, I'm going to take
20  your word --
21      Q    Yeah.
22      A    -- if that --
23      Q    Prior to creation of the daily bond
24  docket, how long did it take for someone to see an
25  attorney after they had been arrested and booked --

Page 72

1  not an attorney, excuse me -- a judge before they
2  had been arrested and booked?
3          MS. MOORE:  Object to form.
4          Read -- read your question again.
5      I -- I got confused.
6          MS. RYAN:  Yeah.
7  BY MS. RYAN:
8      Q    Prior to the creation of the daily bond
9  docket, how long did it take for someone to see a
10  judge after they were arrested and booked?
11      A    I think I've answered the question the
12  best I could based upon CR 1.  I -- before my time
13  as presiding, I -- I -- I guess I should say,
14  really, that's probably out -- I don't have any
15  personal knowledge.
16      Q    If individuals were seeing a judge within
17  48 hours of being booked and arrested -- arrested
18  and booked, what was the purpose of creating the
19  bond docket?
20      A    Because there had been -- I do not want
21  to take this off track.  It is not my purpose.  But
22  over the years, there have been -- we are so
23  helplessly tangled now by using synonymous words or
24  different terms synonymously.
25         Initial appearance, initial arraignment,

Page 73

1  bond setting, Riverside, all of those things, in my
2  estimation, had become hopelessly tangled and needed
3  to be clarified and that judges were reviewing
4  within 24 hours the bond set in each case and the
5  probable cause.
6         And if you read CR 1, I believe it does
7  direct them to review the probable cause within 24
8  hours -- maybe 48, 24 to 48.  But it is my
9  estimation that that is a Riverside -- I'm talking
10  about a Supreme Court case.  That was a Riverside
11  determination on probable cause.
12         And the clarification for CR 2, to answer
13  your question the best I can, was my best effort to
14  try to clearly or more clearly state the objectives
15  of the 14th Judicial District in a way everyone
16  would understand where initial appearance, initial
17  arraignment, those things became less significant
18  with your understanding as long as you understood
19  they -- somebody arrested that does not post bond
20  immediately, is in front of a judge with a lawyer
21  and a hearing as soon as possible, not to exceed 48,
22  and the practice is to try to get it within 24.
23         I hope I answered your question.
24      Q    You did.  You did answer my question.
25  But it -- I understand that prior to

Exhibit 7

Dodge et al. vs. Musselman, et al.
11/16/2020

Page 74

1  the adoption of bond docket, detainees were being
2  assessed by a judge within 24 hours per Local Rule
3  1 --
4       A    I think it was 48 hours, but -- 48 hours.
5  And I think it even goes on to explain that that
6  function lasts six days a week.  There was an
7  assignment of a judge for weekend duty to carry out
8  the function over the weekend, but not both days
9  like we do it now.
10      Q    Okay.  So prior to the adoption of what
11 I'm going to refer to as Administrative Order 9 and
12 10, detainees were being assessed by a judge within
13 24 to 48 hours of probable cause and their bond
14 amount.
15           It was just happening in multiple
16 different forum, and you were attempting to
17 consolidate it into a single forum?
18           MR. WILSON:  Object to the form.
19      A    Can I -- I think we're on the same page.
20 I -- you referred to AOs 9 and 10.  Is there any way
21 I can see them?
22 BY MS. RYAN:
23      Q    Yeah.  Absolutely.
24           MS. RYAN:  Gary, why don't you bring
25           up what was previously marked Tab I and

Page 75

1           what was previously marked Tab J.
2                These will be Exhibits 3 and 4, for
3           the record.
4                So in your binder, Your Honor, these
5           are Tab I and Tab J.
6           (Whereupon, Plaintiff's Exhibit
7           Musseman No. 3, AO-2018-09
8           Administrative Order Establishment of
9           Bond Docket, was marked for
10          identification.)
11          (Whereupon, Plaintiff's Exhibit
12          Musseman No. 4, AO-2018-10 Amended
13          Administrative Order Regarding
14          Pretrial Release Program, was marked
15          for identification.)
16          COURT REPORTER:  Attorney Wilson,
17          your microphone is a little high.  If you
18          could bring that down a little.
19          Thank you, sir.
20          MR. WILSON:  Thank you.
21 BY MS. RYAN:
22      Q    All right.  Let's take a look at what's
23 been previously marked Tab I first, which is now
24 Exhibit 3.
25           Do you recognize this?

Page 76

1       A    Yes, ma'am.
2       Q    What is this?
3       A    This is an administrative order
4  establishing the bond docket that I signed
5  October 3rd of two thousand, I think that's
6  eighteen, if memory serves right.
7       Q    And this is a true and correct copy of
8  that administrative order?
9       A    Yes, ma'am.
10      Q    And moving forward, are you okay if I
11 call this AO-9 for purposes of our discussion?
12      A    100 percent.
13      Q    Awesome.
14           All right.  Why don't you take a look at
15 what was previously marked J, Exhibit [sic] J.
16           Do you recognize this document?
17      A    Not yet.
18           Yes, I do now.  Yes, ma'am.
19      Q    What is this document?
20      A    This is an amended administrative order
21 regarding pretrial release program, that 1105
22 statute I kept referring.  It was signed by me in
23 October, as well, of 2018.  It's obviously part and
24 parcel of the bond docket.
25      Q    Does this appear to be a true and

Page 77

1  accurate copy?  Is there anything that looks wrong
2  about it and --
3       A    No, ma'am.  I -- it looks true.
4       Q    And it -- you did mention this was an
5  amended version.  We may look at the original in a
6  moment, depending on time.
7           But this is the final version of the
8  administrative order; is that right?
9       A    I will accept that.
10      Q    And -- and I'm going to refer to this
11 today, what is Exhibit 4, as AO-10, if that works
12 for you?
13      A    Yes, ma'am.
14      Q    Great.
15           So going back to what we were discussing,
16 you testified that within 24 to 48 hours, a judge
17 was assessing each person who had been arrested and
18 detained.
19           What were they assessing?
20      A    Prior to the bond docket.
21      Q    Yes.
22      A    I don't have personal knowledge of that.
23      Q    Do you -- were judges assessing the bond
24 amount within 24 to 48 hours prior to the adoption
25 of AO-9 and 10?  **Exhibit 7**

Page 78

```
 1              MS. MOORE:  Objection.  Calls for
 2         speculation.
 3      A    Ma'am, I -- I don't have personal
 4  knowledge of that.
 5  BY MS. RYAN:
 6      Q    As presiding --
 7      A    I --
 8      Q    Go ahead.  I apologize.  I don't mean to
 9  interrupt you.
10      A    No.  I -- I thought you were asking me as
11  a fact witness, and I -- I don't have personal
12  knowledge of that.
13      Q    As presiding judge, was it your
14  understanding that the -- that judges were
15  evaluating bond amounts between 24 and 48 hours
16  after arrest prior to the adoption of AO-9 and 10?
17      A    It was my concern that there was
18  confusion as to what exactly they were doing.  That
19  rule, I thought, was leading to confusion, and the
20  reviews could have been by some judges to be
21  Riverside hearings and other judges bond
22  determinations.
23           It was my estimate, as the presiding
24  judge with a personal knowledge of those events, I
25  felt that the rule had become confusing, and I
```

Page 79

```
 1  wanted a more clear rule so everyone was marching in
 2  the same direction.
 3      Q    And what led you to believe that the
 4  judges might be confused as to what was -- I'll stop
 5  there.
 6           What led you to believe the judges might
 7  be confused?
 8      A    We assigned -- it was the weekend
 9  assignments.  The weekend assignments go to a
10  different special judge every weekend, and then they
11  have what -- what I call the duty phone.
12           So if there is a need for a judge, an
13  emergency that needs to be reviewed, a search
14  warrant or something on the weekend when the
15  courthouse is closed, they have access to a special
16  judge by that phone.  That special judge was also
17  responsible for the weekend bond docket, if you
18  will.
19           And remember, by that rule, that was held
20  one day a week, either a Saturday or a Sunday.  I
21  don't recall.  But that was done six days a week.
22           You're handing out this duty, this
23  weekend duty to special judges, some of which are
24  assigned to the criminal division.  Most of which
25  are not.  They're assigned to juvenile division.
```

Page 80

```
 1  They're assigned to the family division.  They're
 2  assigned to guardianships or to civil or to small
 3  claims.  There's these judges that are serving in
 4  the weekend in an unfamiliar function.
 5           Anecdotally, from questions I heard that
 6  were asked of those judges about what to do on these
 7  bond reviews, I felt when I reviewed that CR 1, I
 8  think it's -- I'm citing it right, that it was not
 9  as clear as I wanted it to be.
10      Q    So your concern about the confusion was
11  about the weekend special judges?
12      A    The -- about all of the language that
13  even lawyers talk about and -- and even disagree on.
14  They will be talking about initial appearance,
15  initial arraignment, bond setting.  They will be
16  speaking to one another in colloquial terms about
17  those -- those words and have in their mind
18  different meanings or understanding of what they're
19  talking about.
20           Seeing that occur and seeing that same
21  language in CR 1 is what led -- as presiding at
22  least, that was the catalyst, if you will, to think
23  that we needed to improve.
24      Q    So the -- the concerns were, one, how
25  weekend judges were handling bond setting and, two,
```

Page 81

```
 1  the language that judges and practitioners were
 2  using to describe those initial appearances?
 3      A    I think that's fair.
 4      Q    Did you have concerns about the amount of
 5  time that defendants were being held without an
 6  opportunity to seek to reduce their bond?
 7      A    As I studied this and met with groups, I
 8  formed that concern.
 9      Q    So your initial concern was based on this
10  weekend judges and the language people were using,
11  but as you began studying the issue, you began to
12  have additional concerns?
13      A    Fair.
14      Q    And what were those additional concerns?
15      A    That we needed a system that ensured that
16  everyone that does not post their bond immediately
17  gets in front of a judge within a reasonable time.
18  My preference is 24 hours, hence the
19  seven-day-a-week docket.
20           But the best authority I could find from
21  the Supreme Court and appellate courts was 48 hours.
22  But that was -- the goal was 24 hours, with at least
23  a -- a system in place where 48 would not ever be
24  broken but for failure.
25           And that was -- so we were answered
```

Exhibit 7

Rodgers, William H. as Muskogee 05/06/2020

Page 82

1  your question.  That was -- I wanted a real clear
2  rule that made sure that that happened and it
3  happened for everyone.
4      Q    Okay.  So once you began to study the
5  issue, the issue of timing became a concern.
6           Was there anything else that became a
7  concern for you about the administration of bond as
8  you began to study the issue?
9      A    Oh, I'm sure there was.  I -- I'm sure
10 there was.  I --
11     Q    Anything you can recall today, beyond the
12 timing issue?
13     A    A concern for me in setting bond?
14     Q    We mentioned that when you started
15 studying the issue, the time it took that some --
16 for someone to get in front of a judge to have their
17 bond amount considered was one concern after you
18 began studying the issue.
19          I'm asking if there were any others?
20     A    Yes, there was.  This -- I know this is
21 very nuanced, and I don't mean to be nuanced, but
22 having that bond docket where they would be
23 available in front of the judge, represented by
24 counsel -- and we made sure the public defender is
25 appointed if they don't hire one by then -- gives

Page 83

1  them an opportunity to explain to the judge more who
2  they are and for the judge to give an individualized
3  consideration.
4           One of the concerns that I started to
5  develop -- and this is where I worry about the
6  nuance -- I mentioned earlier there's this ever
7  present tension between individualism and
8  consistency.
9           Without -- an example I can give you:  I
10 had, as a presiding, concern that the goal of
11 consistency might start to overtake individualism in
12 the sense that judges might read a bond amount in a
13 bond schedule as some objective, correct de -- de
14 fact -- de facto bond.
15          That was another concern I had that I
16 wanted to address so that they didn't feel like you
17 had to find an exception that would somehow justify
18 a bond lower than the bond schedule.
19     Q    Okay.  Any other concerns?
20     A    Not that come to mind right now.  If I --
21 if I think of something, which I might later,
22 I'll -- I'll interrupt you.
23     Q    Okay.  All right.  I'm -- I'm going to
24 come back to those, but I want to -- very quickly,
25 just so I understand, once a presiding judge has

Page 84

1  issued -- and is "issued" the fair word there? --
2  issued an administrative order, does that presiding
3  judge have the power to unilaterally reverse that
4  order?
5      A    Yes, ma'am.
6      Q    Given that you're not presiding judge
7  anymore, does Judge LaFortune have the ability to
8  unilaterally reverse AO-9 and 10 that were issued
9  while you were presiding judge?
10     A    No.  But it's a very -- I have caveats.
11     Q    Okay.
12     A    And if -- if my understanding is wrong,
13 then my answer changes.
14     Q    Okay.
15     A    We, as presiding, the entire body of
16 elected judges, enacted by vote this bond docket and
17 bond practice as a local rule.  That was to ensure
18 consistency, clarity, and permanency.  It is more
19 then an administrative order.
20          And I believe that what I did -- I tried
21 to clean up.  If you go through, you have
22 administrative orders from the different presidings
23 that dealt with issues that are bond-related or at
24 least the cousin to bond-related issues that go back
25 into the '90s and '80s, probably.

Page 85

1           I tried at the time -- as presiding, I
2  think that I went through and, at least in an
3  administrative order or otherwise, I think maybe by
4  local rule -- it should be available in your
5  discovery -- I went back and struck all of these
6  other AOs once we got the local rule in place.
7           So my understanding is that AO-10 and
8  AO-9 were included in the AOs that I struck or set
9  aside with the adoption of Local Rule CR 2.
10          If my memory is incorrect and I did not
11 include 9 and 10 in that order striking them, then
12 my answer changes.
13     Q    I understand.
14          So if those weren't struck, then
15 theoretically, Judge LaFortune could strike them
16 now, but your position is that Local Rule 2 codifies
17 what was contained in these two?
18     A    Yes, ma'am.
19     Q    Okay.  So let's talk about local rules.
20          How -- you mentioned local rules are
21 adopted by not just the presiding judge, but by --
22 is it all district court judges or a specific
23 division?
24     A    No.  It's all the elected district and
25 associate district judges within the eighth judicial

Exhibit 7

Judge with Blankenship on 12/16/2020

Page 86

1  district.

2      Q      And how can a local rule be rescinded, if
3  at all?

4      A      With a new rule and a vote of all of the
5  judges.

6      Q      And can administrative orders -- future
7  administrative orders clarify issues addressed in a
8  local rule?

9      A      Yes, ma'am.

10     Q      Can they strike issues in a local rule?

11     A      I don't believe so.

12     Q      Okay.  That's helpful.

13            So let's talk a little bit more about
14  these two specifically.

15            When do you recall discussions first
16  beginning about the adoption of something like AO-9?

17     A      Before I was presiding.  When I was vice
18  presiding in 2017.

19     Q      Do you recall what the instigation of
20  those conversations in 2017 were?

21     A      The anecdotal things I shared with you
22  earlier.  But also at the time, there was discussion
23  in broader context about jail population and things
24  like that.

25            Vera -- the Vera Institute was in, and we

Page 87

1  had -- you know, they -- they -- they didn't have a
2  lot, but they did have presentations.  So we were
3  attending presentations, and we were talking to
4  Vera.  But then also, you know, talking to each
5  other about some of our opinions about these things
6  that Vera was presenting and ideas.

7            So I -- it's -- I -- I -- I don't mean to
8  be evasive.  I -- it's so hard for me the tease out
9  some of this because the -- the bond schedule was so
10  part of broader things that were happening in 2016,
11  2017.

12            But to answer your question, I would
13  pinpoint the concern that I wanted to have something
14  that looked more like what is described in AO-19
15  probably started around 2017.

16     Q      And a couple of times in that answer you
17  mentioned "we."

18            When you were mentioning "we," were you
19  referring to you and other district court judges?

20     A      I was.

21     Q      Who were you referring to?

22     A      Me and other district court judges.

23     Q      Okay.  Who else was engaged -- you
24  mentioned Vera.  Who else was engaged beyond other
25  district court judges, yourself, and Vera in those

Page 88

1  early discussions of some -- some potential changes
2  to the way that bond was set in those initial
3  appearances?

4      A      I -- I -- in these Vera meetings there
5  were -- gosh, there were clerks, jailers that would
6  do the -- the minute work and all the paperwork on
7  arrests.  So there was sheriff's office represent --
8  the people there.  There were DAs and public
9  defenders and so many groups.  But that was part of
10  the broader conversation.

11            When I -- when you say "who," I mean all
12  of us, all the district judges, the DAs, public
13  defenders.

14            But this started a more -- at that time,
15  it was just more Vera incarceration rates, jail
16  population things.  It started to crystallize more
17  that I wanted to focus or tease out bonds from that
18  broader population.

19            In 2017, in the conversations I -- I had
20  conversations with individuals, but my memory is
21  that I had conversations with those individuals when
22  I wanted to figure out logistically how in the world
23  to do something different.  So I --

24     Q      I think that's a fair pivot.

25            So you have talked about the broad

Page 89

1  conversations, and it sounds like at some point you
2  realized working on bond specifically might be a
3  pivot; is that fair?

4      A      Yes.  For me, yes.

5      Q      And so did you start to engage in
6  discussions around that issue, the more narrow bond
7  issue at some point?

8      A      Yes.

9      Q      And about when was that?

10     A      Like I said, I believe 2017.  If you have
11  things --

12     Q      Okay.

13     A      If you have things that it's 2016, I
14  would not dispute it.  Things run together.  But it
15  was before I was presiding, is my memory.

16     Q      Okay.  And who were involved in those
17  more narrow discussions?

18            MS. MOORE:  Who's in the background
19            making noise?

20            THE WITNESS:  Am I okay to answer?
21            I didn't know if there has been an
22            objection made.

23            MS. MOORE:  No.  There's no
24            objection, Your Honor.  But there's a --
25            there was background noise.

Exhibit 7

Page 90

```
 1          that -- I -- I don't know whose mic
 2     that's on.
 3     A    The question to me was:  Who were these
 4 conversations with about the more particular areas
 5 of bond?  Is that fair?
 6 BY MS. RYAN:
 7     Q    Exactly right.
 8     A    It started with the public defender, the
 9 DA, I think Still She Rises.  I think that's a -- a
10 fair group.
11          And then those discussions were -- my
12 gosh, they weren't really productive in their
13 infancy, and they didn't start to take form until
14 2018, when I had become presiding.
15     Q    Who were involved in the conversations
16 that matured from their -- from their infancy?
17     A    The DA, the public defender, and the
18 court.  Still She Rises was present at some of these
19 meetings.  And then other people that would have
20 input were invited.
21          I -- I believe -- not all of the
22 meetings, but at times we talked with the supervisor
23 of pretrial services.  Rusty Roberts, who was the
24 president of the bond association, participated.
25 And when I say "the public defender," Corbin
```

Page 91

```
 1 Brewster did participate.
 2          But a lion's share of the work, quite
 3 honestly, was Stuart Southerland.  He was the
 4 representative of the Public Defender's Office, I
 5 would say most all of the time, and was -- I
 6 probably met with Stuart Southerland more than
 7 anyone else.
 8     Q    And so what was -- of those groups you
 9 just mentioned, the DA, public defender, Still She
10 Rises, what was their role in formulating what would
11 eventually become AO-9?
12     A    Logistics.  You know, it's easy to be the
13 command general up high on the hill and give these
14 edicts to carry out, but they're doomed to fail
15 unless the people that are in the trenches every
16 day, knowing how things work, can give you feedback
17 as to why there might be kinks in the hose that you
18 don't foresee or people that you need to involve in
19 the loop, you know, because these did broaden based
20 on these conversations to have to include personnel
21 from the sheriff's office.
22          So I guess, to answer your question, the
23 purpose that each of them played was their
24 perspective, how it would be effected, and the
25 logistical challenge of implementing this.
```

Page 92

```
 1     Q    And were, for example, some of those
 2 logistical challenges that folks were concerned
 3 about?
 4     A    Seven-day-a-week court over the weekend
 5 and even holidays, and the video connections, and if
 6 they would be able to be staffed by DAs and public
 7 defenders, and if there would be ample security for
 8 those attorneys, and if the attorneys would then be
 9 in jail by video or they would be in the courtroom,
10 and how would a judge issue any orders if the --
11 was -- was the minute clerk going to be available?
12          So if the clerk's office sends somebody,
13 would there be some way to make these notations and
14 enter the minutes later?  What was going to be the
15 process of couriering information back and forth,
16 whether it's a pauper's affidavit or something from
17 the jail to the attorneys?
18          I don't mean to go on and bore you, there
19 was just so many -- and I -- I'm probably forgetting
20 about a hundred and fifty-two things, because when
21 you get into the nuts and bolts of something like
22 that, there's just all of these logistical things
23 that I -- I might have thought about or did not
24 think about, and many of the times I had thought
25 about and really misapprehended the consequence or
```

Page 93

```
 1 how those areas would be affected.
 2     Q    At the end of these discussions, you then
 3 issued AO-9; is that fair?
 4     A    Yes.
 5     Q    And was there any -- what was the
 6 reaction to the issuance of the administrative
 7 order?
 8     A    By who?
 9     Q    Generally.
10          Did you receive positive feedback?  Was
11 there a lot of negative feedback?
12     A    I am probably hypersensitive to it
13 because I felt like I was -- I mean, I was in the
14 middle of it.
15          It was negative.
16     Q    And who did you receive negative feedback
17 from?
18     A    The Bondsman's Association was very
19 negative and did not like what I was doing.
20          Whether it's true or not, I felt that the
21 DA's office did not like this.  And at some point,
22 they really quit attending the hearing -- the
23 meetings.  So I really was without their input.
24          The sheriff's office was -- you know,
25 they weren't -- the law -- the jail -- and they
```

**Exhibit 7**

Page 94

1  said -- the sheriff said, We are going to make this
2  happen.
3        But the personnel level, you could tell,
4  it was negative, because now they're working on
5  weekends.
6        I -- I am sorry. I'm answering from
7  feelings. I'm probably too hypersensitive. I was
8  in the middle of it. I didn't get any attaboys.
9     Q    No.
10    A    It was negative.
11    Q    Yeah. No. It -- I -- it's super
12  helpful, because it's helpful for me to understand
13  how it was perceived at the time.
14    A    The Public Defender's Office is separate.
15  They were positive.
16    Q    Okay. Can you -- to the extent you --
17  let me rephrase.
18        What concerns or negative feedback did
19  you receive from the Bondsman's Association
20  specifically about what you were doing in the order?
21        (Whereupon, the court reporter
22        requests clarification.)
23        MS. RYAN: In the order.
24    A    I can't really answer that. It wasn't
25  specific. Again, it's just the way I would

Page 95

1  summarize the criticism. I felt that -- this could
2  be wrong. It was my feeling. I -- they -- they
3  like status quo.
4  BY MS. RYAN:
5     Q    Did anyone express --
6     A    So you --
7     Q    Maybe -- to get away from feelings, did
8  anyone from the Bondsman's Association at all
9  express criticism of the administrative order?
10    A    To me?
11    Q    Yes.
12    A    I don't think so. Rusty Anderson --
13  Rusty Anderson -- Rusty Roberts expressed many times
14  disappointment, concern, frustration about the
15  process, that I call the process of change.
16        But, no, I don't -- no one came from --
17  to me specifically and said this or that about AO-9
18  or AO-10.
19    Q    So Mr. Roberts, what -- can you recall
20  what things he was concerned about in regards to
21  AO-9, AO-10, Local Rule 2, the bond docket?
22    A    Not really. But I'll tell you my memory,
23  if it's acceptable.
24        My memory, really the big umbrella of his
25  concerns, the bonds were -- this docket was

Page 96

1  producing bonds that were too low.
2        Before that, he expressed before -- you
3  know, when we were in the process of trying to
4  implement the docket, he was relaying frustrations
5  due to, I think, more legitimate logistical concerns
6  back in 2017 -- you know, it seems like '16, '17 we
7  started talking about this.
8        And, in fact, what you should have in
9  discovery -- if it -- if my memory is correct, if it
10  would comport with my memory to validate it, you
11  should see AOs that were signed by the previous
12  judge, which was Judge Nightingale, and they were
13  administrative orders to the effect of implementing
14  what she thought was a solid recommendation from the
15  Vera research.
16        And that was a way to stop bond stacking.
17  You'd have one major arrest offense, and then you'd
18  have seven or eight add-ons, and then you would end
19  up with this bond that maybe wasn't really
20  proportional because of all these other bonds. So
21  she administered an AO that said the lead charge
22  would be the only bond.
23        That did legitimately cause a great deal
24  of confusion with bondsmen and also the jailers.
25  They were -- the -- the -- minute clerks, if you will,

Page 97

1  at the jail that processed the booking paperwork
2  could not figure it out and were setting bonds on
3  the wrong -- on -- on the wrong charges. And then
4  they would pick a charge and set a bond.
5        And then the DA's office would look at
6  the case and only file a few of the requested
7  charges from the police officer, which may or may
8  not even include the one they set bond on. And
9  there was confusion then, if they had made bond, was
10  that bond still good? I don't need to go through
11  the litany.
12        But he expressed what I considered some
13  legitimate logistical concerns in the early stages,
14  '17, '18, with the logistics and confusion created
15  at the jail with trying to make these changes. And
16  then it kind of progressed into, I think, a general
17  dissatisfaction with a -- a new idea or the new
18  docket.
19  BY MS. RYAN:
20    Q    What -- how did you respond to his
21  concerns?
22    A    I tried to be transparent and upfront.
23        I told him, This isn't going away. That
24  this is going to happen. I'm sorry you're
25  frustrated.

**Exhibit 7**

Page 98

1     But I try to be transparent.  I -- I
2  don't -- I don't think I ever avoided an unpleasant
3  conversation with him, just -- I think I was
4  upfront.
5     Q    What about the DA's office?  You
6  mentioned that they had some feedback -- some
7  negative feedback.
8     Do you recall any of that feedback being
9  shared with you directly?
10    A    There was an e-mail -- and I can't even
11 remember the contents.  There was an e-mail from
12 Erik Grayless, who was the first assistant at the
13 time.  I don't remember the contents.
14    And it was not just to me.  I think it
15 was kind of everybody.  And I remembered -- without
16 remembering the contents right now, I can remember
17 the feeling that I had that they're not helping with
18 this.
19    Then it got back to me, a statement he
20 had made, but he did not give it to me directly.
21    Q    And what was that statement?
22    A    That he doesn't think he needs to keep
23 coming to the meetings because I'm going to do what
24 I think is right regardless of his input.
25    Q    Did you receive any other criticism,

Page 99

1  directly or indirectly, from the DA's office?
2     A    No, ma'am.
3     Q    And then you also mentioned that you --
4  this was more of a feeling about the sheriff's
5  office.
6     Any criticism or negative feedback that
7  you received, directly or indirectly, from the
8  sheriff's office?
9     A    No.  They promised -- they promised that
10 they would figure out a way to make this work, and
11 they did at every level.
12    Q    So quickly talking about -- we talked a
13 lot about the process.
14    Talking about what this order actually
15 did, in your mind did this order set out an
16 evidentiary standard for the bond docket?
17    A    I don't understand your question.
18    Q    Let me take a step back.
19    So I'm looking at AO-9, which established
20 the bond docket; is that fair?
21    A    Yes.
22    Q    How many days a week did this contemplate
23 the bond docket being run?
24    A    I don't think it did.  Did it -- hold on.
25    Q    Maybe paragraph A?

Page 100

1     A    Yeah.  Monday through Friday.
2     Q    So did this document -- I guess my
3  point -- what I'm trying to get at is the effect of
4  this document.
5     You have now set up the bond docket with
6  this document?
7     A    Yes.
8     Q    Does this -- does this document, as we
9  discussed earlier, is one of the ways, as presiding
10 judge, you were able to exercise your supervisory
11 control, does it establish an evidentiary standard
12 to be used at bond docket hearings?
13    MS. MOORE:  Object to the form.
14    A    An evidentiary standard.
15    No, I don't -- I don't think it does.
16 BY MS. RYAN:
17    Q    Does it require that the judge presiding
18 over the bond docket make findings about what people
19 can -- can afford?
20    A    No, it does not.
21    Q    Does it require considerations of any
22 methods of -- or controls of relief -- when I say
23 "control" -- not relief -- controls of release.
24    When I say "controls of release," does
25 that mean anything to you?

Page 101

1     A    No.
2     Q    Maybe a -- nonmonetary conditions of
3  release?
4     Is that better?
5     A    Okay.
6     Q    Does this document set out when
7  nonmonetary conditions of release should be applied
8  as opposed to monetary conditions of release?
9     A    No.  But I'm not comfortable with just
10 no.  There's a no, but.
11    Q    Okay.  What's the but?
12    A    The AO-10.
13    Q    Okay.  So let's take a look at AO-10.
14    Does AO-10 require findings of ability to
15 pay?
16    A    No.
17    Q    Does AO-10 require that defendants --
18 that all defendants are considered for nonmonetary
19 conditions of release?
20    A    All right.  I'm sorry.  I was reading
21 that.
22    Would you restate your question?
23    Q    Does AO-10 require that all defendants
24 are considered for nonmonetary conditions of
25 release?

**Exhibit 7**

Page 102

1    A    All defendants?
2    Q    Yes.
3    A    No.  No.
4    Q    Beyond these two documents, did you, as
5    presiding judge, issue any other policy guidance
6    related to the administration of the bond docket?
7    A    Policy guidance, no.
8    Q    Did you issue or create any training
9    documents with regard to the administration of the
10   bond docket?
11   A    There were training documents produced,
12   but I think at a later time.  At this time, I don't
13   think so.
14   Q    Did you -- did your administrative chief
15   at the time, which I believe was Judge Moody,
16   produce any policy guidance for the judges that
17   would be presiding over the bond docket with regards
18   to AO-9 and 10?
19   A    Policy guidance, not that I know of.  I
20   just think counsel in discussion.
21   Q    And any training or -- any training
22   documents that he might have issued with regard to
23   AO-9 and 10?
24   A    No.
25   Q    Did you hold any meetings to explain with

Page 103

1    all of the judges who would be presiding over --
2    strike that.
3         So my understanding is that after these
4    were issued, there was a single judge that was going
5    to preside over the bond docket; is that right?
6    A    Yes.
7    Q    And that was Judge Hiddle?
8    A    Yes.
9    Q    Did you have conversations with Judge
10   Hiddle regarding the administration of the bond
11   docket after issuing these two administrative
12   orders?
13   A    Yes.
14   Q    How many times did you meet with Judge
15   Hiddle to discuss administration of the bond docket?
16   A    I don't know.
17   Q    More than once?
18   A    Yes.
19   Q    More than five times?
20   A    I'm sure there was more than five
21   meetings.
22   Q    More than ten times?
23   A    Now I don't know.  Five to ten sounds
24   like a fair estimate.
25   Q    And what did you all discuss about the

Page 104

1    administration of the bond docket during those
2    meetings?
3    A    Wow.
4    Q    Let me -- I'll be narrower.
5         Did you discuss what the evidentiary
6    standards should be for anything he was considering
7    during the administration of the bond docket?
8    A    I am sure we did.  I don't -- under your
9    definition or classification of evidentiary
10   standard, I -- I don't know, but -- but I think
11   there were conversations that would barely fall
12   under that broad umbrella.
13   Q    Did you discuss with Judge Hiddle who he
14   could hear evidence from during the administration
15   of the bond docket?
16   A    Yes.
17   Q    And who did -- did you provide him with
18   guidance as to who he could hear information from?
19   A    I tried, I thought.
20   Q    Okay.  And who did you suggest that he
21   could take information from for the purposes of
22   making findings on the bond docket?
23   A    The defendant, his lawyer, State,
24   whatever they had to present.
25   Q    Did you suggest that he could also take

Page 105

1    into account anything pretrial services shared
2    during the administration of the bond docket?
3    A    I -- boy.  I don't have that specific
4    memory, but I can't imagine that I did not.
5    Q    What about any bail bondsmen in the room,
6    did you suggest that he could take that as a part of
7    the evidence he was considering for purposes of
8    setting bond?
9    A    No.  I don't think we ever discussed it.
10   Q    Okay.  Did you discuss the ability of --
11   did you discuss what findings he needed to make for
12   purposes of setting bond when he was administering
13   the bond docket?
14   A    I'm sure we did, yes.
15   Q    Did he --
16   A    And I --
17   Q    Go ahead.
18   A    I -- you probably know this, and I'm
19   doing what you should never do in a deposition, but
20   that is just offering information.
21        The context of these conversations, it --
22   these AO-9 and 10, back in that time, the idea that
23   we were going to hit the ground running with a
24   seven-day-a-week docket was -- I said it before --
25   this in my estimate, was a monumental process and

Exhibit 7

Page 106

1  not an event.
2       AO-9 and AO-10 were not the end all, be
3  all.  They were the first step.  I felt that we
4  needed to move on it, and we needed to get started
5  and make corrections and -- you know, course
6  corrections and improvements once we got the docket
7  started.  So this was going to evolve into what it
8  is today.
9       The conversations then, based upon that
10 backdrop of information, the conversations I had
11 with Judge Hiddle were logistical.  How many people
12 are we able to do in a day?  Are you able to hear
13 what they have to say?  Are you limited by what they
14 want to say or present to you by time?  Are there
15 ways that we could improve this docket?  Do you need
16 more time?  Do we need to start it at a different
17 time?  Do we need to break it out?
18      And we would reference back -- one of the
19 things we did to kind of try to train ourselves to
20 get ready for this was -- in -- in addition to
21 meetings, was observations.  I had gone with Judge
22 Hiddle and also the public defender to Oklahoma
23 County to watch and observe the way they did a bond
24 docket.
25      So that builds at least, I think, a fair

Page 107

1  backdrop of information for you to understand, at
2  least the context and the time that I was meeting
3  with Hiddle.  It was very logistical driven.  I --
4  we had a lot of people to get through, and there
5  were times he had frustration that he wasn't able to
6  get to the information he wanted, or how could he
7  get the information he wanted in a timely manner
8  knowing there's 70 people on the docket?
9       Q       That makes complete sense to me.  And I
10 appreciate that a number of these conversations
11 dealt with logistics.  I'm trying to determine if
12 there was anything else, specifically the categories
13 I'm going through, that you discussed with him
14 beyond just those logistical things.
15      So, for instance, did you discuss with
16 Judge Hiddle how to make findings after having made
17 a determination on what the bond amount should be?
18      A       I have no independent recollection of
19 that, but I can't -- I -- I'm sure I did.  I'm sure
20 he had questions.
21      Q       Do you recall what you said to him?
22      A       No.
23      Q       And did you discuss with Judge Hiddle how
24 those findings should be memorialized in the docket
25 or a written record?

Page 108

1       A       I believe I did.  I -- I told him on the
2  minutes -- by minute.
3       Q       So earlier we talked about the bond
4  reduction hearings that you held as a district court
5  judge on a felony docket.
6       Did you suggest to Judge Hiddle that the
7  same types of findings should be made in -- on the
8  bail docket?
9       A       I didn't use me as an example.
10      Q       Was your expectation that Judge Hiddle
11 would make findings -- well, let me take one step
12 back.
13      Is there -- did you discuss having a
14 court reporter in the room with Judge Hiddle during
15 the bond docket?
16      A       Not that I remember.
17      Q       Okay.  So earlier when we spoke about the
18 bond hearings that you held in your courtroom, you
19 mentioned that when you did not have a court
20 reporter, you made sure that the clerk entered
21 certain minutes into the written record.
22      Do you remember that discussion?
23      A       I remember that discussion.
24      Q       Did you instruct Judge Hiddle as to the
25 types of things that needed to be entered into the

Page 109

1  minute record for a given bond docket hearing?
2       A       We talked about the minutes, and that is
3  the extent of my memory.
4       Q       So you don't recall whether you
5  instructed him to provide certain things as a part
6  of the written record?
7       A       I do not.
8       Q       Okay.  All right.  At some point, Judge
9  Hiddle -- I actually have this date -- was replaced
10 by Judge Guten on the bond docket, I believe perhaps
11 at the end of 2019, 2020.
12      Does that sound right?
13      A       It wasn't 2020.  I thought -- yeah, '19,
14 I think.
15      Q       You're right.  You're right.  You have --
16 you have absolutely corrected me correctly.
17      A       Okay.
18      Q       I believe maybe it was early in 2019.
19      A       Yeah.
20      Q       Does that sound more correct?
21      A       Yeah.  Yeah.
22      Q       Okay.  So Judge Hiddle was the presiding
23 judge over the bond docket from when it was
24 established in October of 2018 until -- would around
25 February 2019 sound correct?

Exhibit 7

Page 110

1    A    Yes, ma'am.

2    Q    Okay.  So then at that point, who took

3  over the bond docket?

4    A    Judge Guten.

5    Q    And did you have conversations with Judge

6  Guten about administration of the bond docket?

7    A    Yes.

8    Q    Did you have similar conversations with

9  Judge Guten as you had with Judge Hiddle about the

10  administration of the bond docket?

11    A    Yes.  But the docket was starting to take

12  shape.  More so, the conversations with Judge Guten

13  were a little different.  They weren't so much:

14  What does this look like every day?  What can we do

15  to give you the resources we need?  It was more

16  practical, I thought.

17    Q    Okay.  And so when you say, "It was more

18  practical," what did those discussions entail?

19    A    He was a new judge, and I -- and I think

20  that's relevant to understand, that as I was talking

21  with him, I was talking with him as a presiding to a

22  new judge.  And sometimes new judges, I -- I -- I

23  feel that I -- that they need a little bit of

24  confidence and support, and I was encouraging him to

25  make his decisions without fear or favor and just

Page 111

1  call them.

2         And the first and foremost concerns are

3  these people coming back to court.  And if he thinks

4  they are, figure out a way to give them conditions

5  that are fair.

6         I'm trying to think.  'Cause I know with

7  him, I did have the conversation.  I know it sounds

8  nuanced, but it's -- the concern I raised earlier.

9  I said, you know, Don't consider the bond set amount

10  as some de facto go-to where you're looking for an

11  exception or a reason to come off that.

12         I said, You're calling it.  It's a de

13  novo look.  Take a fresh look.

14    Q    So would you characterize your

15  conversations -- strike that.

16         So during your conversations with Judge

17  Guten, you focused on, it sounds like, more how to

18  make these bond decisions than the -- the pure

19  administration of the docket; is that fair?

20    A    No, not how to make the decisions.  It

21  was -- I was trying not only to deal with

22  administration, but try to give him the confidence

23  that he was -- he had all of the independent

24  discretion that he needed, and he was to -- to

25  employ it.

Page 112

1         As I had stated, whether I'm right or I'm

2  wrong, I sensed there was negative reaction in this

3  docket, which meant, in my mind at the time, he was

4  in the eye of the storm.  So he was a new judge in

5  the eye of a storm with negativity.

6         My conversations were not about how to do

7  his job.  I mean, obviously, I focused on things

8  that I thought were, you know, matters of importance

9  in bond settings, but it was to encourage him to

10  give me open, honest feedback about the

11  administration of the docket and to just do the job

12  without fear or favor, even if it was a pretty

13  intense atmosphere.

14    Q    Earlier you mentioned that, when speaking

15  with Judge Hiddle, you knew that there would be

16  corrections and improvements to the bond docket as

17  it evolved?

18    A    Yes.

19    Q    Do you believe there were corrections and

20  improvements that occurred during Judge Hiddle's

21  tenure as presiding -- as the judge presiding over

22  the bond -- bond docket?

23    A    I can't answer that question, based upon

24  my lack of memory, as to when we went to

25  seven-day-a-week court when his tenure ended.  There

Page 113

1  was improvements.  I don't know when his tenure

2  ended and when Guten started and when we went to

3  seven days.  I --

4    Q    So that --

5    A    -- don't have a --

6    Q    That's fair.  Let's take that timing out.

7         Since the beginning of the administration

8  of bond docket, what corrections and improvements do

9  you believe have been made to bond docket?

10    A    I think the seven-day-a-week was an

11  improvement, and that was an evolution.  The first

12  times that that docket happened, it was seven days a

13  week, the weekends and holidays, were performed by

14  the judge and staff actually at the jail.

15         That was in quite a few -- quite a few

16  issues, quite a few issues.  And some paperwork

17  issues were created.  Information transmittal was a

18  big hurdle.

19         And Judge Guten was in at that time, and

20  he had agreed to take over figuring out how to do

21  this by video hookup at the jail.  And he worked

22  with the Public Defender's Office, and I think the

23  DA's office was even helpful in this, and the

24  sheriff's office, getting video hookups at the jail

25  so that you can do arraignments during the

Exhibit 7

Page 114

```
1    weekend with staff at the courthouse and the public
2    defenders, with somebody at the courthouse and a
3    public defender out at the jail and the sheriffs and
4    all the inmates at the jail.
5              That is, I guess, the first and foremost,
6    I -- I think, improvement to that docket as how it
7    looked then versus now, and just over time the flow
8    of receiving communication from the Public
9    Defender's Office.  And I -- I say "Public
10   Defender's Office."  Anybody that has a private
11   attorney or Still She Rises is welcome to attend,
12   but it's a -- large majority, most all of these
13   folks at that time were by the Public Defender's
14   Office.
15             I think over time, trial and error, they
16   have improved greatly on being able to communicate
17   what they think is important, what they want the
18   judge to know for setting a bond.  And now this
19   is -- if the question was me, what improvements I
20   made, this isn't about me at all.
21             This is -- the DA's office really got on
22   board.  Whatever temporary frustration that they
23   must have had during the implementation process
24   early on, they quickly got over, and they were, in
25   my estimation, a huge help because at least that's
```

Page 115

```
1    the other side of the dynamic that -- that's
2    represented.  They -- they now are a participant and
3    have good feedback.
4              Those were all improvements.
5         Q    Many of those improvements, fairly, are
6    what I would consider logistical improvements.
7              Do you -- have you seen -- when we began
8    talking about the bond docket, you said you had two
9    concerns about how things were going at the time.
10   One was the timing it was taking someone to see a
11   judge, and two was the consistency.
12             Do you believe that the bond docket has
13   improved the consistency of making an individualized
14   determination?
15        A    Yes.
16        Q    So you believe the special judges that
17   are -- and, again, when I say "now," I mean during
18   your time as presiding judge -- were able to both
19   provide consistent -- let me strike that.
20             How do you believe that the bond docket
21   has improved consistency?
22        A    Judge Guten was helpful.
23             You know, you talked about earlier some
24   of the things that you do as a presiding are policy
25   driven, and others are -- I -- my term -- and it
```

Page 116

```
1    might not be the best term, but my term was ad hoc
2    training or dialogue.
3              Judge Guten was helpful in that process
4    and had really kind of taken not only the
5    responsibility of the docket serious, but he also
6    took very serious asking questions and assisting
7    others in training them to do the docket and
8    answering questions they had about bonds, bond
9    settings, things like that.
10        Q    And then how do you believe -- I think,
11   as a part of that, when we were talking about
12   consistency, you were worried about that consistency
13   overtaking an individualized determination.
14             Do you believe that bond docket has
15   improved the individualized determinations of bond?
16        A    Yes.
17             And please understand, I -- I think
18   you've misplaced my concern about consistency
19   overriding individualized assessment.  That was from
20   some of the confusion that I saw in -- in CR 1.
21   Just so we're sure.
22        Q    Yeah.
23        A    Yes, to answer your question.  This time,
24   yes, I believe the bond docket has improved and
25   individualized assessment has --
```

Page 117

```
1         Q    And --
2         A    -- improved.
3         Q    -- what -- how -- what is that belief
4    based on?
5         A    From conversations with not only Guten,
6    but other judges that have covered it on the
7    weekend, as well as conversations that I had -- at
8    the time, these are -- these are kind of old
9    conversations, but conversations that I had with the
10   public defender at the time who was monitoring jail
11   population.
12             And the jail population was ticking down
13   as that docket was growing, which tells me, at
14   least, that there is some de novo and -- and better
15   individualized assessment of the in-custody people
16   presenting on the bond docket.
17        Q    All right.  Coming back to -- we talked a
18   little bit about your conversations with Hiddle
19   about running that docket.  We talked about your
20   conversations with Judge Guten about running that
21   docket.
22             Beyond those conversations and the actual
23   AO-9 and 10 and then later Local Rule 2, during your
24   time as presiding judge, is there any other policy,
25   documents, or training that judges should look
```

Exhibit 7

Page 118

1  to to understand how you believe the bond docket
2  should be administrated?
3     A    There was a document, and it's more -- I
4  would -- less policy, but more bench material, bench
5  book material for a -- the practicing judge that
6  Guten and the chief of the division -- I think Judge
7  Moody at the time -- there were probably several
8  people that played a factor, but there was a card,
9  if you will, a laminated card, front and back, that
10 was kind of a practical guide -- bench guide for the
11 judge on the bond docket.
12          I would refer your attention there.
13    Q    Anything else that you can think of
14 beyond that bench card?
15    A    Not right now, ma'am.
16    Q    All right.
17          MS. RYAN:  I am at a good place to
18          take a break and figure out -- so the
19          next session that we come back will be
20          our last session.  I think we have maybe,
21          like, 30, 45 minutes left.  I'll check
22          the time when we're done.
23          So why don't we take a break now,
24          make sure that I can use the last of the
25          time efficiently, and then we'll come

Page 119

1  back and finish up.
2          THE WITNESS:  When do you want us --
3          me back?  It's --
4          MS. RYAN:  It's 11:40 where you are.
5  So maybe by 11:50, 11:55.  Is that okay?
6          MS. MOORE:  Sounds good.
7          THE WITNESS:  Got you.
8          THE VIDEOGRAPHER:  The time is
9          12:41 p.m.  And we're going off the
10         record.
11         (Whereupon, there was a recess taken
12         from 12:41 p.m. to 12:57 p.m.)
13         THE VIDEOGRAPHER:  The time is
14         12:57 p.m.  And we're back on the record.
15 BY MS. RYAN:
16    Q    Welcome back, Your Honor.
17         I am going to ask you to take a look at
18 what was previously marked Tab P.
19         MS. RYAN:  And I'm now going to
20         mark, I believe it's Exhibit 5, for the
21         record.
22         (Whereupon, Plaintiff's Exhibit
23         Musseman No. 5, Rule CR 2.
24         Pre-established Bail and Initial
25         Appearance, was marked for

Page 120

1          identification.)
2  BY MS. RYAN:
3     Q    When you have that in front of me -- or
4  in front of you, tell me when you're ready.
5     A    I'm ready.
6     Q    Okay.
7     A    If I need to read portions of it, I'll
8  tell you.
9     Q    Yeah.  There may be pieces of it you want
10 to read as we get into questions, but for purposes
11 of just authenticating the document, do you
12 recognize this document?
13    A    It is Rule CR 2 that we've talked about a
14 little bit before.
15    Q    And this rule was issued when you were
16 presiding judge; correct?
17    A    It was.
18    Q    But it was voted upon by all judges; is
19 that right?
20    A    Yes.
21    Q    All -- excuse me.  With a caveat to, as
22 you listed earlier, elected district judges?
23    A    And associate judges.
24    Q    And associate judges?
25    A    Yes.

Page 121

1     Q    Does this look like a true and accurate
2  copy?
3     A    It does.
4     Q    Okay.  Great.
5          So I just want to cover a couple of
6  things in this local rule.  So we talked about AO-9
7  and 10.
8          What was the impetus of the adoption of
9  the local rule?
10    A    To have it codified in a way that was,
11 I -- I thought, established more permanence, but
12 also was more readily available.
13         Administrative orders are just that,
14 administrative orders.  And as you can imagine,
15 administrative orders become hard to find.  They're
16 not generally available to everybody.  I think we're
17 in the process now in -- in Tulsa County of putting
18 them online, but they're really not easily
19 obtainable by the general public that might have
20 questions or individualized judges in a -- in a
21 moment.
22         Whereas if you put it in a criminal rule
23 like this, you put it in a local rule, not only do
24 you have the permanence, because the body has put it
25 in place, but you **Exhibit 7** readily

Page 122

1    accessible to everyone, you know.  It's printed in
2    the bench books that the judges get throughout the
3    state.  And it's just -- I guess I've answered the
4    question.
5            For those reasons, it becomes permanent.
6    It becomes more readily available to everyone.
7       Q    Do you remember when the discussions
8    began about having a local rule as opposed to just
9    relying on AO-9 and 10?
10      A    No.  No.  I don't remember when, but I
11   can tell you in -- in my life, at least with this
12   case, there's pre litigation and post filing.
13           The lawsuit was going on.  So I know
14   that.  But I don't remember when or what the
15   catalyst was.
16      Q    Was there anything in the lawsuit itself
17   that caused the court to think, Let's transition
18   from these AOs to a local rule?
19      A    No, not specific.  I don't think anything
20   specific about the lawsuit.
21      Q    Were there any discussions, to your
22   memory, about the lawsuit and transitioning to --
23   from AO-9 and 10 to a local rule?
24      A    Yes and no.  I mean, who -- conversations
25   to who?

Page 123

1       Q    Not privileged conversations.  So
2    conversations among the judges, for instance?
3       A    Oh, no.  No, I don't think so.
4       Q    Okay.
5       A    I don't remember any.
6       Q    Do you know who -- do you remember who
7    first raised the idea of having a local rule as
8    opposed to AO-9 and 10?
9       A    No.
10      Q    Was it you?
11      A    No.  It wasn't me.
12      Q    And you don't recall who would have
13   raised it initially?
14      A    I don't.  But I know it wasn't me, 'cause
15   I remember thinking, That's a good idea.
16      Q    I was fixing to say, how -- how do you
17   remember so strongly?  Okay.
18           Who was consulted in the drafting of this
19   local rule?
20      A    I don't remember exactly who, but I would
21   have called the -- the attorneys that I have with
22   the AG's office.  I -- I -- I get it with any
23   document about this case.  Like the bench card, I
24   think, we did the same thing.
25           When Guten and others prepared that bench

Page 124

1    note -- that bench card I told you about, that
2    laminated card, I -- I called the attorneys at the
3    Attorney General's Office and said, Hey, we have
4    this.  Should this be in discovery?
5            So I'm sure I called the same ones.  And
6    my contact person has just turned in to be
7    Ms. Lawson, would be who I think I talked to on it.
8       Q    What about -- again, setting aside those
9    privileged conversations, what about community
10   stakeholders, were there any community stakeholders
11   or anyone else besides the judges that were involved
12   in the drafting of this local rule?
13      A    I don't think so, no.
14      Q    So did you discuss this -- the issuance
15   of this local rule with the PD before it was issued?
16      A    I do not remember.  But what I will tell
17   you, if I spoke to the PD about it, it would just be
18   about the fact that we might move forward trying to
19   make it a local rule.  It would not have been about
20   the details or language in the local rule.
21      Q    And what about the District Attorney's
22   Office, did you talk -- talk to the District
23   Attorney's Office about transitioning from AO-9 and
24   10 to the local rule?
25      A    Again, the same answer I gave about the

Page 125

1    PD.  I don't think so.  But if I did, it would just
2    be about the fact, not the wording.
3       Q    And would the same be true for any
4    bondsmen that you had talked about -- about the
5    local rule?
6       A    I didn't talk to the bondsmen.  Our
7    conversations, I think -- our conversations with the
8    bond -- or my conversation with -- with the bond
9    representative was not -- has not been going
10   since -- at that point in time.
11           I mean, it -- once this thing got started
12   and it was done, there really was no more input, I
13   don't think, that I received from the bondsmen.
14      Q    Okay.  So were you primarily responsible
15   for the drafting of this or did you rely on someone
16   else?
17      A    I relied on somebody else, like I usually
18   do.
19      Q    Do you recall who you relied on to draft
20   this local rule?
21      A    No.  I lean heavily on my court
22   administrator, Vicki Cox, and I know that anything
23   that I was writing at the time that dealt with
24   bonds, I would have run by the Attorney General's
25   Office.  The level that they had

Exhibit 7

Dodson et al. v. Muskogee, et al.
08/16/2020

Page 126

1  with Vicki, I -- I don't -- I don't -- I don't know.
2      Q    So do you think it's possible that Vicki
3  may have done the first draft of this?
4      A    It is possible.  It's possible.  I
5  just -- I don't -- looking at this, this is not a
6  general administrative order or something that Vicki
7  does routinely.  This looks -- my -- I know I'm not
8  supposed to guess.  I don't know.
9      Q    So when you presented this to the judges
10  for a vote, did you share with them who had drafted
11  it?
12      A    No.  I would have -- no.  I would have --
13  I don't remember what I shared with them.
14      Q    So let's -- you didn't -- let me just be
15  clear.
16          You didn't draft this?
17      A    I did not draft this.
18      Q    Okay.  And you're not sure who did draft
19  this?  You don't know?
20      A    I believe -- well, I don't know who
21  personally drafted it.  I think that the -- I think
22  a lion's share of the work came probably from the
23  Attorney General's Office.
24      Q    Okay.
25      A    As to who did it and to what level Vicki

Page 127

1  Cox participated, I don't know.  But I know that
2  when I reviewed it, I definitely had talked with the
3  Attorney General's Office before moving forward on
4  it.
5      Q    Okay.  Do you recall -- well, it -- let
6  me ask -- I'm trying to ask this in a way that
7  doesn't infringe on privilege.
8          Is there anyone else besides the attorney
9  general that might have drafted this that we could
10  talk to about it?
11      A    No.
12      Q    Okay.  When you received it, did you
13  revise it?
14      A    Gosh.  I'm sure I did.  I -- all of these
15  cases at that time were in a bind -- they -- they
16  just were cases I read all the time.  I was so into
17  these cases.  And there were some others that are
18  not in this administrative order.  I know I read
19  over it.  I had questions about cases I wanted to
20  put in it.
21          So, yeah, I'm sure I had some -- I don't
22  remember exactly what I would have done as far as
23  drafting.  But, yes, there were some cases that I
24  wanted in it, and there were things that I probably
25  asked questions about.

Page 128

1      I'm sorry.  That's the best I can give
2  you.
3      Q    Okay.  So in this, there are several
4  Oklahoma cases that are cited to make clear what the
5  defendant's rights are under the Oklahoma State
6  Constitution as it -- as it relates to bail; right?
7      A    Yes, ma'am.
8      Q    I don't see any reflection of the
9  protections of the (interruption); is that right?
10          (Whereupon, the court reporter
11           requests clarification.)
12          MS. RYAN:  Of course.
13  BY MS. RYAN:
14      Q    I don't see any reflections of the
15  protections of the federal Constitution; is that
16  right?
17          MS. MOORE:  Object to form.
18      A    I -- I'm sorry.  You cut out halfway
19  through.
20  BY MS. RYAN:
21      Q    Yeah, of course.
22      A    You don't see the protections, and then
23  you cut out.
24      Q    I don't see anything in this -- we just
25  mentioned that this addresses the protections under

Page 129

1  the -- under some Oklahoma authority for individuals
2  as to the right to bond.
3          This document does not include
4  protections as to the federal Constitution as to the
5  rights to bond; correct?
6          MS. MOORE:  Object to form.
7      A    It says what it says.  I don't dispute
8  your conclusion.
9  BY MS. RYAN:
10      Q    Okay.  Going quick -- back quickly to a
11  couple questions from a moment ago.
12          Do you remember where you got the first
13  draft of this?
14      A    My memory is that Vicki Cox brought it to
15  me.  I was sitting right here at my desk.
16      Q    Okay.  So you believe that --
17      A    Now, I -- that is my best memory, and
18  I --
19      Q    And we can ask Ms. Cox that as well.
20  So -- but if that's your memory, great.
21          All right.  Does this local rule require
22  that the judge administering bond docket make
23  findings as to what people can afford when it comes
24  to bond?
25          MS. MOORE:  Object to the form.

Exhibit 7

Page 130

1    A    One moment.  There's language I'm going
2    to refer to.
3    BY MS. RYAN:
4    Q    Of course.
5    A    I think I've had it -- one moment.
6    Sorry.
7         I've had a chance to read it.  I'm sorry.
8    Will you ask me the question again?  I went to
9    financial.
10   Q    Yeah, of course.
11        Does this local rule require that a judge
12   make findings as to what a defendant has the ability
13   to pay?
14   A    No, it does not.
15   Q    Does it require other findings if an
16   ability to pay is -- is not available to defendant?
17   A    It lists the consideration including,
18   first and foremost, return to court, but also the
19   financial condition of the defendant, his or her
20   reputation in the community, and other -- other
21   considerations.  But it says what it says.
22   Q    So it --
23   A    It doesn't require findings.  It lists
24   considerations.
25   Q    Okay.  Does this local rule require the

Page 131

1    consideration of nonmonetary conditions of release?
2    A    It allows consideration.  Yes, it allows
3    consideration of all.
4    Q    Okay.  Does it require that a judge
5    consider nonmonetary conditions of release?
6    A    Require?
7         I don't think it requires it in -- in
8    the -- the written context of this local rule -- of
9    this rule.
10   Q    So stepping back from the text of the
11   rule, was there guidance provided that accompanied
12   this local rule as to what findings should be made
13   as to ability to pay?
14   A    Well, we cited them to the Oklahoma
15   cases, Brill, Gurich, and Bowman, I think.  And that
16   gives them a good idea of what findings are
17   required.
18   Q    And was there policy guidance or training
19   to the judges as to where those findings must be
20   made?
21   A    Not policy guidelines where the findings
22   must be made, no.
23   Q    Was there training given to those judges
24   as to where and how the findings should be made?
25   A    I -- I think it would be encompassed in

Page 132

1    the -- that bench card that I told you about.
2    Q    So to the extent that there was guidance
3    provided about what the -- what findings should be
4    made and how they should be made, that would be
5    contained on that bench card?
6    A    I think so.  I think -- I think I agree
7    with you.
8    Q    So beyond that bench card -- what -- I
9    can just be transparent.  I'm trying to understand.
10   If I was a special judge having been handed this
11   local rule, what should I look to for guidance as to
12   how to administer the docket?
13        Is there anything beyond this local rule
14   and the bench card that we just minutes -- mentioned
15   that would have given me that guidance?
16   A    The cited cases.
17   Q    Okay.  Beyond the cited cases?
18   A    Well, you read the cited cases and then
19   the cases they cite, and you're able to read and
20   investigate to your satisfaction.  You'll have
21   questions as the judge on any matter in front of you
22   about what the tests are.  What are the prongs to
23   this fact -- what are the factors that I considered,
24   not -- not just bonds, but any context as a judge?
25        And I -- I don't -- I don't know what

Page 133

1    your level of -- of familiarity is with judges and
2    bench books, but we don't have a go-to guide, a
3    how-to on the first time you get a TRO.  Everything
4    changes every day.  You don't have a book that tells
5    you now do this, and do this, and put it here.
6         You go to the cases, and you read to your
7    satisfaction.  And that's my answer to you.
8         And then this rule, not only does it
9    describe the docket, it says the first and foremost
10   concern.  It explains every other consideration they
11   can be making, but it empowers them to make those
12   considerations and then gives them the cases to look
13   at and investigate to their satisfaction.
14   Q    Yeah.  And I think a lot of what we just
15   discussed related to, like, the merits of setting
16   bond.  I guess I'm also -- I -- as you can probably
17   tell, I'm very focused on the process, too.
18        Beyond the bench card, the cited cases,
19   and the local rule, is there any other guidance that
20   judges would have been provided about the process of
21   making their findings?
22   A    Beyond the local rules to administrative
23   order -- what was your -- I'm sorry.  I lost it.
24   Q    Local rules -- local rules, the cited
25   cases, and the bench card -- what -- is it --

**Exhibit 7**

Roger L. Hilfiger v. Musselman et al    05/26/2020

Page 134

1 there have been any additional guidance provided to
2 special judges as -- as to how to make their
3 findings procedurally?
4     A    I think there would, but not the guidance
5 you're looking for, not policy guidance.  That would
6 have been with looking up the cases and being able
7 to talk to supervisors or other colleagues.
8     Q    So for instance, there's not guidance
9 that would have instructed special judges to make
10 finding -- make factual -- oral factual findings?
11    A    Oral factual findings?
12        I -- I -- I have not read them, no.
13        If your question is in any of these
14 things we've talked about?  No, there's not.
15    Q    Okay.  Or how any findings the judge
16 makes should be recorded in the minutes of the
17 docket?
18    A    Correct.
19    Q    Okay.  That's all that I was getting at.
20        All right.  Let's talk about findings
21 just a little bit more.  Give me just one second.
22        All right.  Let's look at the bench card
23 that you've mentioned a couple of times today.  I
24 think it is buried in that Redwell that you have, I
25 believe, as Tab Y.

Page 135

1        MS. RYAN:  Gary, I'm going to ask
2 you to pull up what was previously marked
3 Tab Y.  I believe it will now be
4 Exhibit 6 -- Court Reporter, you can
5 correct me if I'm wrong -- to this
6 deposition.
7        (Whereupon, Plaintiff's Exhibit
8        Musseman No. 6, Tulsa County District
9        Court, Bench Card: Judicial Guide to
10       Bond Docket, was marked for
11       identification.)
12 BY MS. RYAN:
13    Q    Judge Musseman, do you recognize this
14 document?
15    A    Yes.  It is the bench card that I spoke
16 of earlier.
17    Q    Is it look to be a true and direct copy
18 of that bench card --
19    A    It looks --
20    Q    -- based on your recollection?
21    A    Yeah.  It looks to be, based on my
22 recollection.
23    Q    You have no reason to believe it's not
24 the bench card that you were speaking of a few
25 minutes ago, that you said you shared with your

Page 136

1 counsel as a part of discovery in this case?
2     A    No concerns at all.
3     Q    Okay.  Did you create this document?
4     A    No.
5     Q    Do you know who created this document?
6     A    I -- it was always presented to me as
7 Judge Guten had presented it --
8     Q    Okay.
9     A    -- but I'm -- I'm sure he had input, but
10 I think Guten is the focal point of this.
11    Q    Okay.  What is the purpose of a bench
12 card?
13    A    Just practical guidance for the judge on
14 the weekend doing the bond docket or for any judge
15 that does the bond docket.  Guten does it.  But then
16 on weekends, others share responsibility, and if he
17 is not there one day, someone else shares the
18 responsibility.
19        And it's just a quick tutorial for
20 somebody sitting on the -- doing it that day.
21    Q    Okay.  So for instance -- I think you
22 mentioned this earlier -- special judges who don't
23 normally sit on the criminal docket, is it possible
24 that they might have to staff bond docket on the
25 weekend?

Page 137

1     A    Yes.
2     Q    So is it possible that a judge without
3 experience on a criminal docket might have to staff
4 bond docket?
5     A    Yes.
6     Q    And so what would the role of the bench
7 card be for that person, to the extent it's
8 different than what you've already shared the role
9 of the bench card is?
10    A    I -- I don't know if you cut out or I
11 didn't understand.  Would you ask it again?
12    Q    I -- I said so the role of the bench card
13 would be just as you shared for those individuals as
14 well that don't have that criminal experience?
15    A    Yes.
16    Q    Do you -- did you have an opportunity to
17 revise the bench card when it was shared with you?
18    A    I think I did.
19    Q    Okay.  Did you --
20    A    I --
21    Q    Oh.
22    A    I didn't revise it.  I had an opportunity
23 to review it.
24    Q    That was a better way of phrasing that.
25        So you had -- the point is you review it,

**Exhibit 7**

Dodge v. Graham in Susan Daniel
12/16/2020

Page 138

1  but you didn't make any revisions --

2      A    I --

3      Q    -- is that fair?

4      A    That is fair.

5      Q    Okay.  Is there -- when you reviewed it,

6  do you recall having any concerns with it or any

7  mistakes?

8      A    No.  I don't -- no, I don't.

9      Q    And on this bench card, on the top right

10  corner on the first page, it mentions the Brill

11  factors.

12         Do you see that?

13      A    Yes, ma'am.

14      Q    And I think as we discussed a moment ago

15  while looking at Local Rule 2, the Brill factors are

16  one case under the Oklahoma Constitution -- or Brill

17  is one case under the Oklahoma Constitution -- I'm

18  getting some echo.  I'm not sure if others are.

19         Can you hear me?

20      A    You're -- you're cutting out.  You're

21  cutting out.

22      Q    Okay.  I'll try to get closer, and you

23  can let me know if you can't hear me.  So let me

24  restate.

25         If you look at the top of page 1, the top

Page 139

1  right, you'll notice that it sets out the Brill

2  factors.

3         Can you tell me what you understand the

4  Brill factors to be?

5      A    Considerations.

6      Q    Considerations under?

7      A    When you're looking at someone -- it's --

8  Brill -- and the case says what it says.  And I'm on

9  a civil docket now.  So I hate talking about a case

10  that I haven't read in years.

11         But Brill sets out guidelines in which

12  courts should consider, in my memory, really, is

13  holding people without bail.  You know, you --

14  there's -- I think Brill v. Gulrich kind of shows

15  the proposition that bail is not a fundamental

16  constitutional right, and it gives guidance to

17  judges in order to make determinations that there

18  should be no bond or bail in a case.  And it

19  obviously cites common factors that judges consider

20  in the traditional setting of bail in context of the

21  broader question.

22      Q    Do you know why Brill is the case that's

23  included here as opposed to any other case or legal

24  authority?

25      A    No.

Page 140

1      Q    Did you discuss that with Judge Guten

2  when you reviewed this?

3      A    No.

4      Q    Does this document provide guidance as to

5  whether a judge is required to make findings of the

6  ability to pay?

7      A    No.

8      Q    Okay.  Does it suggest that a judge is

9  required to consider nonmonetary conditions of

10  release?

11      A    Let me review it.

12      Q    Of course.

13      A    Can you answer -- can you ask your

14  question again?  I'm sorry.

15      Q    Does it suggest that a judge is required

16  to consider nonmonetary conditions of release?

17      A    Yes.

18      Q    And where are you seeing that?

19      A    Well, the front page -- we -- we were

20  looking at the top right from Brill, but if you look

21  at "Setting the Bond," look at the bottom, those two

22  paragraphs.

23         "Even if that means requiring no bond and

24  releasing them on a personal recognizance or

25  referring them to pretrial release."  And then it

Page 141

1  describes more of a how-to.  The -- "Pre-trial has

2  caseworkers in the jail," and blah, blah, blah.

3  This is how you get in touch with them.

4      Q    So can you -- I apologize.  I'm missing

5  where you are.  Are you on the front or on the back?

6      A    Well, I have two pages.  It's the -- it's

7  the one with three boxes.

8      Q    Yup.

9      A    The same page with Brill.  If you go to

10  the opposite side of the page, "Setting the Bond,"

11  go down to the bottom half of that column.

12      Q    Okay.  So I think you're pointing out

13  the:  "Set of bond you believe is reasonable to

14  ensure the arrestee's appearance back in Court, even

15  if that means requiring no bond and releasing them

16  on a Personal Recognizance bond"?

17         Do you see that?

18      A    Yes.

19      Q    Is that what you're referring to?

20      A    Yes, ma'am.

21      Q    Then it goes on to say "referring them to

22  Pre-Trial Release."

23         What does that mean to you, "referring

24  them to Pre-Trial Release"?

25      A    If you actually read that whole --

**Exhibit 7**

Page 142

1  services, court services will work up a packet for
2  you for that individual if -- if you want to know
3  more about it before you put them on pretrial.
4       Q     And do -- and you -- do judges have the
5  ability to set nonmonetary conditions of release
6  without having received a packet from pretrial
7  services?
8       A     Yes.
9       Q     Okay.  And then --
10      A     Yes.
11      Q     -- how would they -- how would they do
12 that?  They would just set those conditions and then
13 have pretrial execute those conditions?
14      A     Well, you can have pretrial execute those
15 conditions or you -- you don't even have to have
16 them executed.  You can do a personal recognizance
17 or refer them to pretrial.
18            You don't have to utilize pretrial.  If
19 the judge wants to PR somebody, they have all the
20 right in the world to give a personal recognizance
21 release and set conditions.
22      Q     So --
23      A     Sometimes those conditions are supervised
24 by pretrial.  Sometimes they are not.
25      Q     This is something I was a little confused

Page 143

1  about earlier.
2            You just said that the judge "has all the
3  right in the world to give a personal recognizance
4  release."
5       A     Yes.
6       Q     Is it your belief that he only has that
7  authority at bond docket?  That that's not something
8  that can be done through the bond schedule?  PR can
9  only be given through bond docket?
10      A     Not just through bond docket.  Any --
11 anytime during the proceeding, a judge has that
12 authority on -- with a -- on an individual case.
13            But you understand my thought process.
14 Whether I'm correct or incorrect, you at least
15 understand, yes, it's not by standing order.
16      Q     So -- and just to go back to that from
17 earlier today, it's your understanding that this
18 statute, which I'll check on the statute number, but
19 we together today have been preferring to as 1105,
20 limits the presiding judge's ability to have certain
21 offenses be default PRs on the bond schedule?
22      A     I -- I'm not confident saying that.  I --
23 I think you used the word "PR" where I would use
24 pretrial.  I think 1105 is pretrial.
25      Q     So is there any statute which limits the

Page 144

1  ability of the presiding judge to set bond schedule
2  amounts that are default PRs?
3       A     Yes, there is.
4       Q     And what is that?
5       A     I have no idea right now.  I -- sorry.  I
6  couldn't tell you.
7       Q     We can -- I'm sure there's some other
8  method of discovery.  We can do a follow-up
9  question.
10            MS. RYAN:  I believe that I am done.
11            I'm going to reserve my last five minutes
12            for any redirect should counsel for the
13            judge and counsel for the County have any
14            questions.
15            MS. MOORE:  We'd like to have five
16            minutes then to confer.
17            MS. RYAN:  Okay.
18            THE VIDEOGRAPHER:  The time is
19            1:31 p.m.  And we're going off the
20            record.
21            (Whereupon, there was a recess taken
22            from 1:31 p.m. to 1:38 p.m.)
23            THE VIDEOGRAPHER:  The time is
24            1:38 p.m. And we're back on the record.
25            MS. MOORE:  Doug?

Page 145

1            MR. WILSON:  Yes.
2            MS. MOORE:  I'm going to let you go
3            first.
4            MR. WILSON:  Okay.
5
6                CROSS-EXAMINATION
7
8  BY MR. WILSON:
9       Q     I've just got one question.
10            I think earlier today, Judge, you had --
11 in answer to a question -- I think the question
12 talked about the Tulsa County bond schedule, and I
13 forget what your answer was, but my question has to
14 do with the -- the bond schedule that you amend as
15 the presiding judge in consultation with the DA and
16 the public defender.
17            Is that the only schedule applicable in
18 Tulsa County?
19      A     Yes.
20      Q     Okay.  Tulsa County, as an entity,
21 doesn't establish a bond schedule different from
22 what the State court establishes; correct?
23      A     Yes.
24            MR. WILSON:  I don't have any other
25            question

**Exhibit 7**

Page 146

1    MS. MOORE:  Okay.  We're going to
2  reserve all of our questions and pass the
3  witness.
4    MS. RYAN:  I don't have anything
5  else.
6    MS. MOORE:  Okay.
7    MR. WILSON:  We're done.
8    MS. RYAN:  Thank you so much, Your
9  Honor.  We appreciate all your time
10 today.  I'm sure it's not your normal
11 day.  So we appreciate it.
12   THE WITNESS:  Yes, ma'am.  Everybody
13 be safe.
14   MS. RYAN:  Yes, absolutely.  Thank
15 you.
16   THE VIDEOGRAPHER:  This --
17   MS. RYAN:  Thank you, Judge.
18   THE VIDEOGRAPHER:  This concludes
19 today's testimony for the remote video
20 deposition of Judge William J. Musseman,
21 Jr.
22   The time is now 1:39 p.m.  And we're
23 going off the record.
24   (Whereupon, there was a discussion
25   off the record.)

Page 147

1    MS. MOORE:  Thanks.  Yes, read and
2  sign.
3    (Thereupon, the deposition was
4    concluded at 1:40 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 148

1        C E R T I F I C A T E
2    I, Clifford Edwards, Certified Shorthand
3  Reporter, do hereby certify that prior to the
4  commencement of the examination, the witness was
5  duly remotely sworn by me to testify to the truth,
6  the whole truth and nothing but the truth.
7    I DO FURTHER CERTIFY that the
8  foregoing is a verbatim transcript of the
9  testimony, that said deposition was taken by me
10 stenographically at the time and date hereinbefore
11 set forth, and the foregoing is a true and
12 accurate transcript of the testimony.
13   I FURTHER CERTIFY that I am neither of
14 counsel nor attorney to any of the parties to said
15 suit, nor am I an employee of any party to said
16 suit, nor of any counsel in said suit, nor am I
17 interested in the outcome of said cause.
18   Witness my hand and seal as Notary Public
19 this 31st day of December, 2020.
20
21
22        Clifford Edwards
23         Notary Public
24 My commission expires:  9/30/2021
25

Page 149

1        J U R A T
2
3    I have read the foregoing 148 pages and hereby
4  acknowledge the same to be a true and correct record
5  of the testimony.
6
7
8
9    _____
10        JUDGE WILLIAM J. MUSSEMAN, JR.
11
12 Subscribed and sworn to
13 _____.
14 Before me this _____ day of _____,
15 2020.
16
17
18
19
20 _____
21 Notary Public
22 My Commission Expires:
23
24
25

## Exhibit 7

Page 150

```
1              DEPOSITION ERRATA SHEET
2
3    Page No._____Line No._____ Change to:_____
4    _____
5    Reason for change:_____
6    Page No._____Line No._____Change to:_____
7    _____
8    Reason for change:_____
9    Page No._____Line No._____ Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No._____ Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   _____
20   Reason for change:_____
21
22
23   SIGNATURE:_____DATE:_____
24   NAME:  JUDGE WILLIAM J. MUSSEMAN, JR.
25
```

Page 151

```
1              DEPOSITION ERRATA SHEET
2    Page No._____Line No._____ Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____ Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____ Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20
21
22
23   SIGNATURE:_____DATE:_____
24   NAME:  JUDGE WILLIAM J. MUSSEMAN, JR.
25
```

**Exhibit 7**

**Exhibit 7**

**Exhibit 7**

**Exhibit 7**

**Exhibit 7**

**Exhibit 7**

**Exhibit 7**

Case 4:18-cv-00298-SPF-JFJ Document 365-7 Filed in USDC ND/OK on 05/26/23 Page 46
Judgment Williams v. Board of Regents, NE
12/15/2020

**Exhibit 7**

**Exhibit 7**

**Exhibit 7**

**Exhibit 7**

**Exhibit 7**

**Exhibit 7**

**Exhibit 7**

**Exhibit 7**

**Exhibit 7**

**Exhibit 7**

**Exhibit 7**

**Exhibit 7**

**Exhibit 7**