```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OKLAHOMA
 2

 3   MICHAEL PARGA, RICHARD FELTZ,
     TARA O'DONLEY, and CHRISTOPHER
 4   WOOD, on behalf of themselves
     and all others similarly
 5   situated,

 6                Plaintiffs,

 7   -vs-                            Case No. 18-CV-0298-CVE-JFJ

 8   BOARD OF COUNTY COMMISSIONERS
     OF THE COUNTY OF TULSA, VIC
 9   REGALADO, Tulsa County Sheriff,
     in his official capacity;
10   TERRY H. BITTING, TAMMY BRUCE,
     MARTHA RUPP CARTER, STEPHEN R.
11   CLARK, THERESA DREILING, OWEN
     EVANS, JAMES W. KEELEY, DEBORAH
12   LUDI LEITCH, J. ANTHONY MILLER,
     DAWN MOODY, MILLIE OTEY, KIRSTEN
13   PACE, APRIL SEIBERT, CLIFFORD
     SMITH, and SARAH SMITH, in their
14   capacities as Tulsa County Special
     Judges; and WILLIAM MUSSEMAN, in his
15   capacity as Tulsa County District
     Judge,
16
                  Defendants.
17

18

19            DEPOSITION OF ASHTON DENNIS

20        TAKEN ON BEHALF OF THE DEFENDANTS

21     ON JANUARY 25, 2021, BEGINNING AT 9:03 A.M.

22                    VIA ZOOM

23

24   REPORTED BY:  Shannon S. Harwood, CSR, RPR, CRR

25
```

Exhibit 16

Ashton Dennis     1/25/2021     2 (2 - 5)

Page 2

1 APPEARANCES
2 on behalf of the PLAINTIFFS
3 Ms. Phoebe Kasdin
   Ms. Hayley Horowitz
4 STILL SHE RISES
   567 E. 36th Street North
5 Tulsa, OK 74106
   918-392-0867
6 phoebek@stillsherises.org
   hayleyh@stillsherises.org
7
   Ms. Alexandria Twiem
8 CIVIL RIGHTS CORPS
   1601 Connecticut Ave. NW
9 Suite 800
   Washington, DC 20009
10 alexandria@civilrightscorps.org
   202-844-4975
11
12 on behalf of the DEFENDANTS, BOARD OF COUNTY
   COMMISSIONERS OF TULSA COUNTY, VIC REGALADO, TULSA
13 COUNTY SHERIFF
14 Mr. Doug Wilson
   TULSA COUNTY DISTRICT ATTORNEY'S OFFICE
15 500 South Denver Avenue
   Tulsa, OK 74103
16 918-596-4805
   douglas.wilson@tulsacounty.org
17
18 on behalf of the DEFENDANTS, TERRY H. BITTING, TAMMY
   BRUCE, MARTHA RUPP CARTER, STEPHEN R. CLARK, THERESA
19 DREILING, OWEN EVANS, JAMES W. KEELEY, DEBORAH LUDI
   LEITCH, J. ANTHONY MILLER, DAWN MOODY, MILLIE OTEY,
20 KIRSTEN PACE, APRIL SEIBERT, CLIFFORD SMITH, SARAH
   SMITH, and WILLIAM MUSSEMAN
21
   Ms. Erin Moore
22 Ms. Stefanie Lawson
   OKLAHOMA ATTORNEY GENERAL'S OFFICE
23 313 N.E. 21st Street
   Oklahoma City, OK 73105
24 405-521-3921
   erin.moore@oag.ok.gov
25 stefanie.lawson@oag.ok.gov

Page 3

INDEX

                 PAGE
Direct Examination by Ms. Moore     5
Cross Examination by Mr. Wilson     26

Page 4

1                STIPULATIONS
2
3      It is hereby stipulated and agreed by and
4 between the parties hereto, through their respective
5 attorneys, that the deposition of ASHTON DENNIS may be
6 taken pursuant to agreement and notice and in accordance
7 with the Federal Rules of Civil Procedure on January 25,
8 2020, via zoom, before Shannon S. Harwood, CSR, RPR,
9 CRR.

Page 5

1 WHEREUPON,
2          ASHTON DENNIS,
3 after having been first duly sworn, deposes and says in
4 reply to questions propounded as follows, to-wit;
5          DIRECT EXAMINATION
6 BY MS. MOORE:
7    Q. Mr. Dennis, can you hear me?
8    A. Yes.
9    Q. Hi. My name is Erin Moore and I'm going to be
10 taking your deposition today. If you can't hear me
11 because of buffering or something, try to indicate that
12 because sometimes there's some lag and things with the
13 computers and I want to make sure you can hear us.
14 Okay?
15    A. Okay.
16    Q. So that's the first thing I want you to do is
17 if there seems to be some technical problem, let us know
18 because I want you to be able to hear me. Yeah, I think
19 you just went into buffering. Is that me or is it on
20 your end?
21      MR. WILSON: I don't think it's you, Erin.
22      MS. MOORE: It's not me? Phoebe?
23      MR. WILSON: Might be now.
24      MS. MOORE: It might be now. Hello?
25      MS. LAWSON: No, they're frozen on my screen

Professional Reporters
800.376.1006
www.proreporters.com



Exhibit 16

| Ashton Dennis | 1/25/2021 | 3 (6 - 9) |

Page 6

1  too.
2      MS. MOORE: Okay. Yeah, Phoebe, we've lost
3  Mr. Dennis. Can you hear me?
4      MR. WILSON: Are we down a wifi connection.
5      MS. KASDIN: I can hear you now. I lost you
6  too. Let me check his. I'm so sorry. Hold on.
7      MS. MOORE: We lost him. He -- he froze
8  first.
9      THE REPORTER: And, Mr. Wilson, I can barely
10 hear you.
11     MR. WILSON: Okay. Is that better?
12     THE REPORTER: That's better. Thank you so
13 much.
14     MR. WILSON: Erin, did we want to enter into
15 the same stipulations as the other depos?
16     MS. MOORE: Yeah, I guess we do. I mean,
17 since we -- especially since we did that agreement by
18 email yesterday -- that day, so I guess, yeah.
19     MS. HOROWITZ: I mean, I can do this while
20 Phoebe is --
21     MS. MOORE: Okay.
22     MS. HOROWITZ: -- helping get the tech set up.
23 I mean, everything that we've agreed to --
24     MS. MOORE: Before --
25     MS. HOROWITZ: -- by email or otherwise, we

Page 7

1  agree applies.
2      MS. MOORE: Okay. All right. That -- that
3  works. I figured we were, but just keeping -- keep it
4  on the record, so thanks, Doug. Are we back on, Phoebe?
5      Q. (By Mr. Moore) Mr. Dennis can you hear me?
6      A. Yes, I can hear you.
7      Q. Okay. So we -- you've seen now what the
8  technical problems look like, that you freeze up, you
9  can't hear me, so if that happens again or -- or
10 something, we'll try to get it resolved, but tell me
11 what you didn't hear when we get it back resolved so I
12 know how to go backwards to get us back where we're
13 starting where you know what I'm saying.
14     Does that make sense?
15     A. Well -- well, you were just into your
16 introduction --
17     Q. Okay.
18     A. -- when you cut off.
19     Q. All right. So starting again. I'm going to
20 be asking you questions. I want -- and with the
21 technology issues, wait a couple seconds before you
22 start answering anything. That will allow me to finish
23 my question, make sure you hear it, and it also gives
24 your counsel a chance to interject an objection or
25 something in case they want to preserve something for

Page 8

1  the record.
2      Most of the time, you'll still answer the
3  question. The only time you will not answer a question
4  after they object is if they specifically direct you not
5  to answer the question, so -- but if you don't
6  understand the question, I need you to tell me, "I don't
7  understand the question" and I will try to rephrase it
8  or work through what you're not understanding so we can
9  get to a question and get the information out of you in
10 a way that you understand and I understand. If you
11 answer a question without telling me that you don't
12 understand, I'm going to assume you understood the
13 question.
14     Does that make sense?
15     A. Yes.
16     Q. Okay. Again, can you hear me okay?
17     A. Yes.
18     Q. All right. Is there anything that is going to
19 prevent you today from being able to give truthful and
20 accurate testimony about what you remember?
21     A. No.
22     Q. Okay. Have you ever been deposed before?
23     A. No.
24     Q. Okay. Have you ever testified in a court
25 proceeding?

Page 9

1      A. Yes.
2      Q. Okay. Where you were under oath like you just
3  were?
4      A. Yes.
5      Q. Okay. You've done that. Okay. So this is
6  actually just the same as that, but the judge just isn't
7  here. That's -- so think of it that way. It's just
8  like being in front of a judge. What did you testify in
9  before?
10     A. My criminal -- past criminal cases.
11     Q. Okay. Have you had any non criminal cases
12 that you've testified in, like paternity or car
13 accidents?
14     A. No.
15     Q. Okay. Can you tell me your full name?
16     A. Ashton Lee Dennis.
17     Q. Okay. And can you spell that for me?
18     A. A-S-H-T-O-N, Lee, L-E-E, Dennis, D-E-N-N-I-S.
19     Q. All right. Thank you. And where do you live?
20     A. Tulsa.
21     Q. Can you tell me an address?
22     A. 2201 North Quannah Avenue.
23     Q. Okay. And who do you live with?
24     A. My sister.
25     Q. Your sister. Okay. Do you have any children?

Ashton Dennis     1/25/2021     4 (10 - 13)

Page 10

1  A. I have three.
2  Q. You have three. Okay. And do they have the
3  same mother or do they have multiple mothers?
4  A. No, they have the same mother.
5  Q. And who -- what's her name?
6  A. Tisha Abdual.
7  Q. Okay. Can you try to spell that for me? I
8  didn't understand.
9  A. T-I-S-H-A, Abdual, A-B-D-U-A-L.
10 Q. Okay. And where does she live?
11 A. Houston, Texas.
12 Q. Okay. And what's your sister's name?
13 A. India Dennis.
14 Q. Okay. Do you have any other siblings?
15 A. Yes, I have three other brothers.
16 Q. And what are their names?
17 A. Nick Dennis, Isaac Dennis and Jeremy Dennis.
18 Q. Okay. Where do they live?
19 A. Here in Tulsa.
20 Q. Okay. Do you have any grandparents or aunts
21 and uncles or parents?
22 A. Grandparents are passed. Mother is passed.
23 Father is passed. I do have three aunties that stay
24 here in Tulsa.
25 Q. Okay. What are their names?

Page 11

1  A. Patricia, Carolyn -- oh, I don't -- I call my
2  third auntie -- her name is -- I can't remember her
3  first name, just -- we call her babe.
4  Q. That's okay. That's okay. I understand, you
5  know, there are names and they're not necessarily their
6  legal names. That's okay. Do you have a cell phone?
7  A. Yes, I do.
8  Q. Okay. What kind of cell phone do you have?
9  A. The carrier or the phone device?
10 Q. Both actually.
11 A. Well, I'm with Assist Wireless and I have an
12 iPhone 8 Plus.
13 Q. Okay. Thank you. Do you have a car?
14 A. No, I don't.
15 Q. Okay. Do you have access to a car?
16 A. I mean, through family, yes.
17 Q. Okay. Do you currently work?
18 A. No.
19 Q. Okay. Are you on disability?
20 A. Yes.
21 Q. Okay. And when were you approved for
22 disability?
23 A. Since birth.
24 Q. Since birth. Okay. And can you describe your
25 disability for me?

Page 12

1  A. I have osteobrocosis (sic) and scoliosis.
2  Q. Okay. All right. Can you tell me how much
3  education you've -- or schooling you have completed?
4  A. High school graduate, 2004.
5  Q. Where did you graduate from?
6  A. Broken Arrow High School.
7  Q. Okay. That's a good school. Did you take any
8  medications?
9  A. No.
10 Q. Okay. Do you have any hearing problems?
11 A. No.
12 Q. All right. So I don't want to talk about why
13 or what happened to get you arrested, so we're going to
14 start after you get arrested on December 15th, 2020.
15 Okay. Because that's what at issue right now.
16    Do you understand that?
17 A. Yes.
18 Q. Okay. So after you're arrested, what
19 happened?
20    MS. KASDIN: Object to the form of the
21 question.
22 Q. (By Ms. Moore) Okay. Did you understand that
23 question or do I need to rephrase, Mr. Dennis?
24 A. I understood.
25 Q. Okay. What physically happened to you after

Page 13

1  you were arrested?
2  A. I was transported to the David L. Moss
3  Correctional Facility.
4  Q. Okay. And who transported you there?
5  A. Tulsa Police Department.
6  Q. Okay. And did the Tulsa Police Department
7  tell you anything about what you were charged with or
8  why you were being booked into the jail?
9     MS. KASDIN: Object to the form of the
10 question.
11 Q. (By Ms. Moore) Did you understand that,
12 Mr. Dennis?
13 A. Yes.
14 Q. Okay. What did -- what did Tulsa Police
15 Department tell you while they were booking you in?
16 A. Allegations of stolen property, stolen car and
17 stolen firearm.
18 Q. Okay. Did they tell you anything about bond
19 amounts?
20 A. No, not...
21 Q. And that was the Tulsa Police Department did
22 not tell you anything?
23 A. No.
24 Q. Okay. All right. So you're -- you're now at
25 the jail and you're being booked in. Do you know who is

Page 14

1　booking you in?
2　　A.　Employee for the David L. Moss Correctional
3　Facility.
4　　Q.　Okay. And what did they do?
5　　A.　Took pictures. Once the pictures was tooken,
6　they gave me a printout of my charges and my court date,
7　and I was instructed to sit down.
8　　Q.　Did the printout contain information about
9　bond amounts?
10　　A.　No.
11　　Q.　Okay. Were you told about bond amounts at
12　booking?
13　　A.　I asked.
14　　Q.　You asked?
15　　A.　But they --
16　　Q.　Okay. What did they tell you about bond
17　amounts?
18　　A.　She just written down what my bond was for the
19　charges I was in -- in for.
20　　Q.　She wrote it down for you?
21　　A.　Correct.
22　　Q.　Okay. And was that on the charge sheet or on
23　a different piece of paper?
24　　A.　On the charges, charge sheet.
25　　Q.　Were you told about your next court date?

Page 15

1　　A.　Yeah, it was listed on the piece of paper
2　printout.
3　　Q.　Did they tell you anything else about it?
4　　A.　No.
5　　Q.　Okay. So you were given the piece of paper
6　and told to go sit in a room?
7　　A.　I was in the booking area.
8　　Q.　In the booking area. Okay. Did you still
9　have access to your phone?
10　　A.　No.
11　　Q.　Okay. Did you have access to a phone to make
12　calls?
13　　A.　Yes.
14　　Q.　Okay. Did you call anyone?
15　　A.　Yes, I did.
16　　Q.　Who did you call?
17　　A.　I contacted my kids and my bail bondsman.
18　　Q.　Which bail bondsman did you contact?
19　　A.　His name is James Pharr, P-H-A-R-R.
20　　Q.　Okay. And how long were you in booking or the
21　booking area, sorry?
22　　A.　Probably like an hour or two maybe.
23　　Q.　Okay. Did you make any other phone calls?
24　　A.　No.
25　　Q.　Okay. After booking, where did you go in the

Page 16

1　jail?
2　　A.　Went to dress out.
3　　Q.　Okay. And what happens in dress out?
4　　A.　I took off all my street clothes, what they
5　call them, was handed their inmate clothing and told me
6　to, I guess, squat or bend over, make sure I didn't have
7　any -- anything in my rectum.
8　　Q.　Okay. All right. So you're dressed out and
9　changed into the jail clothes. What happens next?
10　　A.　Took to the quarantine pod.
11　　Q.　What did they tell you about quarantine pod?
12　　A.　Nothing. I was instructed the -- they told me
13　what actually cell I was in, which was a handicapped
14　cell and that was that.
15　　Q.　Did you tell them that you had a handicap
16　issue?
17　　A.　No, I mean, for -- from the eyes can see, I'm
18　pretty physically -- I mean, they can tell I have
19　something wrong with me.
20　　Q.　Okay. Well, I just wanted to make sure I
21　understood why you got put in a handicapped cell. So
22　they noted your handi -- your disability and your
23　handicap?
24　　A.　Correct.
25　　Q.　Okay. And you're in the quarantine pod. Are

Page 17

1　you told when they'll come back for you for your next
2　court date?
3　　A.　No. It was the next day.
4　　Q.　Okay. When did they come to get you for your
5　next court date? Do you remember the time?
6　　A.　Oh, the next morning. About 6, a little bit
7　after breakfast.
8　　Q.　Okay. So after breakfast. And do they tell
9　you anything then about the court date?
10　　A.　No, the DO woke me up and told me that I had
11　court.
12　　Q.　Uh-huh. And they -- they came to get you for
13　court and what -- what happened when they came to get
14　you for court?
15　　A.　Well, I was let go from the pod to the video
16　arraignment or video court and I was instructed --
17　instructed to sit down and wait for the judge.
18　　Q.　Okay.
19　　A.　On a prompter.
20　　Q.　Did anyone tell you this was a bond hearing?
21　　A.　No.
22　　Q.　Were there any signs telling you what -- what
23　kind of hearing you could have?
24　　A.　No.
25　　Q.　Okay. Were there any jail personnel in the

Page 18

1  video courtroom?
2      A.  Yes.
3      Q.  Did they say anything before the docket
4  happened?
5      A.  Yeah, I was told it was a bond hearing.
6      Q.  Okay. And did they say anything more than
7  that?
8      A.  No.
9      Q.  Okay. What happened -- tell me about the bond
10 hearing?
11         MS. KASDIN: Object to form.
12     Q.  (By Ms. Moore) You're sitting in the bond --
13 in this courtroom and what happens?
14     A.  Well, they -- as it was my turn, I was
15 enlisted to come up to the podium and I was -- the judge
16 was talking and I was told to remain quiet.
17     Q.  Who told you to remain quiet?
18     A.  The judge.
19     Q.  Judge did. Okay. Do you know who the judge
20 was?
21     A.  No, not by name.
22     Q.  Okay. Were you told you had an attorney
23 representing you?
24     A.  I was told the Public Defender's Office was
25 there.

Page 19

1      Q.  Did the judge say anything before you were
2  specifically called up to the podium to everyone?
3      A.  No, not really.
4      Q.  Okay.
5      A.  No, not that I can remember.
6      Q.  Okay. So the judge didn't -- you don't
7  remember if the judge came on and told the entire
8  courtroom what the purpose of the hearings were?
9      A.  I don't remember.
10     Q.  Okay. Okay. So you're up at the podium and
11 what happens next?
12        MS. KASDIN: Object to the form.
13     A.  They -- she were -- read off my charges,
14 dismissed two of the charges that I had that was listed
15 and she was talking back and forth with the DA and the
16 Public Defender's Office.
17     Q.  (By Ms. Moore) Okay. Could you hear what
18 they were saying?
19     A.  No.
20     Q.  Okay. But you heard her dismiss two of the
21 charges, right?
22     A.  Correct.
23     Q.  Okay. Did she tell you your new bond amount?
24     A.  I think so.
25     Q.  Okay. And then your hearing was over?

Page 20

1      A.  Yes.
2      Q.  Okay.
3      A.  Once -- after they gave me the new bond.
4      Q.  Okay. So they gave -- who gave you the new
5  bond amount?
6      A.  The judge.
7      Q.  The judge. So you heard her say that?
8      A.  Correct.
9      Q.  Okay. Were you given any paper at the end of
10 the hearing from someone in the David L. Moss facility?
11     A.  No, not that I can remember.
12     Q.  Okay. After the hearing was done, where did
13 you go?
14     A.  Back to the pod.
15     Q.  Okay. How much was your bond after the
16 hearing?
17     A.  About 4,000.
18     Q.  Okay. Did you call your bail bondsman back?
19     A.  No.
20     Q.  Okay. When was your next court appearance
21 after the bail bond hearing?
22     A.  I don't remember the date.
23     Q.  Do you remember how many days after?
24     A.  Had to be a few -- couple days after --
25     Q.  Okay.

Page 21

1      A.  -- the bail hearing.
2      Q.  Can you tell me about that hearing?
3      A.  It really wasn't too much there. I was -- the
4  DO came to my cell and told me I need to go to court. I
5  was released down to the video hearing. Once I got to
6  the video court, I was told to fill out for pauper's
7  affidavit for the Public Defender's Office.
8      Q.  Okay. And you filled that out?
9      A.  Yes.
10     Q.  Okay. And were you appointed a public
11 defender?
12     A.  Not right then and there, no.
13     Q.  Well, at the hearing, were you appointed a
14 public defender?
15     A.  No, after I filled out the paperwork, I was
16 told to go back to the pod.
17     Q.  Okay. Did you see a judge that day?
18     A.  No.
19     Q.  You didn't stand at the podium?
20     A.  No.
21     Q.  Okay. Have you been appointed a public
22 defender?
23     A.  Yes.
24     Q.  Okay. Do you know what your current charges
25 are against you?

Ashton Dennis                1/25/2021                     7 (22 - 25)

**Page 22**

1  A. Yes.
2  Q. Do they -- have you seen the Information filed
3  against you?
4  A. No.
5  Q. Okay. Do you know which judge oversaw your
6  arraignment?
7  A. The first one or the --
8  Q. The second one. Not the bond hearing, the
9  second.
10 A. Oh, no.
11 Q. Okay. Back at the bond hearing, did the --
12 did it -- the judge ask you about your ability -- what
13 you could afford?
14 A. No.
15 Q. Did the judge ask you about employment?
16 A. No.
17 Q. Did the judge ask you about disability?
18 A. No.
19 Q. Okay. Prior to your bond hearing, did you
20 fill out any paperwork?
21 A. No.
22 Q. Do you know who the presiding judge is?
23 A. No.
24 Q. Okay. Do you -- did you tell anyone at the
25 bond hearing that you couldn't hear?

**Page 23**

1  A. (Shakes head in the negative.)
2  Q. You -- do you know why the -- strike that.
3     Do you know what -- strike that.
4     Do you know what this lawsuit is about that
5  I'm -- that you're testifying in?
6  A. Yes.
7  Q. Okay. What's it about in your words?
8  A. Well, from the understanding I have, it's to
9  try to correct some wrongdoing in how they handle things
10 in David L. Moss far as people coming in with high bonds
11 and not able to pay.
12 Q. Okay. What does ability to pay mean to you?
13    MS. KASDIN: Object to the form.
14 A. I guess their financial standpoint in life, if
15 they're working, that type of thing.
16    MS. MOORE: Okay. Let's take a five minute
17 break right now. Okay?
18    THE WITNESS: Yeah.
19    MS. MOORE: Thank you.
20    (A recess was taken from 9:31 a.m. to
21 9:40 a.m.)
22 Q. (By Ms. Moore) Mr. Dennis, we're back on the
23 record and you're still under oath. So can you explain
24 to me who is paying your disability payments?
25 A. Who's paying?

**Page 24**

1     MS. KASDIN: Object to the form.
2  A. Yes, the state pays, Tulsa Oklahoma.
3  Q. (By Mr. Moore) Okay. And how do you get
4  those payments?
5  A. A debit card that -- through the Social
6  Security Office, administration office.
7  Q. Okay. Are you a member of a -- of an Indian
8  tribe?
9  A. No.
10 Q. Okay. Do you have any Indian descent?
11 A. Not that I'm aware of.
12 Q. Okay. After the bond hearing, did you ask
13 anyone to help you with bond?
14 A. No.
15 Q. Did you fill out an application for The Bail
16 Project after the bond hearing?
17 A. Yes.
18 Q. Okay. Did you call your sister about your
19 bond?
20 A. No.
21 Q. Did you call one of your aunties?
22 A. No.
23 Q. You already said you didn't call your bail
24 bondsman. That's correct?
25 A. Correct.

**Page 25**

1  Q. Do you know you're asking to intervene in a
2  lawsuit?
3  A. Yes.
4  Q. Okay. And do you know you're asking to
5  intervene to be a class representative?
6  A. Yes.
7  Q. Do you understand what a class representative
8  does?
9  A. A bit.
10 Q. Okay. Can you tell me what that bit of
11 understanding is?
12 A. I guess being a voice for the other inmates
13 that's the same predicament that I was in, currently in.
14 Q. Okay. And what do you -- if you were allowed
15 to intervene, what do you want out of the lawsuit?
16 A. I don't want anything in particular, just to
17 -- I guess just to be a voice to -- for people that's in
18 -- in custody or having problems or not having the
19 ability to pay the bond amounts that the jailers give us
20 or the judges give us.
21 Q. What do you think the -- what do you think
22 that should look like if you're given that voice? What
23 -- how do you think the Court should correct?
24    MS. KASDIN: Object to the form of the
25 question.

**Page 26**

1  A. I don't know.
2  Q. (By Ms. Moore) You don't know. Okay.
3     MS. MOORE: Doug, I'm going to pass the
4  witness to you.
5     THE WITNESS: I can't hear you, sir.
6     MR. WILSON: Thank you. That's the quietest
7  I've been in a long time.
8           CROSS EXAMINATION
9  BY MR. WILSON:
10  Q. Mr. Dennis, I represent Sheriff Vic Regalado
11 and the Tulsa County commissioners in this case and I've
12 just got a couple -- a couple questions I'd like to ask.
13 Okay?
14  A. Yes, sir.
15  Q. Do you know Sheriff Vic Regalado? Have you
16 ever met him?
17  A. No, sir.
18  Q. Okay. And am I correct that he was not
19 involved directly in your arrest and detention at the
20 jail?
21  A. No.
22     MS. KASDIN: Object to the form of the
23 question.
24  Q. (By Mr. Wilson) Okay. Did you have any
25 interactions with the sheriff in your arrest or

**Page 27**

1  detention at the jail?
2  A. I'm not sure.
3  Q. Did you speak to him?
4  A. No, no, no, no.
5  Q. Okay. Did he speak to you?
6  A. No, sir.
7  Q. Okay. You didn't meet him at that time,
8  correct?
9  A. No, sir.
10  Q. Okay. Have you ever met any of the county
11 commissioners?
12  A. No, sir.
13  Q. Have any of them spoken to you?
14  A. No, sir.
15  Q. And have you spoken to any of them?
16  A. No, sir.
17  Q. Okay. Do you know George Foss?
18  A. No, sir.
19  Q. Okay. When the judge advised you at the bond
20 docket that your bond was now $4,000, did you take any
21 steps to try and pay that bond?
22     MS. KASDIN: Object to the form of the
23 question.
24  A. No, sir. I really couldn't.
25  Q. (By Mr. Wilson) Why didn't -- why did you

**Page 28**

1  make no effort to try and pay it?
2     MS. KASDIN: Object to the form of the
3  question.
4  A. Because once you're in a pod, it's based off
5  money. So if you don't have any money to use the phone,
6  you don't have any access to the outside world.
7  Q. (By Mr. Wilson) Well, you made phone calls
8  while you were in jail, right?
9     MS. KASDIN: Object to the form of the
10 question.
11     THE REPORTER: I'm sorry, I didn't hear the
12 answer.
13  A. Just in booking.
14  Q. (By Mr. Wilson) Okay. Did people call you
15 while you were in jail?
16  A. No.
17  Q. Did anyone with The Bail Project call you
18 while you were in jail?
19  A. No, sir.
20  Q. And you did not call anyone with The Bail
21 Project, correct?
22  A. No, sir.
23  Q. Okay. How is it that you and The Bail Project
24 got together in December of 2020?
25     MS. KASDIN: Object to the form of the

**Page 29**

1  question.
2  A. I guess have to say through the -- I don't
3  know what that little machine is called in jail.
4  Computer email prompter kind of thing.
5  Q. (By Mr. Wilson) Have you heard --
6  A. Kiosk, kiosk.
7  Q. Referred to it as a kiosk. So did you make a
8  request through the kiosk?
9  A. No.
10  Q. Okay. Did The Bail Project reach out to you
11 through the kiosk?
12  A. Yes.
13  Q. Okay. And after they did so, did you speak
14 with them by phone?
15  A. No.
16  Q. After they did so, did you speak with them by
17 video?
18  A. Yes.
19  Q. And did you speak with them about payment of
20 your bail?
21  A. Yes.
22  Q. How many times prior to this had you been in
23 jail?
24  A. I would have to say about -- probably once or
25 twice.

Page 30

1  Q. In the previous times that you were in jail,
2  did you bond out of either of those?
3  A. No.
4  Q. Did you make any effort to bond out on those
5  occasions?
6  A. No.
7  Q. Have you ever pled guilty to any crimes?
8  A. Yes.
9  Q. What crimes have you pled guilty to?
10 A. My previous charges. Possession with intent
11 was one of them.
12 Q. What are the others?
13 A. Possession charges.
14 Q. And were any of those felonies?
15 A. Yes.
16    MR. WILSON: If you'll give me five minutes,
17 I'll try and go through my notes and wrap it up. Okay?
18    THE WITNESS: Yes, sir.
19    (A recess was taken from 9:52 a.m. to
20 9:58 a.m.)
21 A. Okay. Mr. Wilson, I was just -- when you
22 asked me have I been in jail before this.
23 Q. (By Mr. Wilson) Yes, sir.
24 A. I have been in jail several other times due to
25 traffic -- traffic infractions and stuff like that.

Page 31

1  Q. So your disability, does it keep you from
2  driving?
3  A. No.
4  Q. Do you have a driver's license?
5  A. No, they're suspended.
6  Q. And why was it suspended?
7  A. Not having proof of insurance.
8  Q. Of the $700 that -- strike that.
9     I don't know whether or not you stated how
10 much in disability payments you get from Social Security
11 or not. So let me just go ahead and ask that question.
12 Do you know how much you get every month from Social
13 Security disability?
14 A. 751.
15 Q. Okay.
16 A. A month.
17 Q. And can you tell me, what does that money go
18 to pay?
19    MS. KASDIN: Object to the form of the
20 question.
21 A. Child support, my housing. I pay my sister
22 rent and stuff for the utilities.
23 Q. (By Mr. Wilson) Groceries?
24 A. Yes. My clothing and other things of that
25 nature also.

Page 32

1  Q. When you need health care, who pays for that?
2  A. I have insurance.
3  Q. And what kind of insurance do you have?
4  A. The state insurance, Medicare, Medicaid or
5  however they pronounce that.
6  Q. Is there a child support order entered
7  somewhere against you?
8  A. Yes.
9  Q. Okay. Do you know where?
10 A. Here in Tulsa, Oklahoma. In Tulsa.
11 Q. And at the time of that child support order,
12 was disability your sole source of income?
13 A. Yes.
14 Q. Do you know approximately what year that was,
15 sir?
16 A. That they had the child support, no, I don't.
17 Q. Do you make any extra money on top of your
18 disability payments?
19 A. No, I don't.
20 Q. Okay. Was some of that money then used to buy
21 the drugs that you were trafficking in that you were
22 convicted of?
23    MS. KASDIN: Object to the form of the
24 question.
25 A. No.

Page 33

1  Q. (By Mr. Wilson) Okay. How did you get money
2  to purchase drugs?
3     MS. KASDIN: Object to the form of the
4  question.
5  A. I'm not sure.
6  Q. (By Mr. Wilson) Well, looks like your money
7  gets spent on child support, housing, groceries,
8  clothing and that kind of stuff, rent, utilities.
9  Pretty much eats up all the 751 every month. Would you
10 agree?
11 A. Yep.
12 Q. Okay. And you've already told me that you
13 pled guilty to possession with intent, right?
14 A. Correct.
15 Q. And is that cocaine?
16 A. Correct.
17 Q. Okay. And you pled guilty to possession of
18 cocaine before, correct?
19 A. Yes.
20 Q. And from what I understand, cocaine is not
21 inexpensive, correct?
22 A. Correct.
23    MS. KASDIN: Object to the form of the
24 question.
25 Q. (By Mr. Wilson) So where do you get the money

**Ashton Dennis**  1/25/2021  10 (34 - 37)

Page 34

1 to purchase the cocaine?
2      MS. KASDIN: Object to the form of the
3 question.
4   A. I don't know.
5   Q. (By Mr. Wilson) Are you being truthful with
6 me, sir?
7   A. Yes, I am.
8      MS. KASDIN: Object to the form of the
9 question.
10   Q. (By Mr. Wilson) You don't have any idea how
11 you came by the money?
12      MS. KASDIN: Object to the form of the
13 question.
14   A. Sorry.
15      MS. KASDIN: Asked and answered. This is
16 getting repetitive.
17   A. What did you say? I didn't hear what you
18 said.
19   Q. (By Mr. Wilson) I asked, you don't have any
20 idea how you came by the money to purchase the cocaine
21 that you already pled guilty to?
22      MS. KASDIN: Object to the form of the
23 question.
24   A. A friend.
25   Q. (By Mr. Wilson) So when you're arrested and

Page 35

1 you're advised that, you know, it will take $4,000 to
2 bail you out of jail, why do you not contact family or
3 friends to try and come up with the bond money?
4   A. Because I don't --
5      MS. KASDIN: Object to the form of the
6 question.
7   A. To place a phone call, I don't have the money
8 to place a phone call.
9   Q. (By Mr. Wilson) Well, your -- your family
10 knew that you were in jail, right?
11   A. Correct.
12      MS. KASDIN: I'm going to ask if we could just
13 take a short break here, if everyone is okay with that?
14      MR. WILSON: Sure. Five minutes?
15      MS. KASDIN: That should work. Thank you.
16      (A recess was taken from 10:05 a.m. to
17 10:12 a.m.)
18   Q. (By Mr. Wilson) Mr. Dennis, you recognize
19 you're still under oath?
20   A. Yes.
21   Q. Okay. I'm -- and I'm not trying to wrestle
22 with you about any of these issues. I'm just -- most
23 folks -- most folks when they get in jail try and make
24 bond, and I'm just trying to figure out why in your
25 situation that's not taking place. And I understand

Page 36

1 that you're telling me you don't have any money to pay
2 for use of the telephone, correct?
3   A. Correct.
4      MS. KASDIN: Object to the form.
5   Q. (By Mr. Wilson) Did I understand your
6 testimony correct, Mr. Dennis?
7   A. Yes.
8   Q. Okay. And your family knew you were in jail
9 in December, correct?
10   A. Yes.
11   Q. Okay. Did they make any attempt to call you?
12      MS. KASDIN: Object to the form?
13   A. No.
14   Q. (By Mr. Wilson) Do you know why?
15   A. No.
16      MS. KASDIN: Object. My apologies.
17   Q. (By Mr. Wilson) Are you wearing a watch
18 today, Mr. Dennis?
19   A. Yes.
20   Q. Could you hold that up to the camera, please,
21 so I can just take a quick picture of it?
22   A. (Witness complies.)
23   Q. Can you tell me what kind of watch that is?
24   A. Invicta.
25   Q. How do you spell that?

Page 37

1   A. I-N-C-T-I-A (sic).
2   Q. And how did you get that watch?
3   A. It's a present.
4   Q. From?
5   A. Girlfriend, previous girlfriend.
6   Q. And her name?
7   A. Camille.
8   Q. What's her last name?
9   A. Sirls.
10   Q. Could you spell it, please?
11   A. Sirls with an S.
12   Q. G-I-R-L-S?
13   A. Yes.
14   Q. And where does she live?
15   A. She stays in Tulsa.
16   Q. She have a house here?
17   A. She has an apartment.
18   Q. Where at?
19   A. Town Square.
20   Q. Do you have her phone number?
21   A. No, I don't. Her number just currently
22 changed. I don't have her current number.
23   Q. Are you dating her at the moment?
24   A. No.
25   Q. Are you dating anyone at the moment?

**Ashton Dennis**                    1/25/2021                                    11 (38 - 41)

Page 38

1   A. No.
2   Q. Okay. How did you get to the deposition
3   today?
4   A. With attorney's help.
5   Q. And can you explain physically how that
6   occurred?
7   A. They contacted the Lift program, Ms. Phoebe
8   arranged for a ride here for the deposition this
9   morning.
10  Q. Very good. So there was someone who picked
11  you up and will take you back home; is that right?
12  A. Correct.
13  Q. Okay. Thank you. Tell me about James Pharr?
14      MS. KASDIN: Object to the form of the
15  question.
16  A. The -- my bail bondsman?
17  Q. (By Mr. Wilson) Yes, sir.
18  A. He's a bail bondsman.
19  Q. And how do you know him?
20  A. Through a friend. His stepdaughter. I was
21  friends with his stepdaughter.
22  Q. What's his stepdaughter's name?
23  A. I think -- I don't remember her name. I'm not
24  -- I'm not sure on that name. I haven't spoken to her
25  in awhile. I don't remember her name.

Page 39

1   Q. That's fine. How many times have you spoken
2   with Mr. Pharr or Pharr, I'm sorry?
3   A. Just the time I called to see about getting
4   him for bail.
5   Q. And could you tell me about that conversation?
6   What did you ask him?
7   A. Basically asked him what would he need far as
8   amount of money to help me get out of jail.
9   Q. And do you recall what he said?
10  A. He said I would need a cosigner and I don't
11  remember the dollar amount that he said that he would
12  need. I know it was out of my range, so...
13  Q. Do you think it's fair for the State to
14  require someone to post bail so that they can be out of
15  jail --
16      MS. KASDIN: Object --
17  Q. (By Mr. Wilson) -- prior to trial?
18      MS. KASDIN: Object to the form.
19  A. Yes.
20      MR. WILSON: I don't have any other questions.
21  I'll pass the witness. Thank you, sir.
22      MS. MOORE: Phoebe?
23      MS. KASDIN: Nothing from me. Thank you.
24      MS. MOORE: Okay. I'm going to reserve all my
25  further questions and conclude this deposition.

Page 40

1       THE REPORTER: Do you want Mr. Dennis to read
2   and sign?
3       MS. KASDIN: Yes.
4       THE REPORTER: Thank you.
5       MR. WILSON: Thank you, Mr. Dennis. You have
6   a good day.
7       THE WITNESS: You guys have a good day.
8       MR. WILSON: All righty. Bye-bye.
9       (Deposition concluded at 10:19 a.m.)

Page 41

1                    JURAT
2       FELTZ VS. BOARD OF COUNTY COMMISSIONERS
3            JOB FILE NO. 148999
4   STATE OF OKLAHOMA
5   SS
6   COUNTY OF TULSA
7       I, ASHTON DENNIS, do hereby state under oath
8   that I have read the above and foregoing deposition in
9   its entirety and that the same is a full, true and
10  correct transcription of my testimony so given at said
11  time and place, except for the corrections noted.
12
13
14      _____
15          Signature of Witness
16
17      Subscribed and sworn to before me, the
18  undersigned Notary Public in and for the State of
19  Oklahoma by said witness, ASHTON DENNIS, on this
20  _____ day of _____, 2020.
21
22
23      _____
24          NOTARY PUBLIC
25      MY COMMISSION EXPIRES: _____

**Professional Reporters**
800.376.1006
www.proreporters.com

**Exhibit 16**

Page 42

```
 1           ERRATA SHEET
 2    FELTZ VS. BOARD OF COUNTY COMMISSIONERS
 3         DEPOSITION OF ASHTON DENNIS
 4   REPORTED BY: SHANNON S. HARWOOD, CSR, RPR, CRR
 5    DATE OF DEPOSITION TAKEN: JANUARY 25, 2021
 6          JOB FILE NO. 148999
 7  PAGE  LINE  IS              SHOULD BE
```

Page 43

CERTIFICATE

STATE OF OKLAHOMA )
                  )
COUNTY OF TULSA   )

I, Shannon S. Harwood, a Certified Shorthand Reporter in and for the State of Oklahoma, do hereby certify that the foregoing is a true and correct transcription of my shorthand notes of proceedings had in Case Number 18-cv-0298-CVE-JFJ heard on the 25th day of January, 2021, and is only valid with my stamped seal and my original signature.

I further certify that I am not related to nor attorney for either of said parties nor otherwise interested in said action.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 1st day of February, 2021.

*Shannon Harwood*

Shannon S. Harwood, CSR, RPR, CRR