# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| RICHARD FELTZ and ASHTON DENNIS, on behalf of themselves and all other similarly situated, | |
| *Plaintiffs*, | |
| v. | Case No. 18-CV-0298-SPF-JFJ |
| VIC REGALADO, *et al*., | |
| *Defendants*. | |

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY  JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION ...........................................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................3

    I.    The Parties and Witnesses .......................................................3

    II.    Defendants Jail People Who Are Unable to Pay, Without Individualized Hearings ...............................................................................6

        A.    Pre-Set Bonds Determine Whether Someone Will be Jailed ..........6

        B.    Attorneys Are Appointed at Initial Arraignment, Six Days After Arrest ..............................................................................7

    III.    The Bond Docket Is Established Without Clear Legal Standards or Procedures to Ensure a Fair Hearing .......................................8

        A.    The Bond Docket Does Not Allow for Plaintiffs to Defend Their Rights ..............................................................................9

        B.    Bond Docket Judges Do Not Make the Substantive Findings Required to Justify Plaintiffs' Detention .......................................12

    IV.    Secured Money Bail Conditions Do Not Improve Appearance Rates ..16

ARGUMENT ...............................................................................17

    I.    Defendants Violate Plaintiffs' Substantive Due Process Right to Liberty ...............................................................................18

        A.    Defendants Deprive Plaintiffs of a Fundamental Interest in Liberty ...............................................................................18

B.   Defendants May Take Away the Liberty of People Charged with Crimes Only When Necessary to Ensure Public Safety and Guard Against Flight.................................................................20

C.   At the Time of Filing, Defendants Systematically Detained People Without Establishing A Compelling Interest or Narrow Tailoring .........................................................................21

D.   The Bond Docket Has Not Cured Defendants' Substantive Due Process Violations..........................................................24

II.   Defendants Violate Plaintiffs' Right Against Wealth-Based Detention .........................................................................26

A.   Defendants Must Show that Detaining Only People Who Cannot Afford Bail Serves a Substantial and Legitimate Interest.............27

B.   Defendants Cannot Show That Requiring People to Pay for Their Release Serves a Legitimate State Interest ....................................28

III.   Defendants Violate Plaintiffs' Procedural Due Process Rights.............30

A.   Plaintiffs Are Entitled to Adequate Notice......................................32

B.   Plaintiffs Are Entitled to a Meaningful Opportunity to Be Heard and to Confront Evidence.................................................33

C.   Plaintiffs Are Entitled to Findings on the Record that the Government Has Met Its Burden by Clear and Convincing Evidence ...................................................................34

D.   Plaintiffs Are Entitled to Unfettered Access to Counsel to Assist with Bond Hearings.................................................35

IV.   All Named Defendants Have Authority to Correct the Constitutional Violations Complained of....................................................36

CONCLUSION ..................................................................................................39

# TABLE OF AUTHORITIES

### Cases

*Bearden v. Georgia*, 461 U.S. 660 (1983) ........................................................ 27, 30

*Bell v. Wolfish,* 441 U.S. 520 (1979). ........................................................19

*Brangan v. Commonwealth,* 80 N.E.3d 949 (2017) ................................................19

*Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261 (1990) ............34

*DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189 (1989)..........20

*Ebonie S. v. Pueblo Sch. Dist. 60*, 695 F.3d 1051(10th Cir. 2012) .........................18

*Foucha v. Louisiana*, 504 U.S. 71 (1992)........................................................ 18, 21

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ................................................................34

*Hartman v. Cal. Dep't of Corr. & Rehab*, 707 F.3d 1114 (9th Cir. 2013)..............36

*Hernandez v. Lynch*, No. 16-620, 2016 WL 7116611 (C.D. Cal. Nov. 10, 2016)..25

*Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2022) ............................................26

*Ind v. Colo. Dep't of Corr., 801 F.3d 1209 (10th Cir. 2015) Ind v. Colo. Dep't of Corr.*, 801 F.3d 1209 (10th Cir. 2015)................................................................26

*Johnson v. Zerbst*, 304 U.S. 458 (1938) ................................................................35

*Jones v. United States*, 463 U.S. 354 (1983) ........................................................18

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ............................................ 31, 32, 33

*Morrissey v. Brewer*, 408 U.S. 471 (1972)............................................................31

*Navajo Nation v. San Juan Cnty.*, 929 F.3d 1270 (10th Cir. 2019)................. 21, 28

*Pugh v. Rainwater*, 572 F.2d 1053 (5th Cir. 1978) ........................................ 19, 21

*Reno v. Flores*, 507 U.S. 292 (1993) ................................................................ 18, 20

*Riggins v. Goodman*, 572 F.3d 1101 (10th Cir. 2009) ...........................................33

*San Antonio Indep. Sch. Dist. v.Rodriguez*, 411 U.S. 1 (1973) ........................ 22, 27

*Santosky v. Kramer*, 455 U.S. 745 (1982) ............................................................34

*Seegmiller v. LaVerkin City*, 528 F.3d 762 (10th Cir. 2008)....................................18

*Swarthout v. Cooke*, 562 U.S. 216 (2011) ................................................................31

*Tate v. Short*, 401 U.S. 395 (1991) ................................................................... 26, 30

*United States v. Leathers*, 412 F.2d 169 (D.C. Cir. 1969)........................................19

*United States v. Mantecon-Zayas*, 949 F.2d 548 (1st Cir. 1991) ............................19

*United States v. Salerno*, 481 U.S. 739 (1987)..................................... 18, 20, 26, 35

*Upjohn Co. v. United States,* 449 U.S. 383 (1981)...................................................36

*Valdez-Jimenez v. Eighth Jud. Dist. Ct.*, 460 P.3d 976  (Nev. 2020)......................19

*Vasquez v. Cooper*, 862 F.2d 250 (10th Cir. 1988) .................................................27

*Vitek v. Jones*, 445 U.S. 480, 496 (1980)................................................................32

*Weatherford v. Bursey*, 429 U.S. 545 (1977)..........................................................36

*Williams v. Illinois*, 399 U.S. 235 (1970) ........................................................ 26, 30

### Constitutional Provisions

Okla. Const. Art. VII, Sec. 8(h) ..................................................................................5

U.S. Const., Amend. XIV, § 1 ......................................................................... *passim*

### Statutes

20 Okla. Stat. § 20-123 ................................................................................................5

20 Okla. Stat. § 23(2).............................................................................................4, 37

22 Okla. Stat. § 1105.............................................................................................4, 37

22 Okla. Stat. § 1105.2..........................................................................................4, 37

### Rules

Rules on Admin. of Courts, 20 Okla. Stat. Ch. 1, Appx. 2, Rule 1 ....................4, 37

Rules on Admin. of Courts, 20 Okla. Stat. Ch. 1, Appx. 2, Rule 2.....................4, 37

Tulsa Cnty. Dist. Ct. Local Cr. R. 2............................................................... 8, 9, 10

Tulsa Cnty. Dist. Ct. Local R. 1(A). ........................................................................37

**Other Authorities**

Administrative Order 2018-09 ......................................................................................8

## INTRODUCTION

In 2018, when Named Plaintiff Richard Feltz filed this lawsuit seeking declaratory and injunctive relief, bail amounts were assigned to anyone booked into the Tulsa County jail on pre-arraignment charges. The bail amounts were not based on personalized assessments, but on arrest charges. People who could not afford to post bail were detained without any access to a court or public defender for six or more days after arrest. These facts are undisputed. They also establish that defendants were violating Section 1 of the Fourteenth Amendment, which forbids the government from jailing someone—and, separately, for jailing someone based on wealth—without showing that there is a good reason to do so, and giving them an opportunity to show that there is not.

Several months after the case was filed, defendants instituted a new appearance between arrest and arraignment. Now, people who cannot afford their bail appear on "bond docket," usually within 48 hours of arrest, for a judge to consider their pre-assigned bond. But the bond docket has not been a cure. Judges impose bond amounts without considering whether they are affordable, and even knowing that they are not, and they do not ask or analyze whether there is any reason to keep the person in jail, or if there are other conditions that would allow for release without adverse consequences. The people who appear on bond docket are not allowed to participate in advocating for their own release. They often do not know why they are appearing, or what the judge's decision will be based on. Appearing by video feed from the jail, they sometimes cannot hear or see proceedings, and they are routinely told not to speak, except in answer to specific questions. They cannot talk privately to their lawyers, and, when they are finally told what their bail will be, most of them learn that they will have to stay in jail, and they are often not told why.

Named Plaintiff Ashton Dennis described his experience appearing on the docket. Ex. 8 (Dennis Dep.) at 12:12-23:1. Mr. Dennis was told his bond, and assigned to a handicap cell in light of his visible disability. *Id*. at 14:11-21, 6:11-24. There, he spent the night, and in the morning, he was brought to video court without knowing why. *Id*. at 14:25-15:4, 16:25-18:8. He could not clearly hear or see the attorney he was told had been appointed to represent him, and he could not fully hear or follow the conversation about his case that was taking place in the courtroom. *Id*. at 19:10-19. The judge told Mr. Dennis to remain quiet. *Id*. at 18:12-18. The judge did not ask him about his ability to pay, his employment status, or his disability. *Id*. at 22:11-18. At the hearing's conclusion, the judge told Mr. Dennis that two of his arrest charges would be dropped, and he was given a new bond of about $4,000. *Id*. at 19:20-20:8, 20:15-17.  No one explained why. *Id*. at 19:23-20:11

Every witness who has testified—including a judge, a jail administrator, and a public defender, who are among the docket's most frequent attendees—describes a standard bond docket procedure that corroborates Mr. Dennis's account, one in which people continue routinely to be jailed, without having a chance to meaningfully advocate for themselves with the assistance of the lawyer who has been appointed, and without anyone deciding, or explaining, why it is important for them to stay in jail. The undisputed testimony of these defendants, their agents, and third parties confirms, as a matter of law, that the bond docket has not provided the relief that plaintiffs sued to obtain.

As the judges who set court policy and preside over the bond docket, and the jailers who both detain plaintiffs and coordinate and facilitate bond docket procedures, defendants have the power and authority to correct the constitutional violations that their current pretrial detention system entails. There are no facts in the record that defendants can identify that would allow a reasonable juror or jurist to conclude that they do not have a legal obligation to change their unconstitutional

2

procedures. Plaintiffs are entitled to a judgment as a matter of law on all their claims, and to the equitable relief they seek.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.   The Parties and Witnesses

1.   ***Richard Feltz*** is a named plaintiff. He was arrested on new charges on June 2, 2018 and booked into the Tulsa County jail, where he was assigned a bond in excess of $50,000. Mr. Feltz spent seven days in jail on his bond. He filed this lawsuit on June 6, 2018, while he was still detained. [1]

2.   ***Ashton Dennis*** is a named plaintiff. Mr. Dennis was arrested on new charges on December 15, 2020 and booked into the Tulsa County Jail. He was assigned a bond and remained in jail through the date of his bond docket appearance and his arraignment, at which time, he completed a pauper's affidavit and was assigned a public defender. Mr. Dennis moved to join this lawsuit as a named plaintiff before his arraignment and while he was detained.[2]

3.   Mr. Feltz and Mr. Dennis have been appointed representatives of a certified class, defined as:

> All people who are or will be detained prior to their initial arraignment in the Tulsa County Jail because they are unable to pay a secured financial condition of release.[3]

---

[1] Ex. 9 (Feltz Dep.) at 9:8-10:10, 12:15-14:6, 14:23-15:22; Ex. 19 (Feltz Booking); Ex. 6 (Compl.)

[2] Ex. 8 (Ashton Dep.) at 12:12-22:10; Mot. to Intervene (Dec. 20, 2020), ECF No. 225.

[3] Order Certifying Class (Marc. 16, 2023), ECF No. 357.

4.   ***Presiding District Court Judge Doug Drummond*** is the presiding judge of the Tulsa County District Court.[4]

5.   As presiding judge, he has administrative authority over the district court and supervisory authority over the special judges, including responsibility for ensuring that they comply with statutory and constitutional requirements, and institutional objectives.[5]

6.   His powers to carry out these responsibilities include the authority to issue and revoke administrative orders, to assign and reassign special judges, and to issue, revoke and revise a bond schedule.[6]

7.   ***Judge William Musseman*** was the presiding judge of the Tulsa County District Court between January 2018 and January 2020.[7]

8.   Judge Musseman oversaw the process to revise bail and arraignment procedures for arrestees that culminated in the issuance of two administrative orders

---

[4] Judge Drummond succeeded Judge William LaFortune in the role of Presiding Judge and has therefore automatically replaced him as a defendant in this case under Fed. R. Civ. P. 25(d). *See* Ex. 17 (Admin. Order, Assign. of Dist. Judges).

[5] Ex. 1 (Musseman Dep.) at 59:12-60:22, 62:3-12; *see also* 20 Okla. Stat. § 23(2); Rules on Admin. of Courts, 20 Okla. Stat. Ch. 1, Appx. 2, Rule 1(D), (E), Rule 2(C).

[6] Ex. 1 (Musseman Dep.) at 59:12-60:22, 63:5-22; Ex. 4 (Guten Dep.) at 16:11-17:11; Ex. 20 (Musseman Aff.) ¶ 1; *see also* 22 Okla. Stat. § 1105(A) (presiding judge may "prescribe by court rule the conditions under which the court clerk or deputy court clerk, or the sheriff or deputy sheriff, may prepare and execute an order of release on behalf of the court"); 22 Okla. Stat. § 1105.2(B), (C) (authorizing, but not directing, each district's presiding judge to establish a bail schedule).

[7] Ex. 1 (Musseman Dep.) at 15:6-12.

in October 2020, creating the bond docket and amending the pretrial release program.[8]

9. ***Tulsa County Special District Court Judges*** are judges with limited jurisdiction who are appointed by, and serve at the pleasure of district court judges.[9]

10. ***Special District Court Judge David Guten*** served as a Tulsa County Special District Court Judge from February, 2019, until he became a District Court Judge in 2023.[10]

11. Beginning in February 2019, Judge Guten was the Special District Court Judge who primarily oversaw the bond docket.[11]

12. ***Vic Regalado*** is the Sheriff of Tulsa County. He is the head of the Tulsa County Sheriff's Office, and "has the charge and custody of the jail of his county, and all the prisoners in the same."[12]

13. ***Anita Wright*** is a court liaison employed by the Tulsa County Sheriff's Office. She is responsible for setting the dockets and, except for her two days off per week, has attended the dockets daily since they began in 2018, and has attended arraignments every day since the beginning of 2018.[13]

14. ***Brad Johnson*** is the Chief Fiscal Advisor to the Tulsa County Sheriff and, among other responsibilities, is the head of bonds and releases at the Tulsa County Jail.[14]

---

[8] Ex. 20 (Musseman Aff.) ¶¶ 4-5.

[9] Okla. Const. Art. VII, Sec. 8(h); 20 Okla. Stat. § 20-123.

[10] Ex. 4 (Guten Dep.) at 11:19-12:11; Ex. 17 (Admin. Order, Assign. of Dist. Judges).

[11] Ex. 4 (Guten Dep.) at 11:15-12:11, 23:4-23.

[12] Ex. 18 (Sheriff's Ans. to 2d Am. Compl.) ¶ 18.

[13] Ex. 3 (Wright Dep.) at 16:19-21, 33:6-24, 172:3-23, 221:13-19.

[14] Ex. 2 (Johnson Trans.) at 21:2-7, 22:22-23:6.

15. ***Stuart Southerland*** is the First Assistant Public Defender in Tulsa County. He has regularly attended bond docket since its inception and has observed thousands of bond docket appearances, overseen by more than 20 different judges.[15]

## II.  Defendants Jail People Who Are Unable to Pay, Without Individualized Hearings

### A. Pre-Set Bonds Determine Whether Someone Will be Jailed

16. At all times since June 2018, anyone arrested in Tulsa County without a warrant on pre-arraignment charges has their bond set by an offense-based, secured money bond schedule.[16]

17. The bond schedule lists arrest charges and corresponding dollar amounts.[17]

18. The bond schedule is a standing order of the Tulsa County District Court that directs the Sheriff's Office to release anyone who pays a surety or cash bond in the amount corresponding to their arrest charges, unless the amount indicated is $0, which indicates that a person is to be jailed without bond.[18]

---

[15] Ex. 5 (Southerland Dep. Tr.) at 9:18-22, 49:20-52:25.

[16] Ex. 1 (Musseman Dep.) at 35:2-36:1, 47:7-47:20; Ex. 3 (Wright Dep.) at 50:2-19; Ex. 18 (Sheriff's Ans.) ¶ 60; *see also* Cnty. Defs.' Protective Order Mot. Reply Br. at 4 ("[T]here is no dispute that for at least the past five years the Tulsa County Sheriff has detained and continues to detain arrestees brought to the Tulsa County Jail until a judge orders or approves their release. The Tulsa County Sheriff has admitted that he uses the offense-based, secured money-bail schedule . . . .").

[17] Ex. 22 (ECF No. 158-10, Bond Schedule); *see also* Ex. 20 (ECF No. 51-1, JMusseman Aff.) ¶ 2; Ex. 23 (Guten Aff.) ¶ 4.

[18] Ex. 1 (Musseman Dep.) at 35:2-15, 47:7-47:20, 66:22-67:4; Ex. 3 (Wright Dep.) at 45:15-46:3, 55:6-57:2; Ex. 2 (Johnson Dep.) at 53:10-22; Ex. 18 (Sheriff's Ans.) ¶ 60; Ex. 22 (Bond Schedule); Ex. 20 (Musseman Aff.) ¶¶ 1, 2; Ex. 21 (Def. Judges' Resp. to 3d Proposed Stips.) at Nos. 1, 2, 5, 9, 56; Ex. 23 (Guten Aff.) ¶ 4.

19. Anyone arrested on a warrant on pre-arraignment charges has their bond amount set by reference to the warrant, where the judge executing the warrant has listed either a dollar bond amount or an indication that the person is to be jailed without bond.[19]

20. Everyone arrested on pre-arraignment charges is either jailed without bond or assigned a money bond amount. Other release conditions, such as personal recognizance or nonmonetary conditions, can be assigned only after a person appears before a judge.[20]

21. The sheriff will release anyone who can afford to post their assigned bond immediately after booking, and will jail anyone who cannot.[21]

**B. Attorneys Are Appointed at Initial Arraignment, Six Days After Arrest**

22. For someone booked on pre-arraignment charges, an initial arraignment is typically scheduled for six days after booking.[22]

23. When this suit was filed, the initial arraignment was the first court appearance after booking.[23]

---

[19] Ex. 3 (Wright Dep.) at 87:23-88:25; Ex. 18 (Sheriff's Ans.) ¶ 60.

[20] Ex. 2 (Johnson Dep. Tr.) at 39:2-17; Ex. 3 (Wright Dep.) at 88:11-15, 112:9-113:9.

[21] Ex. 2 (Johnson Dep.) at 33:17-36:4, 39:2-17; Ex. 3 (Wright Dep.) at 56:6-57:2; 87:23-88:25, 103:2-105:13; Ex. 18 (Sheriff's Ans.) at ¶¶ 62, 63; Ex. 28.

[22] Ex. 3 (Wright Dep.) at 156:14-158:25; 164:2-9.

[23] Ex. 3 (Wright Dep.) at 141:2-20, 156:14-20, 161:11-162:1; Ex. 5 (Southerland Dep.) at 23:2-24:4.

24. Indigency determinations for appointment of counsel are made at the initial arraignment. Most people still in jail at the time of arraignment are found indigent and offered counsel.[24]

25. At initial arraignment, judges tell people who ask about reducing their bonds to speak to their attorneys about filing a motion. People do not have access to appointed counsel for purposes of filing motions until after initial arraignment.[25]

### III. The Bond Docket Is Established Without Clear Legal Standards or Procedures to Ensure a Fair Hearing

26. The bond docket was established in October 2018 by Administrative Order 2018-09, issued by the District Court's presiding judge. Approximately one year later, Tulsa County District Court Local Criminal Rule 2 supplanted the administrative order and now governs the bond docket.[26]

27. Around the time of the bond docket's creation in 2018, then-Special District Court Judge Bill Hiddle worked with Anita Wright to establish the logistics of the bond schedule, including when it would occur, who would appear, and when they would appear.[27]

28. Under Rule 2, if someone cannot afford their assigned bond amount, they are scheduled for a bond docket appearance that occurs within 48 hours of arrest.[28]

---

[24] Ex. 3 (Wright Dep.) at 165:5-167:18; Ex. 5 (Southerland Dep.) at 23:2-28:5. *See infra* at ¶ 33 for undisputed facts about the limited appointment of counsel for purposes of bond docket.

[25] Ex. 3 (Wright Dep.) at 175:11-176:12; Ex. 5 (Southerland Dep.) at 23:2-24:9, 26:25-27:4.

[26] Ex. 1 (Musseman Dep.) at 75:22-76:6, 84:6-85:8; Ex. 29 (Admin. Order 2018-09); Ex. 30 (Local Cr. R. 2).

[27] Ex. 3 (Wright Dep.) at 137:4-140:8, 142:3-150:15, 155:10-156:3.

[28] Ex. 30 (Local Cr. R. 2) at 3.

29. The stated purpose of the bond hearing is to "determin[e] the appropriate conditions of release" for "individuals not otherwise capable of posting bail pursuant to the schedule," and to provide "the accused . . . the opportunity to object to the bail amount/conditions set for him or her."[29]

30. If someone who had money bail assigned at booking is still in jail at the time of their bond docket hearing, it is presumed that they are unable to pay their bail.[30]

## A. The Bond Docket Does Not Allow for Plaintiffs to Defend Their Rights

31. The bond docket is held daily, and people generally appear within two days of arrest if they are still in custody.[31]

32. Tulsa County District Court special judges preside over the docket according to rotating schedules. Since the docket's creation, at least ten to twenty different judges have presided, some of whom have no other judicial experience with criminal proceedings.[32]

33. An attorney from the public defender's office attends the docket and is appointed to represent people who appear. The appointment is for the purpose and duration of the appearance only.[33]

---

[29] *Id.* at 2-3.

[30] Ex. 4 (Guten Dep.) at 101:21-102:23; Ex. 25 (Guten Decl.) ¶ 5; Ex. 30 (Local Cr. R. 2) at 2-3 (stating that bond docket is for "individuals not otherwise capable of posting bail pursuant to the schedule").

[31] Ex. 4 (J. Guten Dep.) at 119:12-120:12; Ex. 30 (Local Cr. R. 2) at 3.

[32] Ex. 3 (Wright Dep.) at 233:14-234:12; Ex. 4 (Guten Dep.) at 12:21-15:16; Ex. 5 (Southerland Dep.) at 52:20-25.

[33] Ex. 4 (Guten Dep.) at 46:12-47:13; Ex. 5 (Southerland Dep.) at 44:13-47:19; Ex. 30 (ECF No. 89-1, Local Cr. R. 2) at 3.

34. During the time between the bond docket and the initial arraignment, people are not represented by counsel and have no additional court hearings scheduled.[34]

35. People who appear on the docket appear by video feed from the jail. They can see and hear the judge, but they cannot always see and hear other participants, including the attorneys who appear on behalf of the District Attorney and Public Defender.[35]

36. People who appear on the docket cannot communicate privately with the attorney appointed to represent them. They sometimes rely on the judge to transmit to them what the attorney is saying.[36]

37. A private communication between an attorney and someone incarcerated at the jail would need to be arranged by the attorney through jail staff. The jail might not arrange for confidential meetings between attorneys and people appearing on bond docket in the morning before the docket begins.[37]

38. Prior to appearing, people are informed by jail staff about their bond docket appearance dates, but jail staff does not routinely explain the purpose of the appearance.[38]

39. Some people do not attend bond docket and are deemed to have waived their appearance, even if no one has explained to them the purpose of the docket.[39]

---

[34] Ex. 5 (Southerland Dep.) at 46:17-47:19.

[35] Ex. 30 (ECF No. 89-1, Local Cr. R. 2) at 3; Ex. 3 (Wright Dep.) at 222:8-225:2; Ex. 4 (Guten Dep.) at 34:21-36:19; Ex. 5 (Southerland Dep.) at 68:9-72:20.

[36] Ex. 4 (Guten Dep.) at 36:6-19; Ex. 3 (Wright Dep.) at 267:3-268:4.

[37] Ex. 3 (Wright Dep.) at 267:2-268:4.

[38] *Id.* at 119:25-124:25.

[39] *Id*. at 210:9-215:14; Ex. 4 (Guten Dep.) at 73:20-74:1; 75:20-76:22.

40. Bond docket judges do not typically inform people appearing on bond docket about the governing legal standards, or explain the factors that will inform their decision.[40]

41. When Judge Guten presided over bond docket, he would tell people that they were appearing for a bond hearing, not a factual hearing; advise them that if they spoke about their case it could be used against them; inform them that a public defender was present; and then begin to ask questions. His usually practice was not to explain to people how the answers to his questions would factor into his ruling.[41]

42. Bond docket judges do not inform people that they have the right to see and rebut the evidence that will be considered, or to present evidence of their own.[42]

43. People appearing on bond docket do not have access to all of the evidence that is presented to the court, such as criminal history information and arrest and booking reports.[43]

44. Bond docket judges do not tell people they have the right to present an argument, and routinely tell people not to talk about their cases.[44]

45. Sometimes, a person's bond conditions will be decided by agreement of the attorneys attending bond docket, before the person joins the video feed for their hearing.[45]

---

[40] Ex. 4 (Guten Dep.) at 41:17-44:17; Ex. 3 (Wright Dep.) at 237:25-239:25.

[41] Ex. 4 (Guten Dep.) at 41:17-44:17; Ex. 3 (Wright Dep.) at 236:10.

[42] Ex. 3 (Wright Dep.) at 237:16-24.

[43] Ex. 3 (Wright Dep.) 227:3-7; Ex. 4 (Guten Dep.) at 30:1-34:2; 81:4-82:7; Ex. 5 (Southerland Dep.) at 72:22-79:21; 198:7-17.

[44] Ex. 3 (Wright Dep.) at 237:11-24; Ex. 4 (Guten Dep.) at 42:17-45:17; Ex. 5 (Southerland Dep.) at 96:10-21.

[45] Ex. 3 (Wright Dep.) at 242:13-243:14.

46.  Sometimes a defense attorney will advise the bond docket judge that they are waiving a bond hearing on someone's behalf before the bond docket begins and the person appears.[46]

### B. Bond Docket Judges Do Not Make the Substantive Findings Required to Justify Plaintiffs' Detention

#### 1. Most Plaintiffs Who Appear Will Still Be Detained on Unaffordable Bond After their Appearance

47.  At bond docket, judges can lower or eliminate monetary bond conditions, and can impose non-monetary conditions of release with or without accompanying monetary conditions.[47]

48.  There are a number of non-monetary release conditions and resources that can be imposed by a judge, such as GPS monitors, alcohol-monitoring devices, house arrest, prohibitions against operating a motor vehicle, no-contact orders, or surrender of firearms. The Public Defender's office and pretrial services both have programs for collecting peoples' phone numbers in order to send them court reminders, the Public Defender's office can arrange for transportation to court, and pretrial services can arrange for regular check-ins or access to services that assist with food, shelter, and clothing.[48]

49.  Bond docket judges assign secured money bail conditions for most people who appear.[49]

---

[46] Ex. 4 (Guten Dep.) at 73:22-74:14.

[47] Rule 2; Ex. 4 (Guten Dep.) at 52:6-55:9.

[48] Ex. 4 (Guten Dep.) at 52:3-53:4, 92:12-93:17; Ex. 32 (Carrier Dep.) at 83:2-12, 86:23-94:; 239:18-241:6.

[49] Ex. 3 (Wright Dep.) at 243:22-244:3; Ex. 5 (Southerland Dep.) at 107:5-19; *see also infra* ¶¶ 52-54.

50. Many people are assigned the same bail amount at bond docket as they were assigned at booking, according to the bond schedule or their arrest warrants.[50]

51. When people state at bond docket how much they can afford to pay, and there is no contrary evidence, bond docket judges sometimes set bail at higher amounts than people state they can afford.[51]

52. In July and August 2019, the Public Defender submitted reports to the Tulsa County District Court, citing a local rule to the effect that "[e]ach month, the County Indigent Defender shall examine into the causes for confinement of all persons confined in the Tulsa County Jail."[52]

53. According to the July 2019 report: In June 2019, out of 403 people who appeared on bond docket, 13 were granted personal recognizance, 90 had their initial bond amounts reduced, and most of the remaining people had their initial bonds unchanged. Among the 90 people whose bond amounts were reduced, fewer than half had been released from jail by five days after their appearance; and fourteen more were released sometime between one week after their bond docket appearance and the date of the Public Defender's report in July.[53]

54. According to the August 2019 report: In July 2019, out of 470 people who appeared on bond docket, 71 were granted personal recognizance, another 144 had their bail reduced, and most of the remaining people had their initial bonds unchanged. Among the 144 people whose bond amounts were reduced, 47 had been released from jail by five days after their appearance, and 16 more bonded out

---

[50] *See infra* ¶¶ 52-54; Ex. 5 (Southerland Dep.) at 107:22-110:8.

[51] Ex. 3 (Wright Dep.) at 247:5-14; Ex. 5 (Southerland Dep.) at 111:19-114:16.

[52] Ex. 31 (Pub. Def. July 2019 Rep.) at 1; Ex 33 (Pub. Def. Aug. 2019 Rep.) at 1.

[53] Ex. 31 (Pub. Def. July 2019 Rep.) at 4.

sometime between one week after bond docket and the date of the Public Defender's report in August.[54]

### 2. Bond Docket Judges Impose Bond Conditions According to Unguided Discretion

55. Rule 2 emphasizes that conditions of release are within the sole discretion of the trial court.[55]

56. Rule 2 allows judges setting bail to consider multiple factors and does not require any particular factual findings or legal conclusions before bail is imposed.[56]

57. Rule 2 classifies a plaintiff's ability to afford bail as one factor among several that judges are free to consider when setting release conditions.[57]

58. Rule 2 addresses unaffordable bail twice: first to state that unaffordable bail is not necessarily excessive, and second to state that judges "may consider various factors including but not limited to the seriousness of the charge and criminal appearance history" when setting bail for someone who "is claiming to be indigent," and not just unable to afford a bond amount.[58]

59. Rule 2 does not instruct judges to determine whether the conditions they impose will result in a person's detention.[59]

60. Rule 2 does not require judges to consider less restrictive conditions than a bond amount that will result in a person's detention.[60]

---

[54] Ex. 33 (Pub. Def. Aug. 2019 Rep.) at 4.

[55] Ex. 30 (Local Crim. R. 2) at 1.

[56] *Id*. at 1, 3.

[57] *Id*.

[58] *Id*. at 3.

[59] *Id*. at 1-3.

[60] *Id*. at 1-3.

61. Bond docket judges consider ability-to-pay as one of many factors to consider when setting monetary release conditions.[61]

62. Bond docket judges do not always make specific findings about a person's ability to pay.[62]

63. Bond docket judges do not always explain the bond amounts that they impose, or articulate their reasoning. [63]

64. When asked to describe his standard procedure for making oral findings after determining the bond amount, Judge Guten testified: "[I]t really is case by case, and . . . it really depends on the information that I have and – and what I try to do is at least relay back what the most important information was that I received in – in justifying why I set the bond at what I did." [64]

65. When asked to explain why he sometimes imposed only non-monetary conditions of release, and sometimes imposed both monetary and non-monetary conditions, Judge Guten testified: "[I]t just depends. There's not any one specific thing that . . . I have to have. Every case is unique . . . and it's really just the information that I receive in the moment, the argument that I receive in the moment and . . . what I believe is the most appropriate thing to do at that time. So I don't know if there really is any consistency or . . . detailed explanation, if you will, as to what has to happen or to get one over the other. It really is . . . just an independent evaluation of . . . each case."[65]

---

[61] Ex. 4 (Guten Dep.) at 87:21-88:21.

[62] Ex. 4 (Guten Dep.) at 87:21-89:3; Ex. 5 (Southerland Dep.) at 113:18-114:16.

[63] Ex. 3 (Wright Dep.) at 244:4-248:10; Ex. 4 (Guten Dep.) at 22:25-23:2; Ex. 5 (Southerland Dep.) at 115:18-116:15.

[64] *Id*. at 55:10-57:8

[65] *Id*. 53:5-54:8.

66. Court reporters do not attend bond docket proceedings.[66]

67.  The only record created of bond docket proceedings is a minute entry, which indicates the bond amount and any non-monetary conditions that were set, along with the plaintiff's next court date. As a general rule, these minutes do not include an explanation of the bond conditions that were imposed.[67]

## IV. Secured Money Bail Conditions Do Not Improve Appearance Rates

68.  One of two defense experts, Dr. Tracy Morris, is a statistician who reviewed Tulsa County jail and court data gathered between March 1, 2018 and June 15, 2020.[68]

69. Dr. Morris did not conclude that posting secured money bail increases a person's likelihood of appearing in court.[69]

70. Dr. Morris found a correlation between lower failure to appear rates and secured money bail, but testified that the correlation could be caused by factors unrelated to bond type.[70]

71.  Dr. Morris testified that she could not offer any opinion as to whether secured bond conditions are more or less effective than unsecured bond conditions for ensuring appearance in court.[71]

---

[66] Ex. 4 (Guten Dep.) at 58:16-59:4.

[67] *Id*. at 56:12-57:8.

[68] Ex. 10 (Morris Rep.) at 1, 13.

[69] Ex. 16 (Morris Dep. Vol. II) at 12:10-17:14.

[70] Ex. 10 (Morris Rep.) at 9-10; Ex. 16 (Morris Dep. Vol. II) at 12:10-17:14.

[71] Ex. 10 (Morris Rep.) at 16:13-17:1.

72. The second defense expert, Dr. David Krahl, is a sociologist who reviewed Dr. Morris's report to form opinions about the relationship between secured bail and appearance rates.[72]

73. Dr. Krahl confirmed that Dr. Morris's report did not find that secured money bail causes improve appearance rates.[73]

74. Dr. Krahl also is not aware of anything in the academic literature showing a causal relationship between secured bond conditions and improved appearance rates.**[74]**

## ARGUMENT

Class members are jailed because they cannot afford their bail. Their bail is assigned to them without a judge ever having determined if its amount will keep them detained in light of their ability to pay, and, if so, whether they needed to be detained. This violates the Fourteenth Amendment in three respects.

First, plaintiffs are stripped of their fundamental right to bodily freedom, without the government having established that it has a compelling reason to keep them in jail. That violates substantive due process. *Infra*, Part I. Second, plaintiffs are subjected to wealth-based detention, without the government having established that it has a compelling reason to jail people who cannot afford bond, while releasing people who can. That violates substantive due process and equal protection. *Infra*, Part II. Third, plaintiffs are stripped of their fundamental liberty without having been

---

[72][72] Ex. 15 (Krahl Dep. Vol. I) at 17:1-2; Ex. 14 (Krahl Dep. Vol. II) at 160:11-163:12.

[73] Ex. 14 (Krahl Dep. Vol. II) at 160:11-163:12.

[74] *Id*. at 179:17-181:3.

provided the procedures necessary to meaningfully contest the basis for their detention. That violates procedural due process. *Infra* Part III.

## I.   Defendants Violate Plaintiffs' Substantive Due Process Right to Liberty

Defendants violate plaintiffs' substantive due process right to liberty by jailing them without establishing that incarceration is narrowly tailored to serve a compelling government interest. In Tulsa County, a person is jailed when they are arrested and cannot afford the bail that is set for them. *Supra*, Statement of Undisputed Material Fact ("SUMF") ¶ 21. Freedom from detention—including pretrial detention—is a fundamental liberty interest. *Reno v. Flores*, 507 U.S. 292, 301-02 (1993) (citing *United States v. Salerno*, 481 U.S. 739, 746 (1987) as a case involving "fundamental liberty interest").

Substantive due process "forbids the government to infringe fundamental liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Seegmiller v. LaVerkin City*, 528 F.3d 762, 766-67 (10th Cir. 2008). Defendants systematically jail plaintiffs without establishing that—or even inquiring into whether—their incarceration serves a compelling purpose.

### A. Defendants Deprive Plaintiffs of a Fundamental Interest in Liberty

"Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)*; see also Jones v. United States*, 463 U.S. 354, 361 (1983) ("[C]ommitment for any purpose constitutes a significant deprivation of liberty that requires due process protection . . ." (citation omitted)); *Ebonie S. v. Pueblo Sch. Dist. 60*, 695 F.3d 1051, 1059 (10th Cir. 2012) (citing cases "recognizing a fundamental right to freedom from restraint [that] deal with

18

incarceration or other modes of confinement"). The government's decision to detain someone pretrial "necessarily entails" a "curtailment of liberty." *Bell v. Wolfish,* 441 U.S. 520, 533-34 (1979).

When a person cannot afford money bail that has been set as a condition of their release, defendants jail them, and so restrain their freedom. *See* SUMF ¶¶ 16-21. Courts widely recognize that an order requiring a person to pay an unaffordable amount of money to secure release is therefore equivalent to an order of pretrial detention. *E.g.*, *United States v. Mantecon-Zayas*, 949 F.2d 548, 550 (1st Cir. 1991) ("[O]nce a court finds itself in this situation—insisting on terms in a 'release' order that will cause the defendant to be detained pending trial—it must satisfy the procedural requirements for a valid detention order. . . ."); *United States v. Leathers*, 412 F.2d 169, 171 (D.C. Cir. 1969) ("[T]he setting of bond unreachable because of its amount would be tantamount to setting no conditions at all."); *Valdez-Jimenez v. Eighth Jud. Dist. Ct.*, 460 P.3d 976, 980 (Nev. 2020) ("When bail is set in an amount the defendant cannot afford, . . . it deprives the defendant of his or her liberty and all its attendant benefits, despite the fact that he or she has not been convicted and is presumed innocent."); *Brangan v. Commonwealth,* 80 N.E.3d 949, 963 (2017) (unattainable money bail "is the functional equivalent of an order for pretrial detention, and the judge's decision must be evaluated in light of the same due process requirements applicable to such a deprivation of liberty").

People do not lose their fundamental right to liberty when they are arrested. *Pugh v. Rainwater*, 572 F.2d 1053, 1056 (5th Cir. 1978) (people charged with a crime "remain clothed with a presumption of innocence and with their constitutional guarantees intact"). The government may have a greater array of compelling interests in infringing on someone's liberty post-arrest, but it must still comply with the "'general rule' of substantive due process," *i.e.*, "that the government may not detain a person prior to a judgment of guilt," unless it has a "sufficiently weighty"

19

interest to overcome "the individual's strong interest in liberty." *Salerno*, 481 U.S. at 749, 750-51. "In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty— which is the 'deprivation of liberty' triggering the protections of the Due Process Clause . . . ." *DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 200 (1989).

## B. Defendants May Take Away the Liberty of People Charged with Crimes Only When Necessary to Ensure Public Safety and Guard Against Flight

An order requiring someone to either pay money they cannot afford or be jailed deprives them of their fundamental right to liberty, and it must therefore be "narrowly tailored to serve a compelling state interest," *Reno*, 507 U.S. at 301-02. In the context of people who have been charged with, but not convicted of, crimes, the Supreme Court has found this test satisfied where the government can prove that the person detained presents a risk either of danger to the community or of absconding, and that incarceration is the only effective means of mitigating that risk.[75] *Salerno*, 481 U.S. at 750-51 (no due process violation where government

---

[75] In addition to ensuring public safety and appearance in court, defendants have suggested a third governmental interest to justify their pretrial detention scheme: to facilitate the release of people able to pay bond. *See* Ex. 4 (Guten Dep.) at 111:11-112:8; Ex. 25 (Guten Decl.) ¶ 8; Ex. 30 (Rule 2). This fourth interest is not relevant to the question of whether plaintiffs' loss of liberty satisfies substantive due process. Detaining plaintiffs does not advance any interest the state may have in releasing other people.

detains someone pretrial after establishing "by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person"); *see also Rainwater*, 572 F.2d at 1057-58 ("The ultimate inquiry in each instance is what is necessary to reasonably assure defendant's presence at trial."); *Foucha*, 504 U.S. at 82 (physical confinement of insanity acquittee unconstitutional absent "adversary hearing at which the State must prove by clear and convincing evidence that he is demonstrably dangerous to the community"). Detention, including detention resulting from unaffordable bail, "would constitute imposition of an excessive restraint" whenever "alternate forms of release" could ensure appearance and public safety. *Rainwater*, 572 F.2d. at 1058.

## C. At the Time of Filing, Defendants Systematically Detained People Without Establishing A Compelling Interest or Narrow Tailoring

It is defendants' burden to establish that they advance public safety and likelihood of appearance when they jail people who cannot afford pre-determined money bail, and that they could not achieve the same objectives with other, more carefully designed approaches. *See Navajo Nation v. San Juan Cnty.*, 929 F.3d 1270, 1281 (10th Cir. 2019) (government bears burden to establish compelling interest and narrow tailoring). Because a fundamental right is at stake, "the State's system is not entitled to the usual presumption of validity," and "the State rather than the complainants must carry a heavy burden of justification [and] . . . must demonstrate that its . . . system has been structured with precision, and is tailored narrowly to

21

serve legitimate objectives and . . . it has selected the less drastic means for effectuating its objectives." *San Antonio Indep. Sch. Dist. v. dRodriguez*, 411 U.S. 1, 16-17 (1973) (internal quotation marks omitted). Defendants cannot meet that burden.

Jailing people who cannot afford preset bail is not a well-tailored approach for advancing public safety and court appearances, as it sweeps into jail many people who are low-risk, and releases people who are high-risk. Inability to pay preset bail as it is set in Tulsa does not establish that anyone is dangerous or at risk of flight. While defense witnesses have noted a general correlation in Tulsa between higher bail amounts and the offenses the authors of the schedule consider more serious, Ex. 1 (Musseman Dep.) at 42:15-43:21, defendants can point to no record evidence to support the idea that the severity of an offense reliably predicts a person's flight risk or dangerousness, particularly to the exclusion of all other factors that a judge might consider at an individualized hearing. Even if the nature of someone's offense could reliably predict their level of risk, Tulsa's system does not effectively detain only people who have been charged with more serious offenses, because the amount of a bond does not determine whether someone is detained; whether they can or cannot afford to pay it does.

The bond schedule and arrest warrants in Tulsa assign money bail for even the lowest-level offenses. *See* Ex. 22 (Bond Schedule). They do not provide for immediate release at booking on personal recognizance or other non-monetary conditions for *any* charges. SUMF ¶ 20. Accordingly, someone with no or few monetary resources can be jailed pending arraignment on such offenses as simple trespass, carrying an open container of alcohol, having a defective break light, consuming alcohol publicly, disturbing the peace with loud music, fishing without a license, gambling non-commercially, or trying to cash a check with insufficient funds. *See* Ex. 22 (Bond Schedule).

22

Meanwhile, people who have been arrested for historically evading or attempting to evade justice, or threatening or committing violent acts, can be immediately released if they have enough money. Anyone who has enough money to pay bail need only stay at the jail long enough to be booked after an arrest on charges such as escaping from a jail or assisting someone else to escape; jumping bail; trying to destroy evidence; abetting, committing, or, conspiring to murder; or making threats of a bomb or explosive device. *Id*.

A person is detained after arrest in Tulsa not because their bond is "high", but because it is too high for them to pay. Defendants can cite no evidence in the record to suggest that people less able to pay sums of money pose greater threats to public safety or higher risk of absconding.

Defendants additionally cannot show that their initial bail-setting system is narrowly tailored to promote public safety and judicial administration because it does not require—or even allow—judges to consider alternatives to incarceration. Abundant non-monetary release conditions and resources available in Tulsa can be imposed only after a judicial hearing, SUMF ¶ 20, which, at time this case was filed, mean that they could not be imposed on someone detained at booking without a motion filed by an attorney, who was not appointed until six days after arrest. *Id*. ¶¶ 22-25.

Leaving people detained for at least six days without finding that there is any need for the detention violates substantive due process. At the time this case was filed, court and jail officials systematically violated the substantive due process rights of people who could not afford their pre-set bond amounts.

### D. The Bond Docket Has Not Cured Defendants' Substantive Due Process Violations

Adoption of the bond docket has not cured the substantive due process violations that plaintiffs sued to address. Existence of the bond docket confirms that defendants have the administrative capacity to provide prompt hearings for people detained after booking. But the hearings as they have been conducted since 2018 do not offer plaintiffs the type of consideration that substantive due process requires before someone can be jailed. Rule 2 does not require—and as a matter of practice judicial defendants do not provide— determinations as to whether any monetary bail they impose will result in plaintiffs' detention and, if so, whether that detention is necessary to ensure public safety and appearance in court.

### 1. Most Plaintiffs Who Appear on Bond Docket Continue to Suffer Deprivations of Liberty

Most plaintiffs who appear on the bond docket will still be jailed on unaffordable bail after the appearance, and will not have had a full and fair hearing on the necessity of their detention. Despite bond docket judges' broad discretion to adjust people's preset bond amounts to reduce or eliminate any monetary component, and to add non-monetary requirements and services, judges impose a secured money bail condition for most people. SUMF ¶¶ 47-49, 52-54. Many have their initial bond re-imposed, which they presumably cannot pay, and others have their initial bonds reduced to amounts that the judge has every reason to believe will continue their detention. *Id.* ¶¶ 30, 50-51. As reflected in the two reports produced by the Public Defender in the summer of 2019, most people who appear on bond docket continue to be deprived of their liberty at least until their arraignments days later. *Id.* ¶¶ 52-54.

For people who cannot afford bail in Tulsa, the creation of a bond docket has not relieved them from the prospect of an extended loss of pre-trial liberty.

### 2. Bond Docket Judges Do Not Determine Whether this Ongoing Detention Is Necessary

Substantive due process allows plaintiffs' liberty to be taken only if jailing them is the best way to advance a compelling purpose. *See supra* Part I(A) & (B). Rule 2, on its face, does not require judges to engage in the rigorous inquiry that substantive due process demands. It does not direct judges to determine whether the money bail conditions they impose are unaffordable and will therefore prolong detention, and it does not demand any particular substantive findings before unaffordable bail can be imposed. SUMF ¶¶ 55-60. The bond docket offers plaintiffs with a forum, but Rule 2 does not require judges to use that forum to hear or consider any particular information, or do anything specific with the information that they do hear. *Id*. In practice, bond docket judges order unaffordable bail conditions as a matter of course, as an exercise of broad discretion, without making any particular legal findings or applying any particular legal standards. *Id*. ¶¶ 61-65.

Judge Guten, who presided over bond docket the most frequently during his four years as a special judge, *id.* ¶¶ 10-11, admitted that his approach to setting bond conditions—and in particular deciding whether to impose monetary conditions—was not governed by "any consistency," and could not be described by any "detailed explanation," as his decisions were based on "what I believe is the most appropriate thing to do at that time," *id*. ¶ 65. This vague, standardless approach does not satisfy the rigorous requirements of due process. *See Hernandez v. Lynch*, No. 16-620, 2016 WL 7116611, at \*25, \*27 (C.D. Cal. Nov. 10, 2016) (defendants violate due process and equal protection despite offering bail hearings at which policy is to consider multiple relevant factors, but judges "set[] a bond amount[s] without considering

25

individuals' ability to pay it or alternative conditions of release), *aff'd sub nom. Hernandez v. Sessions*, 872 F.3d 976 (9th Cir. 2022) (bond determination that does not turn on ability to pay and alternative conditions "is unlikely to result in a bond amount that is reasonably related to the government's legitimate interests").

When plaintiffs filed their suit in 2018, they demanded declaratory and injunctive relief to ensure that they would not be detained on unaffordable bail without findings, based on clear and convincing evidence, that their detention was necessary to ensure public safety and appearance in court, and that no less restrictive conditions would suffice. Five years later, class members continue to be detained without such findings. The remedies sought will provide meaningful relief to class members who continue to face the prospect of incarceration without prompt determinations "that no [other] condition or combination of conditions" of release will satisfy the government's interests, *Salerno*, 481 U.S. at 742 (internal quotation marks omitted). *See Ind v. Colo. Dep't of Corr.*, 801 F.3d 1209, 1213 (10th Cir. 2015) (plaintiff's original claim for relief does not become moot and should be adjudicated if resolution "will have some effect in the real world," by redressing an "actual injury").

## II. Defendants Violate Plaintiffs' Right Against Wealth-Based Detention

People who are arrested in Tulsa for the same offense are all assigned the same amount of bond, so that some of them will be jailed while others are released, based on how much money they have. This system implicates plaintiffs' right against wealth-based detention, and is unlawful unless defendants can show that they have a "substantial and legitimate" interest in jailing only people who cannot afford to post bail. *Williams v. Illinois*, 399 U.S. 235, 238 (1970); *see also Tate v. Short*, 401 U.S. 395, 397-99 (1991) (state may not use "invidious discrimination" based on

ability to pay in determining whom to detain and whom to release unless it shows there are no "other alternatives" to promote a "valid interest").

## A. Defendants Must Show that Detaining Only People Who Cannot Afford Bail Serves a Substantial and Legitimate Interest

For all offenses that are assigned a monetary bail amount on the Tulsa County Schedule, defendants have determined that jailing people on the basis of bailable offenses is not necessarily required for public safety or court administration. *See* SUMF ¶ 18, 21 (people who can pay the set bond amount do not need to be jailed). The only reason someone will be jailed after booking is if they cannot afford to pay the preset amount. *Id*. This differential treatment of people based on their ability to pay lies at the cross-roads of due process and equal protection, *Bearden v. Georgia*, 461 U.S. 660, 665 (1983), and is subject to a heightened level of scrutiny, because jailing people who cannot afford a sum of money is "fundamentally unfair," and requires a "careful inquiry" into the states' objectives and alternatives. *Id.*, 461 U.S. at 660, 666; *cf. Vasquez v. Cooper*, 862 F.2d 250, 254 (10th Cir. 1988) (reading *Bearden* to require that, "once the state has determined that its penological interests do not require imprisonment, it cannot . . . require imprisonment without first considering alternative measures of punishment when the [person], through no fault of his own, cannot pay a [sum].").

The Supreme Court's precedents call for this heightened scrutiny when people, "because of their impecunity," have been "completely unable to pay for some desired benefit, and as a consequence, they sustained an absolute deprivation of a meaningful opportunity to enjoy that benefit." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 20 (1973). Here, in order to regain a constitutionally protected benefit—their physical liberty—plaintiffs were required to pay their assigned bail amounts, and when they were "completely unable to pay," *id*., they

27

were completely deprived of their liberty for as long as they were in jail. Defendants must therefore show that their practice of detaining plaintiffs, while releasing similarly situated people who were able to pay, promotes a valid state interest that cannot be advanced in a less restrictive way.

## B. Defendants Cannot Show That Requiring People to Pay for Their Release Serves a Legitimate State Interest

Given the level of scrutiny, the burden again falls to defendants to justify jailing people based on whether they do or do not pay bail. *See Navajo Nation*, 929 F.3d at 1281 (government bears burden to establish justification where heightened scrutiny applies). Defendants must show that payment of a bond meaningfully advances a legitimate state interest, but they cannot. There is no evidence in the record—not even disputed evidence—that it does.[76]

Defendants have articulated the received wisdom that paying money bond increases a person's likelihood of appearing in court, *see* Ex. 4 (Guten Dep.) at 85:11-14, but there is no evidence for this claim. Defendants' own experts confirm that they have found no evidence of a causal relationship between secured financial release conditions and appearance rates in Tulsa County. SUMF ¶¶ 68-74.

Having reviewed over two years of Tulsa jail and court data, Dr. Morris, the statistician, found no basis to conclude that posting secured money bail increases a person's likelihood of appearing in court, *id.* ¶¶ 68-71:

---

[76] By contrast, if this case proceeds to trial, the testimony of plaintiff's witness, economist and criminologist Dr. Aurelie Ouss, will prove that money bail is *not* effective for promoting appearances among people released pretrial, and does *not* reduce—and sometimes increases—public safety risks posed by people who are released pretrial. Ex. 13 (Ouss Rep.) ¶¶ 11, 20-25.

> Q:   So does your analysis conclude that the nature of pretrial release conditions have any causal effect on failure to appear?
>
> A:   No, not at all.
>
> Q:   Does it provide any evidence from which we can infer that monetary bond conditions cause lower failure to appear rates?
>
> A:   No. The best we can do is just say there appears to be a relationship between the two things.

Ex. 16 (Morris Dep. II), at 12:10-18.

Defendants' sociologist expert, Dr. Krahl, confirmed this reading of Dr. Morris's findings, SUMF ¶¶ 72-73:

> Q:   So is there any evidence in Dr. Morris's report that you can point to to indicate that secured monetary bond conditions contribute to or cause lower failure to appear rates?
>
> A:   I can't say there is a causational effect. I can say there is a[n] associational relationship, and that's as far as I can go with this.

Ex. 14 (Krahl Dep. II) at 163:2-12. Dr. Krahl also testified that he was not aware of anything in the academic literature showing a causal relationship between secured bond conditions and improved appearance rates, SUMF ¶ 74:

> Q:   Are you aware of any studies that provide evidence of the existence or non-existence of a causal relationship between pretrial release conditions and failure to appear rates?
>
> A:   There could be some there. But as far as direct evidence, I'm not familiar with those.

29

Q:    Are you aware with [sic] studies that provide any statistical evidence of a causal or non-causal relationship between pretrial release conditions and failure to appear rates?

A:    A causal or non-causal relationship between pretrial release conditions and failure to appear? . . . I'm going to have to say no."

Ex. 14 (Krahl Dep. II) at 179:17-180:7.

Defendants also claim that their practice of releasing people who can pay a pre-set bond while detaining everyone else advances their interest in facilitating a speedier release of people who can afford to pay bail. *See* Ex. 4 (Guten Dep.) at 111:11-112:8; Ex. 25 (Guten Decl.) ¶ 8; Ex. 30 (Rule 2). This supposed justification is merely a description of the defendants' challenged practices that assumes rather than establishes their validity. It begs the question of why the state wants to facilitate speedy release only of people who can afford to pay.

Without a record establishing that discrimination against people with more limited financial means promotes a substantial and legitimate interest that cannot be achieved through alternative means, defendants' use of pre-set bond to determine who must be in jail and who can be free cannot survive the "careful inquiry" that *Bearden*, *Tate*, and *Williams* require. Plaintiffs are entitled to the declaratory and injunctive relief they seek, confirming their right not to be detained solely because of their inability to pay a pre-set bond.

### III. Defendants Violate Plaintiffs' Procedural Due Process Rights

Defendants violate plaintiffs' procedural due process rights because they do not afford adequate procedures for plaintiffs to defend against unjustified incursions on their liberty and equal protection interests. Procedural due process is violated where "there exists a liberty or property interest of which a person has been

deprived," and "the procedures followed by the State were [not] constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219-20 (2011). Defendants violate due process because they do not provide an "appropriate level of process" for plaintiffs to protect their fundamental liberty interests against incarceration and wealth-based detention without constitutionally sufficient bases. *See Citizen Ctr. v. Gessler*, 770 F.3d 900, 916 (10th Cir. 2014) (due process requires "appropriate level of process" where infringement of "a constitutionally protected liberty or property interest" is at stake).

The "appropriate level of process" is assessed by balancing three factors: (1) "the private interests" that are at stake; (2) "the risk of erroneous deprivation" of that interest if the demanded procedures are not provided; and (3) the state's interest in not providing the demanded procedures. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Here, the procedures that plaintiffs demand before they can be detained on unaffordable bond are adequate notice, a prompt and meaningful opportunity to be heard, assistance of appointed counsel, detailed factual findings on the record, and a clear and convincing evidentiary standard. Each of these procedures are due because plaintiffs' interests at stake are fundamental, *supra* Argument Parts I(A), II(A), the risk of erroneous deprivation without them is high, and defendants have no legitimate interest in avoiding them.

The Supreme Court has recognized that due process requires robust procedures to protect against the erroneous deprivation of a person's liberty. *See Morrissey v. Brewer*, 408 U.S. 471, 488-89 (1972) (explaining what due process requires at a parole revocation hearing). Plaintiffs demand only procedures that have long been recognized as necessary to avoid the erroneous deprivation of a person's liberty. At the time of this lawsuit's filing, defendants afforded none of the demanded procedures during the time between arrest and arraignment. During that time, plaintiffs had no opportunity for a hearing or notice of their right to be heard, SUMF

31

¶¶ 22-25, and no access to appointed counsel, *id.*, and defendants made no individualized factual findings about the need for detention based on any evidentiary standard, *id.* ¶¶ 16, 19, 22-25. Since then, defendants' creation of the bond docket has not satisfied plaintiffs' procedural demands, because it does not cure the procedural failings of the system that plaintiffs filed this suit to challenge. Plaintiffs are therefore entitled to declaratory and injunctive relief, affording them access to the following procedures before they are deprived of their pretrial liberty.

### A. Plaintiffs Are Entitled to Adequate Notice

Where a person's liberty is at stake, "notice is essential to afford . . . an opportunity to challenge the contemplated action and to understand the nature of what is happening to him." *Vitek v. Jones*, 445 U.S. 480, 496 (1980). The notice must be tailored, "in light of the decision to be made, to the capacities and circumstances of those who are to be heard, to insure that they are given a meaningful opportunity to present their case." *Mathews*, 424 U.S. at 349 (internal quotation marks omitted). At the time of filing, jail officials simply assigned bond amounts at booking, after which people waited days until they had lawyers appointed who might advise them of their right to establish their inability to pay, and might move for a bond hearing to put the government to the test of establishing an adequate justification for detention. SUMF ¶ 16-25.

People booked in the Tulsa County Jail under current procedures have no more notice of those rights; they are told their preset bond amounts and their bond docket appearance dates, but not the purpose of the bond docket. SUMF ¶ 38, 40-41. Without knowing that they are entitled to challenge the basis for their detention and on what grounds, people regularly choose not to attend and are deemed to have waived their hearings. SUMF ¶ 39.

32

People appearing at bond docket do not have the governing legal standards explained to them, SUMF ¶ 40-41 , and they are not advised of their rights to examine, contest, and present evidence, SUMF ¶ 42. Instead, they are routinely told not to talk about their case. SUMF ¶ 44. The instructions are undoubtedly intended to protect plaintiffs' right against self-incrimination, but without knowing what factors are relevant to the court's decision, and that they have the right to present evidence, plaintiffs do not have a meaningful opportunity to present favorable evidence crucial to the court's ruling. They are unlikely to explain, for example, why they have missed court in the past or what measures they can take to avoid future non-appearances.

## B. Plaintiffs Are Entitled to a Meaningful Opportunity to Be Heard and to Confront Evidence

In general, procedural due process requires "that an individual be given an opportunity for a hearing before he is deprived of any significant . . . interest." *Riggins v. Goodman*, 572 F.3d 1101, 1108 (10th Cir. 2009). But simply bringing plaintiffs before a judge is not enough: "[t]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333 (internal quotation marks omitted). Having not been informed of bail hearings' stakes and standards, and frequently instructed not to talk about their cases, plaintiffs cannot meaningfully participate.

Plaintiffs are further stymied from engaging in a meaningful hearing by the bond dockets' physical set up. Appearing remotely, they are unable to see and hear all participants or access documents that the court may consider as evidence. SUMF ¶ 35, 43. All meaningful proceedings sometimes occur before they are even virtually present, with lawyers and judges having agreed on bail terms before they appear on the video SUMF ¶ 45-46.

Under the bond docket's current conditions, plaintiffs are often reduced to observers, unable to be heard on the questions that will determine whether their liberty will be restored or they will remain in jail. Procedural due process demands instead a forum where they can be heard and present evidence relevant to the court's determination.

## C. Plaintiffs Are Entitled to Findings on the Record that the Government Has Met Its Burden by Clear and Convincing Evidence

An "elementary requirement" of due process is that a decision maker "state the reasons for his determination and indicate the evidence he relied on," *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970), to reach his legal conclusions. In addition, those conclusions must be based on clear and convincing evidence. The Supreme Court has never permitted an evidentiary standard lower than "clear and convincing" in a case involving the deprivation of bodily liberty. *See Santosky v. Kramer*, 455 U.S. 745, 756 (1982) (explaining that clear and convincing standard applies when the interest at stake is "particularly important" and "more substantial than mere loss of money"); *Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 282-83 (1990) (observing that clear and convincing standard applies to deportation, denaturalization, civil commitment, termination of parental rights, allegations of civil fraud, and other types of civil cases).

As the bond docket currently operates, judges do not routinely articulate the bases for their decisions, and they do not find that the applicable legal prerequisites for detention have been found according to any articulable standard. SUMF ¶ 55-65. They also make no written or oral record of their findings, and without court reporters present, the only record created of a bond docket appearance is a court minute, which states who appeared, what release conditions were imposed, and when the next court date will occur. *id.* ¶¶ 66-67.

34

Without clear evidentiary standards, and findings articulated in some form of record, plaintiffs are unable to challenge any unlawful or unlawful rulings that lead to their detention.

### D. Plaintiffs Are Entitled to Unfettered Access to Counsel to Assist with Bond Hearings

The Supreme Court has identified the "right to counsel at the detention hearing" as a key safeguard against unlawful detention. *Salerno*, 41 U.S. at 751-52. Plaintiffs' interests at stake at bail hearing is their freedom, which they are not well equipped to defend while they are confined to jail and face arguments by an experienced and knowledgeable district attorney. *See Johnson v. Zerbst*, 304 U.S. 458, 462-63 (1938) ("[T]he average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty, wherein the prosecution is presented by experienced and learned counsel."). The legal stakes are not only high but complicated, as illustrated by judges' efforts to prevent plaintiffs from speaking on their own behalf lest they waive their Fifth Amendment rights. *Supra* Argument Part III(A).

Currently, attorneys are appointed by the court for purposes of the bond docket, but meaningful representation is frustrated by the bond docket's logistics. Because they are in different physical locations, plaintiffs do not have an opportunity to consult with their appointed lawyers in advance of the hearings, and they cannot communicate privately while they proceed. SUMF ¶ 33, 35-37, They cannot obtain advice from their lawyers about what factual information they should provide, because they cannot share the information with their attorneys outside the hearing of the judge and the district attorney. *Id.* The set-up of the docket forces counsel to gather basic and crucial information from their clients for the first time publicly, during the course of the hearing. *Id.*

35

The Supreme Court in both the civil and criminal contexts, have recognized the harm that a client suffers from "inhibition of free exchanges between defendant and counsel because of the fear of being overheard," *Weatherford v. Bursey*, 429 U.S. 545, 554 n.4 (1977); *see also Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981) (noting that attorney-client privilege recognizes that "sound legal advocacy . . . depends upon the lawyer's being fully informed by the client." Here, where plaintiffs face ongoing imprisonment depending on the hearing's outcome, an opportunity for "full and frank communication" with their attorneys is required. *Upjohn Co.*, 449 U.S. at 389.

## IV. All Named Defendants Have Authority to Correct the Constitutional Violations Complained of

The undisputed evidence confirms that each defendant is liable for causing the foregoing constitutional violations, because each has the authority to correct them. A plaintiff seeking equitable injunctive relief properly sues "the official within the [government] entity who can appropriately respond" regarding "the law or policy challenged." *See Hartman v. Cal. Dep't of Corr. & Rehab*, 707 F.3d 1114, 1127 (9th Cir. 2013).

***The Special Judges.*** Plaintiffs seek declaratory relief from the special judges on their procedural due process claim.[77] There is no dispute that the special judges oversee the bond docket on a rotating schedule, and exercise a large degree of discretion over its daily operation. SUMF 32, 47-48, 55-60. They have the capacity and the obligation to provide the procedural protections that plaintiffs demand, and their failure to do so causes constitutional injury. The Court has already held that, in

---

[77] Plaintiffs' substantive due process and equal protection claims against the special judges were dismissed. *See* Order Reinstating Case (Mar. 15, 2019), ECF No. 48, at 20.

light of these facts, the special judges are properly sued. Order Denying & Partially Granting Defs.' Mots. to Dismiss (Sept. 29, 2021), ECF No. 306, at 28-29.

**The Presiding Judge.** Plaintiffs seek declaratory and injunctive relief from the presiding judge on all claims. Under state law, the presiding judge has administrative authority over the district court. 20 Okla. Stat. § 23(2); Rules on Admin. of Courts, 20 Okla. Stat. Ch. 1, Appx. 2, Rule 1(D), (E), Rule 2(C); *see also* SUMF ¶¶ 5-6. He has supervisory authority over the special judges and is responsible for ensuring that they comply with statutory and constitutional requirements. *Id*. His powers to carry out these responsibilities include the authority to issue and revoke administrative orders, and to assign and reassign special judges *Id*. In addition, the presiding judge has special authority, revoke and revise the bond docket schedule, *Id*. ¶¶ 6, 8; 22 Okla. Stat. § 1105(A) (presiding judge may "prescribe by court rule the conditions under which the court clerk or deputy court clerk, or the sheriff or deputy sheriff, may prepare and execute an order of release on behalf of the court"); 22 Okla. Stat. § 1105.2(B), (C) (authorizing, but not directing, each district's presiding judge to establish a bail schedule); Tulsa Cnty. Dist. Ct. Local R. 1(A).

The presiding judge has the capacity and the obligation to require that substantive findings be made, and procedural protections be afforded, before people are jailed pre-trial, and his failure to do so causes constitutional injury. As also previously held by the Court, the presiding judge is properly sued for injunctive and declaratory relief on the substantive and procedural due process and equal protection claims. Order Denying & Partially Granting Defs.' Mots. to Dismiss (Sept. 29, 2021), ECF No. 306, at 28-29 at 21-22.

***The Tulsa County Sheriff.*** Plaintiffs seek declaratory and injunctive relief against the sheriff on all claims in his capacity as a state officer.[78] The sheriff operates the jail and is the party who detains plaintiffs. SUMF ¶¶ 12, 18, 21  . His jailing people directly causes their constitutional injury. In addition, the sheriff oversees many of the logistics of the bond docket that cause plaintiffs' due process injuries, such as plaintiffs' physical remove from court, the absence of any notice, and plaintiffs' inability to confer with counsel. SUMF ¶¶ 35, 37-39, 43 The sheriff has the capacity and the obligation to afford procedural protections to people in his custody, who cannot lawfully be jailed without them. His failure to do so causes constitutional injury. As previously held by the Court, he is therefore properly sued for injunctive and declaratory relief.

---

[78] The Court dismissed claims against the sheriff in his capacity as a county officer, but held that he is properly sued as a state official. *Id*. at 16-18.

## CONCLUSION

For the reasons above, plaintiffs are entitled to summary judgment on each of their claims. The Court should issue the proposed order submitted with plaintiffs' motion for summary judgment, entering declaratory judgment against all defendants and a permanent injunction against the Tulsa County Sheriff and the Tulsa County Presiding Judge, as set forth therein.

Dated:  May 28, 2023

/s/ Hayley Horowitz
Hayley Horowitz
Phoebe Kasdin
STILL SHE RISES, TULSA
567 E. 36th Street North
Tulsa, OK 74106
(918) 392-0874
hayleyh@stillsherises.org

Allison Holt Ryan*
HOGAN LOVELLS US LLP
555 13th Street, NW
Washington, DC 20004
(202) 637-5600
allison.holt-ryan@hoganlovells.com

Ryan Downer*
CIVIL RIGHTS CORPS
1601 Connecticut Avenue NW, Suite 800
Washington, DC 20009
Telephone: (202) 844-4975
ryan@civilrightscorps.org

*Admitted to practice pro hac vice

*Attorney for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Brief In Support of Motion for Summary Judgment was served on May 26, 2023 via the Northern District of Oklahoma CM-ECF system upon all counsel of record.

<u>/s/</u> Hayley Horowitz