# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

RICHARD FELTZ and ASHTON
DENNIS, on behalf of themselves and
all other similarly situated,

       *Plaintiffs*,

v.

VIC REGALADO, *et al*.,

       *Defendants*.

Case No. 18-CV-0298-SPF-JFJ

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

I.    Plaintiffs' Responses to Defendants' Statement of Undisputed Facts ........... 1

II.   Defendants Are Not Entitled to Summary Judgment on Plaintiffs'
      Substantive Claims for Unjustified and Wealth-Based Detention ............... 10

      A.    Plaintiffs' Substantive Due Process Claim Is Not Better Analyzed as
            an Excessive Bail Claim.................................................................... 10

      B.    Defendants Violate the Fourteenth Amendment Right Against
            Wealth-Based Detention Under Any Standard ................................. 14

            1.    Plaintiffs' Wealth-Based Detention Claim Sounds in Both Due
                  Process and Equal Protection.................................................... 14

            2.    Defendants Must Satisfy Heightened Scrutiny to Justify Their
                  System of Wealth-Based Detention ......................................... 15

            3.    Defendants' Policy of Detaining Only People Who Cannot
                  Afford Preset Bond Does Not Satisfy Any Standard of Review
                  ................................................................................................. 18

III.  Plaintiffs' Procedural Due Process Claim Should Be Analyzed Under
      *Mathews* but Also Succeeds Under *Medina* ................................................ 20

      A.    *Medina* Does Not Apply, Because Defendants' Bail Procedures Are
            Not "Part of the Criminal Process" .................................................. 21

      B.    Defendants' Bail Procedures Fail Both Tests ................................... 23

            1.    *Mathews* requires additional procedures to safeguard against
                  erroneously jailing Plaintiffs.................................................... 23

            2.    *Medina* requires additional procedures to safeguard historically
                  rooted justice and fundamental fairness................................... 24

                  i.    Defendants' procedures violate the deeply rooted principle
                        that a state must affirmatively establish a compelling
                        interest to detain the presumptively innocent. ............... 24

                  ii.   Defendants' procedures are fundamentally unfair because
                        they create an undue risk of unnecessary detention. ..... 28

IV.    Defendant Judges' Acts Are Administrative and, Therefore, Subject to Injunctive Relief ........................................................................ 30

V.    The Prison Litigation Reform Act Does Not Apply ..................................... 31

VI.    There Is No Basis for Abstention ................................................................ 32

    A.    There Is No Adequate State Court Remedy. ...................................... 32

    B.    There Is No Interference with Coercive State Proceedings. .............. 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aime v. Com.*,
  611 N.E.2d 2044 (Mass. 1993) ....................................................... 30

*Albright v. Oliver*,
  510 U.S. 266 (1994) ............................................................... 12, 13

*Antoine v. Byers & Anderson, Inc.*,
  508 U.S. 429,435 (1993) .............................................................. 33

*Baker v. McCollan*,
  443 U.S. 13 (1979) .................................................................... 20

*Bearden v. Georgia*,
  461 U.S. 660 (1983) ............................................................. *passim*

*Becker v. Kroll*,
  494 F.3d 904 (10th Cir. 2007) ........................................................ 12

*Betterman v. Montana*,
  136 S. Ct. 1609 (2016) ............................................................... 18

*Booth v. Churner*,
  206 F.3d 289 (3d Cir. 2000), *aff'd*, 532 U.S. 731 (2001) ............................ 34

*Brill v. Gurich*,
  965 P.2d 404 (Okla. 1998) ............................................................ 30

*Cnty. of Sacramento v. Lewis*,
  523 U.S. 833 (1998) ............................................................. 12, 13

*Cohen v. Beneficial Industrial Loan Corporation*,
  337 U.S. 541 (1949) .................................................................. 37

*Colbruno v. Kessler*,
  928 F.3d 1155 (10th Cir. 2019) ....................................................... 12

*Cooper v. Oklahoma*,
  517 U.S. 348 (1996) ......................................................... 24, 27, 31

*Cruzan by Cruzan v. Dir., Missouri Dep't of Health*,
497 U.S. 261 (1990) ..................................................................... 29

*Daves v. Dallas Cnty.*,
22 F.4th 522 (5th Cir. 2022) ....................................................... 28

*Daves v. Dallas County*,
64 F.4th 616 (5th Cir. 2023) ....................................................... 38

*Deelan v. Fairchild*,
No. 05-3458, 2006 WL 2507599 (10th Cir. Aug. 31, 2006) ............ 34

*Dist. Attorney's Off. for Third Jud. Dist. v. Osborne*,
557 U.S. 52 (2009) ............................................................. 24, 26, 31

*Dodds v. Richardson*,
614 F.3d 1185 (10th Cir. 2010) ............................................. 11, 20

*Doe v. Bagan*,
41 F.3d 571 (10th Cir. 1994) ...................................................... 20

*Doe v. Univ. of Denver*,
952 F.3d 1182 (10th Cir. 2020) ..................................................... 2

*Douglas v. California*,
372 U.S. 353 (1963) ..................................................................... 16

*Dowling v. United States*,
493 U.S. 342 (1990) ..................................................................... 27

*Fields v. Henry Cnty.*,
701 F.3d 180 (6th Cir. 2012) ....................................................... 28

*Flanagan v. United States*,
465 U.S. 259 (1984) ..................................................................... 25

*Forrester v. White*,
484 U.S. 219 (1988) ..................................................................... 34

*Foucha v. Louisiana*,
504 U.S. 71 (1992) ................................................................. 11, 29

*Freeman v. Francis*,
    196 F.3d 641 (6th Cir. 1999) ............................................................. 34

*Gibson v. Berryhill*,
    411 U.S. 564 (1973) ..................................................... 32, 35, 36, 37

*Graham v. Connor*,
    490 U.S. 386 (1989) ............................................................. 12, 13

*Griffin v. Illinois*,
    351 U.S. .............................................................................. 16

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017) ............................................................. 17

*Herrera v. Collins*,
    506 U.S. 390 (1993) ............................................................. 24

*Holland v. Rosen*,
    895 F.3d 272 (3d Cir. 2018) ............................................................. 25

*Huffman v. Pursue*,
    420 U.S. 592 (1975) ............................................................. 36

*In re Humphrey*,
    19 Cal. App. 5th 1006 (2018), aff'd, 11 Cal. 5th 135 (2021) ............................ 30

*Johnson v. Bredesen*,
    624 F.3d 742 (6th Cir. 2010) ............................................................. 17

*Jones v. Bock*,
    549 U.S. 199 (2007) ............................................................. 34

*Jones v. United States*,
    463 U.S. 354 (1983) ............................................................. 11, 24

*Kincaid v. Gov't of D.C.*,
    854 F.3d 721 (D.C. Cir. 2017)............................................................. 27

*Krimstock v. Kelly*,
    464 F.3d 246 (2d Cir. 2006) ............................................................. 24

*Lynch v. United States*,
    557 A.2d 580 (D.C. 1989) ............................................................. 30

*M.L.B. v. S.L.J.*,
    519 U.S. 102 (1996) ...................................................................... 17

*MacFarlane v. Walter*,
    179 F.3d 1139 (9th Cir. 1999) ...................................................... 17

*Maher v. Roe*,
    432 U.S. 464 (1977) ................................................................. 17, 18

*Martinez v. Winner*,
    771 F.2d 424 (10th Cir. 1985) ...................................................... 33

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ............................................................. *passim*

*Mendonza v. Com.*,
    673 N.E.2d 22 (Mass. 1996) ......................................................... 30

*Montana v. Egelhoff*,
    518 U.S. 37 (1996) ........................................................................ 24

*Morrissey v. Brewer*,
    408 U.S. 471 (1972) ................................................................. 30, 32

*Nelson v. Colorado*,
    581 U.S. 128 (2017) ...................................................................... 24

*O'Shea v. Littleton*,
    414 U.S. 488 (1974) ........................................................... 35, 37, 38

*ODonnell v. Harris Cnty.*,
    892 F.3d 147 (5th Cir. 2018) .................................................... 17, 25

*Olsen v. Layton Hills Mall*,
    312 F.3d 1304 (10th Cir. 2002) .................................................... 28

*Opala v. Watt*,
    393 F. Supp. 2d 1154 (W.D. Ok. 2005), *rev'd on other grounds*,
    454 F.3d 1154 (10th Cir. 2006) .................................................... 33

*Page v. King,*
    932 F.3d 898 (9th Cir. 2019) ............................................................. 37

*Parham v. J.R.,*
    442 U.S. 584 (1979) ......................................................................... 23

*Parke v. Raley,*
    506 U.S. 20 (1992) ........................................................................... 24

*Patsy v. Board of Regents of State of Florida,*
    457 U.S. 496 (1982) ......................................................................... 36

*Pugh v. Rainwater,*
    572 F.2d 1053 (5th Cir. 1987) ....................................... 19, 21, 28, 37

*Reno v. Flores,*
    507 U.S. 292 (1993) ......................................................................... 19

*Rodriguez v. Providence Community Corrections, Inc.,*
    155 F.Supp.3d 758 (M.D. Tenn. 2015) ........................................... 37

*Rosales-Mireles v. U.S.,*
    138 S. Ct. 1897 (2018) ...................................................................... 20

*San Antonio Independent School District v. Rodriguez,*
    411 U.S. 1 (1973) ............................................................ 17, 18, 19, 28

*Santosky v. Kramer,*
    455 U.S. 745 (1982) ......................................................................... 29

*Schall v. Martin,*
    467 U.S. 253 (1984) ......................................................................... 13

*Schepp v. Fremont Cty.,*
    900 F. 2d 1448 (10th Cir. 1990) ...................................................... 34

*Schultz v. Alabama,*
    42 F.4th 1298 (11th Cir. 2022) ........................................................ 38

*Seegmiller v. LaVerkin City,*
    528 F.3d 762 (10th Cir. 2008) ......................................................... 12

*Sprint Communications, Inc. v. Jacobs*,
    571 U.S. 69 (2013) ....................................................................... 35

*State v. Butler*,
    No. 2011–K–0879, 2011 WL 12678268 (La. App. 4th Cir. July 28,
    2011) ........................................................................................... 30

*State v. Ingram*,
    165 A.3d 797 (N.J. 2017) ............................................................. 30

*Tate v. Short*,
    401 U.S. 395 (1971) ............................................................... 16, 22

*Turner v. Rogers*,
    564 U.S. 431 (2011) ..................................................................... 30

*United States v. Abuhamra*,
    389 F.3d 309 (2d Cir. 2004) ......................................................... 25

*United States v. James Daniel Good Real Prop.*,
    510 U.S. 43 (1993) ....................................................................... 24

*United States v. Jones*,
    160 F.3d 641 (10th Cir. 1998) ..................................................... 24

*United States v. Salerno*,
    481 U.S. 7391 (1987) ............................................................. *passim*

*United States v. Weissberger*,
    951 F.2d 392 (D.C. Cir. 1991) ..................................................... 26

*Untied States v. Rey*,
    663 F. Supp. 2d 1068 (D.N.M. 2009) ........................................... 28

*Vasquez v. Cooper*,
    862 F.2d 250 (10th Cir. 1988) ..................................................... 22

*Vreeland v. Zupan*,
    644 F. App'x 812 (10th Cir. 2016) (Gorsuch, J.) ......................... 26

*Walker v. City of Calhoun*,
    901 F.3d 1245 (11th Cir. 2018) ....................................... 25, 28, 38

*Washington v. Glucksburg,*
    521 U.S. 702 (1997) ........................................................ 12

*Washington v. Harper,*
    494 U.S. 210 (1990) ........................................................ 12

*Wheeler v. State,*
    864 A.2d 1058 (Md. App. 2005) ...................................... 30

*Williams v. Illinois,*
    399 U.S. 235 (1970) .......................................... 16, 18, 20

*Younger v. Harris,*
    401 U.S. 37 (1971) ...................................... 35, 37, 38, 39

**Statutes**

22 O.S. § 1355A(A), (D) .......................................................... 3

18 U.S.C. § 3626(g)(2) ............................................................ 34

42 U.S.C. § 1983 ............................................................... 34, 36

**Other Authorities**

Fourth Amendment ............................................................ 12, 13

Sixth Amendment ................................................................. 12

Eighth Amendment .......................................... 13, 14, 15, 28

Fourteenth Amendment ................................................. *passim*

Fourth and Sixth Amendments .............................................. 12

Rule 2 ....................................................................... 8, 19, 33

# INTRODUCTION

Even on the erroneous legal standards they invoke, Defendants are not entitled to summary judgment on any of Plaintiffs' claims.

## I.      Plaintiffs' Responses to Defendants' Statement of Undisputed Facts

Any of the facts not listed below are undisputed by Plaintiffs.

6. Disputed that bond reconsideration motions can be made and will be considered "at any time." Class members cannot seek bond reductions at times when they are unrepresented before arraignment, and judges refuse to consider oral pro se bond reduction motions made at arraignment. *E.g.*, Pl. Mot., ECF 369, at 8 n.25 & accompanying text. Defendants cite evidence about *counseled* bond reduction motions, and present no evidence that people can move to reduce their own bonds without counsel. *See* Defs.' Ex. 4 (J. Guten Dep.) at 78:22-80:9 ("*public defenders* can reraise [bond amounts] at any time" (emphasis added)); Defs.' Ex. 7 (J. Musseman Dep.) at 19:15–22:5 (discussing bond reduction motions made by *attorneys*, "once [defendants] show up to district court," after their arraignments); Defs.' Ex. 8 (Southerland Dep.) at 165:3–23 (defense attorneys have discretion over whether to file bond reduction motions on clients' behalf).

7. Disputed that bond amounts can be reviewed by a writ of habeas corpus or an appeal. The cases cited by Defendants establish that *denial of a bail reduction motion* can be reviewed by the state appellate court, but not a bail amount imposed by a warrant or bail schedule; the appellate court has no jurisdiction to review bail without a bail reduction motion having been filed and adjudicated in the district court. See, e.g., Ex. 1 (*Richardson v. Oklahoma* order denying relief because "Petitioner has not attached a copy of any District Court order to his pleadings to show that he has presented arguments to and been denied relief by the proper District Court."). Defendants have not identified habeas proceedings with "58 unique case

numbers arising out of Tulsa County." Def. Mot. at n.3. The list includes cases from four other counties.

9. Plaintiffs do not dispute that a judicial officer conducted a probable cause review on or about June 3, 2018, but Defendants present no evidence that a special judge determined that there was probable cause for each of the arrest charges. Def. Mot. at 10, ¶ 9. Whether probable cause existed is also immaterial.

10. Undisputed but immaterial.[1]

11. Undisputed but immaterial.

12. Undisputed. Plaintiffs note that Mr. Feltz had been in jail for six days by the time the State filed charges against him. *See* Def. Mot. at 10 ¶¶ 8, 12.

13. Plaintiffs do not dispute that bail was posted in Mr. Feltz's Tulsa County case before Mr. Feltz appeared before a judge, and after Mr. Feltz had spent at least a week in jail. *Compare* Defs.' Ex. 14 (Feltz Crim. Docket Sheet) at 3 (stating that bond was posted on June 11, nine days after arrest), *with* Ex. 11 (Feltz Depo.) at 28:3–6 (testifying that he was released on June 9, seven days after arrest). Disputed that Mr. Feltz posted the bail. Court records show that a bail bondsman posted a surety bond, and Defendants present no evidence that Mr. Feltz personally paid any money. *Id.*; *see also* Pls.' Mot to Reconsider, ECF 40, at 3 n.2.

14. Immaterial that Mr. Feltz was represented at arraignment by private counsel. There is no evidence Mr. Feltz was able to or did pay his attorney, or that he had access to a private attorney prior to his arraignment. Plaintiff further notes that Oklahoma law erects barriers to obtaining appointed counsel for someone like Mr. Feltz, who has had bond posted on their behalf prior to arraignment. 22 O.S.

---

[1] Many of the "facts" included in Defendants' Statement are nowhere cited or relied on in the argument sections of their brief. The Court properly disregards all such asserted facts. *See Doe v. Univ. of Denver*, 952 F.3d 1182, 1191–92 (10th Cir. 2020) (Court not obligated "to conjure up arguments from the record that [Defendants] might have made" about the facts' materiality.

§ 1355A(A), (D); *see also* Ex. 2 version of 22 O.S. § 1355A(A), (D) in effect at the time of Mr. Feltz's arrest).

15. Immaterial to the extent this paragraph concerns events in Mr. Feltz's criminal case after he was no longer jailed. If anything, the fact that the judge overseeing Mr. Feltz's initial arraignment allowed him to travel out of state for an extended period of time indicates that Mr. Feltz was not a flight risk and did not need to be jailed for a week or longer following his arrest. The fact that the facility he traveled to was private is also immaterial. Mr. Feltz did not pay for any services he received at the facility. Defs.' Ex. 11 (Feltz Dep.) at 16:17-17:10.

17. Undisputed but immaterial.[2]

24. Disputed. The cited probable cause affidavit does not refer to Mr. Dennis. It lists arrest charges for a different person, Freddie Brown. Defs.' Ex. 17 (Brown Prob. Cause Aff.) at 1. All charges against Mr. Dennis were dismissed on request of the state. Defs.' Ex. 18 (Dennis Crim. Docket Sheet) at 1–2.

25. Disputed. Mr. Dennis's first appearance was a bond docket appearance that occurred the day after his arrest, on December 16, 2020. Defs.' Ex. 16 (Dennis Dep.) at 16:8-18:8; Defs.' Ex. 15 (Dennis NF Docket Sheet) at 2. The December 21 court date that Defendants cite, which occurred six days after his arrest, was Mr. Dennis's second scheduled court date, and was his arraignment. Defs.' Ex. 18 (Dennis Crim. Docket Sheet) at 5. Mr. Dennis did not appear by video or otherwise at his arraignment, although he was still in jail at the time. *Id*.

26. Disputed. An attorney from the Public Defender's Office may have been present in the courtroom at the initial appearance, but Mr. Dennis never spoke to the attorney or heard anything that the attorney said. Defs.' Ex. 16 (Dennis Depo.) at 18:12-20:14.

---

[2] Defendants erroneously cite their Ex. 14. The relevant evidence in found in Ex. 10 at page 4.

27. Disputed. Nothing cited supports Defendants' description of the first appearance. Defendants cite only Mr. Dennis's deposition testimony, in which he said the judge "read off my charges, dismissed two of the charges that I had that was listed and she was talking back and forth with the DA and the Public Defender's Office," but he could not hear what they were saying. Defs.' Ex. 16 (Dennis Depo.) at 19:10-19. No evidence indicates that a probable cause affidavit existed alleging that Mr. Dennis committed any crimes, that the judge reviewed such an affidavit, or that any argument was heard. *Id.*; *supra* ¶ 24.

28. Undisputed, but Defendants have not provided evidence that a probable cause affidavit existed. *Supra* ¶ 24.[3]

31. Disputed. For his December 21, 2020 initial arraignment. Mr. Dennis was not produced by the jail, and the arraignment proceeded in his absence. Defs.' Ex. 18 (Dennis Crim. Docket Sheet) at 5.

32. Disputed that the bond increase was "based upon the charges in the formal information and other information available [to the judge]," Def. Mot. at 13 ¶ 32, as no evidence is cited to indicate what the increase was based on. The docket entry does not indicate any basis for the bond increase, or the documents available to or considered by the judge, stating only "Bond Amended to $40,000 AGG[REGATE]." Def. Ex. 18 (Dennis Crim. Docket Sheet) at 5.

33. Undisputed.[4]

35. Undisputed but immaterial.

36. Undisputed but immaterial. The cited COVID procedures did not bar attorneys from communicating with jailed clients. Ex. 22 (Visitation Plan).[5]

---

[3] Defendants erroneously cite Ex. 18. The relevant evidence is in Ex. 15.
[4] Defendants erroneously cite Exhibit 20. The relevant evidence is in Exhibit 2 (Bond Receipt) and Exhibit 3 (Return Release) to this brief
[5] Plaintiffs object to Defendants' reliance on Exhibit 22, which was not produced by Defendants in discovery.

37. Undisputed, though Plaintiffs dispute any implication that, after the lifting of COVID procedures, attorneys from the Public Defender's Office have appeared at bond docket from the jail, alongside the people they are appointed to represent. Defendants have cited no evidence to support that implication.[6]

39. Undisputed but immaterial.

40. Disputed that Mr. Dennis posted bail; a surety bond was posted. Defs.' Ex. 19 at 1; Ex. 24. Immaterial as an unrelated court case is referenced.

41. Undisputed but immaterial.

42. Undisputed but immaterial.

43. Undisputed, except to the extent that the bond docket as described did not exist when this case was filed. Pl. Mot. at 7–8 nn.22–23, 26 and text.

44. Disputed that appointed public defenders provide meaningful representation at bond docket.[7] Defendants cite no evidence that class members are given a choice regarding representation. *See*, *e.g.*, Pl. Mot., ECF No 369, at 10 n.36 and accompanying text (J. Guten describing his standard communications with class members at bond docket). Class members are simply told they will be represented, they are not given an opportunity to communicate privately with the appointed attorneys, and those attorneys often act on class members' behalf before they even appear at the hearings. *Id*. at 11–12 n. 41, 45–46 & accompanying text; *id*. Ex. 3 (Wright Dep.) at 231:25–233:3.

45. Plaintiffs do not dispute that assistant district attorneys have sometimes represented the state at the bond docket, but they have not always appeared. Pl. Mot. Ex. 5 (Southerland Dep.) at 67:3–68:8 (DA did not attend bond docket for months

---

[6] Defendants cite a portion of Anita Wright's deposition testimony that is not included in their cited Exhibit 23. Wright's complete testimony is at Ex. 3 to Plaintiffs' Summary Judgment Mot.

[7] Defendants cite portions of various depositions that are not included in their Exhibits. Plaintiffs refer the Court to Plaintiffs' Motion for Summary Judgment Exhibit 3 for Ms. Wright's complete testimony, and Exhibit 5 to that motion for Stuart Southerland's complete testimony.

after its creation). Plaintiffs note that Defendants do not cite any evidence in support of their asserted fact number 45, as the testimony cited is not relevant.

46. To the extent that "may" means "are permitted to," Plaintiffs do not dispute that people who are assigned a monetary bond at arrest "may" post bond according to the bail schedule before their bond docket appearances. Plaintiffs dispute any implication that all people detained *can* post bond; people who cannot afford their bonds are detained at least until their first judicial appearances. *E.g.*, Pl. Mot., Ex. 1 (Musseman Dep.) at 57:4–58:8.

47. Plaintiffs do not dispute that people who do not post bail prior to the bond docket may appear on the docket but dispute any implication that people are given a meaningful opportunity to determine whether to appear, because no one advises them of the purpose of bond docket in advance. Pl. Mot. at 10 nn.38–39 & accompanying text. Also disputed that people appearing on bond docket can meaningfully "address bail" during their appearance, Def. Mot. at 15 ¶ 47. *See* Pl. Mot. at 10–12 n. 35, 36, 38, 40–46 & accompanying text (citing evidence that people cannot see or hear attorneys and others participating in their bond docket appearance, cannot review the evidence submitted to the court and are not invited to submit their own evidence or told what evidence might be relevant, do not know the appearance's purpose, cannot confer with an attorney, and are usually told not to speak). Further, the bond docket was not in existence at the time this suit was filed. *Id.* at 7–8 nn.23, 26 & accompanying text. Defendants cite no evidence to support asserted fact 47.

48. Disputed that Court Services provides the court by the time of bond docket with recommendations as to whether someone should be admitted to the Pretrial Release Program. Court Services provides bond docket judges with information about a person's criminal history, based on an NCIC, which might provide some indication as to whether Court Services would recommend the person for Pretrial Release. Pl. Mot. Ex. 4 (Guten Dep.), at 30:10–31:22; *id.* Ex. 25 (Guten Decl.), at

¶ 7. But Court Services does not provide recommendations without information about, e.g., employment and income, which it cannot obtain without interviews; Court services conducts interviews after bond docket is completed and only if a judge refers someone to Court Services at the time of bond docket. *Id*. Ex. 32 (Carrier Dep.) at 166:20–167:24; *id.*, Ex. 4 (Guten Dep.) at 49:12-50:24. At bond docket, judges refer people to Court Services who are "good candidates" for Pretrial Release—*i.e.*, people whom judges believe they would likely approve for Pretrial Release—but they do not order anyone to be released on Pretrial Release at the time of bond docket; anyone referred to Court Services to be considered for pretrial release must remain in jail while waiting for Court Services to conduct an interview. *Id*., Ex. 5 (Southerland Dep.) at 146:6–147:3.

49. Disputed that "[a]ll Special Judges consider the financial status and resources of each criminal defendant." Def. Mot. at 15 ¶ 49. Defendants cite no evidence that special judges specifying bail amounts on arrest warrants have access to, let alone consider, people's financial resources. Defendants cite testimony that special judges presiding over bond docket ask about financial resources, but they do not cite any evidence about how judges use the information they receive. Defs.' Ex. 8 (Southerland Dep.) at 110:9–13, 164:14–165:2. Rule 2 leaves it up to the special judge's discretion whether and how to consider a person's financial resources. *See* Defs.' Ex. 4 (Rule 2). Special judges are not required to consider whether a person's financial resources will prevent them from paying a bail amount, and they routinely impose bond amounts beyond a person's ability to pay, even when it is not their "intent" for the person to remain in custody. Pl. Mot.., Ex. 4 (Guten Dep.) at 138:14–141:8; Pl. Mot. at 13 n. 51 & text.

51. Plaintiffs dispute the materiality of the quoted report, which Defendants do not explain, as well as the accuracy of Dr. Morris's findings, which are affected by multiple methodological errors. For example, Dr. Morris studied an

unrepresentative sample of Tulsa County arrestees, excluding anyone who had ever been arrested and booked into the jail before, and she limited her analysis to people who were released pretrial. Ex. 5 (Dr. Copp. Rebuttal) ¶¶ 14–19. Dr. Morris also does not account for people detained from arrest until case disposition. *Id*. ¶¶ 22–24. At least twenty percent—and possibly a much greater number—of people who would be released if they posted bond, but cannot before their first scheduled appearances, are jailed for the entire pre-disposition period of their cases. Pl. Mot., Ex. 11 (Copp. Rep't) at ¶¶ 13, 36.

52. Plaintiffs incorporate their response to paragraph 51. Dr. Morris's methodological errors led her to significantly underestimate the average time between booking and release for people who are ultimately released pretrial. For example, Dr. Morris estimated that people who are ultimately released on personal recognizance are detained for an average of 3.9 days, whereas the actual mean time detained is 10.7 days. Ex. 5 (Dr. Copp. Rebuttal) ¶ 20. Because of her methodological errors, Dr. Morris's report confirms, but underestimates, the degree to which a person's inability to afford secured money bail conditions prolong detention in Tulsa County for people who are ultimately released on non-monetary conditions; people who can afford to pay bond are, on average, released much more quickly than people who have to wait until bond docket, and often for many days longer, to have nonmonetary conditions imposed, if they are ever released at all. *Id*. ¶¶ 20–21; Pl. Mot., Ex. 11 (Copp Rep't) at ¶¶ 14–17.

53. Plaintiffs dispute Defendants' characterization of their expert's report. Dr. Morris used two different methods for calculating the appearance rates for people on secured and unsecured bond; defendants cite only one of them. Def.'s Ex. 26 (Morris Rep.) at 9–10. Defendants also do not cite Dr. Morris's finding that at least one non-monetary release condition—electronic monitoring—was correlated with better appearance rates than monetary bond. Def.'s Ex. 2 at 9.

Plaintiffs dispute the accuracy of Dr. Morris's conclusions and her methodology for calculating appearance rates. Dr. Morris did not analyze all cases in which people were required to appear and could not establish that the cases analyzed were representative; she found no way to determine whether someone did or did not appear, and so used an unreliable proxy; and could not accurately determine whether people were out on secured or unsecured bond at the time they were measured as having appeared or failed to appear. *Id*. ¶¶ 2–6.

Plaintiffs dispute Defendants' suggestion that secured bail conditions cause higher appearance rates. Dr. Morris did not form an opinion about the causal effects of secured bond conditions on appearance rates, and stated that any differences in appearance rates among people released on secured and unsecured conditions could be caused by factors unrelated to bond type. Pl. Mot. at 16 nn.69–71 & accompanying text. People unable to afford monetary bond may also be more likely, e.g., to lack reliable transportation, be unable to take time off work, or need court date reminders, or spend more time in jail before release all of which increase likelihood of nonappearance, and would not be helped by requiring a secured monetary bond condition. Ex. 5 (Copp Rebuttal) at ¶ 10–11. Social science research in the field of pretrial detention and release practices confirms that money bail is not effective at improving failure to appear rates or public safety, and in fact can be detrimental to both, because it increases the amount of time that people who cannot afford bail spend in jail before their release, which in turn increases re-offense and non-appearance rates. Pls.' Sum. J. Br., Ex. 13 (Ouss Rep't) at ¶¶ 11, 16, 19, 20–25; Ex. 5 (Copp Rebuttal) at ¶ 11. Defendants' literature expert did not identify any studies with contrary findings, and testified that he was not aware of any academic literature showing a causal relationship between secured bond conditions and improved appearance rates. Pl. Mot. at 17 n.74 & text; *see also*, Ex. 6 (Krahl Rep't); Ex. 7 (Krahl Supp. Rep't).

54. Plaintiffs incorporate their response to paragraph 53.

55. Disputed as Defendants do not provide all of the reports they rely on. Also immaterial because the data presented do not reflect on any material aspect of the present case or allow any meaningful conclusions to be drawn.

## II. Defendants Are Not Entitled to Summary Judgment on Plaintiffs' Substantive Claims for Unjustified and Wealth-Based Detention

In Count One of their Complaint, Plaintiffs seek to stop Defendants from jailing them in violation of their substantive rights under the Fourteenth Amendment. The claim is based on two independently sufficient rights: a substantive due process right to physical liberty, and a right against wealth-based detention based on equal protection and due process. Doc. 259 (Second Am. Compl. ("Compl.")) at ¶ 137. Defendants' scheme violates each of these rights by allowing pretrial detention absent a compelling government interest that cannot be advanced by other means. Defendants object to each basis for Count I on different grounds.

Defendants argue that Plaintiffs' substantive due process claim must be disregarded in its entirety because the Eighth Amendment's Excessive Bail Clause provides the only legal basis for challenging harms that stem from the imposition of money bail. The argument relies on a misreading of Supreme Court cases that guard against expanding substantive due process to cover rights explicitly afforded by the Bill of Rights, but which do not require dismissal of substantive due process claims that, like Plaintiffs', protect interests not explicitly covered by the Bill of Rights. By contrast, Defendants do not dispute the existence of a wealth-based detention claim, but misread the law to require less scrutiny of their scheme than the Fourteenth Amendment calls for, and misread the facts to satisfy that lowered standard.

### A. Plaintiffs' Substantive Due Process Claim Is Not Better Analyzed as an Excessive Bail Claim

Plaintiffs' substantive due process claim protects an interest separate from their right against excessive bail: their interest in "[f]reedom from bodily restraint," which "has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). This interest in physical freedom extends to people arrested before a criminal trial. "[T]he right of an accused to freedom pending trial is inherent in the concept of liberty in that it is protected by the Due Process Clause of the Fourteenth Amendment." *Dodds v. Richardson*, 614 F.3d 1185, 1192 (10th Cir. 2010).

To protect against arbitrary, wrongful deprivations of liberty, due process requires that the government have "a constitutionally adequate purpose for [a person's] confinement." *Jones v. United States*, 463 U.S. 354, 361 (1983). Longstanding doctrines establish the standards the government must satisfy before it can deprive someone of fundamental, physical liberty. "[T]he Fourteenth Amendment forbids the government to infringe fundamental liberty interests . . . unless the infringement is narrowly tailored to serve a compelling state interest." *Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008) (quoting *Washington v. Glucksburg*, 521 U.S. 702, 721 (1997)).

Defendants do not dispute that this standard governs substantive due process claims, but argue that plaintiffs are barred from asserting such a claim. The argument is based on a misunderstanding of the doctrine articulated in two Supreme Court cases, *Graham v. Connor*, 490 U.S. 386 (1989), and *Albright v. Oliver*, 510 U.S. 266 (1994). Under *Graham* and *Albright*, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing' such a claim." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) (quoting *Albright*, 510 U.S. at 273 (quoting *Graham*, 490 U.S. at 395)). Defendants misread *Graham* and *Albright* to

bar Plaintiffs' substantive due process claim because it concerns injuries stemming from money bail. According to Defendants, the Excessive Bail Clause also governs money bail and therefore monopolizes the field.[8]

Defendants overread *Graham* and *Albright*. These cases apply where a party attempts to "expand the concept of substantive due process" to conduct already explicitly prohibited by a more specific amendment. *See, e.g.*, *Lewis*, 523 U.S. at 843. But Plaintiffs require no such expansion, both because substantive due process already affords them the relevant protection, and because the Excessive Bail Clause does not "provide[] an explicit textual source" of that protection. *Id.* at 842.

In *Graham*, the Supreme Court declined to apply substantive due process to a claim of excessive force in the course of an arrest, on the ground that the Fourth Amendment "provides an explicit textual source" of such a claim. 490 U.S. at 394–95. In *Albright*, the Court held that a litigant could not assert a substantive due process interest against prosecution without probable cause, because due process does not protect against "the decision to prosecute," leaving the litigant with only a plausible claim for detention without probable cause, which is explicitly governed by the Fourth Amendment. 510 U.S. at 271, 274.

Plaintiffs here assert a substantive due process claim based on an interest that the Fourteenth Amendment unquestionably protects, which is distinct from any potential Eighth Amendment claim. The Supreme Court and Tenth Circuit have long

---

[8] Defendants also note that the Fourth and Sixth Amendments govern other aspects of pretrial detention. Def. Mot. at 30–31. But they do not argue that either amendment covers Plaintiffs' substantive due process claim. The Sixth Amendment right to a speedy trial has no arguable bearing on claims for pretrial detention immediately following arrest. And the Fourth Amendment does not apply where Plaintiffs do not challenge probable cause, the initial seizure of their arrest, or their treatment in police custody. *Colbruno v. Kessler*, 928 F.3d 1155, 1162 (10th Cir. 2019) (reaffirming that "when a 'plaintiff finds himself in the criminal justice system somewhere between the two stools of an initial seizure and post-conviction punishment[,] we turn to the due process clauses of the Fifth or Fourteenth Amendment and their protection against arbitrary governmental action by federal or state authorities'" (quoting *Porro v. Barnes*, 624 F.3d 1322, 1326 (10th Cir. 2010) (Gorsuch, J.))).

held that substantive due process protects the fundamental right to pretrial liberty, and that such a right protects against unjustified pretrial detention. *See*, *United States v. Salerno*, 481 U.S. 739, 750–51 (1987); *Schall v. Martin*, 467 U.S. 253 (1984).

This fundamental liberty interest is implicated whether the mechanism by which a person loses their liberty is a transparent order of detention or de facto one resulting from the imposition of unaffordable money bail. In the latter situation, the Eighth Amendment may also apply, but the two provisions give rise to distinct claims. The Excessive Bail Clause constrains the dollar amount of bail when it is imposed, but it does not address whether detention may be ordered. *See Salerno*, 481 U.S. at 754 ("[T]he Amendment fails to say all arrests must be bailable").

Defendants argue that Plaintiffs should have sought to have their bail reduced under the Eighth Amendment, Def. Mot. at 20, but Plaintiffs do not seek to have their bail reduced, or to have this Court order that any bail amount imposed be affordable. They ask that Defendants be required to establish a substantive justification for pretrial detention. These two questions—whether a required amount of bail is too great and whether a person may be ordered detained—may both arise where bail is set higher than a person can afford, but they are distinct. A person who can pay their assigned bond might still challenge their bail as excessive, but could not sue under substantive due process for infringement of liberty. Conversely, a person whose bond is not too high for the purposes of money bail but who cannot afford it has no Eighth Amendment claim. But they might sue under substantive due process if their detention is unnecessary because other conditions of release might equally serve the government's interests without causing incarceration. *Salerno* itself further illustrates the difference between these rights. After concluding that Congress' "careful delineation" of the "narrow circumstances" permitting pretrial detention under the Bail Reform Act satisfied substantive due process, 481 U.S. at 750–51, the Court addressed the separate question whether the Eighth Amendment

allowed for pretrial detention based on dangerousness, *id.* at 752. The Court reasoned that it "need not decide today whether the Excessive Bail Clause speaks *at all* to Congress' power to define the classes of criminal arrestees who shall be admitted to bail," *id*. (emphasis added). This stands in sharp contrast to substantive due process, which, for example, surely prohibits Congress from denying or admitting bail based on the roll of a die.

**B.    Defendants Violate the Fourteenth Amendment Right Against Wealth-Based Detention Under Any Standard**

Defendants independently violate Plaintiffs' Fourteenth Amendment right against wealth-based detention, which stems from a long-recognized convergence of equal protection and due process. Misconstruing this right as arising under equal protection alone, Defendants misstate controlling precedent and argue that their pretrial detention scheme should be subject to rational basis review. *See* Def. Mot. at 40–45. In the criminal justice context, the Supreme Court has made clear that heightened scrutiny applies where facially neutral state policies result in the incarceration only of people unable to pay.

**1.    Plaintiffs' Wealth-Based Detention Claim Sounds in Both Due Process and Equal Protection**

Plaintiffs' claim emanates from the hybrid due process-equal protection framework established in *Bearden v. Georgia*, 461 U.S. 660 (1983). The petitioner in *Bearden* had his probation revoked after failing to pay a fine and restitution. *Id.* Had he paid, a conviction would not have been entered against him, but because he could not afford to pay, he was convicted and sentenced to prison. *Id.* at 663.

The Supreme Court reviewed its prior decisions on the problem of "equal justice" for "indigents in the criminal justice system." *Id.* at 664. In these prior decisions, the Court had struck down facially neutral policies that imposed equal requirements on all criminal defendants, but in practice placed people with lesser

financial means at a fundamental disadvantage by pricing them out of judicial processes or subjecting them to imprisonment when they could not afford payments.[9] *Bearden* explained that these cases do not fit neatly under the rubric of equal protection or due process alone, but invoke both lines of doctrine. *Id.* at 665.

Because such claims lie at the crossroads of due process and equal protection, and because jailing people who cannot afford a sum of money is "fundamentally unfair," *Bearden* applied a heightened level of scrutiny—not rational basis— requiring a "careful inquiry" into the states' objectives and alternatives. *Id.* at 660, 666. The Court held that the state had violated due process and equal protection by revoking the petitioner's probation solely because he had not "pa[id] the imposed fine and restitution, absent evidence and findings that the defendant was somehow responsible for the failure [to pay] or that alternative forms of punishment were inadequate." *Id.* at 665; *see id.* at 672–73 (articulating this holding).

Since *Bearden*, the Supreme Court and others have reaffirmed the use of *Bearden*'s balancing test instead of the traditional tiers of equal protection scrutiny when the state makes wealth-based classifications that infringe on a person's right to equal justice in the criminal or quasi-criminal context.[10] And these courts consistently describe the inquiry that *Bearden* requires as a form of "heightened scrutiny." *MacFarlane*, 179 F.3d at 1141; *ODonnell v. Harris Cnty.*, 892 F.3d 147, 161 (5th Cir. 2018), *overruled on abstention grounds by Daves v. Dallas Cnty.*, 64 F.4th 616 (5th Cir. 2023); *Johnson v. Bredesen*, 624 F.3d 742, 748 (6th Cir. 2010).

## 2. Defendants Must Satisfy Heightened Scrutiny to Justify Their System of Wealth-Based Detention

---

[9] *See, e.g.*, *Griffin v. Illinois*, 351 U.S. at 19–20; *Douglas v. California*, 372 U.S. 353, 356–57 (1963); *Williams v. Illinois*, 399 U.S. 235 (1970); *Tate v. Short*, 401 U.S. 395 (1971).

[10] *See, e.g.*, *M.L.B. v. S.L.J.*, 519 U.S. 102, 120–27 (1996) (under *Bearden* the state could not bar a mother from appealing the termination of her parental rights because she could not afford a fee); *Hernandez v. Sessions*, 872 F.3d 976, 991–93 (9th Cir. 2017) (under *Bearden* non-citizens in removal cases could not be detained solely because of indigence).

To support their argument that rational basis applies, Defendants rely on two cases—*San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973), and *Maher v. Roe*, 432 U.S. 464 (1977)—in which the Court applied rational basis review to wealth discrimination claims outside of the criminal justice context. Neither suggests rational basis applies here; *Rodriguez* even supports the opposite.

The *Bearden* framework governs whenever a state implements policies in the criminal or quasi-criminal context that, on their face, treat rich and poor alike, but in operation, deny a "substantial benefit" to anyone without the economic means to pay for it. *Bearden*, 461 U.S. at 665. In holding that wealth-based discrimination claims generally do not invoke higher scrutiny, *Rodriguez* specifically stated that its analysis did not apply to the line of cases on which *Bearden* was later based. It drew a distinction between those cases, in which people faced the absolute deprivation of a privilege that they could not pay for—including the option to avoid incarceration, *see Williams v. Illinois*, 399 U.S. 235 (1970)—and cases in which "persons with relatively less money" might find a fine more burdensome. *Rodriguez* at 20–22. *Rodriguez* specifically carved out cases in the *Williams* line for closer review. *Id.* at 20–21. When *Bearden* was decided years later, it confirmed that close scrutiny continued to be the right standard of review. *See Bearden*, 461 U.S. at 666–67.[11]

Here, plaintiffs who are "completely unable to pay" their pre-assigned bail amounts are completely deprived of "the opportunity to . . . utilize the bail schedule" to obtain the benefit of release between booking and the first judicial appearance.

---

[11] Defendants argue that *Bearden*'s higher level of scrutiny applies only in cases that "involve punishment [or] access to judicial resources." *See* Doc. 365 at 31–32. Nothing in *Bearden*, *Rodriguez*, or the cases they rely on suggest that the availability of heightened scrutiny should be limited to these two categories. That would be a bizarre rule, as it would afford a higher level of equal protection and due process protections after conviction than before. *Id.* Pretrial arrestees are "shielded by the presumption of innocence" and are thus entitled to an array of enhanced protections not afforded to the convicted. *Betterman v. Montana*, 136 S. Ct. 1609, 1614 (2016).

Def. Mot. at 33.[12] Defendants argue that Plaintiffs are not "absolutely deprived of the opportunity for pretrial release" because they will have other opportunities for release, but Plaintiffs are "absolutely deprived" of their liberty for at least the period between arrest and the first appearance. Rule 2 acknowledges that a bond schedule offers the benefit of "speedy and convenient release" only "for those who have no difficulty in meeting its requirements." Def. Ex. 4 (quoting *Pugh v. Rainwater*, 572 F.2d 1053, 1057 (5th Cir. 1987)). Since Defendants offer such a significant benefit only to people who can afford it, *Bearden* requires that they show that their practice of detaining Plaintiffs, while releasing similarly situated people who are able to pay, promotes a valid state interest that cannot be advanced in a less restrictive way.

This heightened level of scrutiny applies even if Plaintiffs' claim is analyzed as a pure Equal Protection claim rather than a *Bearden* claim. Denying Plaintiffs the opportunity of immediate release that is offered to people who can pay "impinges upon a fundamental right . . . thereby requiring strict judicial scrutiny," *Rodriguez*, 411 U.S. at 17. Freedom from detention is a fundamental liberty interest. *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 301–02 (1993).

Defendants dispute that Plaintiffs have a liberty interest on two grounds. First they point to the unpublished *Dawson v. Board of County Commissioners of Jefferson County*, Doc. 365 at 43, which holds that there is no fundamental right "to be free from pretrial detention, having paid court-ordered bond, but awaiting the fulfillment of another court ordered release condition." *Dawson*, 732 F. App'x at 632(10th Cir. 2018). But Plaintiffs here do not assert such a right; they assert their

---

[12] Defendants argue that Plaintiffs are not deprived of anything that people with more resources receive, because they share the same "opportunity to eschew individualized judicial determination and utilize the bail schedule, if available . . . OR to participate in the bond docket hearing for a more individualized assessment." Doc. 365 at 33. As in *Bearden*, the option to either pay money or go to jail is formally presented to all people, but only people with enough money to make the required payment can exercise that option. People without enough money are incarcerated.

rights to be free from both wealth-based incarceration and pretrial detention without adequate justification. As argued herein, both are well-established, and, of course, the Tenth Circuit has explicitly held in published cases that pretrial freedom is a fundamental right. *See Dodds*, 614 F.3d at 1193.

Second, Defendants argue that no fundamental right is at stake because Plaintiffs lose their liberty for only part of the pretrial period and have a chance to regain it later.[13] But "[a]ny amount of actual jail time" imposes "exceptionally severe consequences for the incarcerated individual." *Rosales-Mireles v. U.S.*, 138 S. Ct. 1897, 1907 (2018). The six days of detention between booking and first appearance at the time Plaintiffs filed this suit, and the two days between booking and bond docket under Defendants' new procedures, far exceed any brief detentions that have been found too de minimis to implicate fundamental rights, and are long enough to constitute constitutionally protected deprivations of liberty. *See*, *Baker v. McCollan*, 443 U.S. 13, 144 (1979); *Doe v. Bagan*, 41 F.3d 571, 575 (10th Cir. 1994). This is consistent with the *Williams* line, which makes clear that states "may not . . . subject a certain class of convicted defendants to *a period of imprisonment*"—any period— "solely by reason of their indigency." *Williams*, 399 U.S. at 242 (emphasis added).

### 3. Defendants' Policy of Detaining Only People Who Cannot Afford Preset Bond Does Not Satisfy Any Standard of Review

Defendants' wealth-based post-arrest detention scheme is not rational, and certainly cannot pass heightened scrutiny, particularly as a matter of law. Defendants have already made a policy determination that most arrestees are immediately eligible for release pending trial, but they condition release on the immediate ability to pay a predetermined sum. The only characteristic that differentiates people

---

[13] This argument disregards the twenty percent or more of people who would be free if they could afford bail but will instead spend the entirety of their pretrial period in detention. *See supra*, 56.1 Resp. ¶ 51. It also ignores the myriad facts indicating that the bond docket fails to provide a meaningful opportunity to challenge the initial bail setting. *See* Pl. Mot. at 15–23.

released for any given offense from those detained on the same offense is their ability to pay. Defendants insist—but have no evidence to show—that their scheme is rational, because requiring someone to pay a sum of money facilitates pretrial release while improving the likelihood that they will obey the law and appear in court.

In fact, the only evidence in the record shows that, for people who are able to obtain release, imposing secured bail conditions *decreases* their likelihood of appearance and *increases* their likelihood of rearrest. 56.1 Resp. ¶¶ 53–54. People who cannot afford release, meanwhile, will never be in a position in which an incentive to appear in court or avoid reoffending could operate. Defendants' expert claims that people released on secured bond in Tulsa have higher appearance rates than people released on some (but not all) forms of unsecured bond, but she disavows any claim that the secured bond conditions *cause* the higher appearance rates. *Id*. To the extent money bail operates to improve appearance and public safety rates by effecting detention, it is by operation of the detention, and not the release condition, in which case there is no rational reason to detain only poorer people while releasing people who are richer. Any argument that secured bond facilitates release fails by the same logic. *Cf. Bearden*, 461 U.S. at 671 (rejecting proposition that "poverty by itself indicates [a defendant] may commit crimes in the future").

Setting a condition of release without determining whether it is impossible for the arrestee to satisfy furthers no governmental interest and fails both rational basis review as well as the more exacting *Bearden* standard. It also fails the *Bearden* standard for the independent reason that release rates, appearance rates, and public safety can all be advanced by means of less restrictive alternatives. *See Rainwater*, 752 F.2d at 1057 ("The incarceration of those who cannot [afford bail schedule amounts], without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements.") *cf. Vasquez v. Cooper*, 862 F.2d 250, 254 (10th Cir. 1988) ("Once the state has determined that its penological

interests do not require imprisonment, it cannot . . . require imprisonment without first considering alternative[s] … when the [person], own…cannot pay a [sum].").

Because there is no evidence that secured bond advances any of Defendants' goals, Defendants current scheme necessarily fails narrow tailoring. But even if money bond served the purposes Defendants claim, they have testified to numerous alternatives to secured bail, including one—electronic monitoring—that their own expert claims is more closely associated with lower appearance rates than is secured bond. *See* 56.1 Resp. ¶ 53; Pl. Mot. at 12 ¶ 48.

Plaintiffs do not argue that wealth should be the overriding factor for setting conditions of release. To the contrary, the focus on wealth is problematic. Plaintiffs cannot not take advantage of the immediate release offered to wealthier arrestees. They are "subjected to imprisonment solely because of [their] indigency." *Tate*, 401 U.S. at 398. Defendants' differential treatment of people able and unable to pay preset bail does not serve any legitimate purpose and could be replaced with any number of alternatives. It is therefore unlawful under the Fourteenth Amendment.

## III. Plaintiffs' Procedural Due Process Claim Should Be Analyzed Under *Mathews* but Also Succeeds Under *Medina*

Count Two seeks to stop Defendants from violating Plaintiffs' right to pretrial liberty by jailing them without the procedural safeguards required by due process: a hearing, preceded by notice of the critical issues at stake, at which Plaintiffs have access to counsel and the opportunity to present and confront evidence, and at which any order of pretrial detention is accompanied by findings on the record, based on clear and convincing evidence, explaining why there is no combination of conditions under which release can sufficiently protect compelling government interests. Complaint ¶ 139. In their motion for summary judgment, Plaintiffs showed that due process requires these safeguards under the balancing test set forth by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). *See* Pl. Mot. at 37–43.

Defendants argue that their bail procedures should instead be evaluated under the test set forth in *Medina v. California* for state procedural rules that are "part of the criminal law process," 505 U.S. 437, 443 (1992). Def. Mot. at 33–34. To assess the validity of a rule of that sort, *Medina* asks whether it "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental" or "transgresses any recognized principle of 'fundamental fairness' in operation." 505 U.S. at 446, 448. Because *Medina* applies only to criminal procedures for determining guilt or punishment, Plaintiffs maintain that this Court should evaluate Defendants' bail procedures under *Mathews*. But the Court need not decide which test applies in this context, because Defendants' procedures fail both.

## A. *Medina* Does Not Apply, Because Defendants' Bail Procedures Are Not "Part of the Criminal Process"

The Supreme Court has not explicitly defined what makes a state procedure "part of the criminal process" under *Medina*. But its applications of *Medina* indicate that it applies to procedural rules for determining a person's guilt or punishment. The rule assessed in *Medina* concerned the burden of proving incompetence to stand trial, *see* 505 U.S. at 443–46, and the rule assessed in *Patterson v. New York*—from which *Medina* derived its test, *id.* at 445—concerned the burden of proving affirmative defenses, *see Patterson*, 432 U.S. 197, 202 (1977).[14]

Conversely, *Medina* does not apply when a challenged procedure relates to a criminal proceeding, but does not bear on determining of guilt or punishment. *See, e.g.*, *Nelson v. Colorado*, 581 U.S. 128, 134–35 (2017). (*Mathews*, not *Medina*, applied to the evidentiary standard for obtaining a refund of payments relating to an

---

[14] *See also Cooper v. Oklahoma*, 517 U.S. 348, 356–62 (1996) (standard of proof to establish incompetence to stand trial); *Montana v. Egelhoff*, 518 U.S. 37, 43–44, (1996) (right to have jury consider mens rea evidence); *Herrera v. Collins*, 506 U.S. 390, 407–08 (1993) (postconviction relief for actual innocence); *Dist. Attorney's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52 (2009) (postconviction access to state's evidence for DNA testing to show innocence); *Parke v. Raley*, 506 U.S. 20, 32 (1992) (burden of proof at sentencing).

invalid conviction); *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993) (applying *Mathews* to evaluate procedures for civil forfeiture based on a criminal conviction). Most analogous are rulings, including by the Tenth Circuit, that *Mathews* governs procedural due process challenges by criminal defendants to the restraint of their allegedly forfeitable assets pending trial. *See United States v. Jones*, 160 F.3d 641, 645–46 (10th Cir. 1998). As explained by the Second Circuit, *Mathews* rather than *Medina* applies in such cases because they "involve[] no challenge to an underlying criminal proceeding or the procedural rights due the criminal defendant," but rather "the deprivation of property"—or, in this case, liberty—"*pending* a criminal proceeding." *Krimstock v. Kelly*, 464 F.3d 246, 254 (2d Cir. 2006).

Defendants' bail procedures, like the procedures for restraining assets in *Jones* and *Krimstock*, are unrelated to the determination of Plaintiffs' criminal guilt or punishment. *See Salerno*, 481 U.S. at 746-47 (pretrial detention is a regulatory, not penal matter). This Court has already observed that "the injunction requested here is not directed at the state criminal proceedings." Doc. 48 at 12. Defendants' bail procedures are therefore to properly analyzed under *Mathews*.

Circuits throughout the country have reached the same conclusion, consistently applying *Mathews* to adjudicate procedural due process challenges to pretrial detention schemes. *See Holland v. Rosen*, 895 F.3d 272, 297 (3d Cir. 2018) (applying *Mathews* to pretrial bail scheme that subordinated monetary bail to non-monetary conditions of release), *ODonnell v. Harris Cnty.*, 892 F.3d 147, 158–59 (5th Cir. 2018) (applying *Mathews* to pretrial bail scheme), *overruled on other grounds by Daves v. Dallas Cnty.*, 64 F.4th 616 (5th Cir. 2023); *United States v. Abuhamra*, 389 F.3d 309, 318–32 (2d Cir. 2004) (applying *Mathews* to determine bail procedures required by due process pending appeal). *See also Walker v. City of Calhoun*, 901 F.3d 1245, 1265 (11th Cir. 2018) (holding that "[d]ue process . . .

requires analysis of the governmental and private interests that are affected" by pretrial bail scheme (quoting *Mathews*, 424 U.S. at 334)).

An understanding of "the criminal process" that excludes collateral bail determinations accords with the Supreme Court's recognition that "[a]n order denying a motion to reduce bail may be reviewed before trial," because "[t]he issue is finally resolved and is independent of the issues to be tried, and the order becomes moot if review awaits conviction and sentence." *Flanagan v. United States*, 465 U.S. 259, 266 (1984) (citing *Stack*, 342 U.S. at 6). Similarly, the decision whether to detain a presumptively innocent person before trial—indeed, before they have even been formally charged and arraigned[15]—is entirely separate from any criminal process of determining their guilt (and, if necessary, punishment) that may follow, and it cannot meaningfully be challenged once those determinations have been made. *See, e.g.*, *United States v. Weissberger*, 951 F.2d 392, 396 (D.C. Cir. 1991) (noting that "an order denying bail is immediately appealable").

## B. Defendants' Bail Procedures Fail Both Tests

Plaintiffs' procedural due process claim should be analyzed under *Mathews*, not *Medina*, but Defendants' challenged bail procedures fail both tests.

### 1. *Mathews* requires additional procedures to safeguard against erroneously jailing Plaintiffs

Plaintiffs explained in their motion for summary judgment why the Tulsa County bail scheme violates procedural due process under *Mathews*, and why the the balance of cognizable interests favors the procedural safeguards they seek. *See* Pl. Mot. at 37–43. Absent the procedural protections demanded, Plaintiffs face a serious risk of erroneous incarceration—that is, of being detained when it is not necessary to serve Tulsa County's interests in appearance and public safety. Sparing

---

[15] *See* Doc. 357 (Class Cert Order) at 21 (certifying class of "[a]ll people who are or will be detained *prior to their initial arraignment* in the Tulsa County Jail because they are unable to pay a secured financial condition of release" (emphasis added)).

Defendants the marginal burden of providing these safeguards cannot justify such a grave threat to such a basic right. Defendants offer no competing *Mathews* analysis.

## 2. *Medina* requires additional procedures to safeguard historically rooted justice and fundamental fairness.

The question under *Medina* is whether a procedure "'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' *or* 'transgresses any recognized principle of fundamental fairness in operation.'" *Osborne*, 557 U.S. at 69 (emphasis added) (quoting *Medina*, 505 U.S. at 446, 448). Defendants misstate this test by putting "and" in place of "or," Def. Mot. at 33. The test involves two inquiries. It looks to traditional and contemporary practice for a fundamental principle of justice that the challenged procedure offends, 505 U.S. at 446–48; and then it considers whether the challenged procedure is fundamentally unfair in operation, *id.* at 448–52. Failure on either score will invalidate the procedure. *Medina* itself employed this two-step analysis. *See id.* at 448 ("[d]iscerning no historical basis" for finding a due process violation," before "consider[ing] whether the rule transgresses any recognized principle of 'fundamental fairness' in operation." (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990))). So did the unanimous Court in *Cooper v. Oklahoma*, 517 U.S. 348, 362 (1996) (after finding that an evidentiary rule "offend[ed] a principle of justice that is deeply rooted in the traditions and conscience of our people," turning "to a consideration of whether the rule exhibits fundamental fairness in operation." (citation and quotation marks omitted)). Defendants' bail procedures fail the *Medina* test on both of these independently invalidating grounds.

### i. Defendants' procedures offend the deeply rooted principle that a state must affirmatively establish a compelling interest to detain the presumptively innocent

Defendants begin their *Medina* analysis with a confused description of Plaintiffs' procedural due process claim: that the preset bond schedule "denie[s

people] an individual bail hearing," because it offers them the "option of paying a preset bond amount to obtain release prior to their first court appearance." Def. Mot. at 37. Plaintiffs do not complain that they are deprived of an adequate hearing because they might be released in lieu of one. They complain that they do not have the option of *either* release or an adequate hearing.[16] Plaintiffs contend that if a financial condition of release will function as an order of detention and strip someone of liberty, the government "must carry a heavy burden of justification," and must show that it acts "with precision, and is tailored narrowly to serve legitimate objectives and . . . selected the less drastic means for effectuating its objectives." *Rodriguez*, 411 U.S. 1, 16-17 (1973) (internal quotation marks omitted). The weight of the government's burden to justify depriving a presumptively innocent person of their bodily liberty requires an adversarial hearing employing a heightened

---

[16] Defendants' bizarre description of Plaintiffs' procedural due process claim stems from an attempt to analogize *Kincaid v. Gov't of D.C.*, 854 F.3d 721 (D.C. Cir. 2017). The *Kincaid* plaintiffs chose to pay money to resolve charges before trial and then complained that they had been deprived of property without the procedures a trial would afford. Plaintiffs do not object to allowing people release absent a hearing. They object to being *detained* absent a hearing.

Similarly, Plaintiffs do not claim that bond schedules are "inherently unconstitutional," Def. Mot. at 35–36. Defendants could, for example, employ a bond schedule that provides for equally expeditious release on standard non-financial conditions if an arrestee cannot afford to pay the predetermined amount. *Defendants'* schedule is unconstitutional because it detains people who cannot pay, without consideration of alternatives, *Rainwater*, 572 F.2d at 1057, and without the requisite findings and procedural safeguards to justify detention. Defendants cite no cases holding that due process permits a schedule like theirs. In *Daves v. Dallas Cnty.*, 22 F.4th 522 (5th Cir. 2022), the schedules in question "offer[ed] only 'recommended' amounts" that were not binding on the judges setting bail, *id.* at 543. In *Fields v. Henry Cnty.*, 701 F.3d 180 (6th Cir. 2012), the court ruled that the schedule in question did not violate the Eighth Amendment; its only due process ruling was that the plaintiff had not identified a state-created liberty interest eligible for due process protection, *id.* at 187–88. And in *Walker*, the schedule in question was coupled with a Standing Bail Order that provided for either release or a bail hearing within 48 hours at which arrestees have appointed counsel, a judge makes an individualized ability-to-pay determination based on evidence that the arrestee can contest, and the arrestee is released on recognizance if found to be indigent, *id.* at 1252. *See also id.* at 1263 ("[T]he Standing Bail Order presently guarantees release within 48 hours of arrest to all indigent defendants in Walker's shoes.").

evidentiary standard.[17] This deeply rooted principle is reflected in long-standing precedent and current widespread practice.

In *Salerno*, it was crucial to the Bail Reform Act's validity that it provided for "a full-blown adversary hearing," in which "the Government must convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person." 481 U.S. at 750. *Addington v. Texas* held that a state could not civilly commit someone without showing by "clear and convincing evidence" that they were dangerous to others. 441 U.S. 418 (1979). And *Foucha* invalidated a statute that allowed a person to be civilly committed without an "adversary hearing at which the State must prove by clear and convincing evidence that he [wa]s demonstrably dangerous to the community." 504 U.S. at 81. The Court has reached the same conclusion in every other context in which a person's bodily liberty is at stake. *See Santosky v. Kramer*, 455 U.S. 745, 756 (1982) ("This Court has mandated an intermediate standard of proof—'clear and convincing evidence'—when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money.'"); *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 282–83 (1990) (explaining that the Court has required the clear and convincing evidence standard in proceedings involving deportation, denaturalization, civil commitment, the termination of parental rights, in cases involving allegations of civil fraud, and in a variety of other kinds of civil cases implicating important interests).

---

[17] This distinguishes probable cause hearings, where the minimal procedural protections reflect "the nature of the [probable cause] determination itself." *Gerstein*, 420 U.S. at 121. Substantively, "probable cause is a relatively low standard." *United States v. Rey*, 663 F. Supp. 2d 1068, 1112 (D.N.M. 2009). It exists if facts know to law enforcement "would lead a reasonably prudent person to believe that the arrestee has committed or is committing an offense." *Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1312 (10th Cir. 2002) (internal quotation marks omitted).

The *Addington* Court concluded that this intermediate evidentiary standard "strikes a fair balance between the rights of the individual and the legitimate concerns of the state" and noted that "20 states . . . employ the standard of 'clear and convincing' evidence; 3 states use 'clear, *cogent*, and convincing' evidence; and 2 states require 'clear, *unequivocal* and convincing' evidence." *Id.* at 431–32 (footnotes omitted). Many states impose the same standard for bail proceedings. Most recently, the California Court of Appeal held that a court may impose unaffordable bail "only upon a determination by clear and convincing evidence that no less restrictive alternative will satisfy that purpose." *In re Humphrey*, 19 Cal. App. 5th 1006, 1037 (2018), *aff'd*, 11 Cal. 5th 135 (2021).[18]

The requisite adversarial hearings are subject to well-established due process requirements. Most apply even in the post-conviction context, where a person's liberty interest is diminished compared to that of Plaintiffs, who are presumptively innocent. In *Gagnon v. Scarpelli*, the Court explained what due process requires at a probation revocation hearing for a person whose liberty interest has been diminished by a criminal conviction: (a) "notice" of the critical issues to be decided at the hearing, (b) "disclosure" of the evidence presented by the government at the hearing, (c) an "opportunity to be heard in person and to present witnesses and documentary evidence," (d) "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)," (e) a "neutral and detached" factfinder, and (f) findings and reasons on the record of "the evidence relied on." 411 U.S. 778, 786 (1973); s*ee also Morrissey v. Brewer*, 408 U.S. 471, 489 (1972) ( "the minimum requirements of due

---

[18] *See also, e.g.*, *State v. Ingram*, 165 A.3d 797, 803, 805 (N.J. 2017); *State v. Butler*, No. 2011–K–0879, 2011 WL 12678268 (La. App. 4th Cir. July 28, 2011), *writ not considered*, 75 So. 3d 442 (La. 2011); *Wheeler v. State*, 864 A.2d 1058, 1065 (Md. App. 2005); *Brill v. Gurich*, 965 P.2d 404, 409 (Okla. 1998); *Lynch v. United States*, 557 A.2d 580, 581 (D.C. 1989); *Aime v. Com.*, 611 N.E.2d 204, 212–14 (Mass. 1993); *Mendonza v. Com.*, 673 N.E.2d 22, 30 (Mass. 1996).

process" include the same six procedural protections in the context of parole revocation of a convicted and sentenced person); *Turner v. Rogers*, 564 U.S. 431, 447 (2011) (requiring "notice to the defendant that 'ability to pay' is a critical issue," the opportunity to be heard, and findings on the record). Together, these sources show the "consensus" on required procedures that Defendants deny. Def. Mot. at 39.

Defendants argue that, under *Gerstein*, their pretrial procedures "must be 'viewed as a whole.'" Def. Mot. at 38–39 (quoting 420 U.S. at 123). "Viewed as a whole," at the time of filing, Defendants jailed people for six days without any procedures to challenge their detention, a void that that bond docket has only begun to fill. *See* Pl. Mot. at 32–36 (detailing aspects in which Plaintiffs continue to be denied procedural due process); *see also* Pl. Mot. at 2 (Plaintiff Ashton Dennis did not know why he was appearing, could not see or hear the person appointed as his attorney, was told not to speak, could not hear or follow what was said, and was given no explanation for his bond amount). Due process requires Defendants to make findings on the necessity of detention—which turns in large part on information available only to the defendant—and without meaningful inquiry ability to pay, the risks of flight or community danger, and alternative release conditions, Defendants cannot know whether the amount of bail they set operates as a de facto detention order, let alone whether detention is necessary for legitimate purposes.

Because Defendants' bail procedures offend a fundamental principle of justice, they fail the first part of *Medina*'s test and violate procedural due process.

### ii. Defendants' procedures are fundamentally unfair because they create an undue risk of unnecessary detention

Defendants' procedures also violate due process under *Medina* because they are fundamentally unfair in operation. To assess fundamental fairness in operation, the Supreme Court focuses not on tradition but on whether the procedures are

fundamentally inadequate to vindicate the substantive rights provided. *Osborne*, 557 U.S. at 69. Procedures are fundamentally unfair when the risks to the defendant's interests "outweigh the State's interest in the efficient operation of its criminal justice system," *Cooper*, 517 U.S. at 367. This requires consideration of the risk to which the procedures subject the substantive right at stake.

The erroneous deprivation of an arrestee's fundamental liberty interest can have catastrophic consequences for them: job termination, lost housing, separation from children, lapses in medical and mental health care, as well as pressure to plead guilty and thereby relinquish the presumption of innocence and all other constitutional trial rights. Both the individual and the government have a strong interest in avoiding these harms, ensuring the accuracy of pretrial detention determinations, and avoiding wrongful convictions.

Defendants' bail procedures are fundamentally inadequate to vindicate Plaintiffs' substantive right against unnecessary pretrial detention. To determine whether bail will lead to a person's detention and whether that detention is justified, Defendants must evaluate the person's dangerousness and risk of flight, and assess various the release conditions' ability to address those risks. That evaluation turns on facts that are largely in the Plaintiff's possession, such as their access to financial resources, their community ties, their housing and transportation options. But Defendants do not give Plaintiffs notice that these factors are important or any means for presenting them to the court. This creates fundamentally grave risk that Plaintiffs will be jailed from booking at least until arraignment without justification without the means to present a meaningful challenge. The fundamental unfairness is compounded by Defendants' providing fewer procedural protections to safeguard the fundamental liberty interest of a presumptively innocent person than the Supreme Court has held due process requires to protect the lesser liberty interests of probationers and parolees. *Cf. Gagnon*, 411 U.S. at 786; *Brewer*, 408 U.S. at 489.

## IV. Defendant Judges' Acts Are Administrative and, Therefore, Subject to Injunctive Relief

This Court has already ruled—twice—that the presiding judge acts are administrative. Doc. 48 at 19, Doc. 306 at 25. Defendants contend that the Court's prior decisions no longer stand because of the adoption of Rule 2, but the Court's second order was issued after Rule 2. *See* Doc. 306 at 21–22 (discussing Rule 2 before confirming the administrative roles of the presiding judge). Defendants present no new facts that call for revisiting the Court's two prior rulings.

The Court's prior rulings were also correct. Setting out rules and standards for the internal operation of the court, including the bail schedule and rules for the timing, logistics, and scope of pretrial proceedings, remain administrative acts. *See Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 435 (1993) (adopting local policies is an "administrative duty," not "discretionary decisionmaking" that "resolv[es] disputes between parties"); *Opala v. Watt*, 393 F. Supp. 2d 1154, 1164–65 (W.D. Ok. 2005) (establishing rules for selecting the court's chief justice is administrative because it is "designed to facilitate the orderly internal management of the [court]"), *rev'd on other grounds*, 454 F.3d 1154 (10th Cir. 2006).

Plaintiffs ask for hearings that require administrative coordination between the court and the jail; the assignment of judges; and the furnishing of resources— exactly the type of coordination that Judge Musseman undertook when, as presiding judge, he created the bond docket.[19] *See* Pl. Mot. Ex. 3 (Wright Dep.) at 137:7– 138:24 (describing coordinated effort between jail and court staff to create the bond

---

[19] Defendants cite *Martinez v. Winner*, 771 F.2d 424 (10th Cir. 1985), for the proposition that the assignment of cases is a judicial function. In *Martinez*, the plaintiff sued the judicial defendant for acts he undertook as the judge administering a dispute that the plaintiff had before the court as a litigant. *Id.* at 432. Among the other acts complained of was that the judge had assigned himself to adjudicate the matter. *Martinez* therefore concerned actions at the heart of judicial action. *See Antoine*, 508 U.S. at 435 (the "touchstone" of judicial action is "performance of the function of resolving disputes between the parties").

docket, at Judge Musseman's direction). Such acts, "even though they may be essential to the very functioning of the courts, have not . . . been regarded as judicial acts," *Forrester v. White*, 484 U.S. 219, 229 (1988).

Even if this Court finds Defendant Presiding Judge's acts to be judicial, Plaintiffs would still be entitled to declaratory relief. *See* 42 U.S.C. § 1983; *Deelan v. Fairchild*, No. 05-3468, 2006 WL 2507599, at *4 (10th Cir. Aug. 31, 2006) (citing *Schepp v. Fremont Cty.*, 900 F.2d 1448, 1452 (10th Cir. 1990) ("Judicial immunity generally does not bar declaratory relief.").

## V.     The Prison Litigation Reform Act Does Not Apply

The Prison Litigation Reform Act (PLRA) does not apply here. The PLRA places constraints on relief in "any civil proceeding arising under Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison." 18 U.S.C. § 3626(g)(2). "Conditions of confinement" within the PLRA's meaning "relate to the environment in which prisoners live" and "include complaints such as those regarding cell overcrowding, poor prison construction, inadequate medical facilities, and incomplete law libraries." *Booth v. Churner*, 206 F.3d 289, 294 (3d Cir. 2000), *aff'd*, 532 U.S. 731 (2001). This understanding reflects the fact that "[t]he PLRA was plainly intended, at least in part, to 'reduce the intervention of federal courts into the management of the nation's prison systems.'" *Id.* at 295 (quoting *Freeman v. Francis*, 196 F.3d 641, 644 (6th Cir. 1999)).[20]

Plaintiffs do not seek relief affecting the management of Tulsa County's detention facilities, and they do not raise any claims about their conditions of

---

[20] Indeed, the PLRA requires prisoners to exhaust remedies available through the prison's grievance procedures before filing suit. *See Jones v. Bock*, 549 U.S. 199, 223 (2007). That rule would make no sense in cases challenging the constitutionality of the proceedings that led to detention, because prison administrators do not have the power to remedy that illegality through prison grievance procedures.

confinement. They challenge bail practices that determine *whether* confinement prior to trial is appropriate, not the living situation provided while they are confined.

## VI.    There Is No Basis for Abstention

The Court has already ruled that abstention under *Younger v. Harris*, 401 U.S. 37 (1971), would be improper. Doc. 48 at 12–13. Defendants again urge abstention, but avoid citation of *Younger*. Defendants couch their abstention argument as arising under *O'Shea v. Littleton*, 414 U.S. 488 (1974), but as they admit, Def. Mot. at 40, *O'Shea* is an application of *Younger*. *See O'Shea*, 414 U.S. at 500 (voiding a district court injunction that "would accomplish the kind of interference that *Younger v. Harris* . . . sought to avoid" (citation omitted)). Defendants do not articulate a reason for the Court to revisit its prior abstention ruling, and their argument for a different outcome ignores Supreme Court precedent and places reliance on cases that are not analogous and one that is wrongly decided.

Given federal courts' "virtually unflagging" obligation "to hear and decide a case," a court may abstain under *Younger* and *O'Shea* only in "exceptional circumstances," when federal claim adjudication would unduly interfere with "coercive" state court proceedings, and the state offers an adequate opportunity to raise the federal claim. *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 77–82 (2013) (internal quotation marks omitted); *see also O'Shea*, 414 U.S. at 500, 502 (abstaining where injunction sought interference with criminal trials, for injuries that could be remedied during the course of those proceedings). This Court has already held that the neither requirement is met. Doc. 48 at 12–13.

### A.    There Is No Adequate State Court Remedy.

State proceedings provide an adequate avenue for relief only if they provide an "opportunity to raise and *have timely decided* . . . the federal issues involved." *Gibson v. Berryhill*, 411 U.S. 564, 577 (1973) (emphasis added). An opportunity is not timely if a plaintiff must endure the very harm challenged while awaiting

adjudication. *Gibson*, 411 U.S. at 577 & n.16. Defendants argue that Plaintiffs can challenge their detention through reconsideration motions, habeas petitions, or direct appeals, Defs.' Mot. at 41–43, but none of those is available until plaintiffs have already suffered the injuries they complain of. Plaintiffs complain of their six-day detention between arrest and arraignment, when they are jailed without adequate justification or sufficient procedures.[21] Pl. Mot. at 8, ¶¶ 22–25. During that time, they cannot present bond modification motions, *see supra* 56.1 Resp. at ¶ 6, or appeals, *see* Defs.' Mot. at 27 (citing cases where plaintiffs raised challenges to their bail conditions after adjudication of their criminal cases). Habeas is also an inadequate avenue for relief for two reasons. First, it is unavailable without first obtaining a ruling on a bond modification motion in the district court, which Plaintiffs cannot do. *See id*. at ¶ 7. Second, it would require plaintiffs to initiate a separate proceeding, thus imposing an exhaustion requirement that the Supreme Court has rejected for claims under §1983. *See Patsy v. Board of Regents of State of Florida*, 457 U.S. 496, 500 (1982); *Huffman v. Pursue*, 420 U.S. 592, 609 n.21 (1975) (*Younger* deals with "state proceedings which have already been initiated," as §1983 plaintiff "need not first initiate state proceedings").

Treating the period "between arrest and arraignment [as] the only relevant period" does not, as Defendants argue, ask the court to "assum[e] that each moment in erroneous pretrial detention is a constitutional violation," Def. Mot. at 42–43 (quotation marks omitted). It asks the Court to *adjudicate* whether a days'-long detention is unconstitutional. If the initial period of detention is, as Plaintiffs' claim,

---

[21] Defendants have argued that Plaintiffs' challenge to this pre-arraignment period of detention is moot after creation of the bond docket, but the bond docket did not cure the violations. Even with the bond docket, Plaintiffs do not have a meaningful opportunity to challenge the basis for their detention, with the necessary procedural protections. Pl. Mot. at 24–26, 32–36. As the Court has already ruled, where "evidence shows . . . there are alleged constitutional violations which the Court did not rectify," Plaintiffs' claims have not been mooted. Doc. 306 at 24–25.

illegal, state court remedies for subsequent periods of detention are an inadequate remedy simply because they may resolve additional, subsequent periods of detention. *See Gibson v. Berryhill*, 411 U.S. at 577 & n.16 (state post-deprivation remedy for license suspension was not timely in light of injuries suffered by the interim suspension); *Rodriguez v. Providence Community Corrections, Inc.*, 155 F.Supp.3d 758, 766 (M.D. Tenn. 2015) ("[W]hen it comes to the adequacy of the state court proceedings as an opportunity to address constitutional harms, the opportunity must be available before the harm is inflicted").[22]

## B. There Is No Interference with Coercive State Proceedings.

Resolution of Plaintiffs' claims will not interfere with coercive state proceedings. The issues here are collateral to the merits of criminal prosecutions. The Court has already held *Younger* inapplicable on that basis. Doc. 48 at 12–13 ("the injunction requested here is not directed at the state criminal proceeding"); *see also Gerstein*, 420 U.S. at 108 n.9 (*Younger* did not bar injunction requiring probable cause hearings, which "was not directed at the state prosecutions as such, but only at the legality of pretrial detention without a judicial hearing, an issue that could not be raised in . . . the criminal prosecution" and "could not prejudice the conduct of the trial on the merits"); *Cohen v. Beneficial Industrial Loan Corporation*, 337 U.S. 541, 546 (1949) (challenges to pretrial detention present "claims of right separable from . . . rights asserted in the" related criminal action).

Defendants emphasize that the Supreme Court ordered abstention in *O'Shea*, and the *O'Shea* plaintiffs had complained of illegal bail-setting; but they also

---

[22] The harm suffered is also irreparable. Where serious "irreparable injury is threatened," *Younger* does not apply even if the doctrine's usual prerequisites are satisfied. *Rainwater*, 483 F.2d at 782; *Page v. King*, 932 F.3d 898, 903–04 (9th Cir. 2019). That provides an independent ground for rejecting abstention here: Because the "loss of liberty for the time of pretrial detention is irretrievable," plaintiffs' claims "fit[] squarely within the irreparable harm exception to *Younger*," *Page*, 932 F.3d at 903–04 (quotation marks omitted).

complained of selective prosecution, illegal sentencing and illegal jury-fee practices in a sweeping racial-discrimination challenge to virtually all aspects of a local criminal justice system. 414 U.S. at 491–92, 495, 499–504. The injunctive relief sought was in *O'Shea* was "aimed at controlling or preventing the occurrence of specific events that might take place in the course of future *state criminal trials*." *Id.* at 500 (emphasis added); *see also Phelps v. Hamilton*, (abstention required asked the federal court "to monitor the local district attorney's office to [e]nsure that they [were] not prosecuted" 122 F.3d 1309, 1317 (10th Cir. 1997). One term after *O'Shea* was decided, the Supreme Court issued its opinion in *Gerstein*, which reaffirmed that claims directed "only at the legality of pretrial detention without a judicial hearing" are "not directed at the state prosecutions as such," do not unduly interfere with state court proceedings, and thus do not warrant *Younger* abstention. 420 U.S. at 108 n.9. After finding no basis to abstain, the Court issued a relief of precisely the sort Plaintiffs seek in this case. It held that county courts must to adopt procedures for establishing the legal basis for restricting people's liberty pre-trial. *Gerstein* cannot be distinguished and its holding controls this case.

Nearly all courts considering challenges to bail procedures have reached the same result. *See, e.g.*, *Schultz v. Alabama*, 42 F.4th 1298, 1312–13 (11th Cir. 2022) (same); *Walker*, 901 F.3d at 1255 (challenge to bail procedures "asks for a prompt pretrial determination of a distinct issue, which will not interfere with subsequent prosecution"); *Arevalo*, 882 F.3d at 766 (same). Defendants rely heavily on one outlier—*Daves*, 64 F.4th at 631—a split decision which the Court should decline to follow, as it is non-binding, irreconcilable with *Gerstein*, and out of step with all other persuasive authorities.

## CONCLUSION

For the reasons above, Plaintiffs ask the Court to deny Defendants' motion.

Dated: June 26, 2023

*/s/* Hayley Horowitz
Hayley Horowitz
Phoebe Kasdin
STILL SHE RISES, TULSA
567 E. 36th Street North
Tulsa, OK 74106
(918) 392-0874
hayleyh@stillsherises.org

Allison Holt Ryan*
HOGAN LOVELLS US LLP
555 13th Street, NW
Washington, DC 20004
(202) 637-5600
allison.holt-ryan@hoganlovells.com

Ryan Downer*
CIVIL RIGHTS CORPS
1601 Connecticut Avenue NW,
Suite 800
Washington, DC 20009
Telephone: (202) 844-4975
ryan@civilrightscorps.org

*Admitted to practice *pro hac vice*

*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiffs' Opposition to Defendants' Motion for Summary Judgment was served on June 26, 2023 via the Northern District of Oklahoma CM-ECF system upon all counsel of record.

*/s/* Hayley Horowitz