UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| RICHARD FELTZ and ASHTON DENNIS, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>VIC REGALADO, *et al.*,<br><br>*Defendants*. | Case No. 18-CV-0298-CVE-JFJ |

## PLAINTIFFS' SUPPLEMENTAL SUMMARY JUDGMENT BRIEF

After Plaintiffs filed this class action in 2018, challenging pretrial detention procedures in Tulsa County, Defendants began to revise those procedures, making them a regularly shifting target. Last month, Defendants filed a Notice advising the Court that they were partially rolling back their reforms. ECF No. 388. Defendants' Notice was filed after cross motions for summary judgment had been fully submitted. The change in policy that the Notice announced strengthens Plaintiffs' summary judgment motion and undermines Judicial Defendants' cross motion.

Plaintiffs therefore sought and received leave to file this supplemental brief in further support of their Motion for Summary Judgment, ECF Nos. 368, 369, against Defendants, the Tulsa County District Court Presiding Judge and Special Judges (collectively "Judicial Defendants") and the Tulsa County Sheriff; and in further opposition to Judicial Defendants' Motion for Summary Judgment, ECF No. 372.

1

I.      **Defendants Have Begun to Unwind Their Pretrial-Detention Reforms**

Plaintiffs filed this class action to remedy due process and equal protection violations inflicted by Tulsa County's pretrial detention procedures. People arrested and booked into the county jail are assigned monetary bond amounts, without any individualized consideration of ability to pay or the need for their detention. ECF No. 369 at 6–8, ¶¶ 16–25. People who can pay are immediately released, while people who cannot remain jailed. *Id*. When this case was filed in June 2018, the first post-arrest court appearance was typically scheduled for six days after booking, and during that time people had no opportunity to challenge their bonds or seek alternate means of release. *Id*. Plaintiffs sued because these practices violate due process and equal protection.

In October 2018, the Presiding Judge adopted an administrative order implementing a "bond docket," to be held on non-holiday weekdays, at which some people jailed on unaffordable bond could appear before a Special Judge and request affordable or non-monetary pretrial conditions. *Id*. at 8–9, ¶¶ 26–30; ECF No. 369-4 at 23:10–23. Defendants subsequently amended the policy, most notably expanding the docket to be held seven days a week. ECF No. 365 at 14 ¶ 43; ECF No. 373 at 5 ¶ 43. Then, this fall, Defendants began to chip away at those reforms. On September 27, Judicial Defendants filed their Notice advising Plaintiffs and the Court that, since the start of September, they had eliminated one or two scheduled bond dockets per week, meaning that each week, dozens of people who are in jail because they cannot afford their preset bonds must wait up to twice as long for an opportunity to appear before a judge and request individualized consideration of their bond conditions.[1]

---

[1] Plaintiffs have elsewhere explained that even when people do appear on bond docket, they are not afforded basic procedural protections, and the judicial officer

## II. The Recent Changes to Defendants' Policies Reinforce Plaintiffs' Entitlement to Relief

Defendants' partial rescission of their bond docket policies strengthens Plaintiffs' motion for summary judgment—and weakens Judicial Defendants' cross-motion—in three respects. First, the change evidences the impermanence of Defendants' reforms, which bears on the parties' dispute over mootness. It confirms that the Court must adjudicate Plaintiffs' claims challenging pre-trial detention practices as they existed at the time the complaint was filed, without regard to practices that Defendants subsequently adopted. Second, Defendants' recent change exacerbates Plaintiffs' constitutional injury, strengthening their claims and augmenting the need for relief. Third, because the change is purely administrative but impacts the Plaintiffs' Fourteenth Amendment rights, it highlights the availability of injunctive relief against the Presiding Judge and the Sheriff, who can both take non-judicial action to implement equitable remedies ordered by the Court.

### A. Defendants' Policy Changes Confirm that their Reforms Are Impermanent and the Parties' Original Controversy Is Live

Defendants' retreat from a daily bond docket confirms that their reforms are not permanent and thus that Plaintiffs' entitlement to relief turns on the parties' original dispute: the constitutionality of the system as it existed when this suit was filed in June 2018. Although Defendants' pre-trial detention procedures have continued to violate the Fourteenth Amendment since the creation of the bond docket, Plaintiffs do not need to prove that the bond docket is unconstitutional in

---

does not make findings about their ability to pay their assigned bond, the need for their detention or the availability of alternate pretrial conditions that would allow for their release. ECF 369 at 24-26, 34-36.

order to win the prospective relief they seek. Instead, that relief should be granted if substantive and procedural due process prohibit Defendants from jailing people on unaffordable money bond for at least a week with no procedures for individualized findings concerning their ability to pay and the need for detention, or if due process and equal protection prohibit Defendants from jailing people in this manner while releasing people with greater access to money. Defendants sought to have litigation over these two legal questions dismissed as moot after they created the bond docket. *See* ECF Nos. 269 at 14–15, 270 at 14. The Court denied their motion in light of evidence that bond docket procedures, as they existed at the time of Defendants' motion to dismiss, had not completely remedied the practices that Plaintiffs identified as unconstitutional. *See, e.g.*, ECF No. 306 at 25, 29–30.

Alongside the incompleteness of Defendants' reforms, their impermanence is an independent reason that the controversy over Defendants' conduct at the time of filing remains live. Defendants have not renewed their call for the case to be dismissed, but they have indicated that they believe they should prevail on the merits if more recent detention procedures satisfy the Fourteenth Amendment. *See, e.g.*, ECF No. 372 at 6 ¶ 23, 10 ¶¶ 52–53 (implying that their practices at the time this suit was filed have become irrelevant); ECF No. 365 at 27–34 (arguing that the practices in place when summary judgment was briefed satisfied due process and equal protection). This approach misconceives the voluntary cessation exception to mootness, which allows litigation over originally challenged practices to continue even if a defendant abandons or alters those practices before the litigation resolves.

Just as "a defendant cannot automatically moot a case by ending its unlawful conduct once sued," a defendant cannot shift scrutiny from one set of practices to another, which would leave him "free to return to his old ways" once litigation has ended. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91–92 (2013) (quotation marks omitted). To avoid litigation over the constitutionality of their original conduct,

4

Defendants "bear[] the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). The Court must adjudicate the lawfulness of Defendants' original detention practices unless "it can be said with assurance that there is no reasonable expectation that the alleged violation[s] will recur," *and* "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979).

The present, partial dismantling of the bond docket illustrates its vulnerability to being further whittled down or completely eliminated once litigation ends, if Defendants' original procedures are not declared unlawful. Defendants have provided little information about the considerations and procedures that led them to scale back the bond docket, but it seems to have been easily done. A joint memorandum from the offices of the Public Defender and District Attorney to Judge David Guten, dated June 26, 2023, "suggest[s] the possibility of eliminating bond docket settings on Sundays and holidays," so that an attorney from the Public Defender's office will no longer have to attend court on those days. ECF No. 388-1. On September 27, 2023, counsel in this case represented that the bond docket had, by then, already been operating on a five- and six-day schedule for the past month, and that the reduced schedule would continue through November and likely into the future. ECF No. 388 ¶¶ 2, 4; ECF No. 388-2.

Plaintiffs and the Court have not been made privy to the nature of the communications among the Court, the Public Defender, the District Attorney, and the Sheriff surrounding the June 26 memorandum, or to the decision-making and logistical processes by which the Defendants eliminated one or two days of bond docketing each week. No public, formal action appears to have been taken; the Tulsa District Court did not amend its rules, and the presiding judge did not issue an

5

administrative order.² Saturday and holiday bond dockets simply disappeared from the calendar.

Defendants assure the Court that everyone they consulted agreed that their changes would not violate the Constitution. But Defendants also maintain that there was nothing unlawful about their initial pretrial detention practices. *See, e.g.*, ECF No. 371 at 7 (arguing that Defendants' right to jail anyone "under arrest . . . is a given"); *id*. at 8 (arguing that "[t]here is absolutely nothing wrong" with using ability to afford a preset bond as the basis for pretrial detention of any length); ECF No. 372 at 24–25 (arguing that use of a bail schedule is lawful); *id.* at 27–28 (arguing that Defendants do not need to provide any sort of consideration or process before jailing people on unaffordable bail for any length of time).

When a party "continues to defend the legality of [a challenged practice], it is not clear why [they] would necessarily refrain from . . . similar [conduct] in the future." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012); *see also Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (voluntary cessation does not moot dispute where defendant "vigorously defends the constitutionality of its [challenged] program, and nowhere suggests that if this litigation is resolved in its favor it will not resume using" the program). There is now clear evidence that Defendants are ready to scale back procedural protections offered to class members when faced with budgetary, political, logistical, or other pressures. Eliminating the bond docket in its entirety requires only a majority vote

---

² Administrative orders are publicly available on the Oklahoma state courts' website. All administrative orders issued by the Tulsa County District Court's presiding judge in 2023 can be accessed by visiting www.oscn.net, selecting "court records" from the menu bar at the top of the screen, choosing "Tulsa County District Court" from the drop-down menu under "Case Number Look Up," and entering "ao-2023-*" as the Case Number in the text box below.

of the Tulsa County District Court judges. *See* ECF 365 at 9 ¶ 5. A ruling that Defendants must provide adequate procedures and substantive findings before jailing class members on unaffordable bond is still needed to protect against further erosion of the partial protections offered by the bond docket procedures, which, even at their most robust, were inadequate to cure the injuries Plaintiffs sued to address. *Cf. In re L.F. Jennings Oil Co.*, 4 F.3d 887, 889 (10th Cir. 1993) ("The hallmark of a moot case or controversy is that the relief sought can no longer be given or *is no longer needed*." (quoting *Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2nd Cir. 1983) (emphasis added by *Jennings Oil* court))).

### B. Delayed Bond Hearings Exacerbate Plaintiffs' Constitutional Injuries

If the constitutionality of Tulsa County's "current" practices, rather than conditions at the time of filing, are relevant, those practices have now changed in a way that is detrimental to class members. When the bond docket occurred each day, almost all class members unable to pay pre-set bond could expect to be seen in court within thirty hours of booking, and often sooner. *See, e.g.*, ECF No. 369-3 at 197:21–199:22 (jail official testifying that people arrested in the morning hours do not appear on that day's docket and must wait for more than a day to appear on the following day's docket); ECF No. 369-11 (Plaintiffs' expert report showing that most people appear within 30 hours of arrest).

Defendants have now informed the Court that they have eliminated at least one and sometimes two bond dockets per week, with the caveat that no more than 48 hours is to elapse between dockets. ECF No. 388 at ¶ 1. Defendants imply that having a bond docket scheduled at least once every other day ensures that anyone who cannot pay for release at booking will have an appearance within 48 hours of arrest. *See id.* But that is not what the record evidence shows.

With the bond docket occurring less frequently, the period of pre-appearance detention is extended such that some people will be detained for more than two days without a hearing. Anita Wright, a Sheriff's Office employee who sets the daily bond docket, testified that someone booked into the jail at or after approximately 5:30 A.M will not appear on that day's docket. *See* ECF No. 369 at 5 ¶ 13; ECF No. 369-3 at 198:4–7. Thus, for example, a person arrested at 6 A.M. on Friday morning will not attend the bond docket that day. Under the previous policy, that person would have been seen at Saturday's bond docket. Under the new policy, that person would now not appear before Sunday, leaving them incarcerated for over 48 hours.

These additional hours of incarceration are significant. Before September, people routinely appeared in court within 30 hours of booking. Now, dozens of people each week—people arrested the day before a cancelled bond docket—are jailed for an additional day without any type of individualized consideration. *See* ECF No. 369-5 at 51:18–24 (First Assistant Public Defender testifying that approximately 30 people appear on bond docket each day). People arrested in the morning on a Friday or the day before a holiday, in the hours after the 5:30 cut-off, will wait 50 or more hours to appear—a two-thirds increase in the amount of time they are jailed before having any opportunity for an individualized consideration of the need for their ongoing incarceration.

Plaintiffs' expert has shown that even small increases in periods of pretrial detention increase the likelihood of conviction and more severe sentences, lead to higher rates of recidivism, and worsen post-release employment prospects. ECF No. 369-13 at 3–6. Meanwhile, the monetary bond amounts that inflict such harms on people who cannot pay them do not improve appearance rates or reduce recidivism among people who can. *Id*. at 4, 6–9. The indiscriminate detention between booking and bond dockets that occurred under Defendants' previous practices already implicated a fundamental right, without advancing a governmental purpose. *See* ECF

No. 373 at 18–19, 21–23, 28–30. Defendants' new practice leaves class members worse-off than before, with the possibility of incarceration for more than two days, a period of time that well exceeds the brief detentions that have been found too de minimis to implicate fundamental rights. *See Baker v. McCollan*, 443 U.S. 13, 144 (1979); *Doe v. Bagan*, 41 F.3d 571, 575 (10th Cir. 1994).

### C. Bond Docket Scheduling Changes Confirm the Administrative Role of Certain Defendants and the Availability of Injunctive Relief

Defendants' reconfiguration of the bond docket demonstrates the degree to which Plaintiffs' Fourteenth Amendment rights are impacted by purely administrative acts. Injunctive relief can and should issue against the Presiding Judge and the Sheriff to the extent that they have the authority to take administrative, non-judicial acts to ensure protection of Plaintiffs' constitutional rights. *Hartman v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1127 (9th Cir. 2013) (plaintiffs entitled to injunctive relief against government official "who can appropriately respond" to an equitable order); *cf. DeVargas v. Hanger-Silas Mason Co.*, 844 F.2d 714, 718 (10th Cir. 1988) (plaintiff suing government official for prospective equitable relief "seeks to change the behavior of the governmental entity" over which the defendant has authority).

The Presiding Judge (currently, Judge Drummond), who is sued for both declaratory and injunctive relief, has argued that his only acts with an impact on Plaintiffs' pre-trial liberty and equality interests are judicial, as they are acts that "[o]nly a judge may take." ECF No. 365 at 35. The Presiding Judge submits that his conduct within Tulsa County's pretrial detention scheme involves interpreting the law, establishing legal guidelines, and determining applicable bond amounts—none of which, he argues, can be enjoined. *Id*. at 37–38.

9

But, as shown above, Defendants' recent scheduling change has a major impact on class members' liberty interests. When, where, and how court appearances are held determines in substantial part the nature of the process that Plaintiffs' receive when stripped of their liberty awaiting trial. *See, e.g.*, ECF No. 369 at 33–36 (because of the audio and video setup of bond docket, class members cannot hear, see, or communicate with everyone in the court room, including their own attorneys, or review physical evidence). The Presiding Judge's authority to direct the days and times on which certain dockets will occur, and a jail administrator's decisions about who will appear on which day's docket are among the non-judicial acts that the Presiding Judge and Sheriff can take to prevent future due process and equal protection violations in compliance with an injunction issued by this Court.

### III. Summary Judgment Should Be Granted to Plaintiffs and Denied to Judicial Defendants

For these reasons, and the reasons given in Plaintiffs' previously filed briefs, the Court should grant Plaintiffs' summary judgment motion and deny Judicial Defendants' cross motion.

Date: October 24, 2023

/s/ Hayley Horowitz
Hayley Horowitz
Still She Rises, Inc.
608 E. 46th Street
North Tulsa, OK 74126
hayleyh@stillsherises.org
phoebek@stillsherises.org
918-392-0867

Marco Lopez*
Civil Rights Corps
1601 Connecticut Avenue NW
Suite 800

Washington, D.C. 20009
marco@civilrightscorps.org
202-844-4975

Allison Holt Ryan*
Hogan Lovells US LLP
555 13th Street NW
Washington, D.C. 20004
allison.holt-ryan@hoganlovells.com
202-637-5600

Peter William Bautz*
Hogan Lovells US LLP
390 Madison Avenue
New York, NY 10017
peter.bautz@hoganlovells.com
212-918-3000

*Admitted to practice *pro hac vice*

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiffs' Supplemental Summary Judgment Brief was served on October 24, 2023 via the Northern District of Oklahoma CM-ECF system upon all counsel of record.

/s/ Hayley Horowitz