# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

RICHARD FELTZ and ASHTON    )
LEE DENNIS, on behalf of    )
themselves and all others similarly    )
situated,    )
   )
   Plaintiffs,    )
   )
-vs-    )    Case No. 18-cv-0298-SPF-JFJ
   )
VIC REGALADO, *et al.,*    )
   )
   Defendants.    )

## <u>ORDER ON MOTIONS FOR SUMMARY JUDGMENT</u>

# **TABLE OF CONTENTS**

**Page No.**

I.    INTRODUCTION ...................................................................................... 1

II.   PROCEDURAL HISTORY ....................................................................... 1

III.  FACTS ESTABLISHED FOR SUMMARY JUDGMENT
PURPOSES............................................................................................. 3

     A.   The named plaintiffs ........................................................... 5

     B.   The defendants .................................................................... 6

     C.   The Tulsa County bail system ........................................... 6

     D.   The Tulsa County court rules and the bond docket ........................ 8

     E.   The expert testimony.......................................................... 18

IV.  RELIEF SOUGHT................................................................................... 19

V.   WHAT THIS CASE DOES NOT INVOLVE........................................ 22

VI.  OVERVIEW ........................................................................................... 23

VII. THRESHOLD ISSUES .......................................................................... 25

     A.   Injunctive relief is available against the Presiding Judge............... 25

     B.   The Prison Litigation Reform Act is inapplicable............................ 26

     C.   Injunctive relief is available against the Tulsa County Sheriff ...... 27

     D.   *O'Shea* abstention is not required.................................................. 29

VIII. THE MERITS ......................................................................................... 37

     A.   Plaintiffs' claims are governed by the Due Process and Equal
Protection clauses of the Fourteenth Amendment.......................... 37

          1.   Fourth Amendment ................................................................. 37

          2.   Sixth Amendment.................................................................... 39

          3.   Eighth Amendment ................................................................. 39

     B.   Substantive due process ................................................................. 42

     C.   Procedural due process ................................................................... 44

          1.   Which test?............................................................................. 44

          2.   Analysis under Mathews and Medina ..................................... 46

i

       3.    The Mathews test ................................................... 50

       4.    The Medina test .................................................... 57

   D.   Equal protection ......................................................... 60

       1.    Preliminary matters ............................................... 60

       2.    There is no "absolute deprivation" of an arrestee's liberty interest in pretrial release if he receives a due process-compliant hearing within 48 hours of arrest .......................... 64

       3.    The absence of a due process-compliant hearing within 48 hours is an "absolute deprivation," within the meaning of *Rodriguez*, of the arrestee's liberty interest in pretrial release ................................................................ 65

       4.    Because of the absolute deprivation of the plaintiffs' liberty interest in pretrial release, the *Bearden* analytical framework applies ................................................ 66

       5.    Applying the *Bearden* analytical framework, the court concludes that Tulsa County's secured bail system violates the Equal Protection Clause ...................................... 67

IX.   RELIEF ............................................................... 69

X.    CONCLUSION ......................................................... 71

## I.  INTRODUCTION

Plaintiffs, Richard Feltz and Ashton Dennis, represent a class consisting of individuals who are or will be detained in the Tulsa County jail because they are unable to post cash bail or pay the cost of a bail bond.  For themselves and on behalf of the class, they challenge Tulsa County's secured bail system on due process and equal protection grounds.  The defendants named in the Second Amended Class Action Complaint, doc. no. 259, are the Tulsa County Sheriff, Special Judges serving in the District Court of Tulsa County, and the Presiding Judge of the District Court of Tulsa County.[1]

Plaintiffs seek only prospective injunctive and declaratory relief.  Now before the court are the parties' cross motions for summary judgment.

## II. PROCEDURAL HISTORY

In an order entered on September 29, 2021 (Rule 12 Order), the court comprehensively summarized the somewhat convoluted procedural history of this case to that date.  Doc. no. 306.  That history will be repeated here only to the extent necessary to show what issues have been decided and what issues are now before the court for resolution.

The undersigned and Judge Claire Eagan, the judge to whom this case was originally assigned, have ruled on several threshold issues–issues which, consequently, are no longer before the court.  Judge Eagan addressed standing in her March 15, 2019 Opinion and Order, doc. no. 48.  In the Rule 12 Order, after the case was transferred, the court addressed standing, mootness, Eleventh Amendment immunity (and application of Ex Parte Young), and other commonly-encountered 42 U.S.C. § 1983 issues.  Specifically, the Rule 12 Order determined issues as to the

---

[1] The Board of County Commissioners of Tulsa County was also a defendant.  The Board was voluntarily dismissed in May, 2021.

amenability of the Sheriff to suit as a county actor (he was dismissed as a defendant sued in that capacity), the amenability of the Sheriff to suit as a state actor (he was not dismissed in that capacity), the Presiding Judge's amenability to suit (including mootness, judicial immunity and Eleventh Amendment immunity), and the Special Judges' amenability to suit (also including standing, mootness and Eleventh Amendment immunity).

This left the defendants–named in their official capacities only–to defend plaintiffs' claims that:

> Count One:  The sheriff to the extent he is named as a state actor (not as a county actor) and the presiding judge violate plaintiffs' equal protection rights and due process protections against wealth-based detention by detaining and jailing plaintiffs because plaintiffs cannot afford a monetary payment.

> Count Two:  The sheriff to the extent he is named as a state actor (not as a county actor), the presiding judge and the special judges detain and jail plaintiffs without procedural due process protections.

Rule 12 Order, doc. no. 306, at 32.

Then came class certification and Daubert motions.  By order entered on March 16, 2023, the court certified the class consisting of all individuals "who are or will be detained prior to their initial arraignment in the Tulsa County Jail because they are unable to pay a secured financial condition of release."  Doc. no. 357.  On the same day, the court denied all parties' Daubert motions, doc. no. 356, and set a scheduling conference, which led to entry of a scheduling order for motions for summary judgment.  Doc. no. 361.

The summary judgment papers before the court consist of:

- Plaintiffs' Motion for Summary Judgment, doc. no. 368, filed on May 28, 2023.
- Plaintiffs' Brief in Support of Motion for Summary Judgment, doc. no. 369, filed on May 28, 2023.

- Defendant State Judges' Response to Plaintiffs' Motion for Summary Judgment, doc. no. 372, filed on June 26, 2023.

- Plaintiffs' Reply to Defendant States Judges' Response to Plaintiffs' Motion for Summary Judgment, doc. no. 384, filed on July 20, 2023.

- Defendant Regalado's Brief in Opposition to Plaintiffs' Motion for Summary Judgment, doc. no. 371, filed on June 25, 2023.

- Plaintiffs' Reply to Defendant Regalado's Response to Plaintiffs' Motion for Summary Judgment, doc. no. 380, filed on July 19, 2023.

- Defendant State Judges' Motion for Summary Judgment, doc. no. 365, filed on May 26, 2023.  (Adopted by defendant Regalado.  Doc. no. 366.)

- Plaintiffs' Response to Defendant State Judges' Motion for Summary Judgment, doc. no. 373, filed on June 27, 2023.

- Defendant State Judges' Reply to Plaintiffs' Response to Defendant State Judges' Motion for Summary Judgment, doc. no. 378, filed on July 19, 2023.

In September, 2023, after the briefing listed above was completed, the defendant state judges filed a notice of a "pilot test" (expected to become permanent) of a revision to bond docket scheduling.  *See*, Defendant State Judges' Notice to the Court of Expected Change to Tulsa County Bond Docket, doc. no. 388, filed on September 27, 2023.  This triggered an additional round of briefing:

- Plaintiffs' Supplemental Summary Judgment Brief, doc. no. 391, filed on October 24, 2023.

- Judicial Defendants' Response to Plaintiffs' Supplemental Summary Judgment Brief, doc. no. 392, filed on November 11, 2023.

- Plaintiffs' Reply in Support of Their Supplemental Summary Judgment Brief, doc. no. 393, filed on November 14, 2023.

## III.   FACTS ESTABLISHED FOR SUMMARY JUDGMENT PURPOSES

Under Rule 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Rule 56(a), Fed. R. Civ. P.   Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant

3

is entitled to judgment as a matter of law." *Id*. In deciding whether summary judgment is appropriate, the court does not weigh the evidence and determine the truth of the matter asserted, but only determines whether there is a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. A fact is "material" if under the substantive law it is essential to the proper disposition of the claim. *Id*. In adjudicating a motion for summary judgment, the court views the evidence and draws all reasonable inferences therefrom in the light most favorable to the nonmoving party. McGehee v. Forest Oil Corporation, 908 F.3d 619, 624 (10th Cir. 2018).

"Cross-motions for summary judgment are treated as two individual motions for summary judgment and held to the same standard, with each motion viewed in the light most favorable to its nonmoving party." Banner Bank v. First American Title Insurance Company, 916 F.3d 1323, 1326 (10th Cir. 2019). The denial of one motion does not require the grant of the other. *See*, Buell Cabinet Co. v. Sudduth, 608 F.2d 431, 433 (10th Cir. 1979). When the parties file cross-motions for summary judgment, the court is entitled "to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation marks and citation omitted).

Accordingly, for purposes of ruling on the parties' respective Rule 56 motions, the court looks to (and records here) only the facts established with the clarity demanded by Rule 56 (*e.g.*, "no genuine dispute"), indulging all reasonable inferences favorable to the nonmoving party, as discussed above.

**A. The named plaintiffs.**

Plaintiff Richard Feltz was arrested on felony charges on June 2, 2018, and booked into the Tulsa County jail, where bond was set in excess of $50,000.  He had a probable cause hearing–not to be confused with a detention hearing–on June 3.  He spent seven days in jail.  He filed this action on June 6, 2018, while still detained in the jail.  Formal charges were filed in Tulsa County against Mr. Feltz on June 8, six days after the arrest.

In October, 2018, about four months after this action was filed, the Tulsa County judges established the "bond docket" (explained below).[2]

Plaintiff Ashton Dennis–disabled from birth and living on disability assistance–was arrested on felony charges and booked into the jail on December 15, 2020.  The charges were filed on December 18.  He moved to join this action as a named plaintiff before he was arraigned and while he remained detained.  He was arraigned on December 21 (and did not appear at the arraignment).  After Mr. Dennis was arrested, he was assigned a bond and remained in jail through the date of his bond docket appearance and his arraignment, at which time he completed a pauper's affidavit and was assigned a public defender.  The Bail Project[3] posted bond for Mr.

---

[2] It is not unusual–and not in any sense a cause for criticism–for state or local authorities to revise their bail-related practices after bail litigation is filed. See, *e.g.*, Daves v. Dallas County, Texas, 64 F.4th 616, 620 (5th Cir. 2023), *cert. denied*, 144 S.Ct. 548 (Jan. 8, 2024) (statutory revision of bail bonding requirements); Schultz v. Alabama, 42 F.4th 1298, 1309 (11th Cir. 2022), *cert. denied sub nom.* Hester v. Gentry, 143 S.Ct. 2610 (2023) (new system adopted sixteen days before preliminary injunction hearing); Walker v. City of Calhoun, 901 F.3d 1245, 1252 (11th Cir. 2018), *cert. denied*, 139 S.Ct. 1446 (2019) (new rule adopted, providing for prompt hearing and additional release options); ODonnell v. Harris County, 892 F.3d 147, 159 (5th Cir. 2018) (ODonnell I), 892 F.3d, 160, *overruled on standing, justiciability and abstention* by Daves v. Dallas County, Texas, 22 F.4th 522 (5th Cir. 2022), and *overruled on Younger abstention* by Daves v. Dallas County, Texas, 64 F.4th 616 (5th Cir. 2023), *cert. denied*, 144 S.Ct. 548 (Jan. 8, 2024) ("new efforts" to improve "bail-setting procedures");  Pugh v. Rainwater, 572 F.2d 1053, 1058 (5th Cir. 1978) (revised rule elaborating on release options).

[3] The Bail Project is an organization that makes bond for selected indigent arrestees by depositing in cash the entire amount (up to $5,000) required.  Doc. no. 369-5, p. 147.

Dennis on December 29, and he was released.  The charges were dismissed at the instance of the State on February 23, 2021.[4]

## B. The defendants.[5]

The defendants are the Presiding Judge of the District Court of Tulsa County, the Special District Court Judges of that court (Judicial Defendants), and the County Sheriff (Sheriff).[6]  In the Rule 12 Order, doc. no. 306, the court dismissed plaintiffs' claims with prejudice as to the Sheriff as a *county* actor but retained the Sheriff as a defendant in his capacity as a *state* actor. *Id.* at 31.  There are no individual-capacity defendants in this action.

## C. The Tulsa County bail system.

Tulsa County uses a "Preset Bond Schedule."  Doc. no. 369-22.[7]  The schedule applies to everyone booked into the jail.  Doc. no. 372, at 5.  The schedule governs

---

[4] Of note but ultimately immaterial is the fact that Mr. Dennis was arrested on a state felon-in-possession charge on August 10, 2021.  He posted bond, was released, and later entered a guilty plea.

[5] Not much elaboration is required here as to the official status and duties of the various defendants, all of whom are involved, in one way or another, with administration of the District Court of Tulsa County or with the process by which arrestees are moved through the post-arrest and pre-trial stages of criminal cases in that court.  Their duties and their official character were addressed at length at an earlier stage of this action, as set forth in the Rule 12 Order, doc. no. 306.  Those matters were addressed in detail in plaintiffs' principal summary judgment brief, doc. no. 369, at 4-6, and, as relevant here, admitted by the defendants. *See*, doc. no. 372, at 4-5 (State Judges' response) and doc. no. 371, at 3-4 (Sheriff).

[6] The Presiding Judge, automatically substituted as a party as of January 1, 2024, is the Honorable Dawn Moody (in place of Judge Douglas Drummond).  Effective as of other dates, Special Judges Shannon Taylor, Todd Chesbro and Melissa East have been automatically substituted for Special Judges Stephen Clark, Rich Hathcoat and Ann Keele.  Doc. no. 396.

[7] Except where noted, references to evidentiary materials are to the internal page number (such as a page cited in a deposition transcript) rather than to the ECF page.  Where "undisputed material facts" from the parties' briefs are cited in this order (indicated in every instance with a ¶ symbol), the fact as stated in the brief is not materially disputed by the opposing party or parties.  Assertions (regardless of the party making the assertion) purporting to dispute undisputed material facts, but not supported by record citations, are disregarded. *See*, LCvR56-1.

an arrestee's release–or not–until he is seen by a judge.  *Id*.[8]  A representative page of the 28-page schedule is p. 7:[9]

| | | | |
|---|---|---|---|
| 21-1268-0003 | CONSPIRACY TO COMMIT TERRORISM | FELONY | $0.00 |
| 21-1516 | CONSUMER FRAUD | MISDEMEANOR | $500.00 |
| 37-8 | CONSUMING/INHALING INTOXICANTS IN PUBLIC PLACE | MISDEMEANOR | $100.00 |
| 27-304-A1B | CONTEMPT COURT/REFUSE SWORN | MISDEMEANOR | $300.00 |
| 99-18 | CONTEMPT OF COURT (CIVIL) | MISDEMEANOR | $0.00 |
| 21-856-3 | CONTRIBUTE DELIQUENCY MINOR 2ND OFFENSE | FELONY | $1000.00 |
| 21-856 | CONTRIBUTE DELIQUENCY OF MINOR | MISDEMEANOR | $500.00 |
| 99-01 | COURT COST | MISDEMEANOR | $0.00 |
| 99-02 | COURT COST REVIEW | MISDEMEANOR | $0.00 |
| 99-24 | COURT SANCTION | MISDEMEANOR | $0.00 |
| 47-6-301.2-1 | CREATE/MANUF/DISPLAY COUNTERFEIT/FICT DL AFCF | FELONY | $20000.00 |
| 21-1550.41-C | CREATE/MANUF/PUBLISH/SELL FALSE/FICT ID DOCUMENT | FELONY | $10000.00 |
| 21-1550.41-C-1 | CREATE/MANUF/SELL FALSE/FICT ID DOCUMENT AFCF | FELONY | $20000.00 |
| 47-6-301.2(A-E) | CREATE/PUBLISH/DISPLAY/MANUF COUNTERFEIT/FICT DL * | FELONY | $10000.00 |
| 21-886-A | CRIME AGAINST NATURE | FELONY | $10000.00 |
| 47-11-1401-J | CROSS CENTER MEDIAN | MISDEMEANOR | $100.00 |
| 21-1685 | CRUELTY TO ANIMALS | FELONY | $2000.00 |
| 21-1685-01 | CRUELTY TO ANIMALS AFCF | FELONY | $8000.00 |
| 21-649.1 | CRUELTY/INTERFERE POLICE DOG/HORSE | FELONY | $4000.00 |
| 21-649.1-01 | CRUELTY/INTERFERE POLICE DOG/HORSE AFCF | FELONY | $8000.00 |
| 63-2-509 | CULTIVATION OF MARIJUANA | FELONY | $5000.00 |
| 63-2-509-A | CULTIVATION OF MARIJUANA AFCF | FELONY | $10000.00 |
| 63-2-509-A2 | CULTIVATION OF MARIJUANA PRESENCE MINOR | FELONY | $5000.00 |
| 63-2-509-A2-01 | CULTIVATION OF MARIJUANA PRESENCE MINOR AFCF | FELONY | $10000.00 |
| 21-1167 | DAMAGE BURIAL MARKER/STRUCTURE | MISDEMEANOR | $500.00 |
| 21-1161-A | DAMAGE/VIOLATE BURIAL SITE | FELONY | $10000.00 |
| 21-1265.3 | DEFECTIVE ARTICLES WAR/DEFENSE | FELONY | $20000.00 |
| 47-12-204 | DEFECTIVE LIGHTS OTHER THAN H/LIGHTS | MISDEMEANOR | $100.00 |
| 47-12-101 | DEFECTIVE VEHICLE/IMPROPER EQUIP | MISDEMEANOR | $100.00 |
| 21-1503-A1 | DEFRAUD AN INNKEEPER (LESS $20) | MISDEMEANOR | $500.00 |
| 21-1503 | DEFRAUD INNKEEPER  UNDER $1000.00 | MISDEMEANOR | $250.00 |
| 21-1503-A | DEFRAUD INNKEEPER (MORE T/$500) | FELONY | $2000.00 |
| 21-1503-A-01 | DEFRAUD INNKEEPER (MORE T/$500) AFCF | FELONY | $4000.00 |
| 63-2-402-B07 | DELIVER CD | FELONY | $7500.00 |
| 63-2-402-B08 | DELIVER CD AFCF | FELONY | $15000.00 |
| 63-2-402-C06 | DELIVER MARIJUANA | FELONY | $5000.00 |
| 63-2-402-C07 | DELIVER MARIJUANA AFCF | FELONY | $10000.00 |
| 63-2-402-C10 | DELIVER MARIJUANA PRESENCE MINOR | FELONY | $10000.00 |
| 63-2-402-C11 | DELIVER MARIJUANA PRESENCE MINOR AFCF | FELONY | $20000.00 |

As can be seen, the preset bond for a recidivist drug dealer ("DELIVER CD AFCF") is $15,000.  The recidivist drug dealer who can afford to post the assigned bond will go free immediately after booking, without seeing a judge (and, consequently, with no judicial assessment of danger to the community).  Doc. no.

---

[8] If an arrestee comes in on a warrant, the applicable bond amount, per the schedule, is endorsed on the warrant.  Doc. no. 308, p. 12, par. 60.

[9] If the relevant entry on the bond schedule is "0.00," the arrestee has to "wait to see a judge in order for the judge to set the bond."  Doc. no. 369-3, p. 55.

369-1, pp. 35-36; 369-2, p. 39; doc. no. 369-3, pp. 88-89.[10]  The officer who releases arrestees who can meet the demands of the preset bond schedule is the Sheriff, acting under the mandatory language of Tulsa County rules CR 1 and CR 2, with no judicial involvement.  Tulsa County CR 1, CR 2, doc. nos. 365-1, 365-4.  The net result, as described by Judge David Guten, is that an arrestee who can post a preset bond "will not sit in the jail."  Doc. no. 369-4, at 102.  He departs "immediately after booking."  Doc. no. 372, at 6, ¶ 21.  And an arrestee who cannot afford the assigned bond will stay in jail.  Doc. no. 369-2, at 39; doc. no. 369-3, at 56.

**D. The Tulsa County court rules and the bond docket.**

At the time this action was filed in June, 2018, the initial arraignment was the arrestee's first court appearance.  Doc. no. 369-3, at 156.  In October, 2018, by Administrative Order 2018-09 (later embodied in Tulsa County CR 2, doc. no. 369-30), the court established a "bond docket."  The bond docket is a proceeding that was incorporated into the Tulsa court's criminal process at the pre-arraignment stage.  The bond docket should be understood in light of the evolution of Tulsa County's rules governing arraignments and bail bonding.

Tulsa County CR 1 requires a probable cause hearing, within 48 hours after arrest, for arrestees held in the county jail.  Doc. no. 365-1.  Arraignment must occur within six days after booking.  *Id.*

Tulsa County now has a fairly elaborate court rule (CR 2, labeled "Pre-established Bail and Initial Appearance") governing release on bail.  Doc. no. 369-30.  That version of the rule became effective on August 22, 2019 (and, thus, was in force when plaintiff Ashton Dennis was arrested).  The previous version of the rule, effective when plaintiff Feltz was arrested in June, 2018, was much shorter:

---

[10] The arrestee "sometimes can be retained on the booking floor for a period of time, an hour or two, and try to help facilitate the expeditious movement and bonding of that individual."  Doc. no. 369-2, p. 36.

> All initial arraignments, except felony traffic offenses, shall be held at the times established by the Presiding Judge and judges assigned to the Criminal Division.
>
> When the Courthouse is closed to public business, judicial reviews of Affidavits of Arrest will be conducted by a Magistrate by 7:00 a.m. on designated days at the Tulsa County jail. The dates of the judicial reviews when the courthouse is closed and a list of Magistrates assigned to this duty will be provided by the Presiding Judge.

Doc. no. 365, p. 6, ¶ 2.[11]

The new version of CR 2 (applicable by its own terms only in Tulsa County):

- "Adopts and affirms" the previously-established bail schedule.

- Provides a non-exclusive list of considerations relevant to fixing bail, including "the probability that the accused, if free, will appear at trial," the "seriousness of the crime charged," the arrestee's reputation and "his or her financial condition."

- Expresses "the opinion of the Court" that the use of the preset bond schedule "'provides speedy and convenient release for those who have no difficulty in meeting its requirements'" (quoting Pugh v. Rainwater, 572 F.2d 1053, 1057 (5th Cir. 1978).[12]

- Provides that those who do not bond out per the preset bond schedule within 48 hours of arrest will be brought before the court for "appearance via video transmission or teleconference at a time to be set by the Court." This is the bond docket.

Doc. no. 369-30, pp. 1-2.

The bond docket appearance for new arrestees is held before the arraignment.

Under CR 2, arrestees who do not have retained counsel will be represented by appointed counsel "for the limited purpose of determining the appropriate conditions

---

[11] The previous version of the rule was actually a court rule for Oklahoma's Fourteenth Judicial District, which includes Tulsa County and Pawnee County. Because (i) Tulsa County is the only county involved in this case, and (ii) the new version of the rule applies only to Tulsa County, the rule will, for simplicity and clarity, be referred to as a Tulsa County rule.

[12] The court cannot but note that, in quoting that sentence from Pugh v. Rainwater, the rule omits the very next sentence: "The incarceration of those who cannot [meet the requirements of a bond schedule] without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements." 572 F.2d at 1057.

of release."  Doc. no. 369-30, p. 3.  Individuals facing charges for which there is a preset bond who appear at the bond docket are presumed to be unable to bear the cost of a bond.  Doc. no. 369-4, p. 102.

CR 2 does not require the judge to make a finding as to whether the conditions imposed by the court will amount to an order of detention, nor does it require judges to consider conditions less restrictive than a bond amount that will *de facto* result in pretrial detention.

On the day of his bond docket appearance, Mr. Dennis was told he "had court," and was taken to a "video courtroom" in the jail.  He was told this would be a bond hearing and that "the Public Defender's Office was there [*i.e.*, in the actual courtroom, with the judge]."  Doc. no. 369-8, at 17-18.  In the courtroom at the courthouse, the judge "read off my charges" and was "talking back and forth with the DA and the Public Defender's Office," but Mr. Dennis couldn't hear what was being said.  *Id.* at 19.  At the bond hearing, Mr. Dennis was not asked about his disability, or his employment status, or what bond he could afford.  *Id.* at 16 (disability); 22.  Some of the charges were dismissed, his bond was reduced to $4,000 and he was taken "[b]ack to the pod."  *Id*. at 19-20.

Initially, the bond docket was held five days a week.  Doc. no. 369-4, p. 119.  That was later expanded to seven days a week.  *Id.*  In the fall of 2023, the schedule was cut back to six days (but not holidays) a week.  Doc. no. 388.[13]  As plaintiffs point out and the Judicial Defendants acknowledge, this change will result in some arrestees not being seen at a bond docket until more than 48 hours after arrest, even

---

[13] The court was notified of this change via a filing describing it as an "expected change."  Doc. no. 388, filed on September 27, 2023.  That triggered another round of briefing.  The Judicial Defendants' contribution to that round proceeds on the basis that the "expected" change is now in place and will stay in place.  Doc. no. 392, filed on November 7, 2023.

though CR 2, which is still on the books, requires a hearing within 48 hours of arrest. Doc. nos. 391, 392.

On the day of an arrestee's bond docket appearance, he is told that he "will be going to court that morning. They'll have a bond docket." Doc. no. 369-3, p. 120. The judge "is going to look at their bond to see what they're going to do with it." *Id*. at 121. The arrestee is informed "that this is not a factual hearing. That this is just a bond hearing." *Id*. Court reporters do not attend the bond docket. Doc. no. 369, p. 16, ¶ 66.

The judge presiding at the bond docket will have an NCIC report on the arrestee's criminal history. Doc. no. 369-4, p. 30. "The only one who gets the NCICs is the judge." *Id*. at 31. The judge will also have the arrest and booking sheet, as well as the probable cause affidavit and a printout showing the arrestee's previous stays in the Tulsa County jail. The judge may also have an "early"[14] recommendation suggesting an arrestee may be a candidate for pretrial release, but normally it is the appearance at the bond docket itself that triggers a referral for investigation by Court Services (a court unit similar in some ways to the probation office in a federal court) as to suitability for release. Those individuals remain in jail pending the completion of the investigation and possible entry of an order of release. Doc. no. 369-5, p. 146. Referral to Court Services provides no assurance that the judge will ultimately order the release of the arrestee. Doc. no. 369-5, p. 146-147.

Bond docket judges do not typically inform arrestees appearing on the bond docket about the governing legal standards, or explain the factors that will inform their decision. Doc. no. 369, p. 11, ¶ 40. They routinely tell arrestees not to talk about their cases. Doc. no. 369, p. 11, ¶ 44. They do ask questions about the

---

[14] Doc. no. 369-4, at 30 (Judge Guten).

arrestee's employment, other sources of income, persons who might help post bond, length of residence in Tulsa County and other pending criminal matters.  Doc. no. 369-4, pp. 43-44.  Anita Wright, Tulsa County's long-time "court liaison/detention officer," recalled no instance in which the judge informed an arrestee at the bond docket that he had the right to present evidence or testimony or the right to "examine the evidence presented against them."  Doc. no. 369-3, pp. 33, 237.  The arrestee does not have the opportunity to see the arrest and booking report.  *Id.* at 227.  The public defender does not have the opportunity "to meet with or physically provide arrestees with pieces of paper prior to bond docket."  Doc. no. 369-5, p. 198.  The defender could give papers "to the jail, but we would have to depend on them to give them to the detainees."  *Id.*

Sometimes–presumably in cases in which pretrial release is obviously a lost cause–the public defender appointed for purposes of the hearing will waive the hearing.  Doc. no. 369-4, p. 74.  And sometimes, an arrestee's bond conditions will be agreed upon by the attorneys in the courtroom "before we actually start bond court," *e.g.*, before the arrestee even joins the video feed for his bond docket hearing.  Doc. no. 369-3, p. 242-43.

Whether for the bond docket or for arraignment several days later, arrestees are brought to a room at the county jail "which is usually pretty full, and the judge would proceed [via video link from the courthouse] with the arraignments first, and when those were complete, he would start the bond docket."  Doc. no. 369-5, p. 29.[15]  The bond docket judge consistently sees about thirty arrestees a day.  Doc. no. 369-5, p. 51.

---

[15] During the COVID pandemic, to reduce crowding in the room at the jail, defendants were arraigned in absentia.  Doc. no. 369-5, p. 31.

Appearing via video feed from the jail, arrestees can see and hear the judge, but they cannot always see and hear the other participants, including prosecutors and public defenders.  Doc. no. 369, p. 10, ¶ 35.  There is only one microphone in the courtroom, and that is the one in front of the judge.  Doc. no. 369-4, p. 35.  So the judge will, if necessary, "summarize and repeat [for the benefit of the arrestee, who is not in the courtroom] what's been said by the public defenders." *Id.* at 36 (Judge Guten).[16]  The video camera is pointed only at the judge, so the arrestee cannot see who else is in the courtroom.  Doc. no. 369-5, p. 69.  On those "very rare[]" occasions when a witness appears at the bond docket (typically in a "domestic dispute"), the witness will speak with the judge, but the arrestee will not be able to hear the substance of the conversation.  *Id.* at 69-70.

The public defender has no opportunity to privately speak with the arrestee before or during the bond docket.  The court liaison/detention officer explained that the arrestee "may ask the judge to speak with [a public defender] after the bond docket, but not before or during the bond docket."  Doc. no. 369-3, p. 267.  If "they ask for [a private meeting] during, there would not be anyplace for them to have a private conversation." *Id.* at 268.

Witnesses are not called, examined and cross-examined in the usual sense at the bond docket.  Judge Guten described it as follows:

Q:  Is either side allowed to present witnesses as a part of bond docket?

A:  Yeah, absolutely, if -- if they -- if they have somebody there or they want to bring somebody in.  And, you know, again, pre-COVID, there have been instances where family members have been in the room or -- or somebody else has appeared, and -- and I will let them observe

---

[16] The Judicial Defendants assert, with no citation to record evidence, that "Public Defenders have chosen at times to appear from the jail with their client(s)."  Doc. no. 372, at 7, ¶ 35.  This assertion must be disregarded for lack of a citation to support in the record.  However, it should be noted that if an attorney were to appear via video from the room full of arrestees in the jail rather than in the courtroom, then *neither* the attorney *nor* the client would be able to count on being able to hear what the persons–*e.g.* the prosecutor–in the courtroom other than the judge may be saying.

the proceedings. I may ask them questions. The public defender may get information from them and make argument from the family. Yeah, absolutely, they're -- they're not stopped from doing that at all.

Q: Do you generally swear those witnesses regardless of who brings them in?

A: I -- I don't think that I have.

Doc. no. 369-4, p. 68.

Public defender Stuart Southerland described the appearance of witnesses as follows:

Q: So if witnesses appeared to speak to the judge about -- sorry, let me try this again. On occasion, a witness would appear in the courtroom to speak with a judge about a person's bond docket appearance; is that right?

A: Correct.

Q: And from the jail, you and the defendant would not be able to hear the substance of that conversation; is that right?

A: That's correct.

And I should point out, this would be very unusual. I mean, this did not happen probably even every month. It was a rare occurrence.

Doc. no. 369-5, p. 70-71.

In most cases, the outcome of the bond hearing is that the court sets a "a monetary condition of release." Doc. no. 369-3, p. 243. That said, the bond docket judge does have the authority to lower or eliminate monetary bond conditions, and can impose non-monetary conditions of release with or without accompanying monetary conditions. Doc. no. 369, p. 12, ¶ 47. A number of non-monetary release conditions and resources can be employed, such as GPS monitoring, alcohol-monitoring, house arrest, prohibitions against operating a motor vehicle, no-contact orders, or surrender of firearms. The public defender's office and Tulsa County Pretrial Services both have programs for collecting arrestees' phone numbers in order to send court reminders, the public defender's office can arrange for transportation to court, and pretrial services can arrange for regular check-ins or

14

access to services that assist with food, shelter, and clothing.  Doc. no. 369, p. 12, ¶ 48.

In some cases, the arrestee will tell the bond docket judge that he can't afford the preset bond, but the court will nonetheless set bond at an amount higher than he says he can afford.  Doc. no. 369-3, p. 247; 369-5, p. 113.[17]  In some cases the judge does, and in some cases the judge does not, explain the reasons for the determination of the bond amount.  Doc. no. 369-3, p. 246.  As for the record of the bond hearing, the court minutes typically (there are exceptions–*see*, doc. no. 372-5, p. 12, finding "risk to the community") do not specify "the justification for the ruling."  Doc. no. 369-4, p. 57 (Judge Guten).

In June, 2019, after the bond docket was established but before the bond docket procedure was codified in CR 2, of 403 arrestees who appeared on bond docket, 13 were granted personal recognizance, 90 had their initial bond amounts reduced, and most of the rest had their initial bonds unchanged. Among the 90 whose bond amounts were reduced, fewer than half had been released from jail by five days after their appearance, and 14 more were released sometime between one week after their bond docket appearance and the date of the public defender's report in July. Doc. no. 369, p. 13, ¶ 53.

In July 2019, out of 470 arrestees who appeared on bond docket, 71 were granted personal recognizance, 144 had their bail reduced, and most of the rest had their initial bonds unchanged. Among the 144 whose bond amounts were reduced, 47 had been released from jail by five days after their appearance, and 16 more

---

[17] The court notes that, in appropriate cases, and with the benefit of a meaningful hearing, this would be the state court equivalent of a federal court order of detention without conditions of release.  Preventive pretrial detention of individuals judicially determined to represent a danger to the community does not violate the Constitution.  United States v. Salerno, 481 U.S. 739 (1987).

bonded out sometime between one week after bond docket and the date of the Public Defender's report in August.  Doc. no. 369, p. 13, ¶ 54.

CR 2 makes it clear that "the conditions of release are within the sole discretion of the trial court and will not be overturned absent a clear abuse of discretion."  Doc. no. 369-30, p. 1.  Under the rule, the "foremost consideration when fixing bail is the probability that the accused, if free, will appear at trial."  *Id.*  In addition, "[t]o the extent an accused is claiming to be indigent and not just unable to meet the conditions of release pursuant to the pre-set bond schedule, the Court in exercising its discretion in setting the conditions of release as allowed by law may consider various factors, including but not limited to the seriousness of the charge and criminal and appearance history."  *Id.* at 3.

As has been noted, both before and after the bond docket was established, arrestees were (and are) arraigned before a judge six days after booking (except that Monday arrestees would be set for arraignment on the following Friday).  Doc. no, 369-3, p. 158, 160-61, 164.[18]  Indigent defendants will have counsel appointed for them at arraignment, but are not represented by counsel *at* the arraignment.  *Id.* at 166-67; doc. no. 369-5, p. 24.  As the Judicial Defendants note, the "appointment of the public defender at bond docket is limited to the bond docket only until a formal appointment may be made at arraignment."  Doc. no. 372, p. 7; doc. no. 369-5, p. 45.  Indigent arrestees thus have no representation between the bond docket and arraignment.  Doc. no. 369-5, p. 47.

At arraignment, a defendant who wants his bond reduced will be told by the judge to ask his attorney to file a motion for a bond reduction hearing.  Doc. no. 369-3, p. 175-76.  There is no indication in the summary judgment record that bond

---

[18] Q: "[D]o people continue to be arraigned six days after arrest even after the creation of bond docket?  A: Yes, ma'am."  Doc. no. 369-3, p. 164.

reduction motions, followed by bond reduction hearings, are (or are regarded by Tulsa County judges and defense counsel as) the standard, day-in-day-out means of providing "meaningful consideration" (*see*, n.12, above) of alternatives to detention of newly-arrived arrestees.  Defendants also assert that "[b]ond amounts can also be reviewed with a writ of habeas corpus or an appeal."  Doc. no. 365, at 9.  They go so far as to suggest that an adequate avenue for review of the release status of a freshly-arrested individual is "post-conviction collateral review."  *Id.* at 43.  The legal adequacy of those procedures as avenues for providing meaningful consideration of alternatives to detention is discussed later in this order.

As for the facts bearing on the adequacy of habeas corpus as a component of the process for determining release or detention, the Judicial Defendants invited the court to take judicial notice of 58 bail habeas corpus cases filed in the Oklahoma Court of Criminal Appeals from Tulsa County.  Doc. no. 365, at 10, n.3.  The court has done so.  From the docket printout appended to the Judicial Defendants' brief, the court was able to identify 57 cases out of Tulsa County.  Of those 57 bail-habeas cases filed in the Court of Criminal Appeals, three were decided by that court on the merits of the habeas petition as shown by that court's online docket.[19]  Most of the 54 cases that were not decided on the merits were dismissed due to insufficiency of the record submitted to the appellate court, because the petitioner proceeded *pro se* in the habeas case even though he was represented by counsel in the trial court, or because the petitioner failed to give notice of the habeas case to the required parties.

In the three (of 57) habeas cases out of Tulsa County that were decided on the merits, the average time elapsed between (i) the later of arraignment or a bond reduction hearing in the District Court of Tulsa County and (ii) the merits-based disposition of a habeas proceeding in the Court of Criminal Appeals was 73.3 days.

---

[19] <https://www.oscn.net/dockets/Search.aspx>

The average time elapsed between initial filing in the Court of Criminal Appeals and disposition on the merits by that court was 28 days.

**E. The expert testimony.**

As has been noted, the court, at an earlier stage, denied the Daubert motions filed by the plaintiffs and the Judicial Defendants. That Daubert order addressed the proposed expert testimony of plaintiffs' expert, Dr. Aurelie Ouss, and one of the Judicial Defendants' experts, Dr. David Krahl. Plaintiffs do not rely on the testimony of Dr. Ouss for summary judgment purposes, nor do defendants rely on the testimony of Dr. Krahl.

In opposing plaintiffs' motion for summary judgment, the Judicial Defendants do briefly summarize some of the statistical work of another expert, Dr. Tracy Morris (not challenged in a Daubert motion), but they advance no arguments–let alone developed arguments[20]–either in support of their own motion or in opposition to plaintiffs' motion, based on her work. Although the conclusions the court reaches later in this order do not turn on expert testimony from Dr. Morris or any other expert, it is worth noting here that Dr. Morris flatly disclaimed any finding, based on her statistical analysis, to the effect that more unsecured bonds would cause more no-shows:

> A: So from the data set we can't determine cause and effect. So, no, there is no way to determine whether or not, you know, more unsecured bond would cause more failures to appear because that's just impossible to do with what we have.
>
> Q: Does your analysis speak at all to --
>
> A: One other thing.
>
> Q: Yeah, go ahead.

---

[20] Insufficiently developed arguments are waived. Wall v. Astrue, 561 F.3d 1048, 1066 (10th Cir. 2009); Harvey Barnett, Inc. v. Shidler, 338 F.3d 1125, 1135-36 (10th Cir. 2003).

18

A: That could also be flipped around.  So there is also no way to show from the data set that a more secured bond, you know, has the opposite effect.  It works both ways.  We can't really determine a cause and effect relationship on either side of the case.

Q: So does your testimony mean that you wouldn't be able to predict whether increasing the number of secured bonds would lead to a lower incidence of failure to appear warrants?

A: Right.  It doesn't work either way.

Q: And the other way being you wouldn't be able to predict whether the increase in unsecured bonds would lead to an increased failure to appear warrants?

A: Right. The cause and effect relationship cannot be determined.

Doc. no. 369-16 (deposition of Dr. Tracy Morris), at 14-15.

## IV.   RELIEF SOUGHT

As will be seen, it is important to understand the precise relief plaintiffs seek in this action.  In an exhibit to their motion, doc. no. 368, plaintiffs proffer their proposed form of declaratory and injunctive relief, which the court quotes in full here:

### <u>Declaratory Relief Against All Defendants</u>

Plaintiffs are granted the following declaratory relief against all defendants.

Under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, secured pretrial release conditions may not be imposed without hearings, and due process requires that:

1) the hearings be conducted within a reasonable time after arrest;

2) arrested individuals be given notice of the issues to be decided, and their right to be heard and to present evidence;

3) attorneys [sic] be represented by counsel, with the opportunity for confidential communication between the attorney and client before and during the hearing;

4) an inquiry be made into the arrested individual's ability to pay;

5) consideration be given to alternative conditions of release, unless it is determined by clear and convincing evidence that any

19

imposed monetary condition imposed is immediately affordable by the arrested person; and,

6) findings be made on the record applying the clear and convincing standard of evidence and explaining why an arrestee does not qualify for alternative conditions of release, in any case in which pretrial detention is ordered or a secured bond is imposed that the individual has not be [sic] found able to pay by clear and convincing evidence.

### Injunctive and Declaratory Relief Against the Tulsa County Sheriff and Tulsa County District Court Presiding Judge

Against Defendants Tulsa County Sheriff and Tulsa County Presiding Judge, Plaintiffs are granted summary judgment and the following declaratory and injunctive relief:

The Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution prohibit issuance or enforcement of, and the Tulsa County Sheriff and Tulsa County Presiding Judge are hereby **ENJOINED** from issuing or enforcing, any secured financial condition of release upon an individual who has not received a prompt hearing on pretrial release conditions at which a judicial officer provided, at a minimum, the procedural and substantive safeguards described as follows:

**A. Procedural Requirements.** At any court appearance (i.e., initial appearance or bail hearing) that could result in pretrial detention or imposition of a secured bond that an arrested individual cannot pay, the individual must be given a meaningful, individualized hearing that includes:

1. Notice to the individual of the purpose of the hearing;

2. The opportunity to be heard and present evidence;

3. Representation by counsel;

4. Consideration of alternative, nonmonetary release conditions;

5. Consideration of the necessity of detention in relation to the government's compelling interests (i.e., protecting community safety and against non-appearance); and

6. Verbal or written findings of fact regarding these factors, applying the clear and convincing evidence standard.

**B. Timing.** The meaningful, individualized hearing must take place within a reasonable time period after arrest, and no later than 48 hours from arrest.

**C. Appointment of Counsel.** Counsel must be provided free of charge at the hearing to any individual who is indigent, and to any individual who cannot secure paid counsel in time for the hearing. Before and during any court release proceeding at which release conditions and/or detention are being considered, the individual shall be allowed to communicate fully, expediently, and confidentially with their counsel.

**D. Ability to Pay.** The individual's social and economic circumstances shall be considered when setting conditions of release.

    1. <u>Generally.</u> Prior to an individual being given a release condition that includes monetary bail, the individual shall receive an inquiry into their immediate ability to pay the full amount of the monetary bail.

    2. <u>Inquiry Process</u>

        a. The purpose of the inquiry shall be to determine the amount of money the defendant can pay, using the defendant's own financial resources as would be available within twenty-four (24) hours of bond being set.

        b. Such inquiry shall allow the prosecutor, defense counsel, and the individual the opportunity to provide the court with information pertinent to the individual's ability to pay monetary bail. This information may be provided by proffer and may include statements by the individual's relatives or other persons who are present at the hearing and have information about the individual's ability to pay monetary bail.

        c. All information regarding the individual's ability to pay monetary bond shall be admissible if it is relevant and reliable, regardless of whether it would be admissible under the rules of evidence applicable at criminal trials.

**E. Protections Against Unaffordable Bond.**

    1. Because the imposition of an unaffordable bond creates a *de facto* detention order, the judicial officer shall not impose a

secured monetary bond on an individual who is unable to pay except where a judge finds based on clear and convincing evidence that:

   a. The individual poses a risk of non-appearance in court or a risk to public safety; and

   b. No less restrictive alternative condition, or combination of conditions, can sufficiently address the specific risks identified, as documented by written or verbal findings.

2. The evidentiary burden is on the State to prove that the individual poses a risk of non-appearance or a risk to public safety, and that no less restrictive alternative condition or combination of conditions can address the specific risks identified.

Doc. no. 368 (Plaintiffs' Motion for Summary Judgment), at 6-8.

## V.   WHAT THIS CASE DOES NOT INVOLVE

It is as important to understand what this case *does not* involve as it is to understand what *is* involved.  This case is not a root-and-branch attack on the secured bail system.[21]  In that vein, plaintiffs do not claim that bond schedules are inherently unconstitutional.  Doc. no. 373 at 25, n.16.[22]  Thus, plaintiffs explain that their due process claim, "described with specificity, is that people may not be subjected to de facto pretrial detention orders without the government establishing that their detention is necessary, regardless of whether reasonable bail, unreasonable bail, or no bail is set."  Doc. no. 384, at 3.  Otherwise stated, plaintiffs point out that they

---

[21] *Compare*, ODonnell I (n.2, above), where the Fifth Circuit, although finding constitutional deficiencies in the Harris County bail system, disapproved a preliminary injunction that "amount[ed] to the outright elimination of secured bail" for indigent arrestees.  ODonnell I, 892 F.3d 147, at 163.

[22] Plaintiffs elaborate: "Defendants could, for example, employ a bond schedule that provides for equally expeditious release on standard non-financial conditions if an arrestee cannot afford to pay the predetermined amount. *Defendants'* schedule is unconstitutional because it detains people who cannot pay, without consideration of alternatives, *Rainwater*, 572 F.2d at 1057, and without the requisite findings and procedural safeguards to justify detention."  Doc. no. 373 at 25, n.16.

"do not seek to have their bail reduced, or to have this Court order that any bail amount imposed be affordable."  Doc. no. 373, at 13.

Nor do plaintiffs assert that Tulsa County's CR 2, as such, is unconstitutional. Doc. no. 393, at 1.

Finally, of utmost importance is the fact that plaintiffs do not seek (and the court assuredly will not grant) (i) an injunction against state criminal prosecutions, or (ii) relief which would facilitate the pretrial release of arrestees who pose a flight risk or a danger to the community.

## VI.   OVERVIEW

Plaintiffs assert two claims in the second amended complaint:

Count One: Defendants Presiding Judge [Moody], Tulsa County Board [since dismissed], and Tulsa County Sheriff Violate Plaintiffs' **Equal Protection and Due Process Rights Against Wealth-Based Detention** by Jailing Them Because They Cannot Afford A Monetary Payment.

Count Two: Defendants Violate Plaintiffs' Right to Pretrial Liberty by Jailing Them Without **Procedural Due Process**.

Doc. no. 259, at 31 (emphasis added).

As might be expected, the summary judgment briefing–from both sides–fleshes out the parties' claims and defenses.  The summary judgment motions present what the court will loosely call "threshold" issues and "merits" issues.  The threshold issues are resolved against the defendants, as are–for the most part–the merits issues.

On the merits, there is much to be learned from some Fifth and Eleventh Circuit cases, not the least of which are <u>Pugh v. Rainwater</u>, 572 F.2d 1053 (5th Cir. 1978) (en banc);  <u>Schultz v. Alabama</u>, 42 F.4th 1298 (11th Cir. 2022), *cert. denied sub nom.* <u>Hester v. Gentry</u>, 143 S.Ct. 2610 (2023); <u>Walker v. City of Calhoun</u>, 901 F.3d 1245 (11th Cir. 2018), *cert. denied*, 139 S.Ct. 1446 (2019), and a series of cases challenging bail procedures in Harris County and Dallas County, Texas.

23

The Texas bail litigation begins with ODonnell v. Harris County, 892 F.3d 147 (5th Cir. 2018) (ODonnell I), where the court, in an opinion written by Judge Edith Brown Clement, held that Harris County's bail-setting procedures were deficient as a matter of due process and equal protection.  But the Texas bail litigation certainly didn't end there.  It has a tortuous history.  After ODonnell I, we have ODonnell v. Goodhart, 900 F.3d 220 (5th Cir. 2018) (ODonnell II) (on motion for stay); ODonnell v. Salgado, 913 F.3d 479 (5th Cir. 2019) (ODonnell III) (on motion for vacatur); Daves v. Dallas County, Texas, 984 F.3d 381 (5th Cir. 2020) (Daves I); Daves v. Dallas County, Texas, 22 F.4th 522 (5th Cir. 2022) (Daves II) (overruling ODonnell I in part, re: capacity of county judges to be sued; addressing only standing, justiciability and Younger abstention); and Daves v. Dallas County, Texas, 64 F.4th 616 (5th Cir. 2023) (en banc), cert. denied, 144 S.Ct. 548 (Jan. 8, 2024) (herein: Daves III, overruling ODonnell I as to Younger abstention).

Noteworthy here is that the Daves decisions–which tell us at least as much about the evolution of a court as they do about the evolution of the law–did not reach the merits as addressed in Rainwater, Schultz and Walker, and by Judge Clement for the Fifth Circuit in ODonnell I.

In this order, the court concludes that plaintiffs are entitled to relief on the basis of their equal protection and procedural due process claims.  Separate from those claims, plaintiffs seek relief on a theory of substantive due process, a doctrine distinguished in large part by the fact that it is most often invoked when nothing else will work.  Their substantive due process claim, while perhaps arguable, is rejected as a basis for granting relief in this case.  Plaintiffs' well-grounded equal protection and procedural due process claims make it unnecessary for the court to test the limits of the nebulous doctrine of substantive due process.

As will be seen, the fact that plaintiffs are entitled to relief does not answer the question of what that relief should consist of.  Injunctive relief is appropriate.

24

Undue intrusion into the operation of two branches of the government of a state which is "a sovereign entity in our federal system," <u>Allen v. Cooper</u>, 589 U.S. 248, 254 (2020) (quoting <u>Seminole Tribe of Fla. v. Fla.</u>, 517 U.S. 44, 54  (1996)), is not.

## VII.   THRESHOLD ISSUES

**A.  Injunctive relief is available against the Presiding Judge.**

In two previous orders, one by Judge Eagan and one by the undersigned, the court rejected the argument that the acts upon which plaintiffs base their claims against the Presiding Judge are judicial acts, not administrative acts, and that therefore, injunctive relief is barred.  Doc. no. 48 at 9; doc. no. 306 at 25.[23]   While acknowledging the prior orders, the Presiding Judge argues that Judge Eagan's ruling was entered before CR 2 was adopted, and the undersigned's Rule 12 Order, although entered after CR 2 became effective, relied on Judge Eagan's determination.  The Presiding Judge contends that "the development of a full record and the procedural posture at summary judgment warrant reconsideration." Doc. no. 365, pp. 34-35 n.7.

The court has reviewed the portions of the summary judgment record relied upon by the Presiding Judge for reconsideration of the previous rulings.  The court is satisfied that the previous rulings should remain in place.

The Presiding Judge, citing <u>Coleman v. Governor of Michigan</u>, 413 Fed. Appx. 866 (6th Cir. 2011), contends that the acts of creating and promulgating the preset bond schedule and CR 2 are judicial acts because they resulted from

---

[23]In <u>Pulliam v. Allen</u>, 466 U.S. 522 (1984), the Supreme Court held that judicial immunity does not bar prospective relief against judicial officers for acts or omissions taken in a judicial capacity.  Subsequently, in the Federal Courts Improvement Act of 1996, Congress amended § 1983 to read "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."  Pub. L. No. 104-317, § 309(c) 110 Stat. 3847 (codified at 42 U.S.C. § 1983).  The court's prior rulings found plaintiffs' claims against the Presiding Judge are based on his administrative (non-judicial) acts and, thus, are not precluded by § 1983.

interpretation of Oklahoma law.  In its unpublished decision in <u>Coleman</u>, the Sixth Circuit determined that an administrative order "qualifie[d] as a judicial action performed in [the judge's] official judicial capacity" because it interpreted Michigan law.  <u>Id</u>. at 873.  The court notes that the court, in <u>Coleman</u>, did not cite any authority to support its conclusion.  Nevertheless, the evidentiary material before the court does not demonstrate that the Presiding Judge interpreted Oklahoma law in performing the challenged acts.  The court concludes that neither <u>Coleman</u> nor <u>Reynolds v. Flynn</u>, Civil Action No. 21-cv-01154-RM-NYW, 2022 WL 252327, at *26 (D. Colo. Jan. 27, 2022), which follows <u>Coleman</u>, require reconsideration of the court's rulings.

The Presiding Judge also cites one of the Fifth Circuit's <u>Daves</u> decisions, specifically, <u>Daves v. Dallas County, Texas</u>, 22 F.4th 522 (5th Cir. 2022), where the court determined that the county judges' creation of a bail schedule, for later application to specific arrestees, was a judicial act that enforced state law.  <u>Id</u>. at 539-40.  The adoption of a preset bond schedule adjudicated nothing.  The court is more persuaded by Judge Haynes' conclusion in his dissent that the county judges "were not engaged in judicial conduct" in promulgating a bond schedule.  As Judge Haynes explained, the county judges "were merely directing other judges in a manner divorced from any given case."  <u>Id</u>. at 560.  (Haynes, J., dissenting); <i>see also</i>, <u>Schultz v. Alabama</u>, 2018 WL 9786086 at *7 (N.D. Ala. Nov. 8, 2018) (judges' conduct in adopting standing bail order was not a judicial act).

The Presiding Judge is correct that the record is now fully developed.  With the benefit of that full record, the court adheres to its previous conclusion that injunctive relief against the Presiding Judge is not prohibited.

## B.   The Prison Litigation Reform Act is inapplicable.

The Presiding Judge also argues that the Prison Litigation Reform Act (PLRA), specifically, 18 U.S.C. § 3626(a)(1)(B), precludes the injunctive relief

requested by plaintiffs because it requires actions that exceed the authority of the Presiding Judge under state law.  The Presiding Judge also contends that the requested relief fails to comply with the PLRA, specifically, 18 U.S.C. §3626(a)(1)(A), because it is not narrowly drawn, extends further than necessary to correct the alleged federal law violations, and is not the least intrusive means necessary to correct the alleged federal law violations.  Plaintiffs counter that the PLRA does not apply to the injunctive relief they seek in this action.

Section 3626(a)(1) governs "[p]rospective relief" in any "civil action with respect to prison conditions."  18 U.S.C. § 3626(a)(1).  The term "civil action with respect to prison conditions" is defined as "any civil proceeding arising under Federal law with respect to the conditions of confinement" or "the effects of actions by government officials on the lives of persons confined in prison."  18 U.S.C. § 3626(g).  The court concludes that plaintiffs' constitutional challenge to Tulsa County's secured bail system does not involve "conditions of confinement" or the "effects of actions by government official on the lives of persons confined in prison." *See*, *e.g.* Thomas v. Stitt, 653 F. Supp. 3d 1084, 1088 (W.D. Okla. 2023) ("PLRA's exhaustion requirement does not apply" as "[t]he claims asserted here concern the constitutionality of Oklahoma's parole procedures, not prison conditions or prison life.") (citing Howard v. Coonrod, 546 F. Supp. 3d 1121, 1130 (M.D. Fla. 2021)).  The court therefore concludes that the PLRA does not preclude the injunctive relief plaintiffs seek.

## C.   Injunctive relief is available against the Tulsa County Sheriff.

In the Rule 12 Order, the court concluded that Ex parte Young, 209 U.S. 123 (1908), permits injunctive relief against the Tulsa County Sheriff, as a state actor, "based on his role in carrying out the orders and procedures of state-court judges."  Doc. no. 306 at 20.  Now, at the summary judgment stage, the Sheriff urges that with respect to bail determinations, he is "not a player," because he "plays no role in bail

hearings or bail determinations." Doc. no. 371 at 8.  Although the Sheriff may not be involved in setting bail amounts, he does not dispute that he enforces those bail amounts by detaining plaintiffs until they have satisfied the requirements of the preset bond schedule.  The court accordingly concludes quite readily that he is subject to injunctive relief. *See*, *e.g.* McNeil v. Community Probation Services, LLC, 945 F.3d 991, 994-96 (6th Cir. 2019) (upholding preliminary injunction barring county sheriff's enforcement of unconstitutional financial conditions of release set by judges); Guill v. Allen, No. 1:19cv1126, 2023 WL 6159978, at *34-36 (M.D.N.C. Sept. 21, 2023) (denying county sheriff's summary judgment motion challenging injunctive relief to prevent alleged unconstitutional bail determinations); *see also*, Nashville Community Bail Fund v. Gentry, 446 F. Supp. 3d 282, 301 (M.D. Tenn. 2020) ("[I]t is well established, under Ex parte Young, that the appropriate way to obtain injunctive relief against an unconstitutional statute is by filing suit against an official or officials charged with enforcing the challenged law.").

Nevertheless, the Sheriff argues that the court should not enjoin him, but instead issue a "declaratory judgment against the state judges." Doc. no. 371 at 12. The Sheriff points out (correctly) that if the state judges violate the declaratory judgment, injunctive relief against them would be available under § 1983.  The Sheriff believes that an injunction against him would require that he "function as a pseudo-appellate court," *id*., and risk contempt charges or criminal prosecution for disobeying the orders of the state judges.  The court disagrees.

In McNeil, the Sixth Circuit specifically rejected the sheriff's argument that it was improper to enjoin "an official who implements a constitutional violation caused by another official." 945 F.3d at 996.  As the court noted, "[t]here are plenty of cases allowing injunction actions like this one." *Id*. (citing Doe v. DeWine, 910 F.3d 842, 846, 848-49 (6th Cir. 2018) (permitting suit under Ex parte Young against state actors at multiple points in the enforcement chain of the challenged statute);

Diaz v. Michigan Dept. of Corrections, 703 F.3d 956, 958-59, 966 (6th Cir. 2013) (permitting Ex parte Young suit against state actors at three levels of allegedly unlawful action)); *see also*, ODonnell I, 892 F.3d at 165 (setting forth a model injunction authorizing the county sheriff "to decline to enforce orders requiring payment of prescheduled bail amounts as a condition of release for said defendants if the orders are not accompanied by a record showing that the required individual assessment was made and an opportunity for formal review was provided.").  The court is confident that it can craft an injunction that would prevent the Sheriff from acting as a "pseudo-appellate court" in reviewing the process afforded by the Tulsa County judges in setting conditions of release.

Moreover, if the court determines some aspects of the Tulsa County secured bail system to be violative of the Fourteenth Amendment, and grants appropriately tailored injunctive relief, the Sheriff will have a defense to any contempt or criminal proceedings. *See*, Nashville Community Bail Fund, 446 F. Supp. 3d at 301 (the U.S. Constitution takes precedence over statute, rule, or policy that is not constitutional in origin where the two types of laws conflict); *see also*, Safe Streets Alliance v. Hickenlooper, 859 F.3d 865, 906 n.19 (10th Cir. 2017) ("[A] 'court may not convict a criminal defendant of violating a state law that federal law prohibits.'") (quoting Armstrong v. Exceptional Child Center, Inc., 135 S.Ct. 1378, 1384 (2015)).  Thus, the Sheriff's concern about contempt or criminal proceedings does not warrant the denial of injunctive relief in favor of plaintiffs.

### D.   O'Shea abstention is not required.

Citing O'Shea v. Littleton, 414 U.S. 488 (1974), and Younger v. Harris, 401 U.S. 37 (1971), the Judicial Defendants argue that the relief plaintiffs seek is barred because they "seek injunctive and declaratory relief which would result in federal oversight of state criminal proceedings, or at the bare minimum result in the creation of an opportunity for any disgruntled criminal defendant to run to federal court any

time they feel aggrieved by the outcome of a particular process in a criminal state court proceeding." Doc. no. 365, at 39. The court disagrees.[24]

As a preliminary matter, it should be borne in mind that the Court of Appeals, in a case addressing the propriety of O'Shea abstention, recently reaffirmed that "[g]enerally, 'federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress.'" Courthouse News Serv. v. New Mexico Admin. Off. of Cts., 53 F.4th 1245, 1255 (10th Cir. 2022) (quoting from Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996)). Thus, because of the "'virtually unflagging obligation of the federal courts to exercise the jurisdiction given them,' the Supreme Court has repeatedly cautioned that '[a]bstention from the exercise of federal jurisdiction is the exception, not the rule.'" Id. (quoting from Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC, 953 F.3d 660, 668 (10th Cir. 2020) (in turn quoting from Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976)). That is the beginning point.

At the heart of O'Shea was the plaintiffs' claim that "state criminal laws and procedures are deliberately applied more harshly to black residents of Cairo and inadequately applied to white persons who victimize blacks, to deter respondents from engaging in their lawful attempt to achieve equality." O'Shea, 414 U.S. at 491. The alleged mistreatment took many forms, including selective prosecution, discriminatory bail bond practices, imposition of harsher sentences on Black

---

[24] At an earlier stage of this case, Judge Eagan considered, and rejected, defendants' argument that the court should abstain under Younger v. Harris, 401 U.S. 37 (1971). Doc. no. 48. She concluded that one of the prerequisites to Younger abstention–that the state proceedings afford an adequate opportunity to litigate the federal constitutional issues–was not satisfied, because the issues relating to the alleged wealth-based detention system and the legality of pretrial detention practices "cannot be raised in defense of any plaintiff's criminal prosecution." Id. at 13 (citing Gerstein v. Pugh, 420 U.S. 103 (1975)). Although O'Shea abstention is, doctrinally, an offshoot of Younger abstention, it is clear that Judge Eagan did not have before her, and consequently did not address, the species of abstention–O'Shea abstention–the court now considers.

defendants, and exaction of payments from defendants as a prerequisite to having a jury trial.

Reversing the district court's dismissal of the case, the Seventh Circuit held that if the plaintiffs proved their allegations, the district court "should proceed to fashion appropriate injunctive relief," with a suggestion that that relief might include "periodic reports of various types of aggregate data on actions on bail and sentencing." *Id*. at 492 and 493 n.1 (quoting from Seventh Circuit opinion). It is apparent from the Supreme Court's opinion, as indicated by the passages quoted below, that the relief thought appropriate by the Seventh Circuit would have gotten the district court heavily involved in monitoring and, when necessary, disrupting individual state-court criminal proceedings.

Reversing the Court of Appeals, the Supreme Court concluded that plaintiffs' claims, if successful, would result in "unwarranted anticipatory interference in the state criminal process by means of continuous or piecemeal interruptions of the state proceedings by litigation in the federal courts." *Id*. at 500. The Court wanted no part of "an injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials," explaining that the order sought by plaintiffs "would contemplate interruption of state proceedings to adjudicate assertions of noncompliance by petitioners. This seems to us nothing less than an ongoing federal audit of state criminal proceedings which would indirectly accomplish the kind of interference that Younger v. Harris, supra, and related cases sought to prevent." *Id*. The Court's recitation of these concerns fortified its conclusion that the relief sought "would require for its enforcement the continuous supervision by the federal court over the conduct of the [state defendants] in the course of future criminal trial proceedings involving any of the members of the respondents' broadly defined class." *Id*. at 501.

31

Before examining how the case at bar lines up with O'Shea, a look at the Tenth Circuit's treatment of O'Shea is in order.

It has been clear for a long time in this circuit that the main vice O'Shea abstention seeks to avoid is the situation in which a federal court would, on a case-specific basis, "direct and monitor" state proceedings. Joseph A. ex rel. Corrine Wolfe v. Ingram, 275 F.3d 1253, 1271 (10th Cir. 2002) (quoting from Suggs v. Brannon, 804 F.2d 274, 279 (4th Cir. 1986)). In that 2002 case, the Court of Appeals quoted the passage from O'Shea, quoted above, where the Supreme Court expressed its distaste for any injunction that would "contemplate interruption of state proceedings" or entail "an ongoing federal audit" of criminal proceedings. Id. at 1270. Two decades later, the Tenth Circuit, in ruling against O'Shea abstention, again emphasized its concern about an injunction that would require an "intensive, context specific legal inquiry," comparing that with a case in which the requested relief would be "more akin to a bright-line finding than the ongoing monitoring of the substance of state proceedings." Courthouse News Serv., 53 F.4th at 1260 (quoting Courthouse News Serv. v. Planet, 750 F.3d 776, 791 (9th Cir. 2014) (cleaned up). The Tenth Circuit's Courthouse News decision also recognized some logical limits on the reach of O'Shea: "[T]he fact 'that *some* additional litigation may later arise to enforce an injunction does not itself justify abstaining from deciding a constitutional claim.' Planet I, 750 F.3d at 792 (noting that if O'Shea abstention were to apply every time litigants seek federal court injunctions to reform the institutions of state government, this 'would justify abstention as a matter of course in almost any civil rights action under § 1983')." Id. at 1261.

The Judicial Defendants rely heavily on Daves III in arguing that O'Shea abstention is required. As will be seen, the short answer to the defendants' reliance on Daves III is that, viewing that decision on the facts before the Fifth Circuit, Daves III is distinguishable. But if the Fifth Circuit's pronouncements in Daves III were

intended to apply beyond the facts then before that court, <u>Daves III</u> flies in the face of the Supreme Court's decision in <u>Gerstein v. Pugh</u>, 420 U.S. 103 (1975).

In the first paragraph of her opinion for the divided en banc court in <u>Daves III</u>, Judge Edith Jones left no room for doubt as to where she (and the majority) were headed: "In a second round of en banc review, we conclude that this case, whose aim was to revise by federal decree the Texas state court procedures for felony and misdemeanor pretrial bail, should never have been brought in federal court." <u>Daves III</u>, 64 F.4th at 620.[25]  Focusing on the opinion her colleague, Judge Edith Brown Clement, had written in <u>ODonnell I</u>, Judge Jones perceived the need to "counteract judicial amnesia" on the subject of abstention.  <u>Id.</u> at 623.  As for the facts relevant to <u>O'Shea</u> abstention, the Fifth Circuit noted that the bail reform sought by the <u>Daves III</u> plaintiffs would require periodic reporting to the district court of defendants "for whom a timely individual assessment has not been held,"[26] would "open[] the federal courts any time an arrestee cries foul," and (quoting <u>O'Shea</u>, 414 U.S. at 500) would constitute an "ongoing federal audit of state criminal proceedings."  <u>Id.</u>, at 630-31. On the facts, the <u>Daves III</u> court had a point.  In addition to the weekly reporting requirement, the district court's injunction imposed specific procedural requirements

---

[25] It is worth noting that the district court, in the decision the Fifth Circuit reviewed in <u>Daves III</u>, wrote that, in light of the intervening enactment of Texas bail reform legislation, it "holds that Plaintiffs' request for injunctive relief should be dismissed as moot."  <u>Daves v. Dallas County, Texas</u>, No. 3:18-CV-154-N, 2022 WL 2473364, at *6 (N.D. Tex. July 6, 2022).  Thus, no operative injunction was before the Fifth Circuit–because *there was no injunction at all*.  (Nor did the district court grant any other form of relief.)  The Fifth Circuit expressly recognized as much:  "[T]he parties' dispute has become moot in light of S.B. 6 [the intervening Texas legislation]."  <u>Daves III</u>, 64 F.4th at 621.  The en banc majority nevertheless felt compelled, in a case in which all relief had been denied, to expound its view of why <u>O'Shea</u> abstention should preclude granting the relief that the district court had unequivocally denied.

[26] The <u>Daves III</u> opinion here referred to the injunction in <u>ODonnell I</u>, observing that the <u>Daves</u> injunction "mirrored" the <u>ODonnell</u> injunction.  <u>Daves III</u>, 64 F.4th at 630.  And, indeed, the <u>Daves III</u> injunction includes the quoted language.  <u>Daves v. Dallas County</u>, No. 3:18-CV-0154-N (N.D. Tex. Sept. 20, 2018), <u>Preliminary Injunction</u>, doc. no. 165, at 5.

on state court Pretrial Service staff, prescribed the content of the form of financial affidavit to be filled out by Dallas County arrestees, and prescribed other specific steps in the bail-setting process, some of which, though not essential to the relief granted, could invite unseemly follow-on litigation with state officers in the federal district court.  Daves v. Dallas County, No. 3:18-CV-0154-N (N.D. Tex. Sept. 20, 2018), Preliminary Injunction, doc. no. 165.

The relief sought by the plaintiffs in the case at bar falls noticeably short of that which the Fifth Circuit found to be cause for abstention in Daves III.  The specifics of the relief to be granted in this case will soon be addressed with the aid of further advocacy.[27]  It is sufficient for present purposes to note that the relief plaintiffs seek in this case (Part IV, above) would do little more than impose, with the force of an injunction (or declaratory relief), the constitutional obligations any court has to an indigent arrestee who is confronted with an initial bail determination predicated on a preset bond schedule.

So, the Daves III decision is distinguishable on the facts even though it includes some very broad pronouncements.  But if that decision were read, taking it on its own terms, to apply to the case at bar, it would fly in the face of the Supreme Court's decision in Gerstein.

In Gerstein, decided one year after O'Shea, the issue was "whether a person arrested and held for trial under a prosecutor's information is constitutionally entitled to a judicial determination of probable cause for pretrial restraint of liberty." 420 U.S. at 105.  Noting that "[t]he consequences of prolonged detention may be more serious than the interference occasioned by arrest" and that "[p]retrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships," the Court held that "the Fourth Amendment

---

[27] See Part IX, below.

requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Id*. at 114.  The court elaborated that the state "must provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty, and this determination must be made by a judicial officer either before or promptly after arrest." *Id*. at 125.

In terms of procedure in the initial stages of criminal prosecutions, the procedural context in Gerstein (*e.g.*, post-arrest, with personal liberty at stake and a resultant need for a prompt determination, with meaningful consideration of the relevant facts) closely resembles the context in the case at bar in which issues as to admission to bail are front and center.  The district court had ordered the defendants "to give the named plaintiffs an immediate preliminary hearing to determine probable cause for further detention.  It also ordered them to submit a plan providing preliminary hearings in all cases instituted by information." *Id*. at 107-08.  As for abstention, the Supreme Court noted that the trial court "correctly held that respondents' claim for relief was not barred by the equitable restrictions on federal intervention in state prosecutions [citing Younger]. The injunction was not directed at the state prosecutions as such, but only at the *legality of pretrial detention without a judicial hearing*, an issue that could not be raised in defense of the criminal prosecution. The order to hold preliminary hearings could not prejudice the conduct of the trial on the merits." *Id*., n.9 (emphasis added).  As for just exactly how a federal injunction might go about imposing that federal constitutional mandate on a state court, the Court intimated no concerns of the kind it had addressed a year before in O'Shea, probably because Gerstein did not (and the case at bar does not) present the specter of "interruption of state proceedings to adjudicate assertions of noncompliance" or an "ongoing federal audit of state criminal proceedings." See Part V, above.  The Eleventh Circuit agrees with this analysis.  In Walker, a challenge to a Georgia city's secured bail system, the Eleventh Circuit noted that

35

"Walker does not ask for the sort of pervasive federal court supervision of State criminal proceedings that was at issue in O'Shea. Instead, as in Gerstein, Walker merely asks for a prompt pretrial determination of a distinct issue, which will not interfere with subsequent prosecution.  At the very least, the district court could reasonably find that the relief Walker seeks is not sufficiently intrusive to implicate Younger." Walker, 901 F.3d at 1255.  The Eleventh Circuit has not deviated from that analysis.  Schultz, 42 F.4th 1298 at 1312 (Plaintiff "merely seeks a faster bail determination, which does not require enjoining or even interfering with any ongoing or imminent state prosecution.").

For all of these reasons, the court concludes that abstention under O'Shea, 414 U.S. 488 (1974), or its doctrinal antecedent, Younger, is not required.[28]  This is not a case in which the plaintiffs seek, or in which the court will create, as the Judicial Defendants put it, "an opportunity for any disgruntled criminal defendant to run to federal court any time they feel aggrieved by the outcome of a particular process in a criminal state court proceeding."  Doc. no. 365, at 39.  The Judicial Defendants' apprehension that this court will be "overseeing individual bail settings in Tulsa County" is unfounded.  Doc. no. 372, at 34.

---

[28] Plaintiffs also argue that that Younger abstention is not required where the remedy afforded by the state is inadequate.  Doc. no. 373, at 32-34.  Plaintiffs are correct.  Younger abstention "naturally presupposes the opportunity to raise and have timely decided by a competent state tribunal the federal issues involved."  Gibson v. Berryhill, 411 U.S. 564, 577 (1973).  Timeliness is especially critical where the asserted constitutional violation exposes the plaintiff to "[t]he consequences of prolonged detention."  Gerstein, 420 U.S. at 114.  This requirement of timeliness ties in, of course, with the due process right "to be heard at a meaningful time and in a meaningful manner."  Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (internal quotation omitted).  Accordingly, the issue of timeliness is addressed in Part VIII (C), below (procedural due process).

## VIII.  THE MERITS

**A.  Plaintiffs' claims are governed by the Due Process and Equal Protection clauses of the Fourteenth Amendment.**

Claiming an unconstitutional denial of equal treatment under the law, plaintiffs invoke the Equal Protection Clause.  And claiming that the process they were afforded was constitutionally deficient, plaintiffs invoke the Due Process Clause.  But the Judicial Defendants argue that these claims are to be adjudicated under some combination of the Fourth, Sixth and Eighth Amendments.  Doc. no. 365, at 19; doc. no. 372, at 12 (Eighth Amendment), 33 ("Plaintiffs' claims are actually Eighth, Fourth, and Sixth Amendment claims disguised as more amorphous Fourteenth Amendment claims.").

The arguments that a claim for equal treatment is not governed by the Equal Protection Clause and that a claim of deficient process is not governed by the Due Process Clause are without merit.

### 1.  <u>Fourth Amendment</u>

Citing <u>Manuel v. City of Joliet</u>, 580 U.S. 357 (2017) and <u>Gerstein</u>, 420 U.S. 103, 114, the Judicial Defendants argue that the process the plaintiffs are due should be determined under the Fourth Amendment, not the Due Process Clause of the Fourteenth Amendment.  Doc. no. 365, at 19; doc. no. 372, at 12.

Both <u>Manuel</u> and <u>Gerstein</u> centered on the probable cause determination.  In <u>Gerstein</u>, the Court held that "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest."  <u>Gerstein</u>, 420 U.S. at 114.  Again focusing on probable cause, the Court, in <u>Manuel</u>, held that the Fourth Amendment is violated when the arrestee is detained as a direct result of a probable cause determination that was predicated on evidence fabricated by the state.  <u>Manuel</u>, 580 U.S. at 366-67.  And, to be sure, the Court, in <u>Manuel</u>, did tell us that "pretrial detention can violate the Fourth

37

Amendment not only when it precedes, but also when it follows, the start of legal process." *Id*. But just as <u>Gerstein</u> focused on *the absence of* a probable cause determination, the focus of <u>Manuel</u> was *a fatal defect in* the probable cause determination. That, plainly, is why the Court concluded that the Fourth Amendment's prohibition of unreasonable "seizure" was the controlling constitutional provision: "All that the judge had before him were police fabrications about the pills' content. The judge's [probable cause] order holding Manuel for trial therefore lacked any proper basis." *Id*. at 368. The detention was rooted in the fabrication of evidence; hence the "seizure" was illegal at its inception for Fourth Amendment purposes.

This reading of <u>Manuel</u> squares with Court of Appeals-level decisions both before and after the Court decided <u>Manuel</u> in 2017. The Tenth Circuit had this to say about the coverage of the Fourth Amendment before <u>Manuel</u> was decided: "[the Fourth Amendment] pertains to the events leading up to and including an arrest of a citizen previously at liberty." <u>Porro v. Barnes</u>, 624 F.3d 1322, 1325 (10th Cir. 2010) (Gorsuch, J.). More to the present point, after <u>Manuel</u> was handed down, the same court told us that: "For plaintiffs *not challenging the probable cause determination itself, but instead only the confinement after a determination of probable cause, 'the protections offered by the Fourth Amendment do not apply.'"* <u>Ellison v. Ladner</u>, 767 F. Appx. 656, 661 (10th Cir. 2019) (citing <u>Wilkins v. DeReyes</u>, 528 F.3d 790, 798 (10th Cir. 2008) (emphasis added; cited as persuasive pursuant to Tenth Circuit Rule 32.1(a)). The Fifth Circuit agrees: "<u>Manuel</u> does not address the availability of due process challenges after a legal seizure, and it cannot be read to mean, as Defendants contend, that *only* the Fourth Amendment is available to pre-trial detainees. For example, even when the detention is legal, a pre-trial detainee subjected to excessive force properly invokes the Fourteenth Amendment." <u>Jauch v. Choctaw County</u>, 874 F.3d 425, 429 (5th Cir. 2017), *cert. denied*, 139 S.Ct. 638 (2018) and <u>McGee v.</u>

Parsano, 55 F.4th 563, 569 (7th Cir. 2022) ("Before a finding of probable cause, the Fourth Amendment protects an arrestee; after such a finding, the Fourteenth Amendment protects a pretrial detainee." (quoting from Pulera v. Sarzant, 966 F.3d 540, 549 (7th Cir. 2020)).

The short of the matter is that no case adjudicating a challenge to bail practices does so (regardless of outcome) on the basis of a Fourth Amendment analysis. *See, e.g.*, United States v. Salerno, 481 U.S. 739 (1987); Schultz, 42 F.4th at 1298; Walker, 901 F. 3d at 1245; ODonnell I, 892 F.3d at 147; and Rainwater, 572 F.2d at 1053. And no case involving a challenge to bail practices applies Graham v. Connor-type reasoning (490 U.S. 386 (1989)) to supplant Fourteenth Amendment due process and equal protection analysis with a Fourth Amendment "seizure" analysis.

## 2. Sixth Amendment

Plaintiffs' constitutional right to counsel, as such, is not really in issue here, and plaintiffs do not assert a free-standing Sixth Amendment claim. Doc. no. 259, at 31-33. Plaintiffs assert no claim that they were denied counsel. What Judge Eagan wrote when the operative complaint was the First Amended Complaint (doc. no. 32) remains true: "There is not a single allegation in the amended complaint that any individual named plaintiff was or will imminently be denied counsel." Doc. no. 48, at 8. What *is* in issue is the proposition that those lawyers, appointed to represent indigent arrestees, should have a meaningful opportunity to do so on behalf of their clients. The Judicial Defendants present no developed argument to the effect that the Sixth Amendment supplants the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The court has found no authority for any such assertion.

## 3. Eighth Amendment

Arguing that "Plaintiffs are only injured because they are unable to pay the actual bail amount," doc. no. 372, at 17, the Judicial Defendants assert that the Excessive Bail Clause of the Eighth Amendment, not the Due Process and Equal

Protection Clauses of the Fourteenth Amendment, governs their claims.  Doc. no. 372, at 12.  The defendants misconceive plaintiffs' claim.  Their essential claim is that "people may not be subjected to de facto pretrial detention orders without the government establishing that their detention is necessary, *regardless of whether reasonable bail, unreasonable bail, or no bail is set*."  Doc. no. 384, at 3 (emphasis added).  Thus, say plaintiffs, "[t]he Excessive Bail Clause constrains the dollar amount of bail when it is imposed, but it does not address whether detention may be ordered."  Doc. no. 373, at 13.

With this understanding of what plaintiffs do, and do not, claim, the court concludes, as have the Fifth and Eleventh Circuits, that a secured bail challenge of the kind now before the court is not fair game for adjudication under the Excessive Bail Clause.

The Judicial Defendants rely mainly on <u>Graham v. Connor</u>, 490 U.S. 386 (1989) and <u>Albright v. Oliver</u>, 510 U.S. 266 (1994), in arguing that this is an Eighth Amendment case.  Doc. no. 372, at 12, *et seq*.  In <u>Graham</u> and <u>Albright</u>, the Court balked at recognizing rights under the amorphous and potentially sprawling[29] doctrine of substantive due process when the gravamen of the plaintiff's claim was specifically covered by one of the first eight amendments to the Constitution. In <u>Graham</u>, an excessive force claim was held to be governed by the Fourth Amendment's "objective reasonableness" standard, and not under the doctrine of substantive due process.  <u>Graham</u>, 490 U.S. at 388.  In <u>Albright</u>, the plurality[30] concluded that an asserted right not to be arrested without probable cause was

---

[29] In <u>Graham</u>, Chief Justice Rehnquist, writing for the Court, politely called it the "more generalized notion 'of substantive due process.'"  <u>Graham</u>, 490 U.S. at 395.

[30] Seven Justices concurred in the judgment, three of whom joined in Chief Justice Rehnquist's plurality opinion.  The other three who concurred in the judgment did so on various grounds, none of which included an endorsement of substantive due process as a basis for Albright's § 1983 claim.

governed by the Fourth Amendment and not substantive due process.  Albright, 510 U.S. at 270.

Neither Graham, nor Albright nor any lower court decisions support the contention that a challenge to a secured bail system is governed by the Eighth Amendment.  The Eleventh Circuit's characterization, for Graham purposes, of the plaintiffs' secured bail challenge in Walker matches the plaintiffs' (and the court's) characterization of the claims before the court in the case at bar:

> We are cognizant that the Supreme Court's Graham decision "requires that if a constitutional claim is covered by a specific constitutional provision, such as the ... Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." United States v. Lanier, 520 U.S. 259, 272 n.9, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). But Walker's claim, like the plaintiffs' in Rainwater, is different. It challenges not the amount and conditions of bail *per se*, but the process by which those terms are set, which Walker alleges invidiously discriminates against the indigent.

Walker, 901 F.3d at 1259.

On that basis, the court, in Walker, concluded that the district court was correct "to evaluate this case under the due process and equal protection rubrics rather than the Eighth Amendment."  *Id*. at 1258.

Likewise, in ODonnell I, the Fifth Circuit rejected the county's contention that plaintiffs' complaint was an "Eighth Amendment case wearing a Fourteenth Amendment costume." ODonnell I, 892 F.3d at 157.[31]  The court recognized, citing Graham, that "when a constitutional provision specifically addresses a given claim for relief under 42 U.S.C. § 1983, a party should seek to apply that provision directly," *id*., but the court found dispositive its holding in Rainwater, 572 F.2d at

---

[31] The Fifth Circuit's Daves decisions (Part VI, above), though overruling ODonnell on issues of standing, capacity of judges to be sued and abstention, did not discuss ODonell's treatment of the Eighth vs. Fourteenth Amendment issue.

1057 (5th Cir. 1978), that the "incarceration of those who cannot [pay money bail], without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements." *Id*. (quoting from Rainwater).

The court agrees with the Fifth and Eleventh Circuits that this case is not governed by the Eighth Amendment.  This case is governed by the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

## B.  Substantive due process

Plaintiffs argue that the defendants "violate plaintiffs' substantive due process right to liberty by jailing them without establishing that incarceration is narrowly tailored to serve a compelling government interest."  Doc. no. 369, at 18.

As a matter of legal method, the "Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this unchartered area are scarce and open-ended."  Dist. Attorney's Off. for Third Jud. Dist. v. Osborne, 557 U.S. 52, 72 (2009) (quoting from Collins v. Harker Heights, 503 U.S. 115, 125 (1992)).  And as another starting point, it is noteworthy that the "protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity."  Albright, 510 U.S. at 272.  Consistent with that, substantive due process has not gotten much traction in the Supreme Court or in the lower courts in cases involving indigence-based claims asserted by pretrial detainees.  That is unremarkable, bearing in mind that it is counterintuitive that resort to a doctrine labeled "substantive" would be necessary where the complaining parties claim that, because of their indigence, they are coming out on the short end *procedurally* in the initial stage of the criminal process and that this maltreatment is untenable both as a matter of procedural due process and as discrimination in violation of an express constitutional guarantee of equal protection of the law.

42

Beginning with the Supreme Court and at a high level of generality, where the question before the court involves "the treatment of indigents in our criminal justice system," the Court has told us that "[d]ue process and equal protection principles converge in the Court's analysis in these cases.  Most decisions in this area have rested on an equal protection framework."  Bearden v. Georgia, 461 U.S. 660, 665 (1983) (citation omitted).  The Court explained:  "[W]e generally analyze the fairness of relations between the criminal defendant and the State under the Due Process Clause, while we approach the question whether the State has invidiously denied one class of defendants a substantial benefit available to another class of defendants under the Equal Protection Clause."  Id.

It is noteworthy, also, that in one of the relatively few Supreme Court cases addressing the constitutional rights of pretrial detainees, the Court chose to "hold that the Fourth Amendment," not the doctrine of substantive due process, "requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest." Gerstein, 420 U.S. at 114.[32]  And addressing another aspect of early-stage criminal procedure, Chief Justice Rehnquist, writing for the Court, declined to hold that "so-called 'substantive due process'" precludes preventive pretrial detention.  Salerno, 481 U.S. at 746.  It is of no moment that the Court, in Salerno, proceeded (if grudgingly) with an analysis that smacked of substantive due process[33] where, as here, the claims before the court map nicely onto a much better defined body of equal protection and procedural due process law.  Anthony

---

[32] The court hastens to repeat that, contrary to the Judicial Defendants' assertions in various places (e.g., doc. no. 365, at 19; doc. no. 372, at 12), the plaintiffs' challenge to Tulsa County's secured bail system is not governed by the Fourth Amendment, as is discussed in Part VIII (A), above.

[33] Deciding whether "pretrial detention 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,'" quoting Snyder v. Massachusetts, 291 U.S. 97, 105  (1934)).

Salerno's unsuccessful attack on the preventive detention provisions of the Bail Reform Act, 18 U.S.C. §§ 3141, *et seq*., didn't fit anywhere else.

It comes as no surprise, then, that in in <u>Schultz</u>, a challenge to a state court's secured bail system, the Eleventh Circuit concluded that "the substantive due process claim is a nonstarter." *Id*. at 1331. *See also*, <u>Walker</u>, 901 F.3d at 1259-60 (applying "hybrid analysis of equal protection and due process principles" rather than substantive due process to a challenge to a secured bail system).

This case readily lends itself to analysis in the framework of Fourteenth Amendment procedural due process and equal protection (regardless of what the ultimate outcome may be). A voyage into the turbid waters of substantive due process is neither necessary nor convincingly supported by the Supreme Court's decisions defining the contours of that doctrine.

## C. Procedural due process

### 1. <u>Which test</u>?

In determining whether Tulsa County's secured bail system comports with the requirements of procedural due process, it is necessary, first, to determine what test applies–or, at least, to determine whether that would make a difference.

Plaintiffs argue for application of the test articulated in <u>Mathews v. Eldridge</u>, 424 U.S. 319 (1976). In <u>Mathews</u>, the Court determined whether a recipient of Social Security disability payments was entitled to an evidentiary hearing prior to the termination of those benefits. The Court concluded that this task required consideration of "three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." <u>Mathews</u>, 424 U.S. at 335.

Notably, the plaintiffs, in summarizing those three factors, elide the final factor ("fiscal and administrative burdens") by describing it simply as "the state's interest in not providing the demanded procedures." Doc. no. 369, at 31. It is not that simple.

The Judicial Defendants argue that <u>Medina v. California</u>, 505 U.S. 437 (1992), not <u>Mathews</u>, provides the applicable test. In <u>Medina</u>, the Court was called upon to determine "whether the Due Process Clause permits a State to require a defendant who alleges incompetence to stand trial to bear the burden of proving so by a preponderance of the evidence." <u>Medina</u>, at 439. The <u>Medina</u> test would have the court ask whether the challenged state court procedure "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." <u>Id</u>. at 445 (internal quotation omitted.)

Those are the two tests. On the facts of this case, the court is not as sure as the plaintiffs are that the <u>Mathews</u> test is more favorable to them, especially if we take into account the final <u>Mathews</u> factor ("fiscal and administrative burdens") that the plaintiffs prefer to gloss over. Before getting into that, it is worth noting that, two years ago, in the secured bail challenge in <u>Schultz</u>, the Eleventh Circuit applied <u>Mathews</u>, writing that if a person has been deprived of a liberty or property interest, "we are guided by the balancing test of <u>Mathews</u>, in which we look to the nature of the private interest affected, the risk of erroneous deprivation, the value of additional safeguards, and the government's interest, including any burdens." <u>Schultz</u>, 42 F.4th at 1332.[34] And in <u>ODonnell I</u>, the Fifth Circuit expressly applied the three-part <u>Mathews</u> test. <u>ODonnell I</u>, 892 F.3d at 158-59.

---

[34] Four years earlier, the same court, in the secured bail challenge in <u>Walker</u>, cited <u>Mathews</u> for various due process-related principles, but did not apply the three-part test. <u>Id</u>. at 1265, 1268. Interestingly, it was the *dissent* in <u>Walker</u>, objecting to the majority's denial of relief, that took issue with "the Majority's embrace of the due process framework approved of in <u>Mathews v. Eldridge</u>." <u>Id</u>. at 1276.

In arguing for the application of the <u>Medina</u> test, the Judicial Defendants have the benefit of a bright-line distinction, *viz.*, the distinction between administrative determinations (<u>Mathews</u>) and criminal prosecutions (<u>Medina</u>).  But that bright line is dimmed somewhat by the fact that, by the time it decided <u>Medina</u>, the Court had applied the <u>Mathews</u> test in two criminal cases, <u>United States v. Raddatz</u>, 447 U.S. 667 (1980), and <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985).

In <u>Medina</u>, the Supreme Court emphasized the deference due the states in matters relating to criminal procedure, because "preventing and dealing with crime is much more the business of the States than it is of the Federal Government," 505 U.S. at 445 (internal quotation omitted).  This is a strong indication that the <u>Medina</u> test should control in this case, involving, as it does, some unquestionably important aspects of criminal procedure.  But, as will be seen, it really makes no difference which test is applied.

## 2.  <u>Analysis under Mathews and Medina</u>

An alleged denial of procedural due process under the Fourteenth Amendment "prompts a two-step inquiry:  (1) whether the plaintiff has shown the deprivation of an interest in 'life, liberty, or property' and (2) whether the procedures followed by the government in depriving the plaintiff of that interest comported with 'due process of law.'"  <u>Elliott v. Martinez</u>, 675 F.3d 1241, 1244 (10th Cir. 2012) (quoting from <u>Ingraham v. Wright</u>, 430 U.S. 651, 673 (1977)).  Consequently, under either test, the first question is whether a protected interest is at stake.

The answer to the first question is easy:  "[L]iberty is valuable and must be seen as within the protection of the Fourteenth Amendment."  <u>Morrissey v. Brewer</u>, 408 U.S. 471, 482 (1972).  More to the present point, where the State proposes to confine an individual who is accused but not convicted, that liberty interest is especially strong, because "[p]retrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships."  <u>Gerstein</u>, 420

U.S. at 114.  Moreover, the "traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction."  Stack v. Boyle, 341 U.S. 1, 4 (1951).[35]  It comes as no surprise, then, that the Court has recognized that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." Salerno, 481 U.S. at 755.  Nor does it come as a surprise that our Court of Appeals has recognized that "the denial of bail must comport with the requirements of due process."  Dodds v. Richardson, 614 F.3d 1185, 1192 (10th Cir. 2010).

As a matter of procedure in dealing with that unquestionable liberty interest, plaintiffs' due process argument "described with specificity, is that people may not be subjected to de facto pretrial detention orders without the government establishing that their detention is necessary, regardless of whether reasonable bail, unreasonable bail, or no bail is set."  Doc. no. 384, at 3.  In that vein, the court proceeds on the basis of the unremarkable proposition that imposition of a bail requirement that is financially unattainable amounts to a de facto detention order. The court hastens to add that the imposition of an unattainable financial requirement may be the perfectly legal, and common sensical, thing to do (numerous examples come to mind), but that de facto detention order "must satisfy the procedural requirements for a valid *detention* order."  United States v. Mantecon-Zayas, 949 F.2d 548, 550 (1st Cir. 1991) (noting the legislative history of the Bail Reform Act).

---

[35] A liberty interest "may arise from two sources—the Due Process Clause itself and the laws of the States."  Hewitt v. Helms, 459 U.S. 460, 466 (1983).  As for Oklahoma law, an arrestee has, without doubt, a state-recognized interest in freedom in the post-arrest, pretrial stage of a prosecution.  Brill v. Gurich, 965 P.2d 404, 405-06 (Okla. 1998).  Of course, even though state law may create a liberty interest, "it does not define the procedure constitutionally required to protect that interest."  ODonnell I, 892 F.3d at 160.

What is at stake here is an arrestee's right to "meaningful consideration" of the facts which would bear on the decision whether to release or detain him pending trial.  In this precise context, the en banc Fifth Circuit wrote that:

> Utilization of a master bond schedule provides speedy and convenient release for those who have no difficulty in meetings [sic] its requirements. The incarceration of those who cannot, without *meaningful consideration of other possible alternatives*, infringes on both due process and equal protection requirements.

Rainwater, 572 F.2d at 1057 (emphasis added).[36],[37]  (As has been noted, the first sentence quoted above is also quoted in Tulsa County's CR 2.  See Part III, and n.12, above.)

Before examining what due process requires for "meaningful consideration" in this context, the facts as to Tulsa County's procedure for addressing bail issues, as set forth at length in Part III, above, should be borne in mind.  All of those facts–favorable and unfavorable to Tulsa County's secured bail system–should be considered.  They won't all be repeated here.  But some of the more problematic facts that go directly to the due process issue should again be noticed.

---

[36] It requires no leap of logic to recognize that due process right to "meaningful consideration," as the Fifth Circuit termed it, overlaps very substantially with what the Oklahoma Court of Criminal Appeals recognized as "the due process rights of citizens of this State to an *individualized determination* to bail."  Clark v. Hall, 53 P.3d 416, 417 (Okla. 2002) (emphasis added).

[37] Nothing in the Fifth Circuit's three Daves decisions (see Part VI, above) indicates disapproval of that court's treatment of the procedural due process issue in Rainwater.  In Daves I, the court expressly acknowledged the continuing force of its key holding in Rainwater:  "These Plaintiffs have a right to pretrial liberty that cannot be taken by the State without constitutionally adequate justification. Supreme Court decisions, such as Salerno, and our own Rainwater opinion support such a right."  Daves I, 984 F.3d 381, 413.  After the Daves I opinion was vacated in favor of rehearing en banc, 988 F.3d 834 (5th Cir. 2021), the court, in Daves II (*on reh'g en banc*, 22 F.4th 522 (5th Cir. 2022), cited Rainwater for the proposition that "[t]here is nothing unconstitutional about the mere promulgation and use of bail schedules."  Daves II, 22 F.4th at 543.  And in Daves III, the Fifth Circuit favorably cited Rainwater on the issue of mootness.  Daves III, 64 F.4th at 634.

As an initial matter, it should be understood that Tulsa County's "bond docket" is the only procedure that routinely serves the function of what is commonly called a detention hearing–a proceeding that will determine whether the arrestee stays in jail or is released on conditions pending trial.

On the morning of the bond docket, the arrestee is informed that he is going court for a bond docket, and that this will not be a factual hearing, just a bond hearing. The public defender is present in the courtroom but will not have spoken with the arrestee before the bond docket and won't have the opportunity to speak with him during the bond docket. In some instances, an arrestee's bond conditions will have been agreed to by the prosecutor and the public defender–with whom the arrestee will have neither spoken nor met–before the arrestee even joins the video feed from the jail.

The arrestee appears by video from a crowded room at the jail, and can see only the judge, who will typically be seeing about thirty arrestees on that day's bond docket. On those rare occasions–typically domestic cases–when a witness appears, the witness may speak with the judge, but the arrestee won't be able to hear that conversation. The only microphone in the courtroom is the one in front of the judge, and the arrestee will not always be able to hear the prosecutor or the public defender, so the judge will summarize what the public defender has said. The judge will have the arrest and booking report, but the arrestee does not have the opportunity to see those papers. The judge–and only the judge–will have an NCIC report on the arrestee's criminal history.

The judge will typically not inform the arrestee of the governing legal standards or explain the factors that will inform the court's decision. The arrestee is routinely told not to talk about the case and has no opportunity to consult privately with the public defender during the bond docket. There will be no court reporter. In some cases the judge does, and in some cases the judge does not, give reasons for

the ruling.  Though there are exceptions, court minutes typically do not specify the justification for the ruling.  In most cases, the outcome of the bond docket is that the judge sets a monetary condition of release.

When the bond docket ends, the public defender's representation of the arrestee ends, not to resume until counsel is appointed to represent the arrestee after (but not at) the arraignment six days later.

### 3. **The Mathews test**

The court will analyze the procedural due process claim first under <u>Mathews</u> and then under <u>Medina</u>.  The ultimate issue, under either test, is whether plaintiffs have shown "a governmental failure to provide an appropriate level of process." <u>Citizen Ctr. v. Gessler</u>, 770 F.3d 900, 916 (10th Cir. 2014).

Turning to the first <u>Mathews</u> factor, the "private interest" at stake in this case is the liberty interest of an arrestee who has been accused but not convicted, conjoined with his constitutional right to a reviewable "individualized determination," <u>Clark v. Hall</u>, 53 P.3d 416, 417 (Okla. 2002), of whether he will go free or stay in jail pending a determination of guilt or innocence.  The defendants do not contend that this is not a weighty interest, and no further discussion of that aspect of the matter is required.

The court next looks to "the probable value, if any, of additional or substitute procedural safeguards."  <u>Mathews</u>, 424 U.S. at 335.  As a practical matter, the additional safeguards relevant here are the procedural safeguards that are not present with Tulsa County's bond docket approach but would be required for "meaningful consideration" leading to an "individualized determination" of whether to detain or release (and if release, on what conditions).  Although the defendants refer (doc. no. 365, at 42-43) to the right to file a request for reconsideration, the right to file a habeas case in the Court of Criminal Appeals, the right to a direct appeal after trial, and the right to post-conviction collateral review as alternative avenues available to

arrestees who are unsuccessful at the bond docket (more about that later), there is no room for doubt, on this record, that in Tulsa County criminal procedure, the "main event" for a determination of pretrial release is the bond docket.

Although the court will now tick, one-by-one, through some of the basics of what due process requires when personal liberty is at stake (*e.g.*, meaningful consideration, leading to an individualized determination), it is equally important to step back and take a broader look. The court reaches its conclusion as to the sufficiency of Tulsa County's secured bond system as a matter of due process under the Fourteenth Amendment by taking an overall look at how the Tulsa County process plays out in practice.

At the core of due process is the right to notice and a meaningful opportunity to be heard. LaChance v. Erickson, 522 U.S. 262, 266 (1998). Notice (in this case, notice of what might make a difference to the judge in setting conditions of release) "is essential to afford the prisoner an opportunity to challenge the contemplated action and to understand the nature of what is happening to him." Vitek v. Jones, 445 U.S. 480, 496 (1980). Thus, the "function of notice is to give the [arrestee] a chance to marshal the facts in his defense." Wolff v. McDonnell, 418 U.S. 539, 564 (1974).

As for the hearing itself, the procedural due process section of the Supreme Court's opinion in Salerno makes it plain that the familiar attributes of what we think of as a real hearing, in the common law tradition of adversary proceedings, were important to the Court's conclusion that the preventive detention provisions of the Bail Reform Act did not run afoul of due process requirements. Salerno, 481 U.S. at 751-52. This included, among other things, the right to testify, the right to present evidence, the right to cross-examine, a "clear and convincing" standard of proof and written findings of fact, stating the reasons for a decision to detain. To be sure, the Court did not hold that all of these attributes were essential to save the

constitutionality of the act (and, for example, this court is not persuaded that a "clear and convincing" standard is constitutionally required). But it is clear that these procedural safeguards were highly material to the Court's conclusion that the act did not contravene the bedrock proposition that "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." Salerno, 481 U.S. at 755.

The issue of findings deserves special attention. The plaintiffs stop short of arguing that written findings are constitutionally required, suggesting, instead, that "findings articulated in some form of record" are necessary. Doc. no. 369, at 35. Where eligibility for welfare payments is at issue, procedural due process requires that the decision maker "state the reasons for his determination," although "his statement need not amount to a full opinion or even formal findings of fact and conclusions of law." Goldberg v. Kelly, 397 U.S. 254, 271 (1970). It would seem incongruous to require less of the decision maker where liberty is at stake. Although the Tenth Circuit spoke only in precatory terms, it is worthy of note that, in United States v. Cook, 880 F.2d 1158 (10th Cir. 1989), the court recognized the importance of findings in facilitating review of release vs. detention decisions: "We further suggest, since the government may also appeal release decisions under § 3145(c), that district courts furnish a brief statement of reasons for granting release or for denying a motion to revoke release. Such a statement would greatly facilitate our review of these determinations." Id. at 1162. See also, Brill v. Gurich, 965 P.2d 404 (Okla. 1998), where the defendant was denied bail based on bare bones findings that he was "a flight risk" and "poses a threat to the community." The trial court made these findings "without any substantiating facts." The trial court order did not "make any findings to establish that there are not any conditions of release that would assure the safety of the community." Id. at 409. The Court of Criminal Appeals concluded that these findings were insufficient to support denial of bail and remanded the case to the trial court with directions to make "findings of fact to include the reasons for

denying bail and to support its conclusion with clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person." *Id*. Brill, dealing with a situation in which bail was denied outright, remains the law of Oklahoma in cases in which the arrestee is ordered held without bond. An order requiring the posting of secured bail in an amount which the arrestee obviously cannot pay or post is effectively the same thing.

The issue of the requisite findings will get more attention when the court determines the precise relief to be granted (see Part IX, below).

Timeliness is also relevant under both Mathews and Medina. If there is a right to be heard, the hearing must be held at a "meaningful time and in a meaningful manner." Armstrong v. Manzo, 380 U.S. 545, 552 (1965).[38] Under CR 2, bail for an arrestee who cannot make bond as set by the Sheriff per the preset bond schedule must be considered by the court within 48 hours after arrest. Even though, as has been noted, the modification of the bond docket schedule to six days (not including holidays) a week results in some arrestees not going to a bond docket within 48 hours, that is not at the heart of this case. What *is* at the heart of this case is the Judicial Defendants' proposition that various procedures, ranging from the filing of a motion for reconsideration to the right to seek post-conviction collateral review, are constitutionally sufficient as alternative avenues for getting a determination of pretrial release. Simply to state that proposition is to refute it. When the issue is

---

[38] The idea that a detained arrestee ought to get meaningful attention in short order is not new. In colonial Virginia, "a free person charged with a crime would be brought before a magistrate who could determine whether an examination by the whole county court was necessary. If the magistrate so decided, he would order the accused held in jail, direct material witnesses to appear, and instruct the sheriff to summon the entire court to assemble for the examination. If the offense was a capital crime, the examining court would decide whether the prisoner should be released or be held for trial in the district court having jurisdiction." Jean Edward Smith, *John Marshall: Definer of a Nation* (New York: Henry Holt and Co. 1996), p. 151, citing 1 Shepherd's [Virginia] Statutes 20-21 (1792).

whether an arrestee will be locked up post-arrest but before conviction, time is of the essence. *Cf.*, County of Riverside v. McLaughlin, 500 U.S. 44, 57-58 (1991) (constitutional requirement of probable cause hearing within 48 hours of arrest–with dictum indicating that bail hearing would be in the same category of urgency); ODonnell I, 892 F.3d at 160 (due process requires bond hearing within 48 hours).

Finally, to state an equally obvious proposition, the right to effective assistance of counsel presupposes an opportunity to communicate effectively with counsel.[39]  At the bond docket, much of the negative information about the arrestee will be known to the prosecutor, the public defender, and the judge.  But, in the nature of things, the positive information–the facts which might provide a sound basis for release conditions that don't amount to a de facto order of detention–will mostly be known only to the arrestee who finds himself sitting in the jail essentially as a spectator (worse yet, a spectator who has a limited ability to discern what is going on in the courtroom).   To understand the importance of effective communication between the arrestee and his counsel, it is not necessary look farther than to the pretrial release guidelines the Court of Criminal Appeals reaffirmed in Brill.  Brill requires Oklahoma courts to consider:

---

[39] The defendants do not contend that a bond hearing is not a critical stage.  CR 2 recognizes the need for counsel at the bond docket. Doc. no. 369-30, p. 4 ("[T]he accused shall be represented by court appointed counsel.")  If bail is in issue, it is a critical stage.  *Cf.*, Coleman v. Alabama, 399 U.S. 1, 9 (1970) (right to counsel important at hearing at which bail may be considered). *See also,* Smith v. Lockhart, 923 F.2d 1314, 1319 (8th Cir. 1991) ("The Supreme Court has recognized the special role played by counsel at preliminary hearings in which bail reduction motions are considered." (citing Coleman), and Wood, *The Bail Reform Act*, 4th Ed. (Washington: Federal Judicial Center, 2022), at 44 ("The procedures and issues involved in pretrial detention or release are complex, as is the decision whether a detention hearing is even warranted. It is important to ensure that defendants are provided the opportunity to consult with an attorney at the earliest stage of criminal proceedings, before any decisions, or even discussions, regarding release or detention occur.").

1. The seriousness of the crime charged against the defendant, the apparent likelihood of conviction and the extent of the punishment prescribed by the Legislature;

2. The defendant's criminal record, if any, and previous record on bail if any;

3. His reputation, and mental condition;

4. The length of his residence in the community;

5. His family ties and relationships;

6. His employment status, record of employment and his financial condition;

7. The identity of responsible members of the community who would vouch for defendant's reliability;

8. Any other factors indicating defendant's mode of life, or ties to the community or bearing on the risk of failure to appear.

Brill, 965 P.2d at 406.

Even if the arrestee, though having been told to say nothing about *the case*, opts to try to comment on some of these factors (notwithstanding the fact that he will typically not have been given notice of these factors), his ability to do so effectively is substantially (and in some cases entirely) dependent on the ability of the public defender to prepare the defendant (and himself) for the hearing and to discuss what really will or won't make a difference.

Bearing in mind that, on this second Mathews factor, we are dealing with "risk of an erroneous deprivation of [liberty] through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," 424 U.S. at 335, the court concludes that the risk of erroneous deprivation is substantial and that the additional safeguards sought by plaintiffs, as discussed above, would go far to reduce that risk.

The final Mathews factor is "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute

procedural requirement would entail." *Id*.[40]  Defendants have not made an issue of expense, perhaps because they argue that the Mathews test (with this third factor) is not applicable.  But if "[d]ue process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person," Patterson v. New York, 432 U.S. 197, 208 (1977), it follows that the court, in determining the constitutional sufficiency of Tulsa County's secured bail system, should not close its eyes to the costs and other burdens a grant of relief in this case would entail.

The Constitution introduces a variety of financial inefficiencies into our criminal justice system.  The right to trial by jury and an indigent arrestee's right to counsel at public expense come quickly to mind.  It is safe to assume that the public resources (judges, court staff, prosecutors, defenders, and jail personnel, aside from any non-personnel costs) required to provide arrestees with the procedural safeguards discussed in this order would not come cheap.  The bond docket proceedings would certainly take more time, but the additional time cannot be estimated by assuming that every eligible arrestee would require a full hearing.  The reality is that arrestees frequently waive a detention hearing when it is obvious, from the standpoint of flight risk or danger to the community, that pretrial release is a lost cause.[41]  In terms of the available judicial resources, the District Court of Tulsa

---

[40] As has been noted, because the Mathews test, unlike the Medina test, requires the court to consider "fiscal and administrative burdens," it is not obvious to the court that the Mathews test is more favorable to the plaintiffs.

[41] The Bail Reform Act, as amended in 1984, makes it clear that, in federal courts, a "judicial officer may not impose a financial condition that results in the pretrial detention of the person." 18 U.S.C. §3142(c)(2).  So, an arrestee may waive a detention hearing and stay in jail pending trial, or he may have a hearing and be released on conditions, or he may have a hearing and be detained if he is found to be a flight risk or a danger to the community, but the court may not, in any event, impose a financial condition that results in pretrial detention.

County has 26 judges.[42]  The task at hand is to provide "meaningful consideration," leading to an "individualized determination," of eligibility for pretrial release. ODonnell I, 892 F.3d at 157; Rainwater, 572 F.2d at 1057; Clark, 53 P.3d at 417. As has been discussed, the collective import of the Supreme Court's decisions in Salerno, Gerstein,  Morrissey and Stack (among many others) is that the liberty interest of an individual who stands accused but not convicted is especially strong because of the effect pretrial detention can have on the individual, his family and his ability to assist in his defense.  The fiscal and administrative burden the procedural safeguards discussed in this order would entail, though not trivial, do not outweigh the importance, under the Constitution, of the interests to be protected by those safeguards.

### 4. **The Medina test**

As has been noted, the Judicial Defendants urge the application of what they describe as "the more deferential test articulated in Medina v. California, 505 U.S.

---

In the U.S. District Court for the Northern District of Oklahoma, for 1,113 defendants charged in fiscal years 2014-2023 with drug or weapons (firearms) offenses (excluding non-U.S. citizens, who are normally detained for immigration-related reasons regardless of other factors), the overall pretrial release rate was 45.6 percent.  Excluding cases in which the government's request for detention was uncontested, the pretrial release rate was 61.5 percent (826 defendants).  Thus, 287 defendants charged with drug or weapons offenses (25.8 percent of the 1,113) didn't even bother to avail themselves of a contested detention hearing.

Including *all* offenses other than immigration offenses (2,663 defendants), the overall pretrial release rate (again excluding non-citizens) was 49.2 percent.  Excluding cases in which the government's request for detention was uncontested, the pretrial release rate was 63.8 percent (2,056 defendants).  Thus, 22.7 percent (607) didn't contest detention.

Since the parties have not had an opportunity to contest these statistics, the court notes them only by way of general background, and not as adjudicative facts.

Source: Admin. Office of the United States Courts, *Pretrial Release and Detention Data Dashboards* (District-level release rates, fiscal years 2014-2023). https://aotablu-e-prd.adu.dcn/#/site/PPSO/views/Pretrial_Output_Tables_FINAL2023_JudgeView/Releasebyjudicialdistricts?:iid=3

[42] https://www.oscn.net/courts/tulsa

437 (1992)." Doc. no. 365, at 22. The Supreme Court's opinion in <u>Medina</u> does not put considerations of fiscal and administrative burden in the equation, and the defendants do not contend otherwise. The question under <u>Medina</u> is whether the challenged state court procedure "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." <u>Medina</u>, 505 U.S. at 445. A relevant inquiry in applying the <u>Medina</u> test is whether the challenged state procedure "transgresses any recognized principle of fundamental fairness *in operation*." *Id*. at 448 (emphasis added, internal quotation omitted).[43] And, on that score, the Court has "has often reaffirmed that fundamental fairness entitles indigent defendants to an adequate opportunity to *present their claims fairly within the adversary system*." <u>Ake</u>, 470 U.S. at 77 (emphasis added).

So, what procedural safeguards are constitutionally due these plaintiffs, by way of protection of their liberty interests, if their treatment at the bail hearing stage is to clear the <u>Medina</u> bar? It helps, as an initial matter, to focus on where an arrestee, accused but not convicted, stands in the due process pecking order. "Prior to conviction, the accused is shielded by the presumption of innocence, the bedrock, axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law." <u>Betterman v. Montana</u>, 578 U.S. 437, 442 (2016) (internal quotation marks omitted). Thus, as he seeks release on bail, he "remain[s] clothed with a presumption of innocence and with [his] constitutional guarantees intact." <u>Rainwater</u>, 572 F.2d at 1056. He clearly has a stronger claim to protection than a convicted defendant because "[a] criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man." <u>Osborne</u>, 557 U.S. at 68. To be sure, a new arrestee, at the time of a bail hearing, stands

---

[43] This reading of the essential holding in <u>Medina</u> was reaffirmed relatively recently in <u>Osborne</u>, 557 U.S. at 69.

accused of a crime (even if not yet formally charged) and may have already had a probable cause hearing.  Analytically, he may not be on exactly the same footing as a person who has not been accused of criminal activity, but the court would be hard put to accord lesser protection to a person who stands accused but not convicted than it would to an offender who has been convicted and now faces the possibility of losing his liberty because of an allegation of a violation while on post-conviction supervision.  For that reason, it is certainly noteworthy that an offender in the latter category enjoys procedural safeguards that closely match the safeguards the plaintiffs seek in the case at bar for arrestees who have not been convicted of anything.  That offender has a right to (i) written notice of the claimed violations (by analogy, written notice of the standards governing the pretrial release decision), (ii) disclosure of the evidence against him (by analogy, disclosure of the probable cause affidavit or similar document), (iii) an opportunity to be heard and present evidence, (iv) the right to confront witnesses, absent a finding of good cause for not allowing confrontation, (v) a neutral decisionmaker, and (vi) written findings.  Gagnon v. Scarpelli, 411 U.S. 778, 786 (1973) (quoting from Morrissey, 408 U.S. at 489).

It is not necessary, at this juncture (see Part IX, below), to decide whether *all* of these safeguards would be necessary (and, if so, in what precise form) in order for a bail system to avoid running afoul of the Medina test.  It suffices for present purposes to focus on the fact that the Tulsa County bail system provides the arrestee skimpy notice (if any) of the criteria which will govern the pretrial release decision, provides incomplete disclosure of the readily available information bearing on the release decision, rarely entertains the presentation of witnesses and evidence in the usual sense, usually does not produce written findings specifying the justification for the ruling on pretrial release, and precludes effective communication and consultation between the defender and the arrestee before and during the bond docket proceedings.

The court concludes that these deficits in Tulsa County's system for determination of pretrial release offend principles of justice "so rooted in the traditions and conscience of our people as to be ranked as fundamental." This conclusion is fortified by the fact that, in assessing how this system works on a day-to-day basis, the focus is on whether it provides "fundamental fairness in operation" and, specifically, on whether it affords indigent arrestees "an adequate opportunity to present their claims fairly within the adversary system." A bail hearing system that makes the arrestee essentially a spectator (and an ill-informed one at that) at the proceedings that will determine whether he will be subjected to pretrial restraint of his liberty for months, or perhaps longer, does not pass muster.

## D.  Equal protection

### 1.  **Preliminary matters**

Turning to plaintiffs' equal protection claim, it is important, as an initial matter, to understand the gist of that claim, as refined at the summary judgment stage. Plaintiffs' equal protection complaint, which they say "lies at the cross-roads of due process and equal protection," is premised on the fact that "[t]he only reason someone will be jailed after booking is if they cannot afford to pay the preset amount." Doc. no. 369, at 27. In equal protection terms, the constitutional violation is the "practice of detaining plaintiffs, while releasing similarly situated people who were able to pay." *Id*. at 28. They are "completely priced out of the opportunity to obtain immediate release under the bail schedule." Doc. no. 384, at 9. Thus–importantly–plaintiffs' argument is that the equal protection violation occurs *when the arrestee arrives at the jail* and is allowed to leave only if he has the money

needed to meet the demands of Tulsa County's preset bond schedule, *regardless* of whether he is accorded a due process-compliant bail hearing 48 hours later.[44]

For reasons to be explained, the court concludes that (i) equal protection is satisfied if the indigent arrestee is given a due process-compliant bail hearing within 48 hours of arrest (and, conversely, that equal protection is violated if the arrestee is not given a due process-compliant hearing within 48 hours), and (ii) because the Tulsa County secured bail system falls short of complying with well-established due process requirements, plaintiffs have also established an equal protection violation. Thus, the equal protection violation the court finds is not, as the plaintiffs would have it, a violation that occurs when the indigent arrestee is confronted with a secured bail requirement upon arrival at the jail, regardless of the availability of "meaningful consideration,"[45] leading to an "individualized determination,"[46] within 48 hours.

Even though the court finds that plaintiffs have established an equal protection violation, it is necessary to explain where and how the court parts ways with the plaintiffs in reaching that conclusion. The short version is that the court has concluded that (i) indigency-related unequal treatment must clear a threshold level of egregiousness before it is actionable under the Equal Protection Clause, and (ii) the threshold level of egregiousness is not met if a due process-compliant bail hearing is provided within 48 hours. The practical effect of this difference is that if defendants eliminate the due process violation (Part VIII (C), above), they will also eliminate the equal protection problem, whereas, in plaintiffs' scheme of things,

---

[44] As has been noted (Part V, above), plaintiffs do not claim that bond schedules are inherently unconstitutional. Their point is that a bond schedule would be constitutional if it provided for "equally expeditious release on standard non-financial conditions" for indigent arrestees. Doc. no. 373, at 25 n.16.

[45] Rainwater, 572 F.2d at 1057.

[46] Clark v. Hall, 53 P.3d at 417.

elimination of the due process violation would still leave an equal protection violation resulting from the fact that the indigent arrestee, when confronted with the preset bond schedule on arrival at the jail, will stay in jail because he is financially unable to immediately buy his freedom.

These conclusions under the heading of equal protection are substantially influenced by the Eleventh Circuit's decision in Walker and the Fifth Circuit's decision in ODonnell I.

In Walker, as in the case at bar, the case as originally filed in the district court was a frontal attack on a bail system incorporating a preset bond schedule.  Under that system as it stood when the case was filed, Walker faced an eleven-day delay, post-arrest, before he would see a judge for a bail hearing.  Id. at 1252.  In Walker, as in this case, the defendants modified their bail system after the suit was filed. Under the revised system, documented in a "Standing Bail Order," if the arrestee could not make bond per the preset bond schedule, he would have a bail hearing within 48 hours after arrest.  He would "be represented by court appointed counsel" and the court would make "an individualized determination [of indigency] based upon the evidence provided."  Id.  Under the revised system, if no hearing were held within 48 hours, the accused would be released on recognizance.[47]  After an initial grant of relief was vacated on appeal, the district court again granted relief under the Equal Protection Clause, finding that "the Standing Bail Order 'still violates the Constitution insofar as it permits individuals who have sufficient resources to post a bond ... to be released immediately, while individuals who do not have those

---

[47] The offenses covered by the Standing Bail Order were relatively low level offenses.  The order provided for release on recognizance upon a showing of indigency, thus obviating the need for a bail hearing addressing the usual issues governing detention vs. release.  Consequently, Walker provides no guidance as to the procedural safeguards that would be required in a due process-compliant contested bail hearing.  The Supreme Court's decisions in Gagnon and Morrissey do provide that guidance, as is discussed in Part VIII (C) (4), above.

resources must wait forty-eight hours for a hearing.'" *Id*. at 1253 (quoting from district court order). The district court required a determination of indigency within 24 hours after arrest. *Id*.

After determining (as this court has) that abstention was not appropriate under Younger or O'Shea, the Eleventh Circuit turned to the merits, determining, first, that the plaintiffs' claims were not governed by the Eighth Amendment's Excessive Bail Clause (as this court also has). On the merits, the Eleventh Circuit derived substantial guidance from the Fifth Circuit's decision in Rainwater (which, under Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981), was binding on the Eleventh Circuit because Rainwater was decided before the Eleventh Circuit was carved out of the Fifth Circuit).

Plaintiffs argue that their fourteenth amendment claim  challenging wealth-based detention must be evaluated on the same basis as the claim of the indigent probationer was evaluated by the Supreme Court in Bearden. Doc. no. 384, at 8. The court agrees. The Eleventh Circuit's treatment of this issue in Walker fortifies that conclusion.

The court, in Walker, read San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1 (1973) to require "two distinguishing characteristics" if a wealth-based discrimination claim is to be successful: first, "because of their impecunity," the complaining parties "were completely unable to pay for some desired benefit," and, second, they, in consequence, "sustained an *absolute deprivation* of a meaningful opportunity to enjoy that benefit." Walker, 901 F.3d at 1261, quoting (with emphasis added) from Rodriguez, 411 U.S. at 20. Thus, said the court in Walker, "differential treatment by wealth is impermissible only where it results in a *total* deprivation of a benefit *because* of poverty." *Id*. Consequently, it is necessary to determine what does, and does not, constitute an "absolute" (or "total") deprivation in this context.

2. **There is no "absolute deprivation" of an arrestee's liberty interest in pretrial release if he receives a due process-compliant hearing within 48 hours of arrest.**

This is where the court parts ways with the plaintiffs.

After noting the "absolute deprivation" standard the Court articulated in Rodriguez, the Walker court elaborated, quoting from Rodriguez: "[A]t least where wealth is involved, the Equal Protection Clause does not require absolute equality or precisely equal advantages." Walker, 901 F.3d at 1261. This is why the revised bail system made a difference in Walker: "Under the Standing Bail Order, Walker and other indigents suffer no 'absolute deprivation' of the benefit they seek, namely pretrial release. Rather, they must merely wait some appropriate amount of time to receive the same benefit as the more affluent." Id. On this basis, the court concluded that the defendants' revised bail system "does not trigger heightened scrutiny under the Supreme Court's equal protection jurisprudence." Id. at 1262. Because the revised bail system in Walker provided for the resolution of release vs. detention issues within 48 hours, the court held that "[t]he district court was wrong to apply heightened scrutiny under the Equal Protection Clause." Id.

This court agrees with the Walker court that pretrial realities do not permit– and the Fourteenth Amendment does not require–elimination of every conceivable disparity, as between the poor and the rich, when it comes to post-arrest detention. One approach proposed by plaintiffs is to permit "equally expeditious release" (*i.e.*, immediate release at the jail, on non-financial conditions) for indigent arrestees. Doc. no. 373 at 25, n.16. But this proposal ignores the need for "meaningful consideration," leading to an "individualized determination," of issues such as the availability of resources with which to post bond. ODonnell I, 892 F.3d at 157; Rainwater, 572 F.2d at 1057; Clark, 53 P.3d at 417. It must be conceded that plaintiffs do have a point when they ask, in substance, why Tulsa County should be permitted to hold an indigent drug dealer in jail while immediately releasing–per the

express terms of Tulsa County's court rules–his cash-heavy competitor who was arrested for the same offense on the next street corner.  But, bearing in mind the preparation and the array of resources that must be brought to bear at one time and in one place for a hearing worthy of the name, it is not realistic (as the court recognized in <u>Walker</u>) to expect that all of this can be accomplished in real time, day by day and night by night.  The court, for that reason, rejects plaintiffs' contention that an arrestee suffers an equal protection violation on arrival at the jail if he, unlike a more affluent arrestee who is there for the same offense, cannot meet the demands of the preset bond schedule.  The court thus agrees with the Eleventh Circuit's conclusion in <u>Walker</u> that a 48-hour wait is constitutionally tolerable–as long as a real bail hearing, with the procedural safeguards required by due process (enabling meaningful consideration and an individualized determination), is available at the end of that 48-hour wait.

### 3.   **The absence of a due process-compliant hearing within 48 hours is an "absolute deprivation," within the meaning of _Rodriguez_, of the arrestee's liberty interest in pretrial release**.

The Tulsa County secured bail system confronts an indigent arrestee with the requirement, on arrival at the jail, to meet the demands of the preset bond schedule, failing which he is exposed to the prospect of awaiting trial–however long that may take–while in custody and without the benefit of a timely, due process-compliant bail hearing.[48]  The liberty interest at stake is not the arrestee's generalized desire to be free from incarceration for the rest of his life; the liberty interest, rather, is the interest of an individual who stands accused but not convicted in freedom from

---

[48] The due process deficits of the Tulsa County system are addressed in Part VIII (C), above.  As is discussed there, the alternatives of filing an interlocutory habeas case in the Court of Criminal Appeals, or complaining about pretrial detention on direct appeal after entry of judgment or on post-conviction collateral review, are wholly deficient as means of protecting the arrestee's liberty interest in pretrial release.

"pretrial restraint of liberty," Gerstein, 420 U.S. at 105, the denial of which the Supreme Court has pointedly noted is a serious matter. *Id*. at 114.  When that freedom is denied, the deprivation is "absolute" within the meaning of Rodriguez.

**4.  Because of the absolute deprivation of the plaintiffs' liberty interest in pretrial release, the *Bearden* analytical framework applies.**

The court agrees with the plaintiffs that the absolute deprivation triggers review under the standard the Supreme Court applied in Bearden.  In Walker, there was not an absolute deprivation, so the Eleventh Circuit did not subject the city's bail system to heightened scrutiny.  In ODonnell I, the arrestees did "sustain an absolute deprivation of their most basic liberty interests—freedom from incarceration." ODonnell I, 93 F.3d at 162.  The Fifth Circuit accordingly concluded that "[h]eightened scrutiny of the County's policy is appropriate," citing, in addition to Rodriguez, Tate v. Short, 401 U.S. 395 (1971), where the Supreme Court invalidated a statute that authorized imprisonment of indigents for failure to pay fines because it violated the Equal Protection Clause. *Id*. (And the court observes once again that it would be passing strange to apply equal protection principles less rigorously to individuals who have been arrested but not convicted than to convicts who face incarceration due to their indigency.)

The court's conclusion in ODonnell I that heightened scrutiny was required is entirely consonant with the Supreme Court's analysis in Rodriguez and Tate.  The court adheres to that approach in the case at bar.  That said, in the case at bar, the court need not, and does not, apply "heightened scrutiny" with the same jaundiced eye as that with which heightened scrutiny is applied in equal protection cases involving discrimination (for instance) on the basis of gender, *e.g.,* J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127 (1994); Craig v. Boren, 429 U.S. 190 (1976).  It is not necessary to undertake an analysis any more stringent than that which was applied on materially indistinguishable facts in Bearden, consisting of: "a careful

inquiry into such factors as 'the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose.'" Bearden, 461 U.S 660, at 666-67 (quoting from Williams v. Illinois, 399 U.S. 235, at 260 (1970) (Harlan, J., concurring)).[49]

5. **Applying the *Bearden* analytical framework, the court concludes that Tulsa County's secured bail system violates the Equal Protection Clause.**

We are dealing here with the right of an indigent arrestee to meaningful–which includes timely–consideration of the facts relevant to pretrial release in situations in which a wealthy arrestee (or, at least, one with enough money to post a secured bond) would, on the very same facts other than indigence, immediately go free pending trial.

Evaluation of "the nature of the individual interest affected, the extent to which it is affected" does not require a long essay here. As has been discussed in detail, the right of an individual who has been accused but not convicted to freedom from pretrial restraint is no ordinary right. "[D]etention prior to trial or without trial is the carefully limited exception." Salerno, 481 U.S. 739, 755. As for "the extent to which it is affected," the denial of the liberty interest of an indigent arrestee awaiting trial is complete where he cannot post secured bail and is not afforded a timely, due process-compliant bail hearing.

---

[49] The Judicial Defendants argue for application of a lenient "rational basis" standard to plaintiffs' equal protection claim. Doc. no. 365, at 30. For reasons now readily apparent, it is not necessary for the court to undertake a rational basis analysis. But the court certainly does not assume that Tulsa County's secured bail system would pass muster on rational basis review. By what reckoning does a bail system withstand rational basis review when, by design, a recidivist fentanyl dealer who has the money to make bond will, within hours of arrest, be put back on the street to resume plying his trade, while an indigent arrestee who has been accused of a much less serious crime faces the very real prospect, for lack of a due process-compliant bail hearing, of sitting in jail to await trial?

Turning to the "rationality of the connection" between the state's purpose and the means employed, the beginning point is that the state's "purpose" (protection of the safety of the community and assurance of appearance before the court when required) is an unassailably legitimate purpose.[50]   "The government's interest in preventing crime by arrestees is both legitimate and compelling." Salerno, 418 U.S. at 749.   But, in the case at bar, the rationality of the connection between the legitimate purpose and the means employed to serve that purpose is undermined by the fact that, in the Tulsa County system, a recidivist drug dealer who has the money to post bond will be set free by the Sheriff (acting under the mandatory language of CR 1) within hours after arrival at the jail while an indigent arrestee, charged with a much less serious offense, *won't* be set free within hours and *won't* get a timely, due process-compliant bail hearing to determine whether he does in fact represent a flight risk or a danger to the community.   By definition, a system equipped and empowered to meaningfully assess flight risk and danger to the community is empowered to satisfy the compelling public interest in protection of the community and assurance of arrestees' compliance with the criminal process.

The last issue in the Bearden analysis is "the existence of alternative means for effectuating the [legitimate] purpose." Bearden, 303 U.S at 666-67.   On this issue, it is important to remember that plaintiffs do not claim that bond schedules are inherently unconstitutional and do not seek a decree mandating that any secured bail amount imposed be affordable.   Nor do they seek a decree that would facilitate the

_____

[50] If some elements of this Bearden analysis smack due process as well as equal protection, it is because, as the Supreme Court noted in Bearden, "[d]ue process and equal protection principles converge in the Court's analysis in these cases [dealing with the treatment of indigents in the criminal justice system]." Bearden, 461 U.S. at 665. The Eleventh Circuit recognized as much in Walker: "Because Walker's claim indeed rests on an allegation of categorically worse treatment of the indigent, it falls within the Bearden and Rainwater framework, and the district court was correct to apply those cases' hybrid analysis of equal protection and due process principles." Walker, 901 F.3d at 1260.

pretrial release of any arrestee who may be shown, after a due process-compliant hearing, to be a candidate for detention–even by setting an unattainable bail amount–under the bail-setting criteria established by the Court of Criminal Appeals in Brill v. Gurich. 965 P.2d 404 (1998).  Thus, the plaintiffs don't ask this court to abolish Tulsa County's secured bail system.  They don't seek (and in any event won't get) any judicial relief other than that required to assure that Tulsa County's secured bail system will not systematically detain arrestees solely because of their indigence. The remedy ("alternative means") is a system that does not detain arrestees without safeguards reasonably approximating (see Part IX, below) those prescribed in Gagnon and Morrissey.  The "alternative means," in place and in daily use in courthouses from coast to coast, do exist.

For the foregoing reasons, the court concludes that the Tulsa County secured bail system, administered as shown by the record in this case, does not satisfy the requirements of either the Due Process Clause or the Equal Protection Clause.

## IX. RELIEF

Plaintiffs' motion for summary judgment will be denied as to their substantive due process claim and granted as to their procedural due process and equal protection claims.  Defendants' summary judgment motions will correspondingly be granted in part and denied in part.  But the case is not ready for entry of judgment.  The relief the court is prepared to grant will be the relief necessary to protect plaintiffs' due process and equal protection rights, as those rights have now been determined to exist.  Importantly, that relief will be "narrowly tailored to cure the constitutional deficiencies" the court has identified.  ODonnell I, 892 F.3d at 166.  And under the Fourteenth Amendment, it is not enough that "another method may seem to [this court's] thinking to be fairer or wiser or to give a surer promise of protection to the prisoner."  Snyder v. Com. of Mass., 291 U.S. 97, 105 (1934).

The relief sought by plaintiffs, as described in Part IV of this order, does not align in every respect with the conclusions set forth in this order.  For that reason, the court will, by separate order, set this case for a hearing to facilitate the court's determination of the precise relief to be granted.  That hearing will be preceded by plaintiffs' submission of their proposed form of judgment (including injunctive and declaratory relief), with a supporting memorandum.  Defendants will have the opportunity to file responses (with alternative draft forms of judgment, if they so choose).

The matters to be addressed at the hearing and in the parties' submissions will include:

What measure of flexibility, if any, is permissible or appropriate with respect to the 48-hour requirement?  *Cf.*, McLaughlin, 500 U.S. at 56 ("[W]e believe that a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of Gerstein.").

Is a "clear and convincing" standard of proof constitutionally required?  The court will observe, preliminarily, that it discerns no constitutional mandate for a "clear and convincing" standard of proof.  If a trial court may decide potentially (and usually) dispositive issues such as suppression of evidence on a preponderance standard, Nix v. Williams, 467 U.S. 431, 444 (1984), the imposition of a "clear and convincing" standard in the present context would seem to be a stretch.  To be sure, the Court, in Salerno, applauded the drafters of the Bail Reform Act for incorporating a "clear and convincing" standard, but the Court also noted that the "extensive safeguards" written into that act exceeded constitutional requirements.  Salerno, 481 U.S. at 752.  It is noteworthy, also, that even though a "clear and convincing" standard applies under the Bail Reform Act where the issue is danger to the community, the statute is silent as to the standard of proof where the issue is risk of

70

flight, with the result that the Courts of Appeals have determined that a preponderance standard will suffice. *See, e.g.*, <u>United States v. Patriarca</u>, 948 F.2d 789, 793 (1st Cir. 1991); <u>United States v. Aitken</u>, 898 F.2d 104, 107 (9th Cir. 1990); <u>United States v. King</u>, 849 F.2d 485, 489 (11th Cir. 1988); <u>United States v. McConnell</u>, 842 F.2d 105, 110 (5th Cir. 1988) (en banc); <u>United States v. Jackson</u>, 823 F.2d 4, 5 (2d Cir. 1987); <u>United States v. Himler</u>, 797 F.2d 156, 161 (3d Cir. 1986) (collecting cases).[51]

In light of the fact that the plaintiffs do not propose a requirement of written findings, do the Judicial Defendants object (and, if so, on what basis) to making oral individualized, case-specific findings on the record in a format readily accessible for review purposes? *See*, <u>ODonnell I</u>, 892 F.3d at 160 (Declining to require the County "to produce 50,000 written opinions per year to satisfy due process," but "requiring magistrates to specifically enunciate their individualized, case-specific reasons" for pretrial detention.)

To what extent do the Judicial Defendants assert, or the plaintiffs acknowledge, that it will be sufficient for some aspects of the relief to be granted to be declaratory rather than injunctive?

## X.   CONCLUSION

Nearly five decades ago, Justice Powell, writing for a unanimous Court, noted the potentially life-changing consequences of prolonged pretrial detention. <u>Gerstein</u>, 420 U.S. at 114. It follows quite easily that our understanding of due process of law and of equal protection of the law should leave little room for a system in which the process, itself, becomes the punishment.

---

[51] In 52 years as a lawyer and judge, the undersigned has yet to see a case, jury or nonjury, in which it appeared that there was any real possibility that the difference between the two standards of proof made any difference in the outcome.

Plaintiffs' motion for summary judgment, doc. no. 368, is **GRANTED** with respect to plaintiffs' procedural due process and equal protection claims and **DENIED** with respect to plaintiffs' substantive due process claim.  Defendants' motions for summary judgment, doc. no. 365 (Judicial Defendants), adopted by Defendant Regalado, doc. no. 366, is **GRANTED** with respect to plaintiffs' substantive due process claim and **DENIED** with respect to plaintiffs' procedural due process and equal protection claims.  A Rule 54 final judgment will be entered following the hearing on the scope of injunctive and declaratory relief.

DATED this 3rd day of April, 2024.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

18-0298p031 MSJ .docx

72