Judge William J. Musseman, Jr.
12/16/2020

1

Page 1

1         IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OKLAHOMA
2

3   Case No. 18-CV-0298-CVE-JFJ

4   - - - - - - - - - - - - - - - - - -X
    RICHARD FELTZ, et al.,            :
5   On behalf of himself             :
    and all others                   :
6   similarly situated,              :
                    Plaintiff        :
7                                    :
    VS                               :
8                                    :
    BOARD OF COUNTY COMMISSIONERS     :
9   OF TULSA COUNTY, et al.,         :
                    Defendants       :
10  - - - - - - - - - - - - - - - - - -X

11

12

13             Videotaped deposition of

14         JUDGE WILLIAM J. MUSSEMAN, JR.

15   taken via videoconference before Clifford Edwards,

16   Certified Shorthand Reporter and Notary Public, on

17          December 16, 2020, at 10:09 a.m.

18

19

20

21

22

23

24

25

**Exhibit 1**

Judge William J. Musseman, Jr.
12/16/2020

102 to 105

Page 102

1    A    All defendants?
2    Q    Yes.
3    A    No.  No.
4    Q    Beyond these two documents, did you, as
5    presiding judge, issue any other policy guidance
6    related to the administration of the bond docket?
7    A    Policy guidance, no.
8    Q    Did you issue or create any training
9    documents with regard to the administration of the
10   bond docket?
11   A    There were training documents produced,
12   but I think at a later time.  At this time, I don't
13   think so.
14   Q    Did you -- did your administrative chief
15   at the time, which I believe was Judge Moody,
16   produce any policy guidance for the judges that
17   would be presiding over the bond docket with regards
18   to AO-9 and 10?
19   A    Policy guidance, not that I know of.  I
20   just think counsel in discussion.
21   Q    And any training or -- any training
22   documents that he might have issued with regard to
23   AO-9 and 10?
24   A    No.
25   Q    Did you hold any meetings to explain with

Page 103

1    all of the judges who would be presiding over --
2    strike that.
3         So my understanding is that after these
4    were issued, there was a single judge that was going
5    to preside over the bond docket; is that right?
6    A    Yes.
7    Q    And that was Judge Hiddle?
8    A    Yes.
9    Q    Did you have conversations with Judge
10   Hiddle regarding the administration of the bond
11   docket after issuing these two administrative
12   orders?
13   A    Yes.
14   Q    How many times did you meet with Judge
15   Hiddle to discuss administration of the bond docket?
16   A    I don't know.
17   Q    More than once?
18   A    Yes.
19   Q    More than five times?
20   A    I'm sure there was more than five
21   meetings.
22   Q    More than ten times?
23   A    Now I don't know.  Five to ten sounds
24   like a fair estimate.
25   Q    And what did you all discuss about the

Page 104

1    administration of the bond docket during those
2    meetings?
3    A    Wow.
4    Q    Let me -- I'll be narrower.
5         Did you discuss what the evidentiary
6    standards should be for anything he was considering
7    during the administration of the bond docket?
8    A    I am sure we did.  I don't -- under your
9    definition or classification of evidentiary
10   standard, I -- I don't know, but -- but I think
11   there were conversations that would barely fall
12   under that broad umbrella.
13   Q    Did you discuss with Judge Hiddle who he
14   could hear evidence from during the administration
15   of the bond docket?
16   A    Yes.
17   Q    And who did -- did you provide him with
18   guidance as to who he could hear information from?
19   A    I tried, I thought.
20   Q    Okay.  And who did you suggest that he
21   could take information from for the purposes of
22   making findings on the bond docket?
23   A    The defendant, his lawyer, State,
24   whatever they had to present.
25   Q    Did you suggest that he could also take

Page 105

1    into account anything pretrial services shared
2    during the administration of the bond docket?
3    A    I -- boy.  I don't have that specific
4    memory, but I can't imagine that I did not.
5    Q    What about any bail bondsmen in the room,
6    did you suggest that he could take that as a part of
7    the evidence he was considering for purposes of
8    setting bond?
9    A    No.  I don't think we ever discussed it.
10   Q    Okay.  Did you discuss the ability of --
11   did you discuss what findings he needed to make for
12   purposes of setting bond when he was administering
13   the bond docket?
14   A    I'm sure we did, yes.
15   Q    Did he --
16   A    And I --
17   Q    Go ahead.
18   A    I -- you probably know this, and I'm
19   doing what you should never do in a deposition, but
20   that is just offering information.
21        The context of these conversations, it --
22   these AO-9 and 10, back in that time, the idea that
23   we were going to hit the ground running with a
24   seven-day-a-week docket was -- I said it before --
25   this in my estimation was going to be a process and

Exhibit 1

Judge William J. Musseman, Jr.
12/16/2020                                    106 to 109

**Page 106**

1  not an event.
2          AO-9 and AO-10 were not the end all, be
3  all.  They were the first step.  I felt that we
4  needed to move on it, and we needed to get started
5  and make corrections and -- you know, course
6  corrections and improvements once we got the docket
7  started.  So this was going to evolve into what it
8  is today.
9          The conversations then, based upon that
10 backdrop of information, the conversations I had
11 with Judge Hiddle were logistical.  How many people
12 are we able to do in a day?  Are you able to hear
13 what they have to say?  Are you limited by what they
14 want to say or present to you by time?  Are there
15 ways that we could improve this docket?  Do you need
16 more time?  Do we need to start it at a different
17 time?  Do we need to break it out?
18         And we would reference back -- one of the
19 things we did to kind of try to train ourselves to
20 get ready for this was -- in -- in addition to
21 meetings, was observations.  I had gone with Judge
22 Hiddle and also the public defender to Oklahoma
23 County to watch and observe the way they did a bond
24 docket.
25         So that builds at least, I think, a fair

**Page 107**

1  backdrop of information for you to understand, at
2  least the context and the time that I was meeting
3  with Hiddle.  It was very logistical driven.  I --
4  we had a lot of people to get through, and there
5  were times he had frustration that he wasn't able to
6  get to the information he wanted, or how could he
7  get the information he wanted in a timely manner
8  knowing there's 70 people on the docket?
9      Q     That makes complete sense to me.  And I
10 appreciate that a number of these conversations
11 dealt with logistics.  I'm trying to determine if
12 there was anything else, specifically the categories
13 I'm going through, that you discussed with him
14 beyond just those logistical things.
15         So, for instance, did you discuss with
16 Judge Hiddle how to make findings after having made
17 a determination on what the bond amount should be?
18     A     I have no independent recollection of
19 that, but I can't -- I -- I'm sure I did.  I'm sure
20 he had questions.
21     Q     Do you recall what you said to him?
22     A     No.
23     Q     And did you discuss with Judge Hiddle how
24 those findings should be memorialized in the docket
25 or a written record?

**Page 108**

1      A     I believe I did.  I -- I told him on the
2  minutes -- by minute.
3      Q     So earlier we talked about the bond
4  reduction hearings that you held as a district court
5  judge on a felony docket.
6          Did you suggest to Judge Hiddle that the
7  same types of findings should be made in -- on the
8  bail docket?
9      A     I didn't use me as an example.
10     Q     Was your expectation that Judge Hiddle
11 would make findings -- well, let me take one step
12 back.
13         Is there -- did you discuss having a
14 court reporter in the room with Judge Hiddle during
15 the bond docket?
16     A     Not that I remember.
17     Q     Okay.  So earlier when we spoke about the
18 bond hearings that you held in your courtroom, you
19 mentioned that when you did not have a court
20 reporter, you made sure that the clerk entered
21 certain minutes into the written record.
22         Do you remember that discussion?
23     A     I remember that discussion.
24     Q     Did you instruct Judge Hiddle as to the
25 types of things that needed to be entered into the

**Page 109**

1  minute record for a given bond docket hearing?
2      A     We talked about the minutes, and that is
3  the extent of my memory.
4      Q     So you don't recall whether you
5  instructed him to provide certain things as a part
6  of the written record?
7      A     I do not.
8      Q     Okay.  All right.  At some point, Judge
9  Hiddle -- I actually have this date -- was replaced
10 by Judge Guten on the bond docket, I believe perhaps
11 at the end of 2019, 2020.
12         Does that sound right?
13     A     It wasn't 2020.  I thought -- yeah, '19,
14 I think.
15     Q     You're right.  You're right.  You have --
16 you have absolutely corrected me correctly.
17     A     Okay.
18     Q     I believe maybe it was early in 2019.
19     A     Yeah.
20     Q     Does that sound more correct?
21     A     Yeah.  Yeah.
22     Q     Okay.  So Judge Hiddle was the presiding
23 judge over the bond docket from when it was
24 established in October of 2018 until -- would around
25 February 2019 sound about right to you?

**Exhibit 1**