# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

RICHARD FELTZ and ASHTON DENNIS, on behalf of themselves and all other similarly situated,

       *Plaintiffs*,

v.

VIC REGALADO, *et al.*,

       *Defendants*.

Case No. 18-CV-0298-SPF-JFJ

## **PLAINTIFFS' MOTION FOR INJUNCTIVE RELIEF**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ............................................................................................ iii

I.    DEFENDANTS' BOND DOCKET PROCEEDINGS CONTINUE TO
       VIOLATE THE FOURTEENTH AMENDMENT ....................................................1

      A.    Defendants Have Begun Providing Some Notice, But It Is
             Insufficient ...............................................................................................1

             1.    The Jail Provides Inadequate Written Notice.......................................2

             2.    The Judges Provide Incomplete Oral Notice .......................................4

      B.    The Bond Docket's Physical Set-Up Prevents Arrestees from
             Fully Participating...................................................................................5

             1.    Arrestees and Defense Attorneys Who Appear from the
                    Jail Struggle to See and Hear Proceedings in the
                    Courthouse ..........................................................................................6

             2.    Defense Attorneys Appearing from the Jail Are
                    Excluded from Ex Parte Courtroom Conversations..............................9

             3.    Arrestees Are Routinely Unable to Review
                    Documentary Evidence ......................................................................10

             4.    Attorneys Cannot Communicate Privately With Both
                    Arrestees and Potential Witnesses ......................................................12

      C.    Arrestees Found to Have "Waived" their Appearances Are
             Routinely Denied their Right to a Hearing ......................................13

      D.    The Judges Continue to Detain People on Unaffordable Bond
             Without Making Record Findings that their Detention Is
             Necessary ...............................................................................................15

             1.    Judges Impose De Facto Detention Orders When
                    Finding No Need to Detain .................................................................17

             2.    Judges Do Not Conduct Meaningful Ability to Pay
                    Determinations....................................................................................17

             3.    Judges Routinely Detain People on Unaffordable Bond
                    Without Making Findings About Alternatives .....................................19

      E.     Defendants Do Not Make Available Records that Reliably Specify the Findings and Conclusions that Justify Detention Orders ........................................................................................21

II.     INJUNCTIVE RELIEF IS NEEDED TO EFFECTUATE THE CONSTITUTIONAL RIGHTS PREVIOUSLY ARTICULATED BY THIS COURT ........................................................................................22

      A.     Effective Distribution of Written Notice ........................................23

      B.     Accurate and Thorough Written and Oral Notices ........................24

      C.     A Clearer Bench Card ....................................................................24

      D.     In-Person Bond Hearings ..............................................................27

      E.     Witness Appearances from Inside the Tulsa County Jail ..............28

      F.     Preserved Audio Recordings .........................................................28

III.    DECLARATORY RELIEF IS NEEDED TO REINFORCE THE COURT'S DUE PROCESS AND EQUAL PROTECTION FINDINGS ...................29

CERTIFICATE OF SERVICE

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES:**

*Atlas Biologicals, Inc. v. Kutrubes*,
  50 F.4th 1307 (10th Cir. 2022) ............................................................30

*Brill v. Gurich*,
  965 P.2d 404 (Okla. Crim. App. 1998)............................................13, 29

*Goldberg v. Kelly*,
  397 U.S. 254 (1970).............................................................................28

*Kitchen v. Herbert*,
  755 F.3d 1193 (10th Cir. 2014) ............................................................22

*Mullane v. Cent. Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950).............................................................................23

*Rocky Mountain. Christian Church v. Bd. of Cnty. Comm'rs*,
  613 F.3d 1229 (10th Cir. 2010) ............................................................22

*Salt Lake Trib. Pub. Co., LLC v. AT&T Corp.*,
  320 F.3d 1081 (10th Cir. 2003) ............................................................22

*Trump v. J. G. G.*,
  604 U.S. ----, 145 S. Ct. 1003 (2025) ..................................................23

*United States v. Robinson*,
  8 F.3d 418 (7th Cir. 1993) ...................................................................25

*United States v. Salerno*,
  481 U.S. 739 (1987)..............................................................................26

Plaintiffs Richard Feltz and Ashton Dennis, on behalf of themselves and the certified class, ask the Court to issue injunctive relief needed to give effect to the Court's April 3, 2024 ruling that Tulsa County's pretrial detention system violates equal protection and due process. Summ. J. Order, Dkt. No. 397.

Plaintiffs request four categories of injunctive relief, seeking (1) improved notice; (3) a more robust bench card; (3) in-person hearings; and (4) preserved audio recordings. In addition, Plaintiffs do not request a comprehensive declaration at this time but do seek a narrow declaration, confirming one aspect of the court's prior holdings: that if a judge imposes a bond that an arrestee cannot presently afford to pay, then the bond order is in fact a detention order, and the court must conduct a hearing and make findings as it would for an explicit order of detention.

The specific forms of relief that Plaintiffs request are carefully tailored to the current operation of the bond docket. Plaintiffs therefore provide the Court with an updated, detailed account of pretrial detention proceedings in Tulsa County that will make clear why the requested relief is required.

## I.    DEFENDANTS' BOND DOCKET PROCEEDINGS CONTINUE TO VIOLATE THE FOURTEENTH AMENDMENT

Since the summary judgment order issued in April 2024, defendants have adopted several reforms. These reforms have not resulted in provision of constitutional pretrial release hearings for class members. They have, however, laid the foundation for several low-burden, high-impact changes that can protect class members' constitutional rights from ongoing violations.

### A.    Defendants Have Begun Providing Some Notice, But It Is Insufficient

Since the Court's summary judgment ruling, Defendants have agreed to implement concrete measures to advise arrestees about their rights on the bond docket, but the measures are

incomplete and leave arrestees still unaware of "the criteria which will govern the pretrial release decision." Summ. J. Order at 59, Dkt. No. 397.

### 1.    *The Jail Provides Inadequate Written Notice*

On March 15, 2025, the jail began to offer some arrestees a written notice of bond docket rights after they are booked into the jail. Ex. 2 at 2-3 (Sheriff Interrog. Resp.) & associated exhibits; Ex. 3 (Notice of Rights). The written notice is typically the only source of information about bond hearings that is offered to arrestees between booking and appearance on the docket. Wright Dep. Tr. at 119:25-20:15, 122:13-23:10, Dkt. No. 369-3. The notice is insufficient for three reasons. First, it is not distributed to everyone who will appear on the docket. Second, it is distributed in a manner that undermines its effectiveness. And third, it does not advise arrestees of the required legal standards for bond hearings: that the judge must find valid grounds for detention and consider alternatives before imposing an unaffordable bond.

The notice is not distributed to everyone scheduled to appear on the docket, including people arrested on warrants. An April 15, 2025 memorandum instructs jail employees to provide the notice to "anyone eligible to bond out of jail," and identifies four categories of people who should *not* receive it: people with three specific kinds of hold, and anyone with a hold and "no open charges." Ex. 4. In practice, however, jail employees also exclude anyone arrested on a warrant. *See* Ex. 6 (Emails re Notice Distribution) at 1 (explaining that arrestees were not given notice because they were arrested on warrants). On June 9, this exclusionary practice was codified in a checklist used by jail employees to decide who should and should not receive the notice. *See* Ex. 5 (Sheriff's Jun. 9 Memo. re Notice) at 3. Plaintiffs and Defendants have litigated whether people arrested on warrants are properly included as class members, *see, e.g.*, Pls.' Second Mot. for Class Cert. Reply Br. at 3-4, Dkt. No. 343, and the Court held that they are, *see* Order Certifying

Class at 12-13, Dkt. No. 357. They therefore appear for bond hearings, *see, e.g.*, Ex. 26-a (May 23 Recording) at 1:37:28-37:45, but the jail excludes them from receiving notice of the hearing's purposes, governing standards, and procedural protections.

Even for arrestees who do see the written notice, the way in which it is distributed undermines its effectiveness. The jail staff who show the form to arrestees are classifications officers, *see* Ex. 2 at 2-3 (Sheriff's Interrog. Resp.), not the booking officers who otherwise provide arrestees with information about bond. Booking officers tell arrestees their bond amounts and the dates of their hearings, and they distribute contact information for bondsmen. *See* Wright Dep. Tr. at 119:25-20:15, 122:13-23:10, Dkt. No. 369-3. The form is therefore shown to arrestees without context or explanation. Moreover, it is provided with a stack of unrelated materials, including the Inmate Handbook, containing an array of information ranging from discipline procedures and visitation rules, to sick call and dinner times, Wright Dep. Tr. at 117:5-25, Dkt. No. 369-3 (describing handbook), and information about the jail's sexual misconduct policies and the Prison Rape Elimination Act. *See* Ex. 5 (Sheriff's Jun. 9 Memo. re Notice) at 3. Arrestees who receive the notice are asked to sign an acknowledgement that they have seen it during a rushed meeting when they are simultaneously asked to provide information or signatures to complete three other categories of paperwork. *Id.*; *see* Ex. 7 (Smith Aff.) ¶¶ 4-10 (describing rushed and overwhelming classifications process). Unsurprisingly, arrestees shown the notice under these conditions are unaware of its significance and subsequently do not remember having seen it. *Compare* Ex. 25 (Smith Signed Notice) *with* Ex. 7 (Smith Aff.) ¶¶ 8-13**.** Anyone who does not receive or does not read the notice will remain unaware that the purpose of their first scheduled hearing is to determine whether they can be released from jail.

Finally, the notice provides arrestees with an abundance of crucial information about their procedural rights, but in describing the legal standards that govern a detention hearing, it omits the very information that this lawsuit is about. The notice tells arrestees that the judge can require bail and/or non-monetary conditions if she finds an arrestee to be a flight or safety risk. Ex. 3 (Notice of Rights). But it does not tell arrestees that their ability or inability to pay is relevant to the court's decision. *Id*. It also does not tell arrestees that, if the judge imposes bail they cannot afford, the judge must explain why their release would present a flight or safety risk and why options that would allow for their release—such as a lower bond or non-monetary conditions—are inadequate to ensure the community's safety and their appearance in court. *Id*. Without articulating these legal standards, the notice does not afford arrestees clarity about the considerations that should determine their bail hearings' outcomes.

## 2. *The Judges Provide Incomplete Oral Notice*

The Tulsa County District Court has also amended its practices for providing notice by adopting a uniform oral advisement for judges to deliver at the start of each bond docket. That advisement omits the same core legal standards as the jail's written notice. *See* Ex. 10 at 3 (Oral Advisement Transcript); Ex. 26-b (Advisement Recording). The advisement informs arrestees that the court will consider whether they are a flight or safety risk, and that the court will consider ability to pay. But it does not inform arrestees that before imposing an unaffordable bond, the court must consider other release conditions and find them inadequate to ensure community safety and appearance. *See* Ex. 10 at 3 (Oral Advisement Transcript) .

In this respect, the court's oral advisement deviates from a bench card that the court has employed since at least March 14, 2025. *See* Ex. 10 at 1-2. The bench card instructs: "If you impose bail, find whether the person will be able to post the amount you set, and articulate the evidence

4

on which the finding is based." *Id*. at 2. Addressing "Consideration of Alternatives to Unaffordable

Bail," the bench card reads:

> Under the Fourteenth Amendment, bail that an arrestee cannot pay is a 'de facto
> detention order,' and all procedural requirements for a valid detention order are
> required. Before you set an aggregate bail amount that an arrestee cannot pay, you
> must consider alternative options for addressing risks of dangerousness and/or
> flight. If you set a bond that the person cannot pay:
>
> - Articulate the risk(s) of flight and/or dangerousness that you find,
>   and the specific evidence on which your finding is based.
>
> - Articulate why no alternative conditions that would enable release—
>   including non-monetary conditions and affordable bail—can
>   reasonably assure safety and appearance, and identify the evidence
>   on which your findings are based.

*Id*. (citing to *Brill v. Gurich*, 965 P.2d 404 (Okla. Crim. App. 1998). Plaintiffs concur with the

bench card's articulation of the legal standards for setting conditions of release, but those standards

are omitted from all notice given to arrestees.

## B.    The Bond Docket's Physical Set-Up Prevents Arrestees from Fully Participating

Bond hearings continue to be conducted from multiple locations, using a Microsoft Teams

videoconferencing setup that frustrates arrestees' ability to participate.  Judges continue to preside

from the courthouse, while arrestees appear from the jail. Defense attorneys must choose between

full communication with the court or with their clients. Until March 20, 2025, assistant public

defenders represented their clients virtually, under the conditions described in the Court's summary

judgment order, Summ. J. Order, Dkt. No. 397 at 12 ("The public defender does not have the

opportunity to meet with or physically provide arrestees with pieces of paper prior to bond docket."

(internal quotation marks and citation omitted)). *See* Ex. 11 (Ali Aff.) ¶ 22 (public defenders

appeared remotely until March 20). Beginning on March 20, one week after this Court set a

schedule for remedial briefing, Corrected Order for Br., Dkt. No. 413, public defenders have

attended hearings from inside the jail where they are able to meet with their clients and share any documents they have. Ex. 11 (Ali Aff.) ¶ 23. But in prioritizing communication with their clients, public defenders subject themselves to the same technological and logistical barriers to full participation that beset their clients.

       1.     *Arrestees and Defense Attorneys Who Appear from the Jail Struggle to See and Hear Proceedings in the Courthouse*

Each arrestee appearing on bond docket stands at a podium in the jailhouse courtroom, several yards away from a monitor. Ex. 11 (Ali Aff.) ¶ 15; Ex. 12 (Jail Photo 1); Ex. 13 (Jail Photo 2). The screen is divided among multiple frames showing participants who sign onto Teams from the courthouse or their own devices, including judges, attorneys, bondsmen, Court Services employees, and translators. Ex. 12 (Jail Photo 1); Ex. 13 (Jail Photo 2); Ex. 11 (Ali Aff.) ¶¶ 24-26. Anyone can attend bond docket virtually via a link on the Tulsa County District Court's website, https://tulsacountydistrictcourt.org/vh_bond.html. However, as shown by a photograph taken from the podium at which arrestees stand, judges and attorneys in the courthouse are markedly harder to see from arrestees' vantage than the public link and bond docket videos suggest. *Compare* Ex. 12 (Jail Photo 1) & Ex. 13 (Jail Photo 2); Ex. 11 (Ali Aff.) ¶ 13, *with, generally*, Ex. 26-a (Mar. 23 Recording).

The monitor that arrestees see is divided into frames, one for each of the various attendees. One of the frames shows the courtroom from which the judge presides. Ex. 12 (Jail Photo 1) & Ex. 13 (Jail Photo 2); Ex. 11 (Ali Aff.) ¶ 16. On at least one recent docket, the courthouse's video feed switched off entirely, and three arrestees could not see people in the courtroom at all for the duration of their hearings. Ex. 11 (Ali Aff.) ¶ 29. When the cameras are functioning properly, the courthouse frame is divided into quarters that show, respectively, the judge's bench, the witness box, and each counsel table. Ex. 12 (Jail Photo 1); Ex. 11 (Ali Aff.) ¶ 16.

On the day that Plaintiffs' counsel visited the jail to take photographs, the monitor was divided into eight frames, so the judge's bench and counsel tables each occupied 1/32 of the screen. Ex. 11 (Ali Aff.) ¶ 11. The camera in the courthouse that captures the judge is mounted on the ceiling across the room, making the judge a tiny figure in the center of a square that occupies less than three percent of the visual display. Ex. 12 (Jail Photo 1); Ex. 13 (Jail Photo 2); Ex. 11 (Ali Aff.) ¶ 15. The photograph attached as Ex. 12 (Jail Photo 1) shows a view of the monitor from the arrestees' podium, with the judge in the top left quadrant of the bottom center frame. The photograph was taken after the docket had ended, and two of eight participants had exited the meeting, reducing the number of frames from eight to six, and making the judge appear larger in the photograph than she had appeared to arrestees on the docket that day. Ex. 12 (Jail Photo 1); Ex. 11 (Ali Aff.) ¶¶ 9-11.

The audio feed between the jail and courthouse has been improved by the addition of microphones and cameras at counsel's tables, but it remains marred by frequent interruptions that prevent arrestees from hearing important moments in their brief appearances. Sometimes glitchy connections render probable cause or bail determinations unintelligible, *see, e.g.*, Ex 25-c (D.L.R Recording) at 0:00-0:17, 01:16-01:50; Ex. 26-d (S.E.Y. Recording) at 02:52-03:07, 04:30-05:11; Ex. 26-b (Advisement Recording) at 01:32-02:27. At other times, microphones fail to pick up judicial inquiries, attorney arguments, and conversations among judges, attorneys, courthouse personnel, bondsmen, and other observers. Available recordings offer many examples. During one hearing, the judge conversed with others in the courthouse about the arrestee's release conditions, but only the judge's portions of the conversation could be heard on the audio feed Ex. 26-e (R.U.H Recording) at 01:08-01:36. The prosecutor's argument in that case was also inaudible. (*Id 02:06-02:12*); *see also* Ex. 26-f ( I.W.Y. Recording) at 0:00-01:01 (prosecutor inaudible in conversation

with judge about arrestee's detention). In another illustrative case, the judge's utterances were largely incomprehensible throughout the hearing. Ex. 26-g (M.E. Recording) at 05:12-05:28; 06:42-07:01; 08:12-08:22; 09:07-09:20. Many of these glitches are brief, but they are a significant portion of hearings that often last no more than two or three minutes in total.

Plaintiffs have attached one full day's docket, May 23, 2025 as a more complete sample for the Court. Ex. 26-a (May 23 Recording).[1] It shows audio glitches interfering with at least four appearances that day. Ex. 26-a (May 23 recording) at 1:25:35-1:25:52 (judge repeats prosecutor's question for defense attorney to hear),1:37:02-1:37:14 (inaudible exchange between judge and prosecutor), 1:16:17-1:16:45 (prosecutor's argument inaudible),1:52:05-1:52:24 (same), 2:43:04-2:43:13 (same). Faulty audio also characterized dockets that were not recorded. *See* Ex. 11 (Ali Aff.) ¶¶ 28, 30. The evidentiary recordings do not fully capture the poor audio quality in the jail, where arrestees cannot increase the volume or tune out substantial ambient noise Ex. 11 (Ali Aff.) ¶ 18. In one case highlighting the discrepancy between sound quality in the recordings versus the jail, an arrestee told the judge he could not hear the prosecutor "at all," although the prosecutor can be heard on the recording. *E.g.* Ex. 26-a (May 23 Recording) at 1:16:17-1:16:45; *see also id.* at 1:52:02-1:52:23 (defense attorney says she cannot hear what on recording is audible).

Because of the audiovisual conditions, arrestees looking at the screen cannot identify the judge or attorneys in the courtroom, or tell who on the screen is speaking to them throughout their hearings. Ex. 7 (Smith Aff.) ¶¶15-16; Ex. 8 (Dennis Aff.) ¶ 9; Ex. 11 (Ali Aff.) ¶¶ 16-17 ("I could make out the shapes of individuals in the courthouse Teams video only if they were wearing colors that contrast with their background."). From the jail, proceedings are sufficiently hard to follow—

---

[1] On weekdays, the Court conducts in-custody arraignments before bond hearings, and both dockets have been captured on the recording. The bond docket recording runs from at 1:11:35 to 2:48:22.

and the judge hard enough to discern—that, during one hearing, the judge verbally excused herself and left the courtroom, and the defense attorney, who argued that day from inside the jailhouse, did not notice; she began to address the empty bench before the prosecutor advised her from the courthouse that the judge had "stepped out for a second." Ex. 26-a (May 23 Recording) at 2:30:40-2:30:57.

### 2. Defense Attorneys Appearing from the Jail Are Excluded from Ex Parte Courtroom Conversations

When defense attorneys are in the jail rather than the courtroom, they, like their clients, cannot fully see and hear the proceedings. In addition, when a defense attorney in the jail takes time to confer with their client or is otherwise unable to attend to the feed, the judge, the prosecutor, and others in the courtroom talk among themselves. Usually portions of those courtroom conversations are not discernable over the audio feed, *see, e.g.*, Ex. 26-e (R.U.H. Recording) at 51:36-51:55, or they are conducted with the courtroom microphones muted. For example, on May 22, before the jail had logged into the Teams meeting, the judge began a conversation about the docket with the prosecutor and almost immediately muted the microphone. *See* Ex. 26-s (Courtroom Chatter Recording).

It is impossible to know what was discussed that morning, but other *ex parte* conversations captured on the recordings reveal a mix of unrelated chitchat and discussions about arrestees and their cases. *See, e.g.*, Ex. 26-e (R.U.H. Recording) at 01:08-01:36; Ex. 26-f (I.W.Y. Recording) at 0:00-0:21. In one case, while the defense attorney conferred with an arrestee in the jail, the judge and prosector in the courtroom puzzled through some questions about the arrestee's charges in a conversation that was only partially audible over Teams. Ex. 26-h (H.L.P. Recording) at 0:00-02:25. During another attorney's jailhouse conference with his client, courtroom talk veered between pleasantries, general conversation about bond docket practices, and a joint effort to clarify

the arrestee's charges. Ex. 26-i (S.L.J. Recording) at 01:32-03:08. Earlier in that same arrestee's appearance, the judge had an inaudible conversation with a bondsman in the courtroom. *See id.* at 0:00-0:39; Ex. 11 (Ali Aff.) ¶ 27.

The video recordings available as evidence show only hearings that the public defender attended from the jail. In this way, they are unrepresentative of bond hearings that have occurred before and after the summary judgment ruling. Attorneys who argue from the jail can prevent their clients from becoming "essentially . . . spectator[s]" at their own hearings by soliciting relevant facts and providing confidential advice, but in exchange they adopt their clients' "limited ability to discern what is going on in the courtroom." Order on Summ. J. at 54, Dkt. No. 397. What the recordings do illustrate, however, is the degree to which the Judicial Defendants and the Sheriff shift responsibility to defense counsel to overcome the hearings' structural infirmities, and the degree to which participation barriers persist even when defense attorneys choose to appear alongside their clients. When defense attorneys do not choose to attend bond docket from the jail, Judicial Defendants proceed with the docket without concern for arrestees' ability to participate. *See* Ex. 11 (Ali Aff.) ¶¶ 22 (observing six dockets that proceeded with attorneys not in jail).

> 3.      *Arrestees Are Routinely Unable to Review Documentary Evidence*

A similar dynamic prevents arrestees from consistently having access to the documentary evidence reviewed by the judges at their bond hearings. Judicial Defendants and the Sheriff do not provide any documents directly to arrestees. Ex. 9 (Judges' Interrog. Resp.) at 8-9. Instead, they claim that "each detainee/defendant has access via counsel," because the public defender receives copies of certain relevant documents via email each morning. *Id.* at 8-9 But emails to public defenders on the morning of bond docket do not reliably translate into arrestee access because of

the bond docket's set-up, with the judge in one place, the arrestee in another, and defense attorneys choosing between the two.

In ordinary circumstances, providing documents to a person via their lawyer is an effective mechanism. But public defenders are not arrestees' lawyers when they receive each day's email. Guten Dep. Tr. at 46:12-47:13, Dkt. No. 369-4; Southerland Dep. Tr. at 44:13-47:19, Dkt. No. 369-5. They ordinarily do not have preexisting relationships with the arrestees and, unless they go to the jail for the hearing, they do not have any means of communicating with the arrestees between receipt of the email and the docket. Wright Dep. Tr. at 267:2-68:4, Dkt. No. 369-3. If defense attorneys do not attend bond docket from the jail, arrestees do not have access to any documentary evidence, and that has been true for most of the hearings since the Court's summary judgment order. In these circumstances, Judicial Defendants again take no steps to ensure that arrestees have access to documents and instead proceed with hearings that rely on evidence they know the arrestee has not seen. Ex. 11 (Ali Aff.) ¶ 22 (bond dockets proceed with public defenders in the courthouse, not with client); Ex. 9 at 8-9 (Judges Interrog. Resp.) (Judicial Defendants provide documents to defense attorneys but not arrestees).

Even when public defenders do appear from the jail, they and their clients do not have access to any documentary evidence that was not included in the day's email. Ordinarily, emails include arrest reports and probable cause affidavits and, if available, financial questionnaires prepared by Court Services staff. Ex. 9 at 8-9 (Judges' Interrog. Resp.); Ex. 7 (Smith Aff.) ¶¶ 17-20. The judge and prosecutor in the courtroom often consult materials that were not emailed to the defender, and they sometimes offer to physically share those materials with one another, an option that is not available to defense attorneys when they appear from the jail.

On the May 23 docket, two hearings in a row featured documentary evidence in the courtroom that the arrestee and his attorney could not review. One person's arrest report and Court Services packet had been omitted from that day's email distribution, so the prosecutor looked up information she had on her computer about the arrestee from a prior arrest. Ex 25-a (May 23 Recording) at 2:20:36-2:20:51. "I know that the PD doesn't have it," the prosecutor said, "but I can show Your Honor my computer that has" the documents. *Id.* at 2:20:57-2:21:20. The prosecutor then presented an argument about reasons to detain based on representations about what was in the materials on her computer. *Id*. at 2:21:20-2:21:47. Throughout this exchange, the public defender was talking privately with her client in the jail and seemed unaware of the courtroom conversation. *Id*. The defender also lacked a pretrial services report for the next arrestee on the docket. *Id*. at 2:29:52-2:30:00. The judge did have a report and referred to it throughout the hearing, but the defense attorney, being in a separate location, could not ask to look at the judge's documents. *Id*. at 2:32:02-2:32:28.

Defendants have put the burden of transmitting relevant evidence to arrestees on defense attorneys, but because attorneys must appear remotely from either the judge or the arrestees, they have been unable to effectively facilitate that access.

    4.    *Attorneys Cannot Communicate Privately With Both Arrestees and Potential Witnesses*

Family and other community members sometimes attend bond docket in the courthouse to watch the hearings, but it is very rare for a community member to speak as a witness in a bail hearing, perhaps in part because it is impossible, given the current docket set-up, for defense attorneys to communicate privately with both witnesses and clients. Bond hearings were recorded for this case from May 9 through 25, and during that time, a family member attempted to speak as a witness in one case. *See* Ex. 26-r (J.A.W. Recording) at 0:00-0:19 (noting a family member in

attendance); 07:36-8:04. The judge promptly told her it was "inappropriate" to speak and warned, "I'm going to have to mute you and have you excused if you keep talking." *Id*. Because the family member was not at the jail, the defense attorney had no way to speak with her in private to determine if she had relevant information and might usefully testify. It is highly likely that she would have had relevant information, given that Oklahoma law instructs courts assessing dangerousness and risk of flight to consider such factors as the arrestee's "reputation, and mental condition," his "family ties and relationships," and "[t]he identity of responsible members of the community who would vouch for [his] reliability." *Brill v. Gurich*, 965 P.2d 404, 406 (Okla. Crim. App. 1998).

### C.    Arrestees Found to Have "Waived" their Appearances Are Routinely Denied their Right to a Hearing

Since the Court's summary judgment ruling, defendants have maintained a docket schedule and scheduling process that, as a rule, provide arrestees with scheduled bond hearings within forty-eight hours of arrest, as required by Tulsa County District Court Local Criminal Rule, Dkt. No. 369-30 at 2.[2] However, arrestees *scheduled* to appear are routinely denied the right to *actually* appear. Arrestees are routinely deemed by the Court to have "waived" their appearances, even when they have not received notice about the hearing's purpose, *see supra* at Part I-A-1, or provided informed consent.

On May 23, 2025, the day for which Plaintiffs have submitted a recording of the full docket, the court found at least seven people to have waived their hearings, without any indication that they had knowingly done so. In each instance, a jail employee reported that the arrestees had waived the hearing or "refused to come down." *See* Ex. 26-a (May 23 Recording) at 1:21:57-

---

[2] Rule 2 is also publicly available online at https://tulsacountydistrictcourt.org/files/TCDC-LocalRulesCriminal-082423.pdf, 3-4.

1:22:21; 1:30:35-1:31:03; 1:54:30-1:55:10; 2:36:53-2:38:52; 2:42:19-2:44:07; 1:45:50-1:48:23; 2:00:06-2:01:28. In each of these cases, the court asked the public defender for consent before proceeding in absentia, but at the time that "consent" was given, the public defenders were strangers to the arrestees. The arrestees had not accepted the representation or even been consulted, and the defenders had no authority to speak on their behalf.

The May 23 docket is representative of waiver practices throughout bail hearings. Out of seventeen days of hearings for which recordings are available, and an additional 19 days for which there is testimonial evidence of proceedings, Ex. 11 (Ali Aff.) ¶ 31, Plaintiffs have found only one day on which a judge declined to waive appearances without evidence of a knowing and voluntary waiver. On that morning, when the public defender advised the judge that she had spoken to an arrestee, advised him of his bond docket rights, and received a knowing and voluntary waiver, the judge found that the arrestee had "waived after being advised by counsel" and proceeded with the hearing. *See, e.g.*, Ex. 26-j (C.A.B. Recording) at 0:00-0:32. But where defense counsel had not obtained a knowing waiver, the judge passed the hearing until the following day's docket and instructed the public defender to advise her about whether to waive. *See, e.g.*, Ex. 26-k (S.S. Recording) at 0:00-01:04.

Other than on May 25, waivers have resembled those on the May 23 docket. Sometimes, the day's docket wraps up with the court quickly disposing of numerous cases in absentia after finding waiver based on physical absence. For example, at the end of the May 21, 2025 docket, the public defender told the judge, "There is no one left in the courtroom, so I believe that everyone else on the docket has waived." Ex. 26-l (May 21 Waiver Recordings) at 0:00-0:09. The judge asked whether the defense attorney was "comfortable proceeding" without the arrestees being present, and the defense attorney stated that he was, *id.* at 0:09-0:21. Those four hearings

14

proceeded in absentia. In only one of them did the attorney indicate that he had communicated with the affected arrestee, who happened to be represented by the public defender in another matter. *Id*. at 0:21-6:19. The same thing happened with the last two appearances on May 19, when the court quickly processed two hearings for arrestees who were not present, without any indication that they had knowingly chosen to give up their right to participate. Ex. 26-m (May 19 Wavier Recordings).

> **D.    The Judges Continue to Detain People on Unaffordable Bond Without Making Record Findings that their Detention Is Necessary**

Since the Court's summary judgment ruling, Judicial Defendants have adopted an order form to record their bond docket determinations. *See* Ex. 10 at 4 (Oral Advisement Transcript). A review of completed forms shows ongoing systematic violations of the Fourteenth Amendment. Bond docket judges still do not treat unaffordable bonds as *de facto* detention orders, despite the clarity of their own bench card on the subject. *Supra* at Part 1-A-2; Ex 10 (Oral Advisement Transcript) at 2.

Judicial Defendants continue to treat arrestees' ability to pay the bonds they set as "just one factor" to consider, rather than a potential trigger for findings that would satisfy a detention order. The judge who presides over bond docket on weekdays, when asked by a spectator in the courtroom about how she decides bond amounts, replied:

> When we're looking at bond, what I'm really looking at is those *Brill* factors, and I'm looking . . . like their criminal history . . . if they're a flight risk, if they're . . . an imminent risk to public safety, if they're a threat to themselves or others. I'm weighing—it's kind of a long story—we've now added, it's almost like a mini cost hearing, their ability to pay. That's just one factor I'm looking at. That's not really covered in *Brill*. So I'm weighing all of that together and making a determination.

Ex. 26-a (May 23 Recording) at 1:42:55-1:43:40.

Because Judicial Defendants treat ability to pay as "just one factor" thrown into the mix, they do not regularly make the findings required to know whether bonds will act to detain, and,

when they do find a bond unaffordable, they do not proceed to determine whether detention is necessary. Adopting a standardless "consideration of all factors" approach, judges routinely cite "all of the evidence" to explain their rulings without identifying any specific evidence or legal standards when imposing bond. *See, e.g.*, Ex. 26-m (May 19 Waivers Recording), at 0:20-0:40 ("I did review and based on my review of the evidence, I feel that $750 is appropriate. . . . Gonna leave the preset bond amount the same."); Ex. 26-l (May 21 Waivers Recording) at 3:23-4:35 ("Based on everything I am seeing, I am going to leave the bond at the $1,500 with that no contact order."); Ex. 26-a (May 23 Recording) at 1:21:51-1:23:50 (finding no flight or safety risk and imposing a $1750 bond, a no-contact order, and a pretrial referral because,"[b]ased on everything I've seen, I feel like the presets are appropriate"); Ex. 26-a (May 23 Recording) at 1:30:35-1:32:37 (maintaining preset amount of $3400, imposing a no-contact order, and making a pretrial referral, "based on what I have reviewed," after finding no flight or safety risk).

Plaintiffs reviewed findings forms from bond docket hearings that were conducted over a two-week period from May 10 through May 23. The findings were overwhelmingly constitutionally inadequate. Multiple times a day, Judges imposed bonds that they explicitly found unaffordable on people whom they also found were not a flight or safety risk, *see, e.g.*, Ex. 15 at 5, 22-24, 26, 31-33, 48-49. They imposed bonds on people whom they found were not a flight or safety risk without making any findings at all about ability to pay. *Id*. at 1-4, 8-12, 15-16, 18, 20, 28, 35-37, 39-45. Judges checked boxes finding flight or safety risks and ability to pay without identifying any supporting evidence. *See* Ex. 17 (findings forms). And judges simply did not articulate why alternative conditions were inadequate. *See, generally*, Exs. 15-17 (findings forms).

1.    *Judges Impose De Facto Detention Orders When Finding No Need to Detain*

Exhibit 15 contains nearly fifty forms from the two-week period imposing monetary bonds where the court simultaneously (1) either made no findings about safety or flight risks, or explicitly found no such risks, and (2) either made no finding about ability to pay, or explicitly found an inability to pay.[3] Those orders meant continued incarceration for at least some, and possibly all, of the people on whom they were imposed. A judge had not found any reason to keep those people in jail—or expressly found that there was no reason to keep them in jail—and, absent any holds on their records, people with more money would have obtained immediate release.

2.    *Judges Do Not Conduct Meaningful Ability to Pay Determinations*

Exhibit 16 contains sixteen additional findings forms from that same two-week period that impose money bonds without any finding of flight or safety risk. On each of these forms, the judge checked a box indicating an ability to pay, but did not identify any factual basis for that check mark. At the hearings for some of these cases, the judge said nothing about the person's ability to pay. One illustrative hearing is T.D.C.'s, which was conducted in absentia. *See* Ex. 16 at 12; Ex. 25-a (May 23 Recording) at 1:21:56-1:23:49. The attorneys offered the judge no information about T.D.C's financial circumstances, and a Court Services interview form submitted to the court, which asks about personal financial information, was blank. Ex. 18 (Interview Form). Nonetheless, the

---

[3] This exhibit is not comprehensive. Plaintiff reviewed findings forms issued on only 12 days during that two-week period and did not do a complete review of forms even during those 12 days. Plaintiff also did not include forms that could be viewed as ambiguous, such as forms where the judge made no finding of dangerousness but checked a box that read "likely to reoffend." Plaintiffs do not suggest that such a checkmark equals a finding of risk to the community, let alone an adequate finding. Nonetheless Plaintiffs proceeded conservatively to include only forms where the absence of a finding was unambiguous. The summarizations that follow of other categories of findings forms are likewise underinclusive for similar reasons.

court imposed a $1550 bond and indicated that T.D.C. "**is** presently able to pay the bond amount imposed." Ex. 16 at 12 (T.D.C. findings form).

In other cases, the judge made vague inquiries about whether the person "might be able to pay a bond," or "might have someone to help post a bond, without mention of any specific amounts. Affirmative and even equivocal responses translated into findings of ability to pay the bond imposed. In B.M.'s case, a Court Services questionnaire stated that she could not afford to post a bond, had no steady income, and had $50 in her bank account. Ex. 19 (Interview Form). At the hearing, the court inquired: "You . . . said 'no,' that you don't have the ability to post bond. Do you have anybody that could help you with bond?" Ex. 26-t (B.M. Recording) at 01:10-01:18. B.M. responded, "Possibly." *Id* at 01:18-01:25. When announcing her ruling, the judge stated, "I thank you for your input about you possibly might have some help with the bond. Those are all things that I consider." *Id*. at 3:17-3:58. She then imposed a $1200 bond, checking on the form, "Defendant has financial resources available to post bond," and added the word "possible." Ex. 16 at 1.

In a third example, the court imposed a $15,000 bond on C. S. and checked on the order form that she "has financial resources available to post a bond," without any specific findings. Ex. 17 at 6. C.S.'s pretrial interview form indicated that she was unemployed, had no income, had no bank account, and had no financial resources to post a bond. Ex. 23 (Interview Form). At C.S.'s hearing, in the only exchange about ability to pay, the judge asked C.S. if she had "a way to post a bond or anybody to help you with bond?" but did not specify an amount. Ex. 26-o (C.S. Recording) at 0:00-0:15. C.S. responded "yes," *id*. and the judge imposed the five-figure bond, noting, "You did state you have means to make a bond." *Id*. at 01:10-01:49 (also noting "some safety concerns," without identifying them or the evidence on which they were based).

In the case of S.L.J., in which the court imposed an aggregate $1700 bond, finding "financial resources available to post bond," and adding the notation "mother." Ex. 21 (Findings Forms). S.L.J.'s pretrial interview questionnaire indicated that she was unemployed, received food stamps as her only income, and had no bank account. Ex. 22 (Interview Form). The form indicated "yes" in response to the question, "Do you have financial resources to post bond?" and "mother" was written in response to the prompt, "If so, how?" *Id.* At S.L.J.'s hearing, her attorney stated that she received SNAP benefits and "has virtually no income." Ex. 26-i (S.L.J. Recording) at 3:30-4:03. When issuing her findings, the judge stated, "You did mention or list that your mother may have the ability to help you post bond," and, finding no flight or safety risk, set bonds totaling $1700. *Id.* at 7:02-7:52.Over and over again, as a matter of practice, bond docket judges avoid making specific and substantiated findings of ability to pay before imposing monetary bonds.

### 3. Judges Routinely Detain People on Unaffordable Bond Without Making Findings About Alternatives

When judges detain people on unaffordable bond, they routinely do so without meaningful consideration of alternatives. This is most obvious in cases where judges set a bond and refer a person to pretrial. The person remains jailed while Court Services conducts an investigation and makes recommendations about conditions of release for the court to consider; the Court ultimately decides whether to order release or continue detention. *See* Summ. J. Order at 11, Dkt. No. 397 (citing Southerland Dep. Tr. at 146-47, Dkt. No. 369-5). If the court ultimately approves release based on a Court Services recommendation, Court Services pays the monetary bond that has been set and monitors the conditions imposed. J. Guten Dep. Tr. at 51:9-52:2, Dkt. No. 369-4. Judges do not need to wait for a Court Services report to impose release conditions that require supervision. They have the authority to release an arrestee on a personal recognizance bond subject to the nonmonetary conditions they choose to specify. *Id.* at 52:6-55:3.

As a matter of routine, judges do not consider this alternative when setting unaffordable bond and referring arrestees to pretrial services, and they do not articulate why this other option is inadequate. On the sample May 23 docket, the judge made at least three pretrial referrals while imposing bonds that she did not find affordable. Ex. 26-a (May 23 Recording) at 1:21:56-1:23:50 (T.D.C hearing) (imposing $1500 bond); 1:27:56-1:30:32 (T.S.N. hearing) (imposing $3800 bond); 1:30:35-1:32:24 (D.S. Hearing) (imposing $3400 bond). The judge explained that a pretrial referral is "not a guarantee," but "if I approve it, then it's a PR bond because they're going to post the bond for you." *Id.* at 1:29:43-1:30:32 (T.S.N. Findings); *see also* Ex. 25-p (C.L.U. Recording) at 2:00-2:44 (making a pretrial referral and telling arrestee "it's a PR bond"); Ex. 26-q (T.S.B. Recording) at 01:39-02:45 ("I may approve it or I may not; if I do approve it, it is in essence a PR bond because they post the bond for you and they have some other services"). Yet the judge made no findings in any of these cases about the inadequacy of a personal recognizance bond combined with appropriate nonmonetary conditions.

Even when judges do consider appropriate nonmonetary conditions and order that they apply if and when a person is released on pretrial supervision, they do not make any findings about why the person cannot be immediately released subject to those conditions. *See, e.g.*, Ex. 26-a (May 23 Hearing) at 1:23:22-1:23:50 (T.D.C.) (no-contact order and pretrial referral); 1:31:56-1:32:24 (D.M.S) (same). As explained by the judges during these dockets, a pretrial referral does not guarantee release. Even when it does lead to release, the release comes much later than it would with a grant of personal recognizance with or without conditions. Judicial Defendants submitted an expert report, which found that 89.1% of people released on personal recognizance, with or without conditions, are released within 48 hours of booking, compared to 32% of people released on the pretrial services program. Morris Rep. at 7, Dkt. No.369-10. Plaintiff's expert agreed that

people released on pretrial supervision are significantly more likely to spend additional time in jail than people released on personal recognizance. Copp Rep. at 4, ¶¶ 15, 17, Dkt. No. 369-11. She found that 53% of people released on pretrial supervision spend more than 72 hours in jail. *Id.* ¶ 15. Conversely, 70% of people released on personal recognizance are out within two days. *Id.* ¶ 17. Those numbers do not account for the people referred to pretrial services who are ultimately denied release on the program and stay in jail without findings about why they could not be allowed to return home.

### E.    Defendants Do Not Make Available Records that Reliably Specify the Findings and Conclusions that Justify Detention Orders

Bond hearing records that are currently available to arrestees detained on unaffordable bond are inadequate for them to discern the findings of fact and conclusions of law that justify their ongoing detention. As detailed above, judges systematically do not use the forms to record findings about ability to pay, dangerousness or flight risk, or alternatives to detention, and to identify the evidentiary bases for those findings. *Supra*.

Judicial Defendants state that "Courtrooms are equipped with either (or both) Microsoft Teams and/or a Zoom Handy Recorder. Transcripts of the audio recordings can be made by request to a court reporter." Ex. 9 at 7-8 (Judges' Interrog. Resp.). They did not identify any technological or logistical measures that would be needed "[t]o create and store audio recordings of bond docket proceedings" for this purpose. *Id*. However, an employee of Still She Rises was recently unable to obtain a transcript of a client's June 9 bond hearing because the court reporter to whom she made the request could not find a recording of the hearing. Ex. 14 (email exchange requesting transcript).

II.    INJUNCTIVE RELIEF IS NEEDED TO EFFECTUATE THE CONSTITUTIONAL RIGHTS PREVIOUSLY ARTICULATED BY THIS COURT

For fourteen months, Plaintiffs have worked with Defendants, trying to give effect to the Court's summary judgment order. Plaintiffs have also spent that time assessing the impacts of the reforms that Defendants have adopted and learning more about relevant jail and courthouse operations. As a result, the injunctive relief that Plaintiffs seek now is more targeted than the relief they previously sought. *See* Mot. for Summ. J. & Pls.' First Proposed Order, Dkt. No. 368; Pls.' Second Proposed Order, Dkt. No. 401-1. The current proposed order is less comprehensive than earlier versions because some of the measures that Defendants have adopted have eliminated the need for certain aspects of injunctive relief. For example, Defendants consistently schedule prompt hearings for class members, and so Plaintiffs no longer seek an injunction to compel prompt scheduling. On the other hand, the relief that Plaintiffs seek now is more detailed in some respects because Plaintiffs are more confident in proposing measures that are "narrowly tailored to remedy [enduring] harm[s]," *Rocky Mountain. Christian Church v. Bd. of Cnty. Comm'rs*, 613 F.3d 1229, 1239 (10th Cir. 2010), and "can give full relief" without undue interference with Defendants' operations. *Salt Lake Trib. Pub. Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1101-02, 1103 (10th Cir. 2003).

Plaintiffs are entitled to injunctive relief because (1) they have succeeded on the merits (2) they suffer ongoing irreparable harm absent an injunction; (3) they propose remedial measures that will not substantially burden Defendants, such that Plaintiffs' ongoing constitutional injuries far outweigh any potential harm to Defendants; and (4) the public interest calls for protecting Plaintiffs' constitutional rights, particularly when doing so can be achieved without significant burden to Defendants. *See Kitchen v. Herbert*, 755 F.3d 1193, 1208 (10th Cir. 2014) (describing four prerequisites for obtaining an injunction).

### A.    Effective Distribution of Written Notice

The Sheriff should be ordered to make two changes to his method for distributing written notice. First, to ensure receipt by all class members, notice should be given to all arrestees with a pre-arraignment charge, *see* Ex. 1 ¶ 1(a), all of whom appear on the bond docket. Second, the jail employees who provide the notice form should simultaneously state (1) that the arrestee will have a hearing to determine whether they must stay in jail or can be released, (2) the date and time of the hearing, and (3) that the notice provides more information about the hearing. *Id.* at ¶ 1(b).

Bond docket appearances occur for most people within a day of booking; to be of use, the notice must be read immediately. Being booked into jail is stressful, and while arrestees attempt to adjust and absorb the information and documents presented to them in an overwhelming and sometimes frightening environment, there is a high risk that many will not look at—let alone read—a densely worded notice that is given to them without context, until it is too late to help. Due process requires that notice "be afforded within a reasonable time and in such a manner as will allow [recipients] to actually seek relief." *Trump v. J. G. G.*, 604 U.S. ----, 145 S. Ct. 1003, 1006 (2025).

Currently, arrestees are given a hearing date without being told the hearing's purpose and then, sometime later, are given a notice form among other papers, without being told that it relates to the hearing. *Supra* at Part I-A-1. Under these circumstances, multiple people each day simply skip a hearing that will offer them the opportunity of release from jail. Plaintiffs' requested method of distribution is "reasonably calculated, under all the circumstances, to apprise interested parties of the [pending proceeding] and afford them an opportunity to present their [case]" for release. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Requiring the Sheriff to add one document to the papers already distributed by booking officers, and requiring that they

speak a sentence or two when making the distribution, will not pose any measurable burden on the Sheriff.

### B.    Accurate and Thorough Written and Oral Notices

The Presiding Judge should be directed to amend the written and oral notices that the Sheriff and Judicial Defendants already provide, to include the due process and equal protection requirements that are at the heart of this case. *See* Ex. 1 ¶¶ 2(d), (e); 4(a), (b), 5. The notices should inform arrestees of the judicial obligation to determine if a monetary condition of release will effectuate detention and, if so, to determine whether detention is necessary. *See* Summ. J. Order, Dkt. No. 397, at 47. The language Plaintiff proposes for amending the notice comes directly from a bench card that the Judicial Defendants already employ, *see* Ex. 10 (Oral Advisement Transcript) at 2, and so there is no dispute that it accurately articulates the legal standard that bond docket judges are meant to apply. The only dispute is whether Defendants should be required to disclose that standard as part of the oral and written notices that they already provide to arrestees. *See* Summ. J. Order at 51, Dkt. No. 397, (effective "notice of what might make a difference to the judge in setting conditions of release is essential to afford [arrestees] . . . an opportunity to challenge [their detention]" (internal quotation marks, alterations, and citation omitted)). The benefit to arrestees of knowing the standards by which they will be jailed or released outweighs the essentially non-existent burden of adding several sentences to a written notice that is already being distributed and an oral advisement that is already being delivered.

### C.    A Clearer Bench Card

The Presiding Judge should be directed to amend the bench card used by bond docket judges to remind them of legal standards governing bond docket proceedings. *See* Ex. 10 (Oral Advisement Transcript) at 2. Plaintiffs request four amendments to address four of the distinct

ways in which Judicial Defendants systematically deprive class members of their liberty without making constitutionally requisite findings.

First, the bench card should be amended to specify that an attorney cannot waive an appearance on behalf of an arrestee without the person's knowing and voluntary consent. Ex. 1 ¶ 6(a). The bench card currently instructs judges to reschedule arrestees who do not appear for bond docket for the next day, and says that a person may waive if "they have an attorney who requests a waiver." Ex. 10 (Oral Advisement Transcript) at 2. But bond docket judges regularly waive people's appearances with the consent of attorneys who have never spoken with them. *See supra* at Part I-C. The requested bench card amendment is a reminder that arrestees' "waiver of a constitutional right must be knowing and voluntary" to be effective. *United States v. Robinson*, 8 F.3d 418, 421 (7th Cir. 1993).

Second, the bench card should be amended to state that a person who cannot afford a bond and is not a flight or safety risk must be given a bond they can afford and, if they cannot afford a bond, they must be released on personal recognizance. Ex. 1 ¶ 6(b). Plaintiffs seek this as an element of "judicial relief . . . required to assure that Tulsa County's secured bail system [does not continue to] systematically detain arrestees solely because of their indigence." Summ. J. Order at 69, Dkt. No. 397. People accused of the same crimes in Tulsa County are booked and released if they have more money and booked and jailed if they have less. *Id.* at 67 ("We are dealing here with an indigent arrestee . . . in situations in which a wealthy arrestee . . . would, on the very same facts other than indigence"). The Court found this system tolerable under the Equal Protection Clause as long as the period of detention attributable solely to the arrestee's indigence does not exceed 48 hours, and "a real bail hearing . . . is available at the end of that 48-hour wait" to determine if continued detention is necessary. *Id.* at 65. In Tulsa, for dozens of people each week

what awaits is not "a real bail hearing" but a reaffirmation that if you do not have access to cash, you are likely to stay in jail whether the government has any reason to keep you there or not. *Supra* at Part I-E-1 (identifying nearly 50 cases in which judges imposed bonds without finding ability to pay and without finding flight or safety risk). The bench card amendment is a vigorous reminder to judges that if there is no basis for keeping someone in jail, they cannot be required to pay money that they do not have to get out. *See* Summ. J. Order at 47, Dkt. No. 397 (*de facto* detention order must satisfy the requirements for a detention order).

Third, the bench card should be amended to say that finding an ability to pay "some" amount of bond is not meaningful. Ex. 1 ¶ 6(c). Judges who do not know if arrestees will be able to pay the bonds they actually impose do not know whether they are ordering people to go home or to stay in jail. *See* Summ. J. Order at 47, Dkt. No. 397 (unaffordable bail requirement is a *de facto* detention order). Under both the Fourteenth Amendment and state law, a detention order requires heightened procedural protections and "findings of fact to include the reasons for denying bail," including "evidence that no conditions of release" are adequate. *Id*. at 52-53 (citing *Brill*, 965 P.2d at 409); *United States v. Salerno*, 481 U.S. 739, 751-52 (1987) (government most establish reasons to detain). And yet judges routinely issue money bonds, not knowing if they will work to detain, without finding a need for detention. *Supra* at Part I-E-2. Defendants must be reminded to make actual findings about whether those heightened protections are required.

Finally, the bench card should be amended to remind Judicial Defendants that arrestees cannot legally be kept in jail on unaffordable bond for a pretrial evaluation if there is no other reason to detain them, *see* Ex. 1 ¶ 6(d), for the same reasons that arrestees cannot legally be kept in jail on unaffordable bond for any reason other than the lack of available alternatives to keep the community safe and ensure appearance. The reminder is needed because of Judicial Defendants'

consistent habit of identifying people who can likely be released on non-monetary conditions, and then ordering them to stay in jail unnecessarily. *See Supra* at Part I-E-3.

Requiring Judicial Defendants to amend bench cards to accurately state propositions of relevant law and encourage constitutional adjudication of bond hearings is not a burden, may avoid unnecessary deprivations of liberty among future class members, and is in the public interest.

### D.    In-Person Bond Hearings

The Sheriff and Presiding Judge should be required to ensure that bond docket judges preside in person, at the jailhouse courtroom. Ex. 1 ¶ 8. The split-location hearings continue to frustrate arrestees' meaningful participation. Despite Defendants' technological modifications, arrestees are still unable to fully see and hear docket participants and evidence, and still do not have access to counsel when Defense attorneys attend the docket in the same location as the judge. Requiring bond dockets to be conducted with judges physically in the jailhouse courtroom will resolve these issues without unduly burdening Defendants.

The Sheriff has represented to the Court that the jail can accommodate the physical presence of judges, judicial staff, and attorneys in the jailhouse courtroom. Ex. 24 (Parties' Joint Mar. 10, 2024 Ltr.) at 5-6. Judicial Defendants have identified no "technological and/or logistical measures needed . . . for bond docket judges to preside in-person" at the jail. Ex. 9 (Judges' Interrog. Resp.) at 7-8. Judges do not need to be in the courthouse to oversee the docket; some judges presiding on weekends may already be doing so from home or other locations outside the courthouse. Ex. 11 (Ali Aff.) ¶ 21. Traveling to the jail from the courthouse is not burdensome, as the buildings are less than a mile away from each other. *Id.* ¶ 32.

### E.    Witness Appearances from Inside the Tulsa County Jail

The Sheriff should be required to facilitate witness appearances from somewhere inside the jail, even if they must appear virtually from outside the jail's courtroom. Ex. 1 ¶ 10. Allowing witnesses to appear from the jail's physical plant makes it possible for Defense attorneys to meet with them, to determine if their testimony will be useful, and to help them prepare to deliver it. Attorneys who learn the identities of their clients just before the docket begins do not have time to contact and locate potential witnesses in multiple locations. Therefore, Defendants should also be directed to include in the jail's written bond docket notice instructions for inviting potential witnesses to the jail to meet with defense attorneys and potentially testify. *Id*. ¶ 2(d).

The Sheriff's attorney represented in a letter to this Court that the jail is equipped for witnesses to attend bail hearings via an audio-video link in an upstairs visitation area, without raising the types of security concerns the jail associates with contact visits between arrestees and their family, friends, and other members of their communities. Ex. 24 Parties' Joint Mar. 10, 2024 Ltr.) at 6.

### F.    Preserved Audio Recordings

Judicial Defendants should be required to make and preserve audio recordings so that arrestees can subsequently obtain transcripts of their bond hearings. *See* Ex. 1 ¶ 12. Class members are entitled to a record of their bond docket proceedings that captures "the reasons for [the judges'] determination[s]," *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970), and from which an appeal can be made. *See* Summ. J. Order at 52, Dkt. No. 397. That record can most reliably and efficiently be made by the method suggested by Judicial Defendants in their responses to Plaintiffs' interrogatories: storing audio recordings for subsequent transcription, if needed. Ex. 9 (Judges' Interrog. Resp.) at 7-8. That approach has the added benefit of ensuring that this Court will not be

called upon to review state judicial hand-written orders to determine whether they accurately and adequately capture the proceedings.

### III.    DECLARATORY RELIEF IS NEEDED TO REINFORCE THE COURT'S DUE PROCESS AND EQUAL PROTECTION FINDINGS

Mindful of the Court's intention to address declaratory relief separately, if and when appropriate, Corrected Order for Br., Dkt. No. 413, Plaintiffs do not propose language for a comprehensive declaration or renew previous motions for a broad declaration. However, Plaintiffs do ask the Court, in resolving this motion, to reiterate the summary judgment order's central holding and declare that, when a judge imposes a money bond on a member of the class, they must:

(1) Find, with an evidentiary basis, that the arrestee can pay the *specific* amount imposed, or

(2) Treat the order as an explicit detention order, and satisfy all criteria that would apply if bail were denied. *See Brill*, 965 P.2d at 408.

*See* Summ. J. Order at 47, Dkt. No. 397. As the Court previously statesd, "*Brill*, dealing with a situation in which bail was denied outright, remains the law of Oklahoma in cases in which the arrestee is ordered held without bond. An order requiring the posting of a secured bail in an amount which the arrestee obviously cannot pay or post is effectively the same thing." *Id*. at 53.

Plaintiffs ask the Court to reiterate that a class member's inability to pay a bond is not one of many factors, but transforms an order imposing bond into an order of detention, and triggers an obligation by the court to hold a due process-compliant hearing to determine whether detaining the person is necessary and justified. Plaintiffs finally request a reiteration by this Court that a class member cannot be subject to an unaffordable bond, absent substantiated findings that the class member cannot be released, on any conditions, without undue threat to public safety or risk of abscondment.

Plaintiffs' request should not be controversial. The declaration that Plaintiffs request matches perfectly the language in Judicial Defendants' bench card. Plaintiffs therefore ask for this declaration in the full expectation that it "will bring about some change," *Atlas Biologicals, Inc. v. Kutrubes*, 50 F.4th 1307, 1329 (10th Cir. 2022) (citation omitted), by reminding Defendants to follow not only this Court's order but the Tulsa County District Court's own guidance.

Dated: June 20, 2025                                Respectfully Submitted,

/s/ Hayley Horowitz
Hayley Horowitz
Phoebe Kasdin
Still She Rises, Inc.
608 E. 46th Street North
Tulsa, OK 74126
hayleyh@stillsherises.org
phoebek@stillsherises.org
918-392-0867

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document and exhibits were served on June 20, 2025 via the Northern District of Oklahoma CM-ECF system upon all counsel of record.

*/s/ Hayley Horowitz*