## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RICHARD FELTZ and ASHTON LEE DENNIS, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| -vs- | ) ) | Case No. 18-cv-0298-SPF-JFJ |
| VIC REGALADO, Tulsa County Sheriff, in his Official Capacity, et al., | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM re: FINAL ORDER
## <u>GRANTING DECLARATORY AND INJUNCTIVE RELIEF</u>

Before the court is Plaintiffs' Motion for Injunctive Relief, doc. no. 421, filed on June 20, 2025. Numerous submissions have been filed in support and in opposition, the latest having been filed on November 3, 2025.

I.  <u>Introduction</u>

All parties' motions for summary judgment have been granted in part and denied in part. <u>Feltz v. Regalado</u>, 751 F.Supp.3d 1198, 1246 (N.D. Okla. 2024).[1] The matter now before the court is the determination of the nature of the relief to be ordered in favor of the plaintiff class on the basis of the claims adjudicated in plaintiffs' favor at the summary judgment stage, bearing in mind that "the denial of the liberty interest of an indigent arrestee awaiting trial is complete where he cannot post secured bail and is not afforded a timely, due process-compliant bail hearing."

---

[1] For brevity, that order will be cited in this memorandum as "SJ Order," with only a page reference.

*Id.* at 1243.  That liberty interest is the interest to be protected by the final order the court enters on this date.

It should also be borne in mind, on the issue of relief, that "plaintiffs do not claim that bond schedules are inherently unconstitutional and do not seek a decree mandating that any secured bail amount imposed be affordable.  Nor do they seek a decree that would facilitate the pretrial release of any arrestee who may be shown, after a due process-compliant hearing, to be a candidate for detention–even by setting an unattainable bail amount–under the bail-setting criteria established by the Court of Criminal Appeals in <u>Brill v. Gurich</u>. 965 P.2d 404 (1998)." *Id.* at 1244.

Entry of a final order has been delayed by the parties' efforts to agree, to the extent possible, on reforms necessary to secure the rights of plaintiffs and class members as adjudicated in the SJ Order.  That process of consultation and negotiation has not been simple or easy.  To the perception of the undersigned, the parties have proceeded with patience, persistence and in good faith to resolve as many aspects of the matter as reasonably possible.  The court, to put it mildly, applauds those efforts.

The parties' efforts since entry of the SJ Order have resulted in several agreed modifications to Tulsa County's handling of detention hearings, with attention also to related matters such as defense counsel's pre-hearing access to arrestees.  The result, as plaintiffs put it, is that they "seek several narrow adjustments to procedures already designed and implemented by the Defendants over the last year."  Doc. no. 442, at 1.

The facts discussed in this order are based on uncontradicted evidentiary materials in the record–materials consisting, in the most significant instances, of the defendants' own records or video recordings of bond docket proceedings conducted by the judicial defendants.  The court does not, in this memorandum, repeat at length the discussion and analysis set forth in the SJ Order.  Consequently, this

memorandum (as well as the final order entered on this date) should be read with an understanding that much of what the court does on this date is informed by the discussion and analysis found in the SJ Order.

II.    <u>General approach to framing the remedial order</u>

Generations of law students have been taught, doubtless to their own delight, that "equity delights to do justice, and not by halves." *See, generally*, W. Hudson R. Unger, *Equity Delights to Do Justice, and Not by Halves*, 33 Dick. L. Rev. 248 (1929). That facile maxim, though "one of the most important of the maxims of equity," *id.* at 248, is at best only a beginning point in informing the court's judgment as to the remedy to be granted in this case.

It is fundamental that "[o]nce a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." <u>Swann v. Charlotte-Mecklenburg Bd. of Ed.</u>, 402 U.S. 1, 15 (1971). Consequently, while a court's adjudication of what the law says is not a discretionary matter, the task of fashioning an equitable remedy for a violation of the law puts the court and the parties on a much broader playing field. "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." <u>Hecht Co. v. Bowles</u>, 321 U.S. 321, 329 (1944).

Tempering the court's application of these well-established principles is the fact that, "[t]hough flexible, this equitable authority [granted by the Judiciary Act of 1789] is not freewheeling." <u>Trump v. CASA, Inc.</u>, 606 U.S. 831, 841 (2025). In this case, the court aims to grant all the relief necessary to vindicate the class members' rights. That is easier said than done. A decree granting the "necessary" relief, taking into account some weighty countervailing considerations the court is not free to ignore, may not be a decree granting "complete" relief. "Complete relief

is not a guarantee—it is the maximum a court can provide. And in equity, 'the broader and deeper the remedy the plaintiff wants, the stronger the plaintiff 's story needs to be.'" *Id.*, 606 U.S. at 854 (quoting S. Bray & P. Miller, *Getting into Equity*, 97 Notre Dame L. Rev. 1763, 1797 (2022)).

Moreover, in this case, involving, as it does, the application of the power of one sovereign against another, the court is mindful that the relief to be granted should be granted only after careful consideration of the bedrock proposition (noted in the SJ Order, at 1218) that undue intrusion into the operation of two branches of the government of a state which is "a sovereign entity in our federal system," Allen v. Cooper, 589 U.S. 248, 254 (2020) (quoting Seminole Tribe of Fla. v. Fla., 517 U.S. 44, 54 (1996)), is never appropriate.

Thus, the relief granted will be "narrowly tailored to cure the constitutional deficiencies" the court has identified, ODonnell v. Harris County, 892 F.3d 147, 166 (5th Cir. 2018), bearing in mind that under the Fourteenth Amendment, it is not enough that "another method may seem to [this court's] thinking to be fairer or wiser or to give a surer promise of protection to the prisoner." Snyder v. Com. of Mass., 291 U.S. 97, 105 (1934).

On the question of the scope of the relief to be granted, the elephant in the room is the fact that plaintiffs seek, and the defendants ardently oppose, a decree mandating in-person detention hearings–hearings held with all the participants in the same room. Although that was a big ask (given the practicalities of Tulsa County jail and court operations), the court is not at all critical of plaintiffs for seeking that relief. The issue of whether to mandate in-person hearings is dealt with at several places in this memorandum and in the final order entered on this date. Suffice it to say here that after careful consideration, the court withholds that relief–at least for now. Much depends on what the defendants do to facilitate video proceedings that

will come reasonably close to replicating what the court will refer to in this memorandum as the interpersonal dynamics of a traditional courtroom setting.

Compliance with an injunction mandating in-person hearings could certainly be accomplished, but effecting that change would be no small matter, considering the logistical challenges and the closely related need to make the process secure for all concerned, including victims and witnesses (to say nothing of judges and lawyers). "Equity not infrequently withholds relief which it is accustomed to give where it would be burdensome to the defendant and of little advantage to the plaintiff." Di Giovanni v. Camden Fire Ins. Ass'n, 296 U.S. 64, 71 (1935). If defendants promptly provide physical arrangements (including audio-visual systems and equipment) enabling all participants to clearly see and be seen, and to clearly hear and be heard, all the while protecting the security of the participants, then an in-person hearing mandate would, comparatively speaking, be of "little advantage." The court is especially mindful here that a court fashioning equitable relief must "look for justice on both sides of the suit and beyond." Peter Charles Hoffer, The Law's Conscience: Equitable Constitutionalism in America (Chapel Hill: U. of North Carolina Press, 1990), 14. The interests at stake here go beyond those of any one arrestee, any one judge or any one sheriff. The final order entered on this date, read together with this memorandum, explains the court's balancing of those interests.

III.  Bond docket proceedings as shown by the recently filed exhibits

As was noted in the SJ Order, Tulsa County authorities modified the procedures relating to the Tulsa County District Court's bond docket after this case was filed. SJ Order, at 1206, 1240. Those procedures were modified again after the court ruled on the summary judgment motions and yet again after the court entered an order calling for submissions on the issue of the final relief to be granted.

Boiled down to its essence, the Tulsa County system as originally challenged in this case was both underinclusive and overinclusive. It was underinclusive in permitting, for instance, the cash-heavy recidivist drug dealer to immediately go free without seeing a judge and with no judicial assessment of danger to the community.[2] It was overinclusive by enabling the state to detain indigent arrestees for failure to post bond even though they have not had a detention hearing that satisfies the demands of due process.

The detention hearings recorded in the exhibits now before the court typically began–before the presiding judge heard anything from either side–with a finding of probable cause to detain on the basis of an affidavit. Then (again, typically) after reciting the amount of "the preset [bond]," the judge would invite *defense* counsel to proceed, which would seem to come dangerously close to standing the burden of proof on its head. *See, e.g.*, doc. no. 421, ex. 26(a) at 1:43:42; 1:56:55 (May 23, 2025 bond docket); *id.*, ex. 26(d) at 0:00:51.

The court's extensive review of the detention hearing videos reinforces the court's preliminary impression (formed at an earlier stage of this case) that, once the procedural routines and substantive norms of a due process-compliant detention hearing system are internalized by all of the day-to-day players (including, most importantly, judges, prosecutors and defense counsel), protracted detention hearings will be unlikely to dominate the bond docket. Cases which are obvious for detention or obvious for release will not consume big chunks of court time, even if there needs to be some discussion (and a ruling) on matters such as non-financial conditions of release. The case we must all bear in mind is the case in which the arrestee's prospects for pretrial release may superficially appear to be grim based on

---

[2] Of course, that aspect of Tulsa County's detention procedures is not before the court. It is up to the state authorities, not this court, to fix that problem.

considerations of flight risk and danger to the community, but in which, with the benefit of effective assistance of counsel and a meaningful opportunity to challenge the state's insistence on detention (whether directly or de facto, via a requirement to post an unaffordable bond), a case for release can be made.  Cases meeting this description are likely exceptions within the mine run of cases, but the Fourteenth Amendment governs every single case.

Financial ability to post a secured bond is–emphatically–not "just one factor" bearing on the release vs. detention determination.  Ex. 26(a) at 1:42:55-1:43:34; 1:51:51 (explanation by judge during bond docket); *id.*, ex. 26(d) at 0:04:30 ("that's just one factor I'm looking at").  If, due to an arrestee's indigence, a secured bond requirement would amount to a de facto detention order, imposition of a secured bond condition of release is permissible under the Fourteenth Amendment only if the State succeeds in convincing the court, and the court articulates a finding, that considerations of risk of flight or safety of the community preclude release pending trial.  An easy example of imposition of a constitutionally permissible unaffordable bond requirement on an indigent arrestee would be the case of an accused armed convenience store robber caught on video as he committed the offense.  The court could require a huge secured bond, not with the thought that the arrestee might make the bond, but *precisely* because he obviously *could not* post it.[3]

In contrast, the financial condition of a more affluent arrestee might be relevant to a determination of what might be an appropriate financial deterrent to nonappearance.  But an *indigent* arrestee's inability to put up a secured bond marks a turning point (rather than being "just one factor") in the release vs. detention

---

[3] It is worth noting again that plaintiffs do not seek an order eliminating Tulsa County's secured bail system.  What they seek is an end to pretrial detention of arrestees "without the government establishing that their detention is necessary, regardless of whether reasonable bail, unreasonable bail, or no bail is set."  Doc. no. 384, at 3.

analysis: the analysis goes straight to a determination of flight risk or danger to the community. Thus, because a finding on the issue of financial ability to post a secured bond is pivotal in determining whether the requirement of a secured bond amounts to a de facto detention order, a vague finding such as "I find that Mr. Jones may have the ability to post some bond" (with a resultant seemingly arbitrary selection of a dollar amount less than the preset bond amount) does not suffice.

At the summary judgment stage, plaintiffs demonstrated that the net effect of the Tulsa County approach to release vs. detention determinations was that there were, as a practical matter, three categories of detained arrestees:

1. Those who were a flight risk,
2. Those who presented a danger to the community, and
3. Those who were, for lack of a due process-compliant detention hearing (and resulting ruling), detained because they lacked the resources to post a secured bond.

The purpose of the final order to be entered on this date is to eliminate the third (and *only* the third) category.

Elements of a Due Process-Compliant Detention Hearing

IV. <u>Effective assistance of counsel</u>

We started out in this case with a situation in which, as explained by the court liaison/detention officer (Anita Wright[4]), the arrestee "may ask the judge to speak with [a public defender] after the bond docket, but not before or during the bond docket." Doc. no. 369-3, p. 267. If "they ask for [a private meeting] during, there would not be anyplace for them to have a private conversation." *Id.* at 268. That,

---

[4] Ms. Wright retired effective Oct. 17, 2025. Doc. no. 445-2.

needless to say, made a mockery of the right to effective assistance of counsel.[5]  The Fourteenth Amendment guarantees meaningful access to the courts, and the "opportunity to communicate privately with an attorney is an important part of that meaningful access." Guajardo-Palma v. Martinson, 622 F.3d 801, 802 (7th Cir. 2010) (quoting Dreher v. Sielaff, 636 F.2d 1141, 1143 (7th Cir.1980)).

The audio-video exhibits reveal, more recently, numerous instances in which it appears that defense counsel's initial contact with the arrestee occurred when the arrestee was called to the lectern at the bond docket. See, e.g., doc. no. 421, ex. 26(a) at 2:09:30.  In another case during the same bond docket, id. at 2:29:53 of ex. 26(a), what was apparently defense counsel's initial conference with her new client lasted just under a minute and took place at the lectern in the jail courtroom after the hearing had already started and the court had found probable cause to detain and announced the amount of the "preset" bond. To thicken that subplot, it appears that arrestees' counsel are now given access to the Tulsa County jail "twenty-four (24) hours a day, seven (7) days a week" to "meet with detainees and inmates," aff. of Jail Administrator Stacie Holloway, doc. no. 430, ex. A, ¶ 3, which has caused an assistant district attorney (and former assistant public defender) to tell the court rather pointedly that "[d]efense attorneys often converse with the arrestees in the midst of the bond docket hearing because they failed to arrive at the Jail before 9:30 a.m. to meet with the people scheduled to be on that day's bond docket."  Aff. of Peggy A. Haddock, doc. no. 430, ex. B, ¶ 12.   Effective assistance of counsel

---

[5] A bail hearing is a critical stage of a prosecution, triggering the right to effective assistance of counsel.  Betschart v. Oregon, 103 F.4th 607, 623 (9th Cir. 2024); Higazy v. Templeton, 505 F.3d 161, 173 (2d Cir. 2007); United States v. Silva, No. 2:25-CR-00107-DCLC-CRW, 2025 WL 3214761, at *3 (E.D. Tenn. Nov. 18, 2025).

presupposes *prepared* counsel.  Further comment (let alone injunctive relief) on the subject of access to arrestees by defense counsel is not necessary because it now appears that counsel have unimpeded access to arrestees for the purpose of preparing for the bond docket.  The court presumes that defense counsel will, without hesitation, avail themselves of that access as needed to enable them to render effective assistance–which, almost by definition presupposes that defense counsel will do what it takes to arrive at detention hearings armed with the case-specific knowledge required to make a case, if one can be made, for pretrial release.

V.    Notice to arrestees by jail personnel

The court declines to require jail personnel to give any particular oral advisement to newly-arrived arrestees.  Plaintiffs' request for prescribed content of an oral advisement, doc. no. 421, at 23, and doc. no. 443-1, at 2, is accordingly rejected.  A court order for any particular form or content of an oral advisement by jail personnel would simply be too fertile a field for collateral litigation.  That said, the court does note, and applauds, the practice of jail personnel to orally give arrestees some overview, amid the stress and confusion of arrival at the jail, of how matters will unfold.  Doc. no. 430, ex. A, ¶¶ 10-11.

The written notice proffered by the parties (ex. 3 to doc. no. 421 [plaintiffs] and ex. C to doc. no. 430 [Sheriff]) easily suffices to comply with paragraph 2 of the declaratory judgment provisions in the final order entered on this date.

VI.    Bench card and oral advisement

The court declines to order the judicial defendants to make any particular form of oral advisement at the outset of a detention hearing docket, as requested by plaintiffs.  Doc. no. 421, at 24, *id.*, ex. 10, p. 3; doc. no. 443-1, at 3-4.  The court likewise declines to prescribe verbiage for a bench card for judges to look at (and recite) while performing their judicial function (with the Presiding Judge ordered to "ensure that copies of the Advisement are affixed to any desk or bench at which a

judge is anticipated to sit while adjudicating bond hearings," doc. no. 443-1, at 4).[6] The judges of the District Court of Tulsa County are presumed to know the law, including the law (relating to such matters as notice) as adjudicated by the court in this case. It ill-behooves this court to impose a lectionary text on the decidedly secular bond docket proceedings. The more natural–and consequently more effective–way to communicate the essential ground rules governing the release vs. detention determination is for the judge to cover those matters the way he or she would naturally articulate them while looking straight up at the day's assemblage of arrestees rather than looking down to give a rote recital of words on a card.

## VII. Proceedings at the hearing

The requisites of a due process-compliant detention hearing are addressed here against the backdrop of the SJ Order, which covered that ground in detail. As noted in that order, "the denial of the liberty interest of an indigent arrestee awaiting trial is complete where he cannot post secured bail and is not afforded a timely, due process-compliant bail hearing." SJ Order, at 1243. But, now that we are at a stage at which the court is required to grant (or deny) the specific types of declaratory and injunctive relief plaintiffs seek, a few specific matters need attention. As a preliminary matter, it bears repeating that, as the court noted in the SJ Order, "the procedural due process section of the Supreme Court's opinion in Salerno [481 U.S. 739 (1987)] makes it plain that the familiar attributes of what we think of as a real hearing, in the common law tradition of adversary proceedings, were important to the Court's conclusion" that preventive detention did not run afoul of due process requirements. SJ Order, at 1234 (citing Salerno, 481 U.S. at 751-52). That understanding underlies much of the court's reasoning in this case. And it is worth repeating that the "meaningful consideration" to which arrestees are entitled at the

---

[6] The proposed card is at p. 2 of ex. 10 to doc. no. 421.

detention hearing includes consideration of conditions of release less restrictive than a bond amount that constitutes a de facto order of detention because, as the court has noted, detention of those who cannot make secured bail, "without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements."  SJ Order, at 1228, quoting from Pugh v. Rainwater, 572 F.2d at 1057 (5th Cir. 1978).

One thing that got some (but not enough) attention in the SJ Order is the fact that "[a] liberty interest 'may arise from two sources—the Due Process Clause itself and the laws of the States.' "  SJ Order at 1231, n. 35.  (Citing Hewitt v. Helms, 459 U.S. 460, 466 (1983).)   As relevant here, Oklahoma's contribution to the law defining that liberty interest for arrestees in Oklahoma courts may be found in Article 2, Section 8 of the Oklahoma Constitution; 22 Okla. Stat. (2022 supp.) § 1101; Clark v. Hall, 53 P.3d 416 (Okla. Ct. Crim. App. 2002); and Brill v. Gurich, 965 P.2d 404 (Okla. Ct. Crim. App. 1998).   Thus, the protections found in those sources are components of the constitutionally protected liberty interest of an arrestee.

After this case progressed to the post-summary judgment stage of determining the precise relief to be granted, plaintiffs filed their Motion for Injunctive Relief, a filing to which the court has already referred several times.  See, doc. no. 421, filed on June 20, 2025, about 15 months after the court ruled on the motions for summary judgment.  Exhibit 26 to that June 20, 2025 motion is a massive audio-visual exhibit consisting of recordings of numerous Tulsa County bond docket proceedings held in the Spring of 2025.  Exhibit 26(a), the largest subdivision of exhibit 26, shows nearly four hours of hearings.  The other 19 subdivisions of exhibit 26 show various other hearings and portions of hearings.  Collectively, the hearings included in exhibit 26 reflect, as much as anything else, unrelenting pressure just to get through the docket.  That reality brings into high relief the need for clarity as to the requisites

12

of a due process-compliant detention hearing.[7]  The court has attempted to provide that clarity in the declaratory judgment section of the final order entered on this date.

On the issue of findings, the court notes that the pre-printed form for bond docket findings provides precious little space for case-specific factual findings supporting the presiding judge's conclusions (indicated by boxes checked or not checked) on the issues of flight risk and safety of the community.  That is not a criticism of the form; rather, the court notes this aspect of the form only for the purpose of emphasizing the importance of making the recording of the hearing available to facilitate review of bond docket determinations.

The record shows an unsettling number of instances in which the bond docket rulings (i) did not include a finding of flight risk or danger to the community, (ii) set a substantial (under the circumstances) bond, which presupposed ability to make bond, and (iii) were predicated on essentially no evidence (or only the sketchiest of "evidence," or vague inquiries) as to the arrestee's actual ability to post a bond in the amount required by the court.  *See, e.g.*, hearings recorded in doc. no. 421, ex. 26(i), (o) and (t).  Thus, plaintiffs accurately state that "as a matter of practice, bond docket judges avoid making specific and substantiated findings of ability to pay before imposing monetary bonds."  Doc. no. 421, at 19.  This matter of a judicial finding of ability to pay is no mere formality; it goes to the heart of the issues in this case.

VIII. Physical arrangements for detention hearings

By a fairly narrow margin, the court declines, at this point, to require that detention hearings take place with the arrestee in the same room as the presiding

---

[7] The video of the hearings is consistent with Judge Guten's testimony to the effect that he had no recollection of having heard sworn testimony at a bond hearing.  Doc. no. 369-4, p. 68.

judge, counsel, and witnesses. On the record before the court, the withholding of the relief sought by class members on this point is, to some degree, a leap of faith. The bond docket proceedings shown by some of the audio-visual exhibits in the record give the court cause for concern with respect to the ability of the arrestee and his counsel to clearly see and hear what is being said and done by all of the participants the bond docket proceedings.[8] Even in those instances in which participants could be heard and more-or-less seen, some of the participants–such as the judge and the prosecutor–were tiny figures in the center of a much larger video image. This might not, in the case of the judge, amount to a major failing, but considerations of the interpersonal dynamics of a traditional courtroom setting are not altogether irrelevant in assessing the adequacy of the video arrangements for hearings in which the arrestee is remote from some of the other major participants.[9] The exhibits in this record clearly illustrate the feasibility of presenting the participants in a way that at least arguably comes close to visually approximating physical presence. *E.g.*, doc. no. 421, ex. 26(j) (image of Assistant District Attorney).

The court will observe, confidently, that there is nothing unusual about detention proceedings being conducted with all of the players in the same room at the same time. That happens every day, in courtrooms from coast to coast. That

---

[8] *See, e.g.*, doc. no. 421, ex. 26(a), at 1:52:20 (defense counsel informing court that she can barely hear the prosecutor); *id.*, ex. 26(b), at 0:01:42 (judge momentarily not audible in jail courtroom); *id.*, ex. 26(c), at 1:49 (same); *id.*, ex. 26(d) at 0:02:20 and 0:05:05. (same).

[9] The Advisory Committee notes to the 1996 amendment to Rule 43(a), Fed.R.Civ.P. (relating to receiving testimony given from a location other than the courtroom) are worth noting here:

> "Contemporaneous transmission of testimony from a different location is permitted only on showing good cause in compelling circumstances. The importance of presenting live testimony in court cannot be forgotten. The very ceremony of trial and the presence of the factfinder may exert a powerful force for truthtelling. The opportunity to judge the demeanor of a witness face-to-face is accorded great value in our tradition."

said, the court is mindful of the nature and physical locations of the Tulsa County courthouse and jail facilities. The court, thus, recognizes the logistical and security[10] challenges that would result from a requirement that all players be in the same room at the same time for daily dockets that may involve dozens of new arrestees every day.

Structure of the Final Order

IX.   The grant of declaratory relief

The declaratory relief granted in the final order memorializes the court's conclusions as to the rights and obligations of the parties as expressed less formally in the SJ Order. The court has chosen, in its discretion, to address a good many points by way of declaratory, rather than injunctive, relief. As explained in part II of this memorandum, that reflects the court's tendency toward restraint, imbibing "a healthy dose of judicial humility." Nat'l Collegiate Athletic Ass'n v. Alston, 594 U.S. 69, 107 (2021). In the court's view, that restraint is appropriate not only for the prudential reasons discussed in part II, but also because the court is confident, with

---

[10] In their briefing, class members do not squarely address the fact that the security equation changes radically once a judge and a prosecutor (to say nothing of, occasionally, a victim) are put in the same room with 20 or 25 sullen arrestees. Maintaining security becomes significantly more labor intensive and equipment intensive (*e.g.*, requiring some combination of handcuffs, waist chains, manacles or stun belts). The affidavits attached to Plaintiffs' Motion to Supplement the Record, doc. no. 445, exs. A and B, show that it is possible, when the necessity unexpectedly arises, for the judge presiding over the bond docket to do so in the courtroom at the jail. Plaintiffs understandably suggest that this information "is relevant to Plaintiffs' request that bond docket be conducted in-person." Doc. no. 445, at 1. The court remains unconvinced–at least at this point and by a narrow margin–that a grant of effective relief remedying the defendants' Fourteenth Amendment violations should include a mandate of in-person bond docket proceedings. As the court has already noted, much depends on what the defendants do to facilitate video proceedings that will come reasonably close to replicating what the court has referred to as the interpersonal dynamics of a traditional courtroom setting. Given the nature of the physical facilities involved in this case, one aspect of the matter that will require particular attention will be the need to provide secure ways for defense counsel to confer with and present the testimony of witnesses. (Even if presentation of testimony on behalf of a defendant is the exception rather than the rule, the fact remains that if a defendant wants a full-blown hearing on matters relevant to release vs. detention, he is entitled to have it.)

these defendants, that the direct compulsion of a comprehensive injunction is not required.  If the court is wrong about that, plaintiffs will be entitled to proceed under 28 U.S.C. § 2202.

X.    The grant of injunctive relief

The one-paragraph injunction set forth in the final order embodies the essence of the Fourteenth Amendment relief to which the plaintiffs are entitled and goes no further than necessary to articulate that outcome in distilled form.  For the reasons stated in part IX, above, the court has concluded that more comprehensive or detailed injunctive relief is not required.

DATED this 12th day of January, 2026.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

18-0298p050.docx